```
                    UNITED STATES DISTRICT COURT
                             FOR THE
                       DISTRICT OF VERMONT
                                        :
UNITED STATES OF AMERICA                :
                                        :
          v.                            :       2:01-CR-12-01
                                        :
DONALD FELL                             :
                                        :
```

**OPINION AND ORDER: VOIR DIRE**

    As the Court writes this opinion, this capital case is in the midst of the lengthy voir dire process.  The Court has established a two-part procedure for voir dire.  First, each potential juror fills out an extensive questionnaire, which, in addition to standard voir dire questions, includes questions about personal history, knowledge of the case, and opinions regarding the death penalty.  Second, each juror is questioned individually, first by the Court, then by attorneys for both the Government and the Defendant Donald Fell.  The Court's questions focus upon views concerning the death penalty and exposure to pretrial publicity.

    At the outset of voir dire, Fell's counsel sought to expand the area of inquiry to include case-specific questions.  In particular, counsel wished to ask jurors whether they could fairly consider aggravating and mitigating factors given the existence of certain case-specific facts.  The Court has permitted these questions, provided the primary purpose of such questions is to ensure impartiality as opposed to committing

jurors to particular findings.  This opinion outlines the reasons for this decision.

This opinion also explains the Court's approach to challenges for cause.  At times, the Court has granted challenges for cause even though the prospective juror has indicated a willingness to follow the Court's instructions.  The Court has sometimes looked past prospective jurors' literal answers and has based rulings on the demeanor of the jurors.  The Court has also focused on prospective jurors' answers to open ended questions rather than on answers to leading questions.  This practice is consistent with Supreme Court authority.

## **Discussion**

Voir dire of prospective jurors serves the critical purpose of affording a criminal defendant a fair and impartial jury.  As the Eighth Circuit has recently explained:

> The Sixth Amendment guarantees the criminally accused a fair trial by a panel of impartial, indifferent jurors. Voir dire serves the purpose of assuring a criminal defendant that this right will be protected.  Without an adequate voir dire the trial judge's responsibility to remove prospective jurors who will not be able impartially to follow the court's instructions and evaluate the evidence cannot be fulfilled.  Similarly, lack of adequate voir dire impairs the defendants' right to exercise peremptory challenges.

United States v. Ortiz, 315 F.3d 873, 888 (8th Cir. 2002) (quotation marks and internal citations omitted).  These principles have long been reflected in the key Supreme Court

cases addressing the role of voir dire.  See, e.g., Morgan v. Illinois, 504 U.S. 719 (1992); Rosales-Lopez v. United States, 451 U.S. 182, 188 (1981) (plurality opinion); Dennis v. United States, 339 U.S. 162, 171-172 (1950).[1]

### A.   Life-Qualifying Questions

Of particular importance to this case, is the Supreme Court's decision in Morgan v. Illinois.  In Morgan, the Supreme Court considered whether, during voir dire in a capital case, a trial court may refuse to ask "life-qualifying" or "reverse-Witherspoon" questions upon the request of defense counsel.  504 U.S. at 724.  These questions inquire if a juror would automatically impose a death sentence after a conviction for a capital offense.  Id.  The Supreme Court held that, under the Due Process Clause of the Fourteenth Amendment, such inquiries must be made if the defendant so requests.  See id. at 738-39.

In Morgan, the trial court asked questions to 'death

---

[1] As Justice Story wrote in 1820:
To insist on a juror's sitting in a cause when he acknowledges himself to be under influences, no matter whether they arise from interest, from prejudices, or from religious opinions, which will prevent him from giving a true verdict according to law and evidence, would be to subvert the objects of a trial by jury, and to bring into disgrace and contempt, the proceedings of courts of justice.  We do not sit here to procure the verdicts of partial and prejudiced men; but of men, honest and indifferent in causes. This is the administration of justice which the law requires of us.
United States v. Cornell, 25 F. Cas. 650, 655-656 (C.C.R.I. 1820) (No. 14,868).

qualify' jurors in accordance with Witherspoon v. Illinois, 391 U.S. 510 (1968). These questions asked jurors if their personal feelings about the death penalty would prevent them from ever voting for the death penalty, regardless of the facts of the case. The defendant requested that the court make a corresponding inquiry as to whether, after a conviction, the jurors would automatically vote for the death penalty. Morgan, 504 U.S. at 723. The trial court refused this request, although it did ask all prospective jurors if they could be fair and impartial to both sides and if they could follow the "instructions on the law even though you may not agree." Id.

