U.S. DISTRICT COURT
DISTRICT OF VERMONT

UNITED STATES DISTRICT COURT            FILED

FOR THE DISTRICT OF VERMONT 2005 SEP 26 PM 4 24

CLERK

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | ) | BY _____ |
| | ) | DEPUTY CLERK |
| v. | ) | NO. 2:01-CR-12 |
| | ) | |
| | ) | |
| DONALD FELL | ) | |

**OPPOSITION OF THE UNITED STATES
TO DEFENDANT'S POST-TRIAL MOTION**

The United States of America, by and through its attorney, David V. Kirby, United
States Attorney for the District of Vermont, opposes "Donald Fell's Motions for Judgement of
Acquittal and New Trial" filed on August 26, 2005.

I.    INTRODUCTION

After over two months of jury selection and trial during May, June and July, 2005, a
jury found Mr. Fell guilty of two capital offenses and returned a verdict of death.  Fell's post-
trial motion asks the Court to overturn the jury's penalty verdict and either (1) empanel another
jury for a new penalty phase hearing, or (2) impose a life sentence.

Fell does not challenge the evidence of his offenses considered by the jury.  Nor does he
challenge the law considered by the jury.  Instead, he challenges the prosecution's conduct in
three ways.  First, he claims that misstatements by prosecutors led him to not call mental health
experts.  Second, he contends that prosecutors wrongfully took positions at the 2005 trial
inconsistent with positions they took in 2001.  Finally, he claims that prosecutors improperly
argued to the jury during summations that certain of his alleged mitigation factors "didn't
relate" to his crimes.  Each of the three claims is baseless.

A.      THE OFFENSES

In the early morning hours of November 27, 2000 Fell and his accomplice, Robert Lee, murdered two people at the Fell residence in Rutland, Vermont: Fell's mother, Debra Fell, and Charles Conway. They committed the murders by stabbing the two victims repeatedly and slashing their throats. After the killings, Fell and Lee took Fell's stolen .12 gauge shotgun and went out looking for a car. At about 3:40 a.m. they found 53-year-old Terry King arriving for work at the Rutland Price Chopper. Accosting her with the shotgun, Fell and Lee kidnapped her and car-jacked her 1996 Dodge Neon.

Fell drove King's car out of Vermont in the dawn hours, with Lee in the front passenger seat holding the shotgun on King in the backseat. After driving southwest for about four hours, Fell stopped the car on the side of Route 22 in rural Dover, New York, and ordered King out. The two men chased her into the woods. After Fell pushed King to the ground, he and Lee beat her to death by kicking her and smashing her head with rocks. Several days later the two men were arrested in King's car in Clarksville, Arkansas.

B.      2001 - 2002 PROCEDURAL HISTORY

On February 1, 2001 a grand jury charged Fell and Lee with four crimes stemming from the abduction and murder of King: carjacking with death resulting (Count 1); kidnapping with death resulting (Count 2); use of a firearm during a crime of violence (Count 3); and being a fugitive in possession of a firearm (Count 4). The first two counts carried a possible death sentence.

In late 2001 Lee died in prison. Also in 2001, the United States considered allowing Fell to plead guilty to Count 2 in exchange for a sentence of life imprisonment. Both parties

2

were aware that the deal required approval by the United States Attorney General.  Such approval was not forthcoming.

After the Attorney General rejected the putative plea, on January 30, 2002 the United States filed a "Notice of Intent To Seek Death Penalty" (the "Original Notice") in compliance with the Federal Death Penalty Act ("FDPA"), 18 U.S.C. § 3591, *et. seq.*  Document 32.  It provided notice of the government's intent to prove various "narrowing" elements set forth in the FDPA.  Those elements consisted of four threshold culpability factors under § 3591(a)(2),[1] three statutory aggravating factors under § 3592(c),[2] and four non-statutory aggravating factors under § 3593(a).[3]  *Id.*

Also in late 2001 and early 2002 both parties retained mental health experts.[4]  The defense retained three in early 2001: Mark J. Mills, M.D., Jonathan J. Lipman, Ph.D., and

---

[1]  The threshold culpability factors were that Fell: (1) was 18 years of age or older at the time of the offenses; (2) intentionally killed Terry King; (3) intentionally inflicted serious bodily injury that resulted in the death of King; and (4) intentionally participated in one or more acts, contemplating that the life of a person would be taken or intending that lethal force would be used in connection with a person, other than a participant in the offense, and King died as a direct result of such act or acts.

[2]  The statutory aggravating factors were that: (1) the death of King occurred during the commission of a kidnapping; (2) Fell killed King in an especially heinous, cruel or depraved matter that involved serious physical abuse; and (3) Fell intentionally killed more than one person in a single criminal episode.

[3]  The non-statutory aggravating factors were that: (1) Fell participated in the abduction of King to facilitate his escape from the area in which he and an accomplice had committed a double murder; (2) Fell participated in the murder of King to prevent her from reporting the kidnapping and carjacking to authorities; (3) Fell participated in the murder of King after substantian premeditation to commit the crime of carjacking; and (4) the killing of King caused her family extreme emotional suffering and severe and irreparable harm.

[4]  The following recitation of facts consists primarily of events memorialized in Court filings and transcripts, and case generated documents.

3

Wilfred G. van Gorp, Ph.D.  The government retained two in early 2002: Richard Wetzel, Ph.D and John Rabun, M.D., both from Missouri.  During 2001 and 2002 the five experts examined Fell.  However, the defense restricted the examinations by the government experts: defense team members attended the examinations and barred any questions about the murders; Fell's mental state during the murders; Fell's interest in knives; his prior criminal behavior; and the dynamics of his relationship with Lee.