The Morgan Court held that a defendant may challenge a prospective juror for cause if that juror would automatically vote for the death penalty after a conviction. The Court stated:

> A juror who will automatically vote for the death penalty in every case will fail in good faith to consider the evidence of aggravating and mitigating circumstances as the instructions require him to do. Indeed, because such a juror has already formed an opinion on the merits, the presence or absence of either aggravating or mitigating circumstances is entirely irrelevant to such a juror. Therefore, based on the requirement of impartiality embodied in the Due Process Clause of the Fourteenth Amendment, a capital defendant may challenge for cause any prospective juror who maintains such views. If even one such juror is empaneled and the death sentence is imposed, the State is disentitled to execute the sentence.

Id. at 729.

The central question in Morgan was whether general 'follow

the law' questions were adequate to protect the defendant's right to exclude jurors who would automatically vote for the death penalty.  See 504 U.S. at 729, 734.  Illinois argued that these general questions would be enough to detect those jurors who would automatically vote for the death penalty.  Id. at 734.  The Supreme Court disagreed.  The Court noted that "[a]s to general questions of fairness and impartiality, such jurors could in all truth and candor respond affirmatively, personally confident that such dogmatic views are fair and impartial, while leaving the specific concern unprobed."  Id. at 735.  The Supreme Court was concerned that jurors might agree to follow the law unaware that their views on the death penalty would interfere with their ability to do so.  Id.  As a result, a "defendant on trial for his life must be permitted on voir dire to ascertain whether his prospective jurors function under such misconception."  Id. at 735-36.

In Morgan, the Supreme Court acknowledged that general 'follow instructions' questions provide little guidance.  When a prospective juror is asked, "Will you follow the court's instructions?", almost all jurors will immediately respond positively.  Nevertheless, many of these jurors may have considerable difficulty following instructions.  Such jurors will not have been dishonest in their response to the general question.  Rather, these jurors do not know what the Court's

instructions are likely to be.  Thus, they are unable to accurately determine whether they will be able to follow these instructions.  This is why general questions are unable to "detect those jurors with views preventing or substantially impairing their duties in accordance with their instructions and oath."  Morgan, 504 U.S. at 734-35.

### B. Case-Specific Questions

In addition to the general 'life-qualifying' questions required by Morgan, counsel for Fell have asked case-specific questions regarding aggravating and mitigating factors that may be presented in this case.  The Government objects to these inquiries and argues that questions predicated on facts specific to the case at trial or upon speculation as to what facts may or may not be proven at trial are always improper.  The Court disagrees.

The Government bases its argument on United States v. McVeigh, 153 F.3d 1166 (10th Cir. 1998).  In McVeigh, the trial court refused to allow defense counsel to ask case-specific questions.  153 F.3d at 1207-08.  The Tenth Circuit held that such question were not required by Morgan.  Id. at 1208.  Moreover, the court stated that "Morgan is designed to illuminate a juror's basic beliefs . . . not to allow defendants to pre-determine jurors' views of the appropriate punishment for the particular crime."  Id.  The court held that case-specific

questions are improper because they seek "to determine what prospective jurors thought of the death penalty in regards to this particular case." Id.

This Court respectfully disagrees with McVeigh to the extent that it holds case-specific questions are always improper under Morgan. In fact, the Court concludes that the Supreme Court's reasoning in Morgan *supports* the use of case-specific questions in some circumstances. The entire premise of the Morgan decision is that highly general questions may not be adequate to detect specific forms of juror bias. See 504 U.S. at 734-36. Thus, Morgan suggests that, in appropriate circumstances, the parties should be allowed to ask more specific questions to investigate potential bias.