On July 8, 2002, the grand jury returned a Superseding Indictment charging Fell with the same offenses as the original Indictment.  Document 57.  The Superseding Indictment was intended to comply with *Ring v. Arizona*, 536 U.S. 584 (2002), and alleged the same threshold culpability factors and the same statutory aggravating factors set forth in the Original Notice. On the same date, the United States filed the Supplemental Notice, alleging  the same non-statutory aggravating factors as the Original Notice.  Document 58.

In mid-2002 Fell filed various pretrial motions, including a motion to have the FDPA declared unconstitutional.  After briefing and argument,  on September 24, 2002 the Court granted the latter motion, holding that § 3593(c), the FDPA's relaxed evidentiary standard for the penalty phase, rendered unconstitutional any jury findings as to the aggravating factors necessary to impose a sentence of death.  Document 70.  In holding § 3593(c) to be unconstitutional, the Court struck the aggravating factors from the Superceding Indictment as well as the Supplemental Notice.  The government appealed the Court's ruling to the Second Circuit Court of Appeals.

4

C.    2004 - EARLY 2005 PROCEDURAL HISTORY

For over two years, from October, 2002 until November, 2004, the case remained on appeal. In November, 2004, the Second Circuit issued a mandate reversing the Court's ruling. *United States v. Fell*, 360 F.3d 135 (2d Cir. 2004).

Shortly after jurisdiction returned to the District in November, 2004, lawyers for both parties conferred about pretrial issues. One issue was the incomplete government mental health examination. The government took the position that if the defense was going to rely at trial upon expert mental health evidence, fairness required that the government be permitted an unrestricted examination for purposes of rebuttal. The government drew counsel's attention to new Rule 12.2(b), requiring a defendant intending to introduce expert evidence relating to his mental condition during the penalty phase of a capital trial to file a written notice, after which a government expert could be permitted an unrestricted mental health examination in order to prepare rebuttal testimony. The government also disclosed that it had retained a new expert.

On December 1, 2004 Fell filed his "Notice of Expert Evidence of Mental Condition" and accompanying memorandum. Document 74. Fell stated that, if convicted of a capital crime, he would rely at the penalty phase upon expert evidence of his mental condition. However, Fell argued, despite his restrictions on the 2002 government examinations, no further examination should be permitted. On December 17, 2004 the government filed a "Supplemental Memorandum" seeking leave of Court for an unrestricted examination. Document 77. Subsequently both parties further briefed the issue. Documents 78 and 79.

On April 7, 2005, the Court issued an Order addressing the Rule 12.2 issue. Document 100. The Court ruled, consistent with Rule 12.2 and well-established case law, that Fell's

intent to introduce expert mental health evidence entitled the government to an unrestricted mental health examination by an expert for purposes of potential rebuttal.  The Court also entered an Order setting forth procedures relating to the examination.  Document 101.  The Order consisted of seven paragraphs.  Paragraph 1 stated that the examination was to be done not by Dr. Michael Welner, M.D., the rebuttal mental health expert retained by the government in early 2004, but by Drs. Wetzel and/or Rabun.  In addition, the interview was to be "videotaped or tape-recorded."  Paragraph 2 provided that the resulting report of examination was only to be released to the government after a guilty verdict on a capital charge.  Paragraph 3 permitted the defense to withdraw its notice of intent to raise a mental health defense at any time prior to introducing evidence on it, in which case the results of the government's mental health examination would be inadmissible.  Paragraph 4 provided that the defendant's refusal to participate in the interview would forfeit his right to present mental health testimony. Paragraph 5 required the government to clear in advance with the defense mental health testing by government experts, and not seek to use more than one test for the purpose of measuring the same mental function.  If the defense objected to a government test, the parties would try and reach agreement, and in the absence of one notify the Court for a hearing.  In the latter event, "[n]o mental health testing may be performed by either party until there is a final decision as to which tests are to be conducted by the government's expert."  *Id.*  Paragraph 6 required the government to notify the defense of the date of its examination at least one week prior, and required the defense to produce to the government at least three days before the examination "all records" relied upon by defense mental health experts.  Paragraph 7 provided that it was unnecessary to "fire-wall" the examination through AUSAs in other Districts.

6

On April 14 the government moved for reconsideration of the Court's ruling that Dr. Welner could not conduct the interview. Document 105. The government urged that it should be permitted to rely upon the mental health expert of its choice, and explained that Dr. Welner had been working intensively on the case for 14 months (including personal interviews of many of Fell's family and friends), in contrast to Drs. Wetzel and Rabun, who had not been involved in the case since 2002. The government stated that it "expects to call Dr. Welner for penalty phase rebuttal whether or not he conducts the final interview. He will testify based upon his extensive psychiatric inquiry, informed by the results of the 2005 interview (by whomever conducts it)." *Id.* at 5. On April 22, the defense filed its first of two motions to exclude testimony by Dr. Welner. Document 107. The Court deferred ruling on the motion until trial.

D.     MID-2005 JURY SELECTION, MENTAL HEALTH EXAMINATION, AND TRIAL.

On April 8, 2005, the Court scheduled jury selection by individual *voir dire* to begin on May 4, 2005. On May 2, the Court ordered Fell to produce a witness list before jury selection. On May 3 the defense submitted its "Witness List."[5] The list included five mental health experts: Dr. Mills; Dr. Lipman; Dr. Rabun; Dr. Wetzel; and a new one, Dr. Mark Cunningham.