Other cases support the conclusion that the parties should be given an opportunity to inquire regarding specific forms of juror bias. In Ham v. South Carolina, 409 U.S. 524 (1973), the Supreme Court unanimously held that, upon the request of the defendant, a trial judge *must* inquire into the possibility of racial prejudice at voir dire. Similarly, courts frequently inquire into jurors' ability to fairly weigh the testimony of law enforcement officers. In some circumstances, failure to ask prospective jurors about their attitudes toward law enforcement testimony is reversible error. See United States v. Gelb, 881 F.2d 1155, 1164 (2d Cir. 1989); United States v. Anagnos, 853

F.2d 1 (1st Cir. 1988); <u>United States v. Contreras-Castro</u>, 825 F.2d 185, 187 (9th Cir. 1987).

When considering these cases, it is important to recall that appellate courts usually address whether a trial court was *required* to ask a particular question at voir dire. This means that appellate decisions must be carefully interpreted. Generally, when an appellate court holds that it was not reversible error to fail to ask a question, the appellate court is *not* holding that a trial court may never ask such questions. For example, the <u>Ham</u> Court held that it was reversible error to refuse a request for voir dire regarding racial prejudice. 409 U.S. at 527. The <u>Ham</u> Court also held that it was *not* reversible error to refuse a request for voir dire regarding prejudice against those wearing beards. <u>Id.</u> at 528. However, it would be a serious misreading of the <u>Ham</u> decision to conclude that trial courts may never inquire as to bias against people with beards. Rather, <u>Ham</u> simply holds that such inquiries are within "the traditionally broad discretion accorded to the trial judge in conducting voir dire." <u>Id.</u>

Overall, the case law on voir dire supports two general propositions. First, "[v]oir dire is necessarily a matter in which the trial court has extremely broad discretion." <u>United States v. Lawes</u>, 292 F.3d 123, 128 (2d Cir. 2002); <u>see also</u> <u>Mu'Min v. Virginia</u>, 500 U.S. 415, 424 (1991). Second, highly

general questions are not always adequate to investigate specific forms of juror bias. Morgan, 504 U.S. at 734-36. These principles suggest that, rather than reject all case-specific questions, a trial court should allow such questions to be asked when they are reasonably directed toward discovering juror bias.

The issue before the Court is what case-specific questions should be allowed with respect to aggravating and mitigating factors. Chief Judge Bennett has recently issued a decision that thoroughly and persuasively discusses this question. See United States v. Johnson, _ F. Supp. 2d _, No. CR 01-3046-MWB, 2005 WL 736518 (N.D. Iowa Mar. 31, 2005). Johnson provides a detailed taxonomy of voir dire questions that inquire as to prospective jurors' ability to consider aggravating and mitigating factors. See 2005 WL 736518, at *11-20. These questions range from the highly abstract to the very specific.

A good example of an abstract question is the question at issue in Morgan. The defendant in that case had requested that prospective jurors be asked: "If you found [the defendant] guilty, would you automatically vote to impose the death penalty no matter what the facts are?" Morgan, 504 U.S. at 723. More specific questions address topics such as the defendant's status or the particular category of capital case. Questions about the defendant's status could address issues such as race, alienage

9

or youth. Questions about the category of case could ask a prospective juror about his or her ability to consider a life or death sentence in a murder-for-hire or rape-murder case. Even more specific questions "ask whether or not jurors can consider or would vote to impose a life sentence or a death sentence in a case involving stated facts, either mitigating or aggravating, that are or might be actually at issue in the case that the jurors would hear." Johnson, 2005 WL 736518, at *17.

The Court agrees with Johnson that questions at any point on this continuum may be permissible if they are not "stake-out" questions. Id. at *18-20, 24-26. Stake-out questions are those that "ask a juror to speculate or precommit to how that juror might vote based on any particular facts." Id. at *18 (quoting McVeigh, 153 F.3d at 1207). Clearly, such questions are improper.