Individual *voir dire* of prospective jurors began on May 4, and continued, intermittently, through June 6. Meanwhile, on May 25 the Court denied the motion for reconsideration. Document 131. In the wake of that adverse result, the government selected Dr. Wetzel to interview Fell, and worked to familiarize him, as well as Dr. Rabun, with the advances in the

---

[5] A copy of May 3 Witness List appears in the Appendix to this memorandum. The list does not appear to have been docketed. A Certificate of Service accompanying the copy of the list in the government's file states that it was served upon the government on May 3, 2005.

investigation since 2002. The government shipped to both doctors hundreds of documents not reviewed by them in 2002. The documents included a multitude of reports of witness interviews conducted since 2002; crime scene photographs and investigative reports not reviewed in 2002; prison documents related to Fell generated since 2002; prison correspondence from Lee not possessed in 2002; and autopsy and toxicology reports not reviewed in 2002. In addition to reviewing these materials, Dr. Wetzel's preparation for the interview included consulting with the other two government mental health experts, Dr. Welner and Dr. Rabun.

In early June the parties negotiated a date and time for the interview, selecting Monday, June 13, 2005.[6] On June 9, a Thursday, the Court conducted peremptory challenges and the final jury draw, scheduling trial to begin on June 20. Dr. Wetzel flew to Vermont on Sunday, June 12. On June 13 he interviewed Fell at the Northeast Regional Correctional Center for most of the day. The interview took place behind closed doors without interruption. It was videotaped, consistent with the Court's Order and agreement of the parties. Afterward, Dr. Wetzel returned to Missouri to prepare his report. The government considered his work on the report, and the videotape of the examination, to be "walled off" until the return of a guilty verdict.[7]

---

[6] Counsel initially refused to permit the examination, claiming that since jury selection was underway it was too late, citing the April 7 Order (requiring the examination to take place "before jury selection begins"). The Court promptly intervened and over-ruled the objection.

[7] After the interview the government arranged for an outside facility to digitalize the video, converting it to DVD form on CDs. Copies of the DVD conversion promptly were sent to Drs. Wetzel and Rabun (also deemed to be walled off).

8

The guilt phase of the trial took place Monday - Friday, June 20 - 24. The government called witnesses to describe the disappearance of Terry King during the early morning hours of November 27, 2000; the arrest of Fell and Lee in Arkansas on November 30, 2000; the discovery of the bodies of Debra Fell and Charles Conway in Rutland on November 30; the interviews of Fell in Arkansas; the discovery of King's body in New York on December 1; the discovery of King's blood and DNA on one of Fell's steel-toed boots; the discovery of a black thread near King's body that shared the same microscopic characteristics and optical properties as the threads in the black T-shirt Fell wore when arrested; and related matters. The defense introduced no evidence. On Friday afternoon at 4 PM (according to the Court's docket) the jury returned guilty verdicts on all four counts. The Court instructed the jury to return on Tuesday, June 28 to begin the penalty phase.

On the afternoon of June 24 after the verdicts, the government notified Dr. Wetzel that the "wall" was down, and asked for his report. Dr. Wetzel responded that he needed the weekend to complete it.

On Monday, June 27, both parties filed memoranda with the Court regarding the penalty phase. The government also filed motions *in limine* and a request for overdue discovery. June 27 is also the date on the "Declaration of Mark D. Cunningham," a new defense mental health expert.[8] The government's *in limine* motions included a request for a *Daubert* hearing to challenge Dr. Cunningham's proposed testimony as to Fell's low moral culpability. The

---

[8] An initial document generated by Dr. Cunningham was his June 14, 2005 letter to Alex Bunin, originally proposed as an insert in Fell's "Mitigation Binder."

government provided a DVD copy of Dr. Wetzel's interview to the defense.[9]  At approximately

this time the government learned that Fell made highly damaging statements to Dr. Wetzel, not

the least of which concerned King's murder.  Fell claimed that he had only kicked Mrs. King

two or three times in the torso, then averted his eyes as Lee inflicted the fatal injuries to her

head.  He contended that, given his lack of involvement in the killing, King's blood or DNA

could not be on his boots.  The presence of blood or DNA on his boots, he suggested, could be

because he had "stepped in something weird" in another state.[10]

Also on June 27 the government received Dr. Wetzel's Report (a copy of which appears

in the Appendix to this memorandum).[11]  Dr. Wetzel concluded that Fell:

> – had "exaggerated the amount of alcohol used" on the night of the killings and in fact
> "was not significantly impaired."  Page 4.  "While I would not dispute that it was likely

---

[9] Fell's motion complains that "[i]t was not until late on June 27, 2005, that the defense received copies of the DVDs." Motion at 9.  Yet it was not until after the guilt verdicts, late on Friday, June 24, that Fell's lawyers asked for the DVDs.  If counsel thought that they were entitled to review the government's interview prior to the verdict (when the government could not do so), they should have timely asserted that right.  Late that Friday afternoon, after the verdict, lawyers for both parties met in the USAO to discuss the penalty phase.  It was during that meeting that counsel asked for a copy of the DVD.  The USAO did not have the capacity to produce copies in-house.  First thing on Monday morning the DVDs were taken to an area facility for copying.  On Monday while the attorneys were in court the DVDs were copied, and after court recessed counsel received copies.  The defense has not and cannot establish any prejudice arising from receipt of a video of the government's rebuttal expert's interview before the penalty phase even began.

[10] Fell's false denial and explanation was refuted by the DNA expert at trial.  Fell made many other very damaging statements during his interview, including descriptions of the two episodes of prison violence proved false by the prison videotapes (entered in evidence).  All government mental health experts (Drs. Wetzel, Rabun, and Welner) were impressed with Fell's lack of affect and detachment during his description of the three killings.  *See* Wetzel Report at 16 ("Mr. Fell showed little emotion and little remorse").