Some courts have simply excluded case-specific questions on the ground that they are stake-out questions. See Richmond v. Polk, 375 F.3d 309, 329-31 (4th Cir. 2004); McVeigh, 153 F.3d at 1207-08. However, the Court agrees with Johnson that not all case-specific questions are stake-out questions. 2005 WL 736518, at *18-21 (discussing this issue in detail). There is a crucial difference between questions that seek to discover how a juror might vote and those that ask whether a juror will be able to fairly consider potential aggravating and mitigating

evidence. For example, a juror may not be asked whether evidence of rape would lead him or her to vote for the death penalty. However, a juror may be asked if, in a murder case involving rape, he or she could fairly consider either a life or death sentence. The first question is an improper stake-out question. The second question is not a stake-out question because it only asks whether the juror is able to fairly consider the potential penalties. To the extent that this question 'commits' a juror it "commits a juror to no other position than fair consideration of the appropriate penalty in light of all of the facts and the court's instructions." Id. at *21. A similar analysis applies to questions that ask whether prospective jurors would be able to fairly consider potential mitigating or aggravating factors. For example, a juror may be asked whether he or she could fairly consider evidence relating to the defendant's upbringing or potential for rehabilitation.

If properly formed, case-specific questions help identify various forms of juror bias. For example, a juror might be excused for cause if he or she could not fairly consider the death penalty where the victim was involved in drug crimes. See United States v. Flores, 63 F.3d 1342, 1356 (5th Cir. 1995). Similarly, a juror might be excused for cause if he or she would refuse to consider any mitigating evidence in a case involving the death of a child. See Johnson 2005 WL 736518, at *24.

Other jurors may have biases regarding particular forms of mitigating evidence. For example, some jurors may be unable to fairly consider any mitigating evidence relating to the defendant's background or upbringing.[2] Such jurors must be excused for cause as the Supreme Court has emphasized that the sentencer may not refuse to consider evidence relating to the defendant's background or upbringing. See <u>Lockett v. Ohio</u>, 438 U.S. 586, 604-05 (1978).

### C. Standards for Challenges for Cause

A juror should be excluded from jury service if "the juror's views would prevent or substantially impair the performance of his duties as a juror in accordance with his instructions and his oath." <u>Wainwright v. Witt</u>, 469 U.S. 412, 424 (1985) (internal quotation marks omitted). A juror may be excluded for cause under this standard even if the juror would not automatically vote for or against the death penalty. <u>Id.</u> A juror's views substantially impair performance when those views "create an obstacle" or significantly interfere with impartial consideration of the law and facts. <u>Id.</u> at 434.

The Court need not find that a juror's bias has been shown with "unmistakable clarity." <u>Id.</u> at 424. This is because

---

[2] Indeed, voir dire in this case has confirmed that some prospective jurors will categorically refuse to consider any evidence relating to the defendant's background as a possible mitigating factor.

"determinations of juror bias cannot be reduced to question-and-answer sessions which obtain results in the manner of a catechism." Id. Rather, a court must carefully examine all of a prospective juror's responses "culminating in a finding by the trial judge concerning the venireman's state of mind." Id. at 428.

When making this finding, the Court must be mindful that "[a]ny complicated voir dire calls upon lay persons to think and express themselves in unfamiliar terms." Patton v. Yount, 467 U.S. 1025, 1038 n.14 (1984). This means that "[d]emeanor plays a fundamental role not only in determining juror credibility, but also in simply understanding what a potential juror is saying." Id.; see also Rosales-Lopez v. United States, 451 U.S. 182, 188 (1981). Also, the Court should focus on responses to open-ended questions. As the Supreme Court explained in Patton:

> It is well to remember that the lay persons on the panel may never have been subjected to the type of leading questions and cross-examination tactics that frequently are employed [at voir dire]. Prospective jurors represent a cross section of the community, and their education and experience vary widely. Also, unlike witnesses, prospective jurors have had no briefing by lawyers prior to taking the stand. Jurors thus cannot be expected invariably to express themselves carefully or even consistently. Every trial judge understands this, and under our system it is that judge who is best situated to determine competency to serve impartially. The trial judge properly may choose to believe those statements that were the *most fully articulated or that appeared to have been least influenced by leading*.

Id. at 1039 (emphasis added).