[11] Dr. Wetzel entitled his 2005 report a "Revised, Partial Report," as it revised, and presumed familiarity with, his 2002 report.

10

that he was drinking excessive amounts of alcohol that night, I would also state that over time he had developed considerable tolerance to alcohol.  Further, his reported behavior, across his many statements, indicates that despite his drinking he was able to think cooly and make rational choices."  Page 7.

– "was generally the leader in his relationship with Bobby Lee."  Page 4.

– "was not under duress" and "was not under the influence of a severe mental or emotional disturbance at the time of the crimes."  Page 4.

– was the victim of sexual abuse as a young child, but did not report any causal connection between the abuse and the murders, and "I agree – I also do not see a causal connection."  Page 5.

– was the victim of "repeated physical abuse as a young child," but "I do not see any causal connection of any kind between his physical abuse as a child and the murder of Mrs. Teresca King.  I am completely confident that there is no relationship."  Page 5.

– "meets the criteria for antisocial personality disorder fully.  I have no doubt of this diagnosis."  Page 7.

– "no defense expert has noted any indication of thought disorder, hallucination or delusion.  No sign of psychosis was reported.  I fully agree."  Page 8.

Dr. Wetzel also wrote that:

– during childhood Fell's "mother made multiple ineffective attempts to control [his] behavior and guide him.  He refused and she accepted this defeat perhaps too easily."  Page 6.

– "in my opinion with reasonable professional certainty, neither crack nor marijuana had any effects on the events of the day [of the murders]."  Page 7.

– there is "no cognitive deficits detectable on neuropsychological testing."  Page 8.

On Tuesday, June 28, the penalty phase trial opened.  The government introduced testimony and evidence from pathologists and crime scene investigators regarding the extraordinary brutality of the three murders.  That same day the government provided Dr. Wetzel's report to the defense.

11

On Wednesday morning, June 29, members of Mrs. King's family described the traumatic impact of her disappearance and murder on her extended and close-knit family. The government then rested.

After the jury was excused, the Court reviewed Fell's "Actual Witness List (June 28)."[12] The defense proposed a schedule of five days of witness testimony, beginning Thursday, June 30, and extending through Thursday, July 7. The Court expressed concern that the defense had scheduled only a few witnesses on several of the proposed days, and urged the defense to compress the schedule. Trial Transcript, Vol. 6-2, June 29, 2005, at 61 - 68.[13] Ultimately it was decided to excuse the jury the following day – Thursday, June 30 – and present the two witnesses proposed for that day with the four proposed for Friday, July 1. Similarly, it was decided to recess the trial on Tuesday, July 5, and present the witnesses proposed for that day with those on Wednesday, July 6. The resulting schedule still entailed defense witnesses testifying through July 7, but required two fewer jury days.

Fell's June 28 witness list included only two mental health experts: Drs. Mills and Cunningham. Thus, by June 28 the defense had decided not to rely upon the other three experts on its May 3 witness list (Drs. Lipman, Wetzel, and Rabun). The June 28 list scheduled Dr. Mills to testify on Friday, July 1, and Dr. Cunningham to testify on Thursday, July 7. During the June 29 hearing, the government protested that the defense had only that same day produced the June 27 "Declaration of Mark D. Cunningham" and had failed to disclose the notes from

---

[12] A copy of the "Actual Witness List (June 28)" is in the Appendix.

[13] Transcript citations are to the daily transcripts produced during the trial.

that expert's interview of Fell.[14]  The government also expressed its concern that the proposed

testimony from Dr. Cunningham was primarily argument.[15]  The Court responded that Dr.

Cunningham's testimony was "something that we need to address in a *Daubert* hearing."  Trial

Transcript, Vol. 6-2, June 29, 2005, at 103.

After June 29, during the discussion of the proposed defense experts, the Court asked

about the government's plans for rebuttal mental health experts.  The government responded

that it had just received, and provided to counsel, Dr. Wetzel's report, continuing that:

> We haven't made a decision about Dr. Wetzel.  We wanted to talk to defense counsel
> about who, if anyone, is going to call him today.  As you know the expert that we've
> been relying upon is Dr. Welner.  We have not received a report from him.  I know he's
> been after us to get him more information.  Pardon me, for interviews.  He's a hound for
> information.  And he's told us that he wants to, to wait as late as possible to do the
> report so he can have as much information as possible.  We recognize that at some point
> fairly soon we need to tell him we want the report so we can get it to counsel.

Trial Transcript, Vol. 6-2, June 29, 2005, at 105.  The Court responded:

> All right.  Well, I mean you can't wait until 24 hours before he testifies.  So realistically
> it's got to be this week I would think . . . .  He's relying upon the reports of others.  He
> apparently now has the most recent report from Dr. Wetzel.  He's done a lot of
> interviews.  Is there any difficulty in setting a deadline of Friday so the defense has the
> opportunity over the weekend to take a look at his report?

Trial Transcript, Vol. 6-2, June 29, 2005, at 106.

After the government agreed to the proposed schedule, the Court set Friday as the

deadline.  The hearing then returned to the subject of Dr. Cunningham.

---

[14]  The Court's April 7 Order required "all . . . records" upon which defense experts
"relie[d] upon to any extent for their report" to be produced prior to the June, 2005 interview.

[15]  The government's July 7 "Memorandum Regarding Dr. Cunningham's *Daubert*
Hearing," challenged that expert's proposed testimony.  Document 187.  Dr. Cunningham
proposed to testify that adverse childhood circumstances diminished the ability of adult violent
offenders to choose not to offend, mitigating their moral culpability for such choices.