Voir dire in this case has confirmed the wisdom of the <u>Patton</u> Court's observations.  Many prospective jurors have given inconsistent responses when faced with repeated leading questions from counsel.  These inconsistent answers might be explained by uncertainty about the complicated concepts at issue, inexperience with cross-examination tactics or eagerness to please the questioner.  In rare cases, a prospective juror may even answer dishonestly.  The Court will carefully evaluate a juror's demeanor when faced with inconsistent or variable answers.  The Court must then decide which answers best reflect a jurors views.  Clearly, answers to open-ended questions are more likely to reveal a juror's true feelings.

The voir dire of two prospective jurors provides an illustration of the Court's use of demeanor evidence and the Court's focus on those responses that are the least influenced by leading questions.  Prospective juror 104 was an attorney who expressed opposition to the death penalty.  He explained that he did not believe that the death penalty was a deterrent and he questioned the wisdom of using the death penalty to show that killing is wrong.  Nevertheless, this juror stated that he was willing to try to put his personal beliefs aside and apply the law impartially. After extensive questioning from the Court, the Government and defense counsel, it became clear that, although juror 104 sincerely wished to be impartial, he would

14

have serious difficulty putting his personal views aside.  Juror 104 had strongly held personal views about the death penalty and he candidly admitted that he could not be sure that these views would not influence his decision.  In fact, when this juror was told that jurors have wide discretion when weighing aggravating and mitigating factors he suggested that he would not be able to fairly consider a death sentence.  Thus, he was excluded under <u>Wainwright</u>'s 'substantial impairment' test.

Prospective juror 114 expressed strong support for the death penalty.  In her written questionnaire she stated that "the death penalty should be used if the gov't makes its case beyond reasonable doubt."  Similarly, in response to open-ended questions from the Court she indicated that the death penalty should be applied to any intentional killing.  Moreover, when asked an open-ended question about what factors might lead her to consider a life sentence, she focused on whether or not the government had proven the killing beyond a reasonable doubt rather than on mitigating factors relating to the circumstances of the offense or the defendant's background.  Later, in response to leading questions from counsel, juror 114 suggested that she would not automatically vote for the death penalty and said that she would consider mitigating factors.  However, her demeanor demonstrated a distinct reluctance on these issues.  In light of this, the Court found that her earlier answers were a

15

more accurate reflection of her views.  The Court concluded that juror 114 would not be able to impartially consider mitigating factors or a life verdict.  Thus, she was excused for cause.

After reviewing all of a prospective juror's testimony, the Court has excused jurors whenever it has been left with a "definite impression" that the juror will not be able to impartially apply the law.  Wainwright, 469 U.S. at 426.  Ultimately, the Court must ensure that each juror will be fair and impartial to both sides.  See Rosales-Lopez, 451 U.S. at 188.

## Conclusion

The Court holds that case-specific questions are sometimes proper and useful.  Nevertheless, the Court will prohibit questions which are framed solely to educate the jury or to have jurors commit to particular points of view.  A balance must be struck between seeking to discover biased jurors who could not be impartial given particular facts and getting jurors to commit to support a particular perspective on the evidence.

This balance suggests that case-specific questions regarding significant and potentially prejudicial facts may be asked if couched in terms of asking whether or not the jury could still consider aggravating and mitigating circumstances in light of the existence of those prejudicial facts.  Thus, the Court will permit counsel to ask questions raising case-specific

facts if the questions are reasonably directed towards discovering whether the juror will be able to fairly and impartially weigh aggravating and mitigating factors.  Any questions that attempt to commit the juror to a particular position will be struck.

The Court will excuse a juror for cause whenever it finds that the juror cannot fairly weigh aggravating and mitigating factors as required by the Federal Death Penalty Act. Similarly, the Court will excuse a juror if he or she cannot impartially consider either the death penalty or life in prison as a potential verdict.  Consistent with Supreme Court guidance on the issue, the Court will evaluate challenges for cause based on the totality of the juror's responses, together with an assessment of that juror's demeanor.

Dated at Burlington, Vermont this 25th day of May, 2005.

/s/ William K. Sessions III
Chief Judge, U.S. District Court