Later that same day the government forwarded a letter to the Court (copied to counsel)

requesting additional time to obtain the report of Dr. Welner.[16]  The letter explained that:

> After advising you this afternoon that our mental health expert, Dr. Michael Welner, would produce his evaluation . . . by Friday of this week, I called Dr. Welner to advise him of the situation.  He answered on his cell phone in Florida where he is working on an unrelated matter through Thursday.  He reports that he won't even be back in his office until late Thursday this week, and cannot have the evaluation done on Friday.  He added that he did not receive copies of Dr. Mark Cunningham's report and the June 13, 2005 defendant interview until recently.
>
> I apologize for representing that Dr. Welner's evaluation would be done Friday, and ask your indulgence for a little more time.  Dr. Welner reports that he will work over the weekend and get the report done on Tuesday.  I note that the report at issue is a rebuttal report, which if provided by Tuesday would still give the defense ample time to prepare for cross examination on Friday next week.

On Friday, July 1, the defense began its penalty phase case with five witnesses who

described adverse circumstances in Fell's childhood: Susan Benczkowski, Fell's stepsister; Teri

Fell, his sister; Marianne Czanker-Chiumento and Christopher Purcell, police officers who

responded to problems involving Fell's parents during 1989-90; and Ellis Carle, a social

services provider with some knowledge of the Fell home during 1984-95.

Prior to testimony on July 1 the government moved *in limine* regarding Dr. Mills, based

upon several factors, including additional discovery lapses by the defense, such as its failure to

disclose the notes of Dr. Mills, scheduled to testify that same day.[17]  The Court pressed counsel,

pointing out that "the rules require that the notes be turned over."  Upon eliciting from counsel

that there were, in fact, undisclosed notes, the Court ordered that Dr. Mills "is not going to

---

[16]  A copy of the letter is in the Appendix.

[17]  The government had several times asked the defense to disclose the notes Dr. Mills wrote during his March, 2001 interview of Fell, consistent with the Court's April 7 Order.

testify until the notes are provided to the government." Trial Transcript, Vol. VII-1, July 1,

2005, at 8.  The government also noted that it had not received a summary of Dr. Mill's

proposed testimony since his May, 2001 five-page report.  The Court then supplemented its

order:

> Before he testifies, number one, all of the records have to be turned over.  Second, the
> government has to be afforded an opportunity to speak with him to get an idea as to
> what he would say . . . .  Then if there is a substantial disagreement as to what he is to
> testify to, if he is in fact testifying to more than just what you say, then the government
> can file a motion in limine at that point and seek to have some time to review his
> testimony.
>
> I don't want to exclude his testimony.  I don't want to unnecessarily restrict his
> testimony.  It seems to me that the defense has a wide-open opportunity here, should
> have a wide open opportunity to provide mitigating evidence.  On the other hand, I want
> to make sure that the government is adequately prepared before he testifies . . . .

Trial Transcript, Vol. VII-1, July 1, 2005, at 11-12.

The government also expressed concern that Dr. Mills might testify based upon the

reports of other, uncalled defense mental health experts (such as Drs. Lipman and van Gorp).

In response, the Court asked the government whether its own mental health experts might not

do the same.  The government responded generally about its intentions as to its experts:

> The fundamental problem we have now is that Welner and Wetzel are rebuttal witnesses
> for us.  We don't really know yet what Dr. Mills is going to testify to.  We haven't been
> able to get his notes . . . .  We are not quite sure what he is going to be relying upon, or
> what he is going to say.
>
> You know, our guys are rebuttal witnesses.  We are going to have to call them, we
> think, [but] we may not call either of them.  We want to see how this goes.  We are
> contemplating that.  But we don't believe we can make a good decision about whether
> we are going to call them . . . which one we are going to call, maybe both, until the
> defense case comes in, because we just don't know what's going to happen.
>
> [W]hat I anticipate actually happening is there is not going to be as big a battle in this
> case over the various mental health experts as we may fear now.  I don't think there's a

15

tremendous variation in how any of these mental health experts would diagnose Mr. Fell. I mean, most of the defense experts never mention a diagnosis, and I think that may be one reason why. I think when we get right down to it, we will probably rely upon only one, although we are not sure, we have one M.D., Welner, and one Ph.D., Wetzel. We have had ongoing communications with Rabun as well, but we are just uncertain as to what's going to happen over the next week with the defense experts so we have been reluctant to ask for a final decision.

Trial Transcript, Vol. VII-1, July 1, 2005, at 14-15.

The Court then returned to the larger picture:

I appreciate that your argument is that discovery has not been forthcoming, and as a result, we are a little bit behind the curve here . . . . My intention is to provide both sides with the opportunity to present their experts openly and on everything that those experts want to testify to. So, the logical solution would be, if you want to follow the order, is the experts for the defense testify, the government's experts testify, and then they [the defense experts] in [sur]rebuttal testify.

Trial Transcript, Vol. VII-1, July 1, 2005, at 17.

Later that same morning (Friday, July 1), during a recess in testimony, the Court asked Dr. Mills to come forward and address the missing notes. Dr. Mills promised the Court to try and locate them immediately. The Court also discussed postponing Dr. Mills' testimony if the notes were not promptly produced. After a discussion of Dr. Mills' schedule, it was agreed that Tuesday the following week was a potential day for his testimony. It was agreed that scheduling would depend upon when the notes were disclosed. Trial Transcript, Vol. VII-1, July 1, 2005, at 97-98.

Still on Friday, July 1, at Noon just after the jury was excused for lunch, counsel advised the Court that the missing notes had just been located and turned over to the government. Trial Transcript, Vol. VII-1, July 1, 2005, at 163. However, at 12:35 P.M.,

16

counsel informed the Court that the defense had decided not to call Dr. Mills.  When the Court

inquired, "you're not going to put him on at all?"  Counsel responded:

> No.  I'm going to save him for surrebuttal if we need him.  There's still Dr.
> Cunningham who's an expert who will testify next week.  If they believe that somehow
> raises rebuttal questions, I'm sure they'll try to present such an expert.

Trial Transcript, Vol. VII-2, July 1, 2005, at 5.

After the Fourth of July holiday weekend, on Tuesday, July 5 the defense turned over to

the government Dr. Cunningham's notes of his interview with Fell.  Late that day Dr. Welner's

72-page report arrived at the U.S. Attorney's Office, and a government attorney delivered a

copy to the local hotel where counsel were staying.

Dr. Welner's report was a comprehensive analysis of all mental health issues raised in

the case since early 2001, when the first three defense experts offered opinions, through mid-

2005, when Fell finally was interviewed about the offenses by Dr. Wetzel, and Dr.

Cunningham's opinions were received.[18]  Dr. Welner analyzed each defense expert's opinions

and each mitigation factor alleged by the defense relating to mental health.  The first issue

treated in the report was Fell's psychological diagnosis.  Dr. Welner concluded that Fell had

Antisocial Personality Disorder ("ASPD"), with Alcohol Dependence.  Pages 8 through 21 of

the report explain that diagnosis and address diagnoses by defense experts.  In a later section of

the report, Dr. Welner addressed the questions, "What other aspects of Donald Fell's

development distinguish themselves?  How have these features impacted his life trajectory,

underlying value system, moral development, perception of life options and nature of choices?"

---

[18]  Due to Fell's violation of the April 7 Order requiring production of experts' records,
Dr. Welner was unable to review Dr. Cunningham's notes before submitting his report.

In that discussion, Dr. Welner opined that Fell met the criteria for psychopathy, noting that it is a construct closely similar to ASPD (and that the two terms are sometimes used interchangably).[19]  Dr. Welner discussed psychopathy over seven pages of his 72 page report.

On July 6, a Wednesday, the jury heard additional penalty phase defense witnesses. First, two childhood school teachers, Sharon Hinchey and Mary Grace Loncoski, described Fell as a child.  Next, four corrections officials described Fell's adjustment during pretrial detention: Mary Jo Scott, Ronald Barclay, James Bailey, and Jason Rushlow.

Also on July 6 the defense filed its (second) "Motion *In Limine* to Exclude Report and Testimony of Michael Welner, M.D."  Document 182.[20]  In the motion, Fell claimed that Dr. Wetzel had been "merely a proxy for Dr. Welner" during the Fell interview, so as to subvert the Court's April 7 Order barring Dr. Welner from conducting the interview.  This claim was based upon one sentence in Dr. Welner's report: "For the scoring of Mr. Fell, I relied upon behavioral observations available through a videotaped interview conducted by Dr. Richard Wetzel, for which I provided questions to be posed to Mr. Fell."  Welner Report at 27.  Having manipulated Dr. Wetzel and the interview, the defense protested, Dr. Welner then "performed several new tests" in contravention of the Court's Order requiring testing be agreed upon by the parties.  Fell also asserted wildly that Dr. Welner's report had "only one purpose - to get the word 'psychopath' before the jury."[21]

---

[19]  *See* note 30.

[20]  The government provided the Court with a copy of Dr. Welner's report on this day.

[21]  Dr. Wetzel also concluded that Fell was a psychopath.

18

That afternoon, after witness testimony, the Court scheduled hearings to explore the defense claim as to Dr. Welner, as well as the government's concerns about Dr. Cunningham. The Court observed that:

> As I understand it, the government has asked for a *Daubert* hearing in regard to Dr. Cunningham, and the defense, if I read this right, is asking for a full *Daubert* hearing . . . in regard to the testimony of Dr. Welner, as well as seeking exclusion of various things that he found in a test that he conducted in violation of the Court's order.

Trial Transcript, Vol. VIII-2, July 6, 2005, at 69.

The Court scheduled the hearing for Dr. Cunningham on the next day, July 7, and the hearing for Dr. Welner the following Monday, July 11.  The Court also pressed the government as what testimony it intended to elicit from Dr. Welner:

> I mean, he's got a number of issues which have been raised by the defense, and you know, I need a whole lot more thorough briefing, quite frankly, on what the government intends to introduce.  For instance, do you intend to introduce all of the factual underpinnings for his testimony?  Do you seek to introduce his psychopathology test?

Trial Transcript, Vol. VIII-2, July 6, 2005, at 72.  The government responded that no decision had been made, stating that the report was:

> considerably more comprehensive at 72 single-spaced pages than would be needed.  We asked him to take a comprehensive approach because, frankly, it appears sometimes that where the defense is going shifts a little bit, and also we're not sure where they're going to be going tomorrow by the time the defense case rests.  I think it's unlikely that we'd be trying to have Dr. Welner address all of the 20 some-odd [mental] health issues . . . in the report.  I think probably we'd want to choose the ones that seem most responsive to the defendant's case . . . .

Trial Transcript, Vol. VIII-2, July 6, 2005, at 72.

Anticipating the scheduled July 11 hearing on Dr. Welner, the Court asked the government, "[d]id you tell him [Dr. Wetzel] to ask the questions that Dr. Welner wanted so

19

that Dr. Welner could use the interview that Dr. Wetzel had to support his opinion?"  The

government responded:

> No.  Those two were in consultation with each other prior to the interview.  We told Dr.
> Wetzel to conduct the interview as he saw fit, but we also told him that, you know, to be
> in touch with Dr. Welner about it, and we know that Dr. Welner prepared some of the
> questions, not all of them, for him to ask.  I didn't – we were not involved in a lot of this
> stuff.
>
> Moreover, my understanding from speaking to him today is that the – the name of the
> psychopathy test, which I can't remember, is not a test which was administered.  It's a
> historical scale that was done after the fact.  We had understood your Court order . . . to
> refer to psychological testing during the interview . . . and there wasn't any.
>
> [W]hat Welner did was after he had gotten all this information together, including the
> DVD of the interview and all these collateral interviews that he's been doing, is he
> plugged in that – whatever the name of that scale is and – and reached results.  Not
> dissimilar, your Honor, to an antisocial personality disorder diagnosis, which is the
> primary diagnosis that Dr. Welner reaches.  You know, it's not a piece of paper like the
> MMPI that you put in front of the defendant and have him fill things in.  Instead, it's a
> review of his history. . . . [W]hat was he doing before the age of 15, for example.  That's
> one of the primary factors for antisocial personality disorder diagnosis.  And a lot of that
> stuff's just historical.

Trial Transcript, Vol. VIII-2, July 6, 2005, at 73-75.

The Court then stated:

> All right.  So – well, that's raised a lot of issues.  That's – fair to say.  So my thought is
> that perhaps in light of the fact that his [Dr. Welner's] *Daubert* hearing will be lengthy,
> to say the least, my thought is perhaps that – that I cancel again on Monday and that we
> have a hearing on Monday, and then I get to read all this stuff and review all this stuff
> and then make a ruling.
>
>     . . . .
>
> And how about briefing on this?  How about describing exactly what's happened here,
> what information has been given to the defense, what information the defense has, what
> specifically are the theories that the defense objects to.  It's the . . . psychopathology test
> that he's using.  I thought in *Sampson* that the use of psychopathology was stricken.
> There's another District Court case in which that particular test was reliable.  I have – I
> mean, I have no information at all from either side about what the objection is or what
> in fact the government intends to introduce.

20

. . . .

> Judge Wolf . . . found that psychopathology is not a generally recognized term in [the] DSM-IV . . . . It's antisocial personality. It's two ways of describing what is essentially the same thing, except psychopathology, that is, a psychopath, has a label, a connotation, with it which was found to be extraordinarily prejudicial. That's one of the concerns that was raised in regard to this particular kind of test.

Trial Transcript, Vol. VIII-2, July 6, 2005, at 75.

Defense counsel added that, "we're going to attack the underlying basis that it shouldn't even be mentioned, but if you allow them to do that, then . . . we should have surrebuttal." The Court then concluded by stating:

> This is a brand-new area for me, and so we'll start . . . looking into it, but what I'm suggesting is that he [Dr. Welner] be here on Monday . . . the jury will be coming back on Tuesday, and at that point we'll proceed, but I would like to address all of these issues. So how much time do you [the government] need to submit a memorandum responding to the issues . . . that have been raised by the defense? . . . . I'd ask for the defense to come up with a memorandum describing their specific objections to what Dr. Welner would testify to. I mean, from the beginning, from day one, I have suggested to both sides that they be afforded an opportunity, a fair opportunity, to put on expert witnesses, and I'm hard-pressed to try to stop an expert witness from testifying. On the other hand, there are a lot of things in Dr. Welner's report, I am told of new facts which would be prejudicial – highly prejudicial, and would need the defense to be given an opportunity to look into them.

> I mean, what I need is somebody to narrow the precise issues down so that I know what the government wants to introduce, what the defense's objections are . . .

> [W]e've got to take it step by step. . . . I can't be rushed into deciding a *Daubert* hearing, which is essentially what you're asking for, you know, on a six-page or five-page memorandum . . . . [T]his is a big deal. I need to find out what happened here; what – what information was provided to the other side; what his opinions are, in fact; how psychopatholgy has been used by other courts in other districts, as to whether it's admissible or not; and what this test is all about. Or if there are other tests out there.

> But – it is true. You know, it is true. I had said that the government had two experts. Those were the experts that they were going to call. But I did not exclude Dr. Welner. I – and now, obviously, Dr. Welner used Dr. Wetzel to ask the questions that Dr. Welner wanted, and so here we are.

21

Trial Transcript, Vol. VIII-2, July 6, 2005, at 83-85.

In sum, on July 6 the defense raised the same issue pressed now regarding subversion of the April 7 Order, and moved *in limine* to exclude or limit Dr. Welner's testimony. In response, that same day – at Fell's request – the Court scheduled a hearing on the issue for Monday, July 11, at which Dr. Welner was going to be present for examination. Moreover, the Court expressed its unequivocal intent to explore the matter fully ("This is a big deal") and requested memoranda.

On the morning of July 7, the defense rebuttal case continued with lay witness Deanna German, a Pennsylvania social services provider who interacted with the Fell family when Fell was a child. Later that day the defense called William Kane, one of Fell's teachers during 1994-95. Finally, the defense called James Aiken, a prison expert.

Also on July 7 the government filed a *Daubert* memorandum explaining its concerns about Dr. Cunningham's testimony. Document 187. During the lunch break, at about 12:30 P.M., defense counsel announced that the defense was going to rest after Mr. Kane and Mr. Aiken finished testifying; in other words, they would not call a mental health expert. Trial Transcript, Vol. IX-2, July 7, 2005, at 4. Counsel added, "for the record, we withdraw our 12.2 notice . . . . There would be no surrebuttal . . . unless you allow them to call an expert for some reason, we would not have surrebuttal." *Id.* at 5. When the Court pressed the government for its expert witness plans, the government responded, "this is a significant turn of events which we just learned of when you did, Your Honor. We're going to need to consider this." *Id.* at 4.

On the morning of Friday, July 8, the defense submitted a letter to the Court arguing that, having withdrawn its Rule 12.2 notice, the government should be barred from introducing

mental health evidence.[22]  After the government cross-examined Mr. Aiken, the defense rested.

Also on July 8 the defense entered into a Stipulation as to Fell's mental health.  The Stipulation provided that:

> After his arrest in late 2000, Donald Fell was subjected to full psychological and psychiatric examinations.  Those examinations determined that (1) he had no cognitive or neurological deficits; (2) his intellect and cognitive functions were intact; (3) and he did not suffer from any mental disease or defect.  The examination also found that Fell was competent to stand trial and knew the difference between right and wrong at the time of the offenses on November 27, 2000.

Exhibit 14.[23]

In the wake of the foregoing, the government called no mental health expert and introduced no further evidence as to Fell's mental health.  The July 11 hearing scheduled by the Court to explore the defense claims regarding Dr. Welner and the alleged subversion of the April 7 Order was cancelled.

On July 12, a Tuesday, after testimony from rebuttal witnesses, the government rested.  In surrebuttal, the defense introduced Exhibit B2 (papers relating to Fell's August, 2000 New York assault), then rested.  Summations and jury instructions took place on July 13.  The jury returned its verdict on Thursday, July 14.  The jury's "Special Verdict Form" reflected unanimous findings in favor of four of the six defense mitigators relating to Fell's childhood.  Document 200.  In addition, 10 jurors found an additional mitigator, handwritten on the form as follows:

---

[22]  A copy of the letter appears in the Appendix.  At the time the government assumed that the letter was intended to preclude any government attempt to introduce Fell's statements during the June 13 interview (such as having "stepped in something weird in another state").

[23]  A copy of the Stipulation appears in the Appendix.

> Total life experience, failure of the state of Pennsylvania social and mental health services to effectively intervene in his childhood abuse and to treat or address his early antisocial behavior.

*Id.*

After dismissing the jury, the Court set a 30 day period for post-trial motions. On July 18 the defense moved to extend that deadline. Document 206. On July 21 the Court granted the motion, resetting the deadline to August 26. Document 207. The instant motion was filed on that date.

II.      DISCUSSION

Fell advances his motion under Fed. R. Crim. P. 29(c) and 33, but presents little analysis of the appropriate legal standards.

A.      LEGAL STANDARDS.

Rule 29(a) of the Federal Rules of Criminal Procedure provides, in pertinent part, that "the court on the defendant's motion must enter a judgment of acquittal of any offense for which *the evidence is insufficient to sustain a conviction.*" (Emphasis added.) While Rule 29(a) expressly provides for such a motion before the case is submitted to the jury, Rule 29(c) provides, in pertinent part, that "[a] defendant may move for judgment of acquittal, or renew such a motion . . . within any . . . time the court sets during the 7-day period" after a guilty verdict or discharge of the jury.

"'[A] court may enter a judgment of acquittal only if the evidence that the defendant committed the crime alleged is nonexistent or so meager that no reasonable jury could find guilt beyond reasonable doubt.'" *United States v. Espaillet*, 380 F.3d 713, 718 (2d Cir. 2004). "[C]ourts must be careful to avoid usurping the role of the jury when confronted with a motion

24

for acquittal." *Id.*, quoting *United States v. Jackson*, 335 F.3d 170, 180 (2d Cir. 2003). "It is settled that 'Rule 29(c) does not provide the trial court with an opportunity to substitute its own determination of . . . the weight of the evidence and the reasonable inferences to be drawn for that of the jury.'" *Id.*, quoting *United States v. Guadagna*, 183 F.3d 122, 130 (2d Cir. 1999). As Fell does not assert that the evidence was insufficient, Rule 29(c) does not appear to be an appropriate procedural vehicle for his motion.

Fed. R. Crim. P. 33 provides that, "[u]pon the defendant's motion, the court may vacate any judgment and grant a new trial *if the interest of justice so requires*." (Emphasis added.) "In considering whether to grant a new trial, a district court may itself weigh the evidence and the credibility of witnesses, but in doing so, it must be careful not to usurp the role of the jury." *United States v. Canova*, 412 F.3d 331, 349-50 (2d Cir. 2005). "The 'ultimate test' is 'whether letting a guilty verdict stand would be a manifest injustice . . . . There must be a real concern that an innocent person may have been convicted.'" *Id.* at 349 (citation omitted).

A Rule 33 motion for a new trial based upon newly discovered evidence is "not favored and should be granted only with great caution." *United States v. Wong*, 78 F.3d 73, 79 (2d Cir. 1996), quoting *United States v. Stofsky*, 527 F.2d 237, 243 (2d Cir. 1975); *see also United States v. Petrillo*, 237 F.3d 119, 123 (2d Cir. 2000)(only "'in the most extraordinary circumstances'")(citation omitted). "Such relief should be granted only if the evidence is material to the verdict, could not with due diligence have been discovered before or during trial and is not cumulative." *Petrillo*, *supra*, quoting *United States v. Sasso*, 59 F.3d 341, 350 (2d Cir. 1995); *accord United States v. White*, 972 F.2d 16, 20-21 (2d Cir.1992).