UNITED STATES DISTRICT COURT
FOR THE
DISTRICT OF VERMONT

UNITED STATES OF AMERICA      :
                             :
            v.               :      Case No. 2:01-cr-12
                             :
DONALD FELL                   :

### OPINION AND ORDER

Donald Fell moves the Court pursuant to 28 U.S.C. § 2255 to vacate, set aside, or correct the judgment and sentence of death imposed upon him, and to grant him a new trial.  Fell's motion includes allegations of ineffective assistance of counsel, prosecutorial misconduct, and juror misconduct.  The sole issue currently before the Court is Fell's claim that juror misconduct deprived him of his Fifth, Sixth, and Eighth Amendment rights to an impartial jury.

Fell brings juror misconduct claims regarding three jurors.  According to his motion, one juror lied during the jury selection process and withheld substantial information about her own life and that of her son.  A second juror defied the Court's instructions and traveled over two hours in the midst of trial to view the crime scenes.  In doing so, the juror obtained information that was not consistent with the trial evidence and, Fell argues, highly prejudicial.  This same juror is also accused of coercing another juror's vote.  A third juror allegedly failed to disclose both extra-record knowledge and material information about his past.

The Court has now heard four days of testimony on the juror misconduct issue.  For the reasons set forth below, the Court finds that Fell has shown juror misconduct and that this misconduct violated his constitutional right to an impartial jury.  Fell is therefore entitled to a new trial, and his motion to vacate is GRANTED.

## I.   Factual and Procedural Background

### A.   The Offense, Indictment, and Plea Negotiations

On the night of November 26, 2000, Donald Fell and co-Defendant Robert Lee murdered Fell's mother Debra and her friend Charles Conway at Debra Fell's home in Rutland, Vermont.  As charged in the superseding indictment, Fell and Lee departed the residence before dawn, armed with a 12-gauge shotgun and in search of a vehicle.  The two men proceeded on foot to the Price Chopper supermarket in downtown Rutland, abducted supermarket employee Teresca King, and commandeered her vehicle.  Fell and Lee then drove to Dutchess County, New York, and brutally murdered Mrs. King.  ECF No. 57 at 1-2.

On November 30, 2000, Fell and Lee were arrested in Clarksville, Arkansas, driving Mrs. King's car.  Upon their transfer to the District of Vermont, they were charged with interstate kidnapping and car-jacking, in violation of 18 U.S.C. §§ 1201(a) and 2119.  On February 1, 2001, a federal grand jury returned a four-count indictment charging Fell and Lee with car-

jacking resulting in death in violation of 18 U.S.C. § 2119(3)
(Count 1); kidnapping resulting in death in violation of 18
U.S.C. § 1201(a) (Count 2); brandishing a firearm in furtherance
of crimes of violence in violation of 18 U.S.C. §
924(c)(1)(A)(ii) (Count 3); and being fugitives who transported a
firearm in interstate commerce in violation of 18 U.S.C. §
922(g)(2) (Count 4).  Counts 1 and 2 were capital offenses.  Fell
and Lee were arraigned on February 7, 2001.[1]

On October 24, 2001, Fell signed an agreement to plead
guilty in exchange for life imprisonment without release.
However, at the time Fell and the United States Attorney for the
District of Vermont reached their agreement, the United States
Department of Justice required all local decisions not to seek
the death penalty in death-eligible cases to be confirmed by the
Attorney General.  In January 2002, the Attorney General rejected
the plea agreement.

On January 30, 2002, the government filed a Notice of Intent
to Seek Death Penalty.  The Notice listed four threshold
culpability factors as set forth in 18 U.S.C. § 3591(a)(2)(A)-
(D), and three statutory aggravating factors identified in 18

---

[1]  Robert Lee died in a Vermont correctional facility in
September 2001.

U.S.C. § 3592(c).[2]  It also listed four non-statutory aggravating factors.[3]  After the government filed its Notice of Intent, the parties negotiated an agreement for the penalty phase to be tried to the Court following a guilty plea to the charges.  That agreement was also rejected by the Attorney General.

**B.   Jury Selection**

Jury selection began on May 4, 2005.  Potential jurors initially completed a two-page background questionnaire (the "short questionnaire").  The jurors were then summoned to Court, where they were given preliminary instructions and directed to complete a longer, 34-page questionnaire (the "long questionnaire").  The long questionnaire consisted of 75 questions divided into six parts: (1) background; (2) experiences and beliefs; (3) important legal principles; (4) views about the death penalty; (5) exposure to media about the case or the death penalty; and (6) personal schedule during the anticipated trial period.

In the preliminary instructions, the Court explained to the prospective jurors:

---

[2]  The three statutory aggravating factors alleged that (1) King's death occurred during the commission of a kidnapping; (2) Fell committed the offense in an especially heinous, cruel, or depraved manner in that it involved serious physical abuse to King; (3) Fell intentionally killed or attempted to kill more than one person in a single criminal episode.

[3]  The four non-statutory aggravating factors, as discussed below, listed intentional and premeditated acts regarding the car-jacking, Mrs. King's abduction, and her eventual murder.

If you cannot answer a question because you do not understand it, write "Do not understand" in the margin next to the question.  If you cannot answer the question because you do not know write "Do not know." If you want to explain your answer, do so either in the space provided on the questionnaire, or on one of the sheets appended to the questionnaire. . . .  If for any reason you do not wish to answer any particular question, please write the word "Private" in the margin next to the question and we will take this matter up with you privately, if necessary.

Because your answers are part of the jury selection process and become part of the record of this court, the answers must be truthful under the penalty of perjury, and you must sign the questionnaire at the end.

ECF No. 512-23 at 34.

Jury selection was conducted over fifteen days between May 4 and June 6.  The Court initially conducted general voir dire of groups of sixteen jurors.  Potential jurors were then questioned individually, first by the Court and then by counsel for the parties.  The jury, along with four alternates, was selected on June 9, 2005.

From their first contact with the Court, prospective jurors and those who were seated for the trial were advised and repeatedly reminded that they must serve "fairly and impartially," meaning that their verdict must be based "on the evidence presented in this courtroom and not on anything that you may have heard or read or experienced outside the courtroom." *Id.* at 26.  They were further advised and reminded not to discuss the case with others or among themselves because "a jury's

verdict must be free from outside influence.  So, I am ordering each and every one of you not to discuss this case with family, friends or any other persons from this point on until I either excuse you, or if you are selected as a juror, until the case concludes." *Id.* at 32-33.

At the beginning of each day of trial, jurors were asked if they had spoken to anyone or learned anything about the case from outside the courtroom. *See, e.g.*, Trial Tr. Vol. I-1 at 10.  At the end of each day of trial, the Court reminded the jurors not to discuss the case with anyone or learn about the case from outside the courtroom. *See, e.g.*, Trial Tr. Vol. I-2 at 89.  The Court instructed jurors that if they did learn anything from outside the courtroom, "you need to tell me."  Trial Tr. Vol. I-1 at 15.  The Court also specifically advised the jurors not to conduct their own investigations. *See* Trial Tr. Vol. VI at 61.

### C.   Conviction, Sentence, and Appeal

The guilt phase of the trial commenced on June 20, 2005.  On June 24, 2005, the jury returned a guilty verdict on all four counts.  The penalty phase began on June 28, 2005, and extended for nine days.  The jury heard mitigation evidence from fourteen witnesses, including family members, teachers, and social workers.  The jury also heard from correctional officers and a prison teacher about Fell's adjustment to prison.  That evidence, as recounted by the Second Circuit on direct appeal, established

6

that

> Fell spent his early years in Pennsylvania with parents
> who were chronic alcoholics.  Both Fell and his sister
> were raped by babysitters when they were young
> children, abandoned by their parents, and raised by
> relatives.  Fell had frequent brushes with the law of
> increasing seriousness and, for a period of time, was
> committed to a home for delinquent youth.  After his
> release, his involvement with the law continued to
> escalate and was punctuated by serious drug and alcohol
> abuse.

*United States v. Fell*, 531 F.3d 197, 205 (2d Cir. 2008).  Fell's

mother Debra moved to Rutland in 1996, and Fell joined her in

2000.  Thereafter, "[t]heir stormy relationship continued.  Fell

and his mother (and their friends) drank heavily, argued

frequently, and abused drugs." *Id.*  Fell was twenty years old at

the time of the murders.

On July 14, 2005, the jury unanimously found that Fell

should receive a sentence of death on the two capital counts.  In

addition to the statutory aggravating factors, the jury found

that the government had proven the following non-statutory

aggravating factors: (1) that Fell participated in the abduction

of Mrs. King to facilitate his escape from the area in which he

and an accomplice had committed a double murder; (2) that Fell

participated in the murder of Mrs. King to prevent her from

reporting the kidnapping and car-jacking to authorities; (3) that

Fell participated in the murder of Mrs. King after substantial

premeditation to commit the crime of car-jacking; and (4) that

Fell caused loss, injury, and harm to the victim and the victim's

7

family.   ECF No. 200 at 8-9 (Special Verdict Form).

The jury also found that Fell's lawyers had demonstrated several mitigating factors, including Fell's childhood physical and sexual abuse; his treatment and institutionalization for mental health conditions; his regular abuse of alcohol and drugs since childhood; and that his parents were violent alcoholics who abandoned him as a child.   No juror found that Fell's capacity to appreciate his conduct was significantly impaired, or that he had shown remorse for killing Mrs. King.   Ten of the twelve jurors found that Fell was raised without positive role models.   Ten of twelve jurors also voted to add a mitigating factor that had not been presented: "Total life experience, failure of the state of Pennsylvania social and mental health services to effectively intervene in his childhood abuse and to treat or address his early antisocial behavior."   *Id.* at 13-14.

In 2008, the United States Courts of Appeals affirmed Fell's conviction and sentence.   *Fell*, 531 F.3d at 240.   In doing so, the Second Circuit concluded that this Court "presided over this complicated and difficult trial with care, fairness, and an exemplary concern for the protection of Fell's rights."   *Id*. Fell's petition for rehearing or, in the alternative, for rehearing *en banc* was denied, *United States v. Fell*, 571 F.3d 264 (2d Cir. 2009), and on March 22, 2010 the Supreme Court declined review.   *Fell v. United States*, 559 U.S. 1031 (Mem. 2010).

**D.   Section 2255 Motion**

On March 21, 2011, represented by new counsel, Fell timely filed a motion for writ of habeas corpus pursuant to 28 U.S.C. § 2255.  The motion includes allegations of ineffective assistance of counsel, prosecutorial misconduct, and juror misconduct.  On December 22, 2011, the government filed its response to the Section 2255 motion, seeking summary dismissal of all claims.  On May 10, 2013, the Court issued two written orders, the first of which dismissed some of Fell's claims.  The second order pertained solely to the juror misconduct claims, and found that Fell had established a sufficient basis for further inquiry with respect to Jurors 26, 143, and 162.

The juror misconduct inquiry required several days of in-court testimony from jurors and other witnesses.  On August 15, 2013, Jurors 143 and 162 were called to testify.  On September 27, 2013, the Court heard testimony from Juror 26.  On October 22, 2013, Fell moved to file an amended Section 2255 motion, adding new factual allegations against these three and one additional juror.  On March 12, 2014, the Court allowed the amendments as to the three initial jurors, but denied the motion with respect to the fourth juror.

Fell's amended Section 2255 motion is over 400 pages long and sets forth approximately twenty claims for relief.  The juror misconduct claims themselves may be divided into three

9

categories.  First, Fell claims that Jurors 26, 143, and 162 intentionally withheld material information during jury selection, and that full disclosures would have supported valid challenges for cause.  Second, he alleges that Jurors 26 and 143 were exposed to prejudicial facts beyond the trial record.  This allegation includes the claim that Juror 143 surreptitiously traveled to Rutland in the midst of trial, viewed the crime scenes himself, spoke with a third party about the facts of the case, and shared his observations with the rest of the jury panel.  Every day of trial thereafter, Juror 143 allegedly lied to the Court as he failed to reveal these extra-record activities.  Fell contends that Juror 143's actions prejudiced the defense's case, and that his dishonesty warrants a new trial on the basis of juror bias.  Third, Fell claims that Juror 143 coerced another juror into changing her vote.

The Court heard additional testimony on March 18-19, 2014, including that of witnesses claiming to have knowledge of Juror 143's trip to Rutland in 2005.  Other witnesses included members of Fell's post-conviction litigation team, an FBI case agent, and Juror 162 for a second day of testimony.  A non-testimonial hearing was held on May 9, 2014, and the parties have now submitted full briefing on the juror misconduct issue.

## II.  General Legal Principles

### A.  Section 2255 Standard

A prisoner in federal custody may file a motion under 28 U.S.C. § 2255 on the grounds that his sentence was imposed in violation of the Constitution or federal laws, was issued by a court that did not have jurisdiction, was in excess of the lawful maximum, "or is otherwise subject to collateral attack."  28 U.S.C. § 2255(a).  Relief under Section 2255 is therefore generally available "only for a constitutional error, a lack of jurisdiction in the sentencing court, or an error of law or fact that constitutes 'a fundamental defect which inherently results in a complete miscarriage of justice.'"  *Cuoco v. United States*, 208 F.3d 27, 30 (2d Cir. 2000) (quoting *United States v. Bokun*, 73 F.3d 8, 12 (2d Cir. 1995)).

"The reasons for narrowly limiting the relief permitted under § 2255 — a respect for the finality of criminal sentences, the efficient allocation of judicial resources, and an aversion to retrying issues years after the underlying events took place — are 'well known and basic to our adversary system of justice.'" *Bokun*, 73 F.3d at 12 (quoting *United States v. Addonizio*, 442 U.S. 178, 184 & n.11 (1979)); *see also Yick Man Mui v. United States*, 614 F.3d 50, 53 (2d Cir. 2010).  The movant bears the burden of establishing by a preponderance of the evidence any claim advanced in his Section 2255 motion.  *See Triana v. United States*, 205 F.3d 36, 40 (2d Cir. 2000); *Napoli v. United States*, 45 F.3d 680, 683 (2d Cir. 1995).

**B.    "Death is Different"**[4]

In this case, Fell is seeking relief from a sentence of death.  The Supreme Court has long acknowledged that a death penalty case is fundamentally different from a non-capital proceeding.

> [T]he penalty of death is qualitatively different from
> a sentence of imprisonment, however long.  Death, in
> its finality, differs more from life imprisonment than
> a 100-year prison term differs from one of only a year
> or two.  Because of that qualitative difference, there
> is a corresponding difference in the need for
> reliability in the determination that death is the
> appropriate punishment in a specific case.

*Woodson v. North Carolina*, 428 U.S. 280, 305 (1976) (plurality opinion) (footnote omitted); *see also Lockett v. Ohio*, 438 U.S. 586, 605 (1978) ("Given that the imposition of death by public authority is so profoundly different from all other penalties, we cannot avoid the conclusion that an individualized decision is essential in capital cases.") (plurality opinion); *Gardner v. Florida*, 430 U.S. 349, 357 (1977) (noting that "death is a different kind of punishment from any other that may be imposed in this country") (plurality opinion).  This general tenet – that "death is different" – carries through to habeas corpus proceedings.  *See, e.g.*, *Strickland v. Washington*, 466 U.S. 668,

---

[4] *Ford v. Wainwright*, 477 U.S. 399, 411 (1986) (opinion of Marshall, Brennan, Blackmun, and Stevens, JJ.) (noting that factfinding in a capital proceeding requires a "heightened standard of reliability" as "a natural consequence of the knowledge that execution is the most irremediable and unfathomable of penalties; that death is different").

704 (1984) (Brennan, J., concurring in part and dissenting in part) (observing in habeas proceeding pursuant to 28 U.S.C. § 2254 that "we have consistently required that capital proceedings be policed at all stages by an especially vigilant concern for procedural fairness and for the accuracy of factfinding").

C.  **Right to an Impartial Jury**

The Sixth Amendment provides that "[i]n all criminal prosecutions, the accused shall enjoy the right to a . . . trial, by an impartial jury . . . ." U.S. Const. Amend. VI. "One touchstone of a fair trial is an impartial trier of fact — 'a jury capable and willing to decide the case solely on the evidence before it.'" *McDonough Power Equip., Inc. v. Greenwood*, 464 U.S. 548, 554 (1984) (quoting *Smith v. Phillips*, 455 U.S. 209, 217 (1982)); *accord United States v. Stewart*, 433 F.3d 273, 303 (2d Cir. 2006). "The right to an impartial jury is nowhere as precious as when a defendant is on trial for his life." *Sampson v. United States*, 724 F.3d 150, 163 (1st Cir. 2013) ("*Sampson II*") (citing *Ross v. Oklahoma*, 487 U.S. 81, 85 (1988)).

The Federal Death Penalty Act ("FDPA") requires a unanimous jury to conclude that the death penalty is warranted. *See* 18 U.S.C. §§ 3593, 3594. "[E]ach juror has the power to decide that a defendant will live rather than die. Each juror must be able to make that decision based solely on the evidence, uninfluenced by personal experiences that he or she may have had." *United*

13

*States v. Sampson*, 820 F. Supp. 2d 151, 157 (D. Mass. 2011)

("*Sampson I*").  "'When possible juror misconduct is brought to

the trial judge's attention he has a duty to investigate and to

determine whether there may have been a violation of the [S]ixth

[A]mendment.'"  *United States v. Lloyd*, 462 F.3d 510, 518 (6th

Cir. 2006) (quoting *United States v. Shackleford*, 777 F.2d 1141,

1145 (6th Cir. 1985)).  "If even one [partial] juror is

empaneled" and the death sentence is imposed, "the [government]

is disentitled to execute the sentence." *Morgan v. Illinois*, 504

U.S. 719, 729 (1992).

## III. Findings of Fact and Conclusions of Law

Fell claims that his jury was not impartial, and that juror

misconduct corrupted his capital trial.  The Court now addresses

Fell's allegations against each juror in turn.[5]

---

[5]  The government has argued previously that Fell's juror
misconduct claims are procedurally defaulted.  The Court has rejected
this argument, noting that juror misconduct claims are poorly suited
to resolution on direct appeal, and that this is particularly true
where evidence of juror misconduct does not appear in the trial
record.  *See* Op. & Order 3-4, May 10, 2103, ECF No. 368 at 3-4 (citing
*Waley v. Johnston*, 316 U.S. 101, 104 (1942) (per curiam) (holding that
an issue was appropriately raised by habeas corpus petition where
"[t]he facts relied on are dehors the record and their effect on the
judgment was not open to consideration and review on appeal")).  Here,
juror misconduct was only discovered after jurors belatedly revealed
their actions to habeas counsel.  Accordingly, Fell had no basis upon
which to pursue his claims previously.  *See, e.g.*, *United States v.
Jackson*, 209 F.3d 1103, 1108 (9th Cir. 2000) (finding no procedural
default where petitioner did not learn about the factual predicate for
a jury tampering claim until investigator interviewed juror more than
three years after the trial); *Ida v. United States*, 191 F. Supp. 2d
426, 436 (S.D.N.Y. 2002) (holding that juror misconduct issue was
properly raised in a Section 2255 motion).

### A.   Juror 162

Fell submits that during voir dire, Juror 162 withheld substantial information about her own personal history and that of her son.  He first claims the juror failed to disclose that, like Donald Fell, she was the victim of sexual abuse as a child. Juror 162's history of sexual abuse was revealed when attorneys for Fell interviewed her in 2011 about her experience as a juror. After the interview, the juror signed a written declaration that included the following statements:

> At trial, we learned that Donald Fell was abused as a child and that his parents were alcoholics.  I was sexually abused by my stepfather for years and it didn't turn me into a murderer.  We all have choices in life and Donald Fell just chose evil.  Donald Fell had plenty of chances to get help, including from teachers and principals.  He was given lots of chances to change things and didn't take them.  That was important to me.

Fell Hr'g Ex. 6 at Bates Nos. 2580-81.

Fell contends that Juror 162's first opportunity to reveal her past sexual abuse was on the pre-trial questionnaires.  The long questionnaire asked:

> Q.38(a): Have you or has a family member or close friend ever been a witness to or the victim of a crime?

The short questionnaire asked essentially this same question. Juror 162 answered "No" to both.  At the August 2013 hearing, she was called to testify about her responses.

Juror 162 testified that as a young child she was removed from the custody of her biological parents, placed in a series of

15

foster homes, and ultimately adopted.  As she disclosed to Fell's attorneys in 2011, her adoptive father sexually abused her over a period of several years.  When questioned why she did not reveal this abuse prior to trial, she responded:

> I didn't connect it.  You know, this is something that
> I have never even thought about.  I mean, I went on and
> lived my life, never considered it.  I never thought
> about it.  And so when that question came up in – you
> know, I would attribute crime as having somebody hold a
> gun to my head or somebody stealing my purse or
> something of that nature.  It's just something that I
> never thought about.  You know, I mean, I had a lot of
> other things happen to me.
>
> . . .
>
> My father was not convicted of any crime, and I – I
> have not considered myself a victim in all these years,
> and I did not connect that question.

Aug. 15, 2013 Hr'g Tr. at 99-100, 114.

The Court asked Juror 162 whether the trial evidence caused her to recall her own experiences of sexual abuse:

> COURT:    But is there – is there some linkage in your mind,
>           at least during the course of the trial, that your
>           experience had some relevance?
>
> JUROR:    No.  You mean the decision that I made?  No.
>
> COURT:    Well, not necessarily the decision, but as you are
>           going through the trial –
>
> JUROR:    No.
>
> COURT:    Did it bring back memories?
>
> JUROR:    No, no.  This is something I never think about . .
>           . I just did not connect it.

*Id.* at 100-01.  The juror also cited the passage of time as a

16

factor:

> JUROR:   . . . It's just, I was so young.  I mean, I went
> on and lived my life.  There's so many different
> things that have happened to me in my life since
> then – I'm 71 years old – I never gave that – you
> know, I just, – it's something you just don't
> think about.

*Id.* at 100.  During her second day of testimony, the juror again
stated that she "didn't connect [her experience of sexual abuse]
as being a crime." Mar. 19, 2014 Hr'g Tr. at 182.

Fell has presented evidence to show that Juror 162 recalled
and spoke about her childhood sexual abuse on several occasions
in the years immediately preceding trial.  The testimony before
the Court established that between 1999 and the Fell trial in
2005, Juror 162 disclosed her experiences of sexual abuse to two
of her neighbors on separate occasions.  Mar. 19, 2014 Hr'g Tr.
at 22 (testimony of Jean Ratta-Roberts); *id.* at 59 (testimony of
Suzann Widener).  Prior to that, she discussed the abuse during a
1996 court-ordered psychological evaluation.  Juror 162 explained
to the evaluator that her past sexual abuse at one point caused
her to run away from home, and that "even now 'the thought makes
[her] feel dirty.'"  ECF No. 512-44 at 98.

The juror also recalled her childhood sexual abuse when
interviewed by Fell's post-conviction attorneys.  In fact,
according to one of the interviewers, Attorney Dina Zloczower, it
was Juror 162 who brought up the issue in 2011 when asked about
her experience as a juror.  Mar. 18, 2014 Hr'g Tr. at 79.  Fell

therefore claims that Juror 162 does remember and think about her experience of childhood sexual abuse, and that her response on the questionnaire as to whether she was the victim of a crime was dishonest.

In addition to her history of sexual abuse, Juror 162 allegedly withheld a host of other personal information. Since trial, Fell has discovered that Juror 162's first husband was killed in a work-related accident when her son, Patrick, was a small child. Thereafter, she became severely depressed and was twice institutionalized for several months at the Vermont State Hospital. Patrick was placed into foster care and lived with a family member for a period of time.

While Juror 162 was at the Vermont State Hospital, an attorney was appointed as her guardian. That attorney proceeded to embezzle Juror 162's assets, including real estate. Juror 162 was able to recover only a small amount of the embezzled assets, and the attorney was never prosecuted. Juror 162 spoke about the embezzlement during the 1996 psychological evaluation referenced previously, but did not disclose it on the juror questionnaires as a "crime" committed against her. Fell's habeas counsel confronted her about this omission at the August 15, 2013 hearing.

> COUNSEL:   But there was another very serious event [in
> addition to sexual abuse], a criminal event, that
> you were a victim of that you did not disclose,
> and that would be when you were ripped off by

> > attorney Don Milne, right?

> JUROR:     That's correct.

> COUNSEL:   And you never mentioned that?

> JUROR:     No, because I didn't think of it.

Aug. 15, 2013 Hr'g Tr. at 162.

At the Vermont State Hospital, Juror 162 reportedly developed a relationship with one of the nurses, Lucille Tatro. After her release from the hospital, Juror 162 was reunited with her son and the two of them lived with Ms. Tatro for the rest of Patrick's childhood.  During that cohabitation, Ms. Tatro reportedly abused Juror 162 and at one point threatened her with a knife.  After the relationship ended, Ms. Tatro allegedly became abusive toward both Juror 162 and the juror's current husband, and in one incident attempted to smash their car windshield and run them off the road.  Juror 162 ultimately filed a police complaint, precipitating Ms. Tatro's arrest and prosecution.  These latter events occurred in July of 1982, twenty-three years before the Fell trial.

Fell contends that Juror 162's violent history with Ms. Tatro should have been revealed on the juror questionnaires.  The pre-trial long questionnaire asked:

> 36.  Have you ever filed a complaint with the police against
> anyone?

Juror 162 answered "No."  As discussed above, Question 38(a) similarly asked whether the juror, a family member or close

19

friend had ever been witness to or the victim of a crime.   The
next sub-question asked:

> 38(b). Did you or your family member or close friend report
>        that crime to the police or other law enforcement
>        agency?

Because Juror 162 answered "No" to Question 38(a), she offered no
information in response to Question 38(b).   The record indicates
that not only did Juror 162 file a police complaint against Ms.
Tatro, but has filed several other complaints with police, mostly
pertaining to noise and other minor disputes with neighbors.

Fell also argues that Juror 162 lied about Ms. Tatro's
physical abuse toward her son Patrick.   During the juror inquiry
in August 2013, Fell's counsel asked Juror 162 about specific
instances of alleged abuse by Ms. Tatro, including locking
Patrick out in the cold and dragging him down the stairs by his
hair.   Juror 162 responded that "I don't know anything about
that.   Never heard of that."   Aug. 15, 2013 Hr'g Tr. at 169.
Fell argues that this testimony is belied by documents from the
state courts, including a 1995 family psychological evaluation in
which Patrick discussed his mistreatment.   Juror 162 subsequently
submitted an affidavit discussing the contents of that
evaluation.   In her March 2014 testimony, Juror 162 ultimately
conceded that, "Later on, as the years progressed, my son told me
certain things that [Tatro] did to him, but I myself never
observed it."   Mar. 19, 2014 Hr'g Tr. at 156.

Among Juror 162's apparent omissions, perhaps the most questionable pertained to her son's substance abuse and criminal histories.   The Court's short questionnaire asked:

> "Have you, or anyone close to you, been a complainant
> in a <u>criminal</u> case?"

Fell Hr'g Ex. 2 at 2.   Juror 162 answered "No."   She elaborated (although not in direct response to the question posed) that "My son was under Dept of Corrections House arrest for DWI and domestic violence 16 years ago.   He is now ass't manager at Shaws, so he sure has been a better person for it."   *Id.*

The long questionnaire asked:

> 43(a). Have you or has a family member or close friend ever
>        been charged with a crime?

Fell Hr'g Ex. 3 at 19.   Juror 162 responded "Yes," and in response to Part (b) of the same question, asking about the result of any prosecution, stated: "(House arrest) my son – DWI + domestic abuse – He was under the Dept of Corrections for 3 yrs – Intense Counseling – Best thing ever happened to him – he is now a different person."   Part (d) of that same question asked whether anything in her son's experience would make it difficult for Juror 162 to sit as a fair and impartial juror.   She answered "No," explaining that  "[m]y son was treated fairly and it helped him change his life."   *Id.* at 21.

Fell contends that by disclosing only limited criminal conduct sixteen years prior, house arrest, and DOC supervision,

Juror 162 lied about her son's extensive criminal history.   In support, Fell has introduced evidence to show that through the time of trial, Juror 162's son had been arrested for numerous crimes and convicted of four felonies.   He served two prison terms, was subjected to multiple periods of parole and supervision, and participated in mandatory substance abuse and domestic abuse treatment programs.

Fell's post-conviction counsel confronted Juror 162 with her son's criminal history at the August 2013 hearing.   When asked about details of a 1983 conviction, which included gun theft, Juror 162 responded that "I don't know anything about that." Aug. 15, 2013 Hr'g Tr. at 156.  Fell notes that in 1996, Juror 162 recalled during the court-ordered psychological evaluation that her son had stolen guns.   When counsel inquired about her son's 1997 conviction for breaking into his girlfriend's home, Juror 162 testified: "If what you are telling me is true, this is the first I have heard of it," explaining that her son had not lived with her "since he was like 18 years old.  So a lot of what you are telling me I don't – I don't know anything about it." *Id*. at 157.

This latter assertion, that Juror 162 was unaware of her son's convictions because they did not live together, lacks credibility, as Juror 162 and her son lived either together or in the same immediate vicinity for significant periods of time over

the decades preceding the trial.  Evidence of their cohabitation includes a bail statement from 1992, in which Patrick listed the same address for both himself and his mother.  Furthermore, in the course of the 1996 psychological evaluation, Juror 162 stated that she and her son were living together, and that it was stressful to have her son at home.  In 1997, Patrick listed his mother as one of his ties to the local community, thus suggesting a close relationship.  In 1998, he provided a home address that, in previous documents, had been listed as his mother's home.  And at the March 18, 2014 hearing, witness testimony clarified that Juror 162 and Patrick lived in adjacent apartments at the time of his fourth DWI arrest in 2001, and for several years thereafter.

State court records further indicate that, at least as of the early 1990s, Juror 162 regularly spent time with Patrick's son and was actively involved in family court proceedings involving her son and grandson.  Indeed, Juror 162 hired an attorney and fought to obtain visitation with her grandson.  An order granting such visitation was issued in April 1997, just prior to Patrick's arrest for two counts of simple assault and one count of felony unlawful trespass.  This close involvement in family matters renders it implausible that Juror 162 was unaware of her son's problems with the law during the years immediately prior to trial.

Fell next contends that Juror 162 did not report honestly

23

about her son's and her own treatment for substance abuse. When asked about substance abuse problems on the juror questionnaire, Juror 162 responded, "my son – alcohol." In her August 2013 testimony, the juror stated her belief that Patrick saw an "alcohol counselor . . . at one time." *Id.* at 158. The evidence before the Court shows that Juror 162's son was treated for alcohol and drug abuse over a period of several years, and that Juror 162 was aware of much of this treatment. In an affidavit filed in the course of her son's divorce proceeding, Juror 162 stated:

> Between October 1992 and May 1995 my son, the Defendant, was living in various facilities and institutions as a result of alcohol related issues and criminal convictions. Throughout that period my son resided at Maple Leaf Farm, The Windsor, Woodstock, Rutland and Chittenden Correctional Centers and Dismas House in Burlington. Throughout that period I transported [her grandson] to see his father at his various locations regularly and faithfully each visitation period . . . . I essentially took over my son's visitation schedule while he was incarcerated.

ECF No. 512-44 at 123-24. In October 2013, Juror 162 disclosed to the Rutland Herald that her son's history of drug abuse began when he was a teenager. Juror 162 herself also reportedly received therapy for alcohol abuse. *Id.* at 99.

In her testimony on March 19, 2014, Juror 162 supplemented some of her earlier statements. As to her son's substance abuse treatments, she conceded that he had been to Maple Leaf Farm twice, as well as Dismas House. Mar. 19, 2014 Hr'g Tr. at 206.

She also acknowledged that her son had served time in prison. *Id.* at 147. With respect to her testimony about not living with her son since he was eighteen, Juror 162 explained that her son had stayed with her "at intermittent times . . . like in between apartments and living conditions." *Id.* at 153. In one such instance, he lived with her "until the apartment next door to me opened up, and then he moved right next door." *Id.*[6]

While Juror 162's questionnaire responses were plainly lacking, she did disclose sufficient information about her son's criminal history to trigger questioning by counsel during voir dire. Counsel's inquiry proceeded as follows:

> COUNSEL: Let me just back up a little bit and ask about – there's going to be evidence in this case that Donnie's – well, first of all, regarding Donnie Fell personally, was – abused alcohol and drugs from a very, very young age, as young as eight years old. And so I am curious as to your own personal experience with your son, whether that in any way could affect your ability to consider that as one of the mitigating circumstances?
>
> JUROR: You asked me a hard question. Drugs and alcohol

---

[6] Fell's allegations of other false statements by Juror 162 are not persuasive. Fell contends that Juror 162 denied that she or anyone close to her had been a party in a civil suit, citing for support the episode of embezzlement and Patrick's divorce and child custody proceedings. The embezzlement occurred decades ago. As to her son's cases, Juror 162's role was limited such that she may not have realized she was formally a party to those proceedings.

Fell also claims that when asked her opinions about the fields of psychology and psychiatry, Juror 162 started to make a negative statement, but had second thoughts, writing: "I am in the health care field and ~~respect~~ the opinion of these people, ~~but~~." Fell contends that by striking the word "but," Juror 162 was intentionally hiding her history of psychiatric treatment. The Court declines to make this inference.

```
                    can do a lot to you, yes, from my own personal
                    experience with my son.

          COUNSEL:  All right.  So my question is –

          JUROR:    But he – I mean, my son, you know, was
                    rehabilitated, through the correctional – through
                    corrections, which was the best thing that ever
                    happened to him.  So that's a hard question.

          COUNSEL:  Was the opportunity that your son had, that was
                    provided through the Department of Corrections,
                    something that you thought was significant?

          JUROR:    Very significant.

          COUNSEL:  And how so?

          JUROR:    Because he had some tough, tough learning things,
                    tough things to go through to overcome his
                    problem.

          COUNSEL:  What did it take him to get intervention?  The
                    authority?  What did it take to get him to a point
                    where authority had –

          JUROR:    It took corrections coming to his house
                    periodically.  It took going to meetings every
                    week.  It took losing his driver's license.  I
                    mean, it took a lot.  He hit the bottom before he
                    went to the top, yeah.
```

Juror Voir Dire 9 at 136-37.  Counsel did not inquire any further

about Patrick's criminal history.

The Court begins its legal analysis with the seminal

*McDonough* decision.  In *McDonough*, the Supreme Court addressed a

party's right to a new trial based upon a juror's non-disclosures

during voir dire.  The Court noted the importance of voir dire

for exploring possible bias.

> Voir dire examination serves to protect [the right to
> an impartial jury] by exposing possible biases, both

> known and unknown, on the part of potential jurors.
> Demonstrated bias in the responses to questions on voir
> dire may result in a juror being excused for cause;
> hints of bias not sufficient to warrant challenge for
> cause may assist parties in exercising their peremptory
> challenges.  The necessity of truthful answers by
> prospective jurors if this process is to serve its
> purpose is obvious.

*McDonough*, 464 U.S. at 554.  *McDonough* also noted that litigants

are "entitled to a fair trial but not a perfect one, for there

are no perfect trials."  *Id.* at 553 (internal quotations marks

and citations omitted).  Furthermore, the Court concluded, "trial

represents an important investment of private and social

resources, and it ill serves the important end of finality to

wipe the slate clean simply to recreate the peremptory challenge

process because counsel lacked an item of information which

objectively he should have obtained from a juror on voir dire

examination."  *Id.* at 555.

McDonough was a personal injury case arising from a

lawnmower accident.  During voir dire, prospective jurors were

asked whether they or any of their family members had ever

suffered an injury that resulted in disability or prolonged pain

and suffering.  The jury ultimately found in favor of the

plaintiff, and the defendant moved for a new trial based upon the

discovery that one juror, having answered the voir dire question

in the negative, had a son who had sustained a broken leg when

injured by an exploding truck tire.  "When questioned afterwards,

the juror reportedly explained that he did not consider that

27

injury to be 'severe' or to have resulted in a 'disability.'"
*United States v. Shaoul*, 41 F.3d 811, 815 (2d Cir. 1994) (quoting
*McDonough*, 464 U.S. at 552 n.3).  The *McDonough* Court determined
that the juror's response was "mistaken, though honest" based
upon his understanding of the question, and that no new trial was
required.  *McDonough*, 464 U.S. at 555.[7]

*McDonough* established the standard for relief in juror non-
disclosure cases.  The Court held that in order to obtain a new
trial based upon juror non-disclosure, "a party must first
demonstrate that a juror failed to answer honestly a material
question on voir dire, and then further show that a correct
response would have provided a valid basis for a challenge for
cause."  *Id.* at 556.[8]  Accordingly, a good faith failure to
respond correctly to a question does not alone warrant a new
trial.  *Shaoul*, 41 F.3d at 815-16.

Under *McDonough*, Fell must first demonstrate "juror
dishonesty" during voir dire.  *Id.*  Voir dire in this case was
comprised of multiple phases, including the completion of the

---

[7]   While McDonough was a civil case, subsequent cases have
applied it in the criminal context.  *See, e.g.*, *Stewart*, 433 F.3d at
303; *United States v. Greer*, 285 F.3d 158, 170-71 (2d Cir. 2002);
*United States v. Colombo*, 869 F.2d 149, 151-52 (2d Cir. 1989).

[8]   In his concurrence, Justice Brennnan, joined by Justice
Marshall, criticized this legal standard: "In my view, the proper
focus when ruling on a motion for new trial in this situation should
be on bias of the juror and the resulting prejudice to the litigant."
*Id.* at 557.  As discussed below, courts have held that in addition to
the *McDonough* test, a party may seek relief by showing actual or
implied bias.

short and long questionnaires, followed by individual questioning by the Court and counsel.  Fell argues that Juror 162 was dishonest with respect to her past sexual abuse, crimes committed against her and her son, her son's criminal and substance abuse histories, and her own substance abuse.

In determining the credibility of Juror 162's questionnaire response with regard to sexual abuse, the Court is mindful of the fact that the abuse occurred many decades before the Fell trial. The Court also notes that the juror questionnaires asked about "crime."  Juror 162 testified that she did not consider her adoptive father's abuse, for which he was never prosecuted or punished, a crime.  Although the juror agreed that sexual abuse of a child is "nowadays" a crime, she contrasted attitudes toward sexual abuse "back in those days."  Mar. 19, 2014 Hr'g Tr. at 186.

The evidence shows that Juror 162 has discussed her sexual abuse in the recent past, including discussions with neighbors. The Court therefore discredits her testimony to the effect that she has completely forgotten about the abuse.  Nonetheless, it is conceivable that the inquiry about "crime" did not prompt Juror 162 to disclose that experience on her questionnaires.

The juror's failure to disclose that she had been the victim of embezzlement is equally understandable.  Again, the offense took place decades before the Fell trial, and there was never an

29

arrest, prosecution, or conviction.  *See, e.g., Dyer v. Calderon*, 151 F.3d 970, 973 (9th Cir. 1998) (explaining that courts "must be tolerant, as jurors may forget incidents long buried in their minds, misunderstand a question or bend the truth a bit to avoid embarrassment").

Juror 162's responses with regard to Ms. Tatro are more difficult to reconcile.  It is conceivable that episodes of domestic violence were not considered by the juror to have been criminal acts.  However, the assault on Juror 162 and her husband that gave rise to a police complaint, and Ms. Tatro's prosecution, arguably should have been disclosed.  Again, however, there was a significant lapse of time between those events, which occurred in 1982, and the Fell jury selection in 2005.  Juror 162 also testified that, as she recalled, it was her husband who filed the police complaint against Ms. Tatro.  Mar. 19, 2014 Hr'g Tr. at 197.  The Court is not persuaded that the juror was intentionally dishonest in this regard.

The record with respect to Juror 162's son, and his substantial criminal and substance abuse records, also presents a close question with respect to the juror's dishonesty.  Juror 162 disclosed that her son had a criminal record, including DWI and domestic assaults.  That she seriously under-reported his criminal history is undisputed.  However, the written juror questionnaires must be viewed in context.  The long questionnaire

in particular consisted of 75 questions not including sub-parts. When prompted to disclose family criminal history, Juror 162 exceeded the space provided, and essentially gave a short synopsis of her son's criminal past.  Indeed, while Patrick did have several arrests and convictions, the majority of his offenses could be summarized as either "DWI" or "domestic abuse."

At voir dire, counsel had the opportunity to delve deeper into Juror 162's own history and that of her son.  The Court finds that her responses to counsel's questions were neither evasive nor dishonest.  When counsel inquired about the potential impact of her son's history, the juror conceded that it was a difficult question.  She acknowledged that she had seen the effects of drugs and alcohol, and that her son had been through hard times.  Her answers also suggested that her son had been under administrative supervision, parole, and/or rehabilitative programming, with "corrections coming to the house periodically" and "meetings every week."  Juror Voir Dire 9 at 137.

Viewed in this context, the juror's failure to fully report the extent of her son's many convictions does not appear to be the result of dishonesty.  First, the structure of the juror questionnaires did not provide for or invite lengthy discussions of criminal histories.  Second, the juror disclosed sufficient information for counsel to probe further, and counsel did so only to a very limited extent.  *See Lopez v. Aramark Uniform & Career*

*Apparel, Inc*., 417 F. Supp. 2d 1062, 1070 (N.D. Iowa 2006) (noting in juror non-disclosure case that "the better approach places the burden on counsel to ask questions of a specific nature with respect to facts that may be important in voir dire"); *see also McDonough*, 464 U.S. at 555 (stating that a new trial should not granted "because counsel lacked an item of information which objectively he should have obtained from a juror on voir dire examination"). While these facts may be relevant to Fell's (yet to be litigated) claims of ineffective assistance of counsel, they do not favor granting relief on his juror misconduct claim.

This is not to say that Juror 162's testimony during this post-conviction proceeding has been completely forthcoming. To the contrary, several of her statements before the Court did not ring true, including the suggestion that she has completely forgotten about her experience of sexual abuse, and that she was unaware of much of her son's criminal history. The Court distinguishes, however, between the juror's performance while completing a lengthy pre-trial questionnaire, and her behavior during a contested testimonial hearing at which her credibility was being questioned.

While statements during a post-conviction hearing are generally relevant to credibility, and may support a finding of juror dishonesty, *see Sampson II*, 724 F.3d at 163, they are

different in nature from pre-trial disclosures.  Once called into
Court, Juror 162 had reason to be defensive about her responses.
The experience of testifying was clearly stressful for the juror,
as at one point the Court was compelled to call a recess after
she became emotional and agitated.  Testifying in that sort of
hostile situation differs significantly from completing a
questionnaire, or answering unthreatening questions from defense
counsel at voir dire.  Accordingly, the Court does not view Juror
162's lack of credibility in these recent proceedings as
necessarily discrediting her responses eight years prior during
the jury selection process.

The Court's view of Juror 162's credibility is also tempered
by her personal history and courtroom demeanor.  Juror 162 has
lived through several tragedies and was twice institutionalized.
The juror's recent personal history includes numerous conflicts
with neighbors, and there was testimony suggesting alcohol
dependency.  Throughout the course of intense examination by
Fell's post-conviction counsel, the juror's insistence upon her
honesty was consistent and vehement.  She was at times emotional,
but mostly in response to accusations of lying.  Finally, whether
Juror 162 has fully accepted her son's history of criminality and
substance abuse, or her own difficult past, is not clear, and the
role of any possible denial was difficult to ascertain in a
courtroom setting.

*McDonough* requires a moving party to show that "a juror failed to answer honestly a material question on voir dire." 464 U.S. at 556. Here, Fell has failed to show that Juror 162's responses on the juror questionnaire and during voir dire, while incomplete, were actually dishonest.[9]

Because the question of Juror 162's honesty is a close one, the Court will consider other factors in the *McDonough* analysis. Writing for the Court in *McDonough*, then-Justice Rehnquist noted that "[t]he motives for concealing information may vary, but only those reasons that affect a juror's impartiality can truly be said to affect the fairness of a trial." 464 U.S. at 556; *Greer*, 285 F.3d at 172-73 (movant must show that juror's dishonesty "evidenced partiality"); *Sampson I*, 820 F. Supp. 2d at 173 ("as articulated by *McDonough*, the party seeking relief must show a motive that calls the juror's impartiality into question").

---

[9]   Fell compares this case to the facts in *Sampson*, in which a death sentence was vacated on the basis of *McDonough*. With respect to juror dishonesty, the differences between the two cases are stark. In *Sampson*, the juror denied on her questionnaire any personal or family experience with drugs, crime, or prison, and failed to disclose that she had a daughter. During the Section 2255 proceeding, she admitted that she had lied, and that in fact her husband regularly abused alcohol and marijuana, had "menaced" her with a shotgun, and had violated an abuse prevention order. The juror also admitted that she had a daughter, and that the daughter was a cocaine addict who had served time in prison. The juror testified that she "had tried to forget about these experiences because thinking of them was 'killing' her," and that she had been "unwilling to admit that such events could happen in her family." *Sampson II*, 724 F.3d at 162. Juror 162, in contrast, revealed not only that she has a son, but a son with substance abuse issues and a criminal record. Juror 162 also maintains that she did not lie during voir dire.

Whether Justice Rehnquist's statement constitutes an independent requirement under *McDonough* is unsettled.[10]   Nonetheless, Fell has failed to show that Juror 162's dishonesty, if any, demonstrated a partiality that affected the fairness of trial.

Fell contends that Juror 162 was driven by an improper

---

[10]   The Fourth Circuit treats motive as an additional prong of the *McDonough* test.   *See McNeill v. Polk*, 476 F.3d 206, 224 n.8 (4th Cir. 2007) (King, J., concurring in part and concurring in the judgment) (referring to motive as the "third prong" of *McDonough*); *Conaway v. Polk*, 453 F.3d 567, 588 (4th Cir. 2006) ("Even where, as here, the two parts of the *McDonough* test have been satisfied, a juror's bias is only established under *McDonough* if the juror's 'motives for concealing information' or the 'reasons that affect [the] juror's impartiality can truly be said to affect the fairness of [the] trial'") (citing *McDonough*, 464 U.S. at 556).   The Ninth Circuit has similarly concluded that "[u]nder *McDonough*, a new trial is warranted only if . . . [the juror's] reasons for making the dishonest response call her impartiality into question."   *Pope v. Man-Data, Inc.*, 209 F.3d 1161, 1164 (9th Cir. 2000).   The Second Circuit, while not assigning motive its own prong, has acknowledged that the juror's reason for lying must have a "bearing on [the juror's] impartiality." *United States v. Langford*, 990 F.2d 65, 68 (2d Cir. 1993).   In *Langford*, the district court found no basis for a new trial because the juror's motive for dishonesty – her embarrassment about a prior prostitution conviction – did not show partiality.   *Id.* at 69-70.   The Second Circuit affirmed, and has since clarified that in reaching this conclusion, the *Langford* court was "focused on the second prong of the *McDonough* test," *i.e.*, whether the juror would have been subject to a valid challenge for cause based upon non-disclosures.   *Shaoul*, 41 F.3d at 815.   In *Colombo*, a juror failed to disclose that her brother-in-law was an attorney for the government because she feared that disclosure would render her ineligible to serve.   The juror also failed to disclose her belief that one of the locations where defendants were alleged to have conspired was a "hang out for gangsters."   869 F.2d at 150.   The Second Circuit did not align either statement with a specific *McDonough* prong, but has since noted that because the *Colombo* "juror admitted not only concealment, but concealment of facts from which specific bias could be inferred, the alleged lies, if established, would demonstrate both dishonesty and partiality and would satisfy both prongs of the *McDonough* test." *Stewart*, 433 F.3d at 305; *see also Greer*, 285 F.3d at 172-73 ("[i]t was not simply that the lies [in *Colombo*] were deliberate, but that the *deliberateness of the particular lies evidenced partiality*") (emphasis in original).

desire to be selected as a juror.  If proven, this argument would demonstrate a motive that indicates partiality, and would thus provide a valid basis for relief.  *See Dyer*, 151 F.3d at 983; *United States v. Daugerdas*, 867 F. Supp. 2d 445, 468 (S.D.N.Y. 2012).  Fell's brief argues that Juror 162's motive is revealed by her questionnaires, in which she cited her interests in true crime books, court television, and commentators such as Nancy Grace.  Juror 162 also disclosed her attention to high profile criminal proceedings such as the Michael Jackson case, the Scott Peterson case, and the O.J. Simpson case.  Juror 162 confirmed a keen interest in trials in her August 2013 testimony.  Based upon these facts, Fell contends that Juror 162 desired to be selected as a juror, and that "[h]er behavior during voir dire . . . was in service of this goal."  ECF No. 509 at 104.  Fell also argues that Juror 162's dishonesty alone is evidence of her desire to be retained as a juror.

Fell's motive argument is based largely upon circumstantial evidence and significant speculation.  If Juror 162 was in fact dishonest, it is unknown whether her dishonesty was based upon her desire to be selected for the jury, or upon some other interest that may or may not be relevant to her partiality.  *See generally Wood v. Bartholomew*, 516 U.S. 1, 8 (1995) (stating that a federal court cannot grant "habeas relief on the basis of little more than speculation with slight support").  While there

36

is evidence to suggest that Juror 162 enjoys trials and may have
wanted to be selected, that evidence does not establish whether
her dishonesty, if any, was driven by that desire. *See United
States v. Greer*, 998 F. Supp. 399, 407 (D. Vt. 1998) ("The Court
will not attribute a malicious design to a juror where the
evidence does not indicate one.").

The reason for a juror's dishonesty need not necessarily be
either express or nefarious.  For example, in *Sampson*, the
juror's dishonesty was linked to her inability to admit to a
family history of violence, drugs, and incarceration.  The
district court determined that the juror's clear emotional
distress about these issues would have, in turn, rendered her
unable to be impartial when such issues came to light.  *Sampson
I*, 820 F. Supp. 2d at 194 (concluding that the juror's "reasons
for lying during voir dire reflect her deep emotional distress
about events similar to those presented in the trial and are,
therefore, 'reasons that affect [her] impartiality.'") (quoting
*McDonough*, 464 U.S. at 556).  On appeal, the First Circuit agreed
with the district court's factual findings and application of the
law.

> [The juror's] display of emotional distress illuminates
> [her] motives for lying.  The *McDonough* Court made
> clear that "only those reasons [for lying] that affect
> a juror's impartiality can truly be said to affect the
> fairness of a trial."  464 U.S. at 556.  Here, it is
> far more likely than not that—as the district court
> found—Juror C's reasons for lying about P and J
> impaired her ability to decide the case solely on the

37

evidence.  The magnitude of Juror C's emotional
distress strongly suggests that it would have been a
Sisyphean task for her to separate the evidence
presented at the penalty-phase hearing from her intense
feelings about her own life experiences.

*Sampson II*, 724 F.3d at 167.

In this case, again assuming dishonesty, Fell has not
demonstrated that Juror 162 had a motive for lying.  Unlike the
juror in *Sampson*, Juror 162 disclosed that her son has a history
of substance abuse and criminality.  Moreover, while the *Sampson*
juror admitted to lying, Juror 162 maintains that she did not lie
and has provided several explanations for why she answered her
short and long questionnaires as she did.  While the Court and
the parties may speculate about other reasons and motivations for
her failure to provide more thorough information during voir
dire, there is insufficient evidence to support a finding that
her "motives for concealing information . . . affect[ed her]
impartiality."  *McDonough*, 464 U.S. at 556.

If the Court assumes both dishonesty and a motive that
satisfies the *McDonough* criteria, it must next consider whether
Juror 162 would have been subject to a valid challenge for cause.
*Id.*  Under this prong of *McDonough*, "the test is not whether the
true facts would compel the Court to remove a juror for cause,
but rather whether a truthful response 'would have provided a
valid basis for a challenge for cause.'"  *Daugerdas*, 867 F. Supp.
2d at 470 (quoting *McDonough*, 464 U.S. at 556).  Accordingly, the

court must "determine if it would have granted the hypothetical challenge." *Greer*, 285 F.3d at 171.

In the Second Circuit, a juror may be challenged for cause on the basis of actual, implied, or inferred bias. *See United States v. Torres*, 128 F.3d 38, 43 (2d Cir. 1997). "Actual bias is 'bias in fact.'" *Id.* (quoting *United States v. Wood*, 299 U.S. 123, 133 (1936); *see also Greer*, 285 F.3d at 171. "A juror is found by the judge to be partial either because the juror admits partiality . . . or the judge finds actual partiality based upon the juror's voir dire answers." *Torres*, 128 F.3d at 43; *see, e.g., Hughes v. United States*, 258 F.3d 453, 456, 460 (6th Cir. 2001) (requiring a new trial after seated juror had expressed bias against defense based on her relationships with law enforcement officers).

Actual bias is generally evidenced by "express proof." *United States v. Haynes*, 398 F.2d 980, 984 (2d Cir. 1968). For example, in *Torres*, a juror testified that because of his experience with drug dealers, he would not be able to fairly judge the credibility of a witness who had dealt drugs, stating that "I think they're the worst people on earth and I wouldn't believe them no matter what they said." 128 F.3d at 44. Here, Juror 162 did not admit to any such partiality. Nor is there any suggestion that her voir dire responses were equivocal when asked if she could be impartial. Accordingly, the Court would not have

granted a hypothetical challenge on the basis of actual bias.

Implied bias, also known as presumed bias, is bias that is presumed as a matter of law. *See id.* at 45. "In contrast to the inquiry for actual bias, which focuses on whether the record at voir dire supports a finding that the juror was in fact partial, the issue for implied bias is whether an average person in the position of the juror in controversy would be prejudiced." *Id.* Adhering to "Justice O'Connor's admonition that implied bias should be reserved for 'extreme situations,'" *Greer*, 285 F.3d at 172 (quoting *Smith*, 455 U.S. at 222 (O'Connor, J., concurring)), the Second Circuit has "cautioned that 'automatically presumed bias deals mainly with jurors who are related to the parties or who were victims of the alleged crime itself.'" *Id.* (quoting *Torres*, 128 F.3d at 45). Juror 162 had no such relationships to the parties, counsel, or the crime itself, and her omissions during voir dire did not present the sort of "extreme situation" that would qualify for presumptive bias. *Id.*

The Second Circuit has also recognized a third form of partiality, known as inferred bias, applicable in "a few circumstances that involve no showing of actual bias, and that fall outside of the implied bias category, where a court may, nevertheless, properly decide to excuse a juror." *Torres*, 128 F.3d at 46-47. "Bias may be inferred when a juror discloses a fact that bespeaks a risk of partiality sufficiently significant

to warrant granting the trial judge discretion to excuse the
juror for cause, but not so great as to make mandatory a
presumption of bias." *Id.* at 47.  In *Torres*, the Second Circuit
declined to "consider the precise scope of a trial judge's
discretion to infer bias." *Id.*

> It is enough for the present to note that cases in
> which a juror has engaged in activities that closely
> approximate those of the defendant on trial are
> particularly apt.  The exercise of the trial judge's
> discretion to grant challenges for cause on the basis
> of inferred bias is especially appropriate in such
> situations.  "Because [in such cases] the bias of a
> juror will rarely be admitted by the juror himself,
> 'partly because the juror may have an interest in
> concealing his own bias and partly because the juror
> may be unaware of it,' [partiality] necessarily must be
> inferred from surrounding facts and circumstances."
> *McDonough Power Equip.*, 464 U.S. at 558 (Brennan, J.,
> concurring) (citation omitted).

*Id.*[11]  "Therefore, the doctrine of inferable bias, which courts
have long 'implicitly assumed to exist,' *Torres*, 128 F.3d at 43,
permits a court in its discretion to dismiss a juror because of
an inference that the juror will not be able to decide the case
based solely on the evidence." *Daugerdas*, 867 F. Supp. 2d at

---

[11]  In *Sampson II*, the First Circuit rejected this
"categorical approach" to bias, noting that *McDonough* "saw no
need to use pigeonholes of this sort."  724 F.3d at 165.
Instead, the First Circuit endorsed a "totality of
circumstances" approach, where the "inquiry depends on whether a
reasonable judge, armed with the information that the dishonest
juror failed to disclose and the reason behind the juror's
dishonesty, would conclude . . . that the juror lacked the
capacity and the will to decide the case based on the evidence
(and that, therefore, a valid basis for excusal for cause
existed)."  *Id.* at 165-66.

475.

In this case, had the Court known all of the facts about
Juror 162's personal history and that of her son, it would not
have granted a challenge for cause on the basis of inferred bias.
Fell emphasizes that the juror's past sexual abuse rendered her
unable to fairly consider Fell's own history of abuse.  The
record does not bear out this contention, as the juror testified
that her own sexual abuse was not a significant factor in her
life.  While the Court does not credit the juror's assertions
that she has completely forgotten about her childhood trauma,
nothing in her testimony suggests that she was unable to be
impartial when viewing Fell's own childhood experience.  And
while Juror 162 connected her experience to Fell's in her written
declaration, she repeatedly assured the Court during voir dire
that she could consider mitigation.

In *Torres*, the Second Circuit stated that a trial judge may
inquire about a juror's partiality, and when determining inferred
bias "might be persuaded by the force of the juror's assurance[s]
. . . ."  128 F.3d at 47 n.12.  In this case, when the
prosecution asked Juror 162 if she could listen to various
mitigating factors and keep an open mind, she replied,
"Certainly."  Juror Voir Dire 9 at 129-30.  Defense counsel
similarly asked her whether her experiences with her son "in any
way could affect your ability to consider that as one of the

42

mitigating circumstances." *Id.* at 136.  Juror 162 replied that it was a "hard question," but indicated that based upon her son's experience, she believed rehabilitation was possible. *Id.*  When the Court asked Juror 162 at voir dire what factors might help her make her decision, she made clear that mitigating circumstances would play a fundamental role in her decision-making process: "First of all the reason . . . [t]he psychological reason about why he would have done it.  The mitigating circumstances, you know.  I would have to hear the whole --." *Id.* at 121.  The prosecution asked Juror 162 whether she would be able to consider the death penalty, and the juror responded that she "would have to know all the mitigating circumstances." *Id.* at 127.  Defense counsel correspondingly asked Juror 162 if she could consider a life sentence, and her response was consistent with what she told both the Court and the prosecutor:

> Well, not hearing what the evidence is, I could – I could make a decision either way . . . I guess that's the easiest way to answer that.  But I haven't heard any evidence yet, so – . . . .  I think what you are asking me, if I am capable of making a decision for life in prison or for the death penalty, without hearing evidence? . . . I would be capable of either one, but naturally I would have to hear all the mitigating circumstances first.

*Id.* at 135-36.

The Court now weighs these responses against the information that Fell's attorneys have gathered since trial.  In addition to

the juror's sexual abuse several decades ago, the Court considers the juror's history of physical abuse by Ms. Tatro, her own substance abuse, and her son's life history.  "When a juror has life experiences that correspond with evidence presented during trial, that congruence raises obvious concerns about the juror's possible bias." *Sampson II*, 724 F.3d at 167 (citing *Torres*, 128 F.3d at 47–48); *see Burton v. Johnson*, 948 F.2d 1150, 1158–59 (10th Cir. 1991)).  While in some cases a court could reasonably conclude that "the juror may have enormous difficulty separating her own life experiences from evidence in the case," *Sampson II*, 724 F.3d at 167, there is little evidence here to justify such a concern.

Unlike the juror in *Sampson*, Juror 162 has not demonstrated distress about her own family history, or about issues of criminality and substance abuse generally.  In fact, her questionnaire responses suggest not only that she is willing to disclose her son's criminal history, but that she is proud of his recovery and rehabilitation.  Given the juror's perception of her own family's successes, and her insistence upon her ability to be impartial, the Court would not have granted a hypothetical challenge for cause in this instance.  *Cf. United States v. Stewart*, 317 F. Supp. 2d 432, 442 (S.D.N.Y. 2004) ("If anything, a prospective juror with a family member who had been convicted of a crime would more likely be considered biased in *favor* of

44

criminal defendants.").

While the Court finds that Fell has not shown either dishonesty or valid grounds for a challenge for cause, there is authority for the proposition that where the *McDonough* standard is not satisfied, a new trial may still be ordered if the defendants can show bias. *See, e.g., Jones v. Cooper*, 311 F.3d 306, 310 (4th Cir. 2002) ("The *McDonough* test is not the exclusive test for determining whether a new trial is warranted: a showing that a juror was actually biased, regardless of whether the juror was truthful or deceitful, can also entitle a defendant to a new trial."); *Skaggs v. Otis Elevator Co.*, 164 F.3d 511, 516 (10th Cir. 1998) ("The advent of the [*McDonough*] test did not eliminate a litigant's broader historic right to prove actual or implied juror bias."). In *McDonough* itself, Justices Blackmun, Stevens and O'Connor concurred separately "to clarify that juror partiality could still be proven by showing actual or implied bias." *Sampson I*, 820 F. Supp. 2d at 175 (citing *McDonough*, 464 U.S. at 556). As Justice Blackmun wrote,

> [We] understand the Court's holding not to foreclose the normal avenue for relief available to a party who is asserting that he did not have the benefit of an impartial jury. Thus, regardless of whether a juror's answer is honest or dishonest, it remains within a trial court's option, in determining whether a jury was biased, to order a post-trial hearing at which the movant has the opportunity to demonstrate actual bias or, in exceptional circumstances, that the facts are such that bias is to be inferred.

*McDonough*, 464 U.S. at 556 (Blackmun, J., concurring).

45

As explained in the challenge for cause analysis, Juror 162 did not evidence the sort of bias that would justify granting a new trial.  Fell has not shown actual bias, as Juror 162 did not admit partiality and the Court has not determined actual partiality based upon the juror's conduct.  Nor does Juror 162's situation present the sort of "exceptional situation" that would give rise to a presumption of bias. *See Torres*, 128 F.3d at 46 (citation and internal quotation omitted).  Finally, while there is no legal authority for granting relief purely on the basis of inferred bias, Juror 162's actions in this case would nonetheless fall short of such an inference.

In sum, the record does not support Fell's claim for relief on the basis of Juror 162's conduct during voir dire.  While the *McDonough* Court highlighted the importance of the voir dire process as a guard against juror bias, it also noted that no trial is perfect, and that counsel has a responsibility to obtain relevant information from prospective jurors.  464 U.S. at 554-55.  Juror 162 completed two questionnaires, one of which contained over 70 questions.  Her answers disclosed information that should have, and in fact did, prompt further questioning by counsel during voir dire.  That questioning was brief, and as noted above, counsel's performance in that regard may support a claim of ineffective assistance of counsel.

While Juror 162's responses during voir dire and her

46

testimony in this post-conviction proceeding present close questions, the Court ultimately finds that Fell has failed to show sufficient misconduct by Juror 162 to warrant habeas corpus relief.  The Court also notes that the Second Circuit "has never found reason to overturn a verdict on the basis of juror nondisclosure under *McDonough*, and only once . . . has remanded for an evidentiary hearing on the matter." *Stewart*, 433 F.3d at 303.[12]  Here, the Court has held evidentiary hearings and has considered the parties' submissions.  For the reasons set forth above, Fell is not entitled to relief on the basis of Juror 162's non-disclosures, and his amended motion in this regard is DENIED.

### B.   Juror 143

Juror 143 is alleged to have engaged in a broad range of misconduct, including: traveling to Rutland to view the crime scenes during trial; informing other jurors of his extra-record observations; speaking with a third party about the case during trial; lying about his actions when serving as a juror; lying during voir dire; coercing another juror into changing her vote; and again lying to the Court in this post-conviction proceeding.

---

[12]  One district court recently granted a new trial on the basis of a juror's non-disclosure, but the facts in that case are readily distinguishable.  *See Daugerdas*, 867 F. Supp. 2d at 445.  In *Daugerdas*, the juror "confessed that she purposefully lied and omitted material information in her voir dire testimony to make herself more 'marketable' as a juror." *Id.* at 469.  The court found that the responses were "premeditated and deliberate," and would have provided a valid basis for a challenge for cause.  *Id.*

Fell claims that Juror 143's actions demonstrate the juror's bias and tainted the entire trial.

### 1.   Exposure To Extra-Record Information

The Court first addresses Fell's claim that Juror 143 engaged in a mid-trial investigation of the crime scenes.  The United States Supreme Court has long held that "it is the law's objective to guard jealously the sanctity of the jury's right to operate as freely as possible from outside unauthorized intrusions purposefully made." *Remmer v. United States*, 350 U.S. 377, 382 (1956).  Accordingly, the introduction of prejudicial extraneous influences into the jury room constitutes misconduct which may result in the reversal of a conviction. *Parker v. Gladden*, 385 U.S. 363, 364–65 (1966).  The Supreme Court has also acknowledged that unauthorized conduct during a trial can "'involve[] such a probability that prejudice will result that it is deemed inherently lacking in due process.'" *Id.* (quoting *Estes v. State of Texas*, 381 U.S. 532, 542–43 (1965)).

In December 2010, during an interview conducted by Fell's post-conviction counsel, Juror 143 revealed that in the midst of trial he drove to Rutland and viewed the house and neighborhood where Debra Fell and Charles Conway were murdered.  He also observed the Price Chopper grocery store where Teresca King was kidnapped.  After the interview, Juror 143 signed a handwritten, thirteen-paragraph sworn declaration (the "sworn declaration")

48

confirming his interview statements.  The sworn declaration detailed some of Juror 143's observations while in Rutland and his subsequent comments to fellow jurors:

> We discussed the evidence, like the rock, the shotgun, the photos of Mrs. King, and the trip to Rutland during the trial when I looked at the mother's house on Robbins Street and the Price Chopper.  The mother's neighborhood wasn't great, but it was okay.  The house was decent.  She was just trying to live her life.  I told them about the Stewart's dumpster next to Price Chopper where I think Fell threw the knife into the dumpster in the parking lot. . . .  The lighting at the Price Chopper in Rutland was weak.  At the time I worked at the Price Chopper in Barre-Berlin and the parking lot was also unsafe because it was poorly lit.

Fell Hr'g Ex. 1, ¶ 5.[13]

Juror 143 was subsequently called to testify in this post-conviction proceeding.  Prior to his August 2013 testimony, an FBI agent provided Juror 143 with a copy of the sworn declaration and spoke with the juror about his statements.  There was also press coverage concerning Juror 143's alleged misconduct.[14]  When Fell's attorneys tried to speak with Juror 143 at his home

---

[13]  The government has objected to the admission of the sworn declaration, citing Fed. R. Evid. 606.  Rule 606(b)(1) provides that "a juror may not testify about any statement made or incident that occurred during the jury's deliberations; the effect of anything on that juror's or another juror's vote; or any juror's mental processes concerning the verdict or indictment."  Fed. R. Civ. P. 606(b)(1). Under Rule 606(b)(2), however, a juror may testify about whether "extraneous prejudicial information was improperly brought to the jury's attention."  Fed. R. Evid. 606(b)(2).  Accordingly, Rule 606 allows the Court to consider whether extra-record information was brought to the Fell jury's attention, and the Court will consider Juror 143's sworn statement for that purpose.

[14]  Brent Curtis, *Fell Appeals Murder Conviction Again*, Rutland Herald, February 18, 2013.

shortly before the hearing, he refused to speak with them.

In his testimony before the Court, Juror 143 disavowed the sworn declaration and stated unequivocally that he "did not go to Rutland or any place of concern for this case during trial." Aug. 15, 2013 Hr'g Tr. at 44. When queried about his statement that Debra Fell's neighborhood "wasn't great but it was okay," Juror 143 explained that "[t]his was based on my visit back in 2010, probably September-ish. I was on my motorcycle." *Id.* at 51. References in the sworn declaration to the lighting at the Price Chopper were, he contended, based upon testimony presented at Fell's trial in 2005.

Juror 143 testified that when the two Fell attorneys came to his home to speak with him in December 2010, he was under the impression that they were representatives of the Court. While there is no evidence that the juror was misled in this regard, this fact adds to the credibility of his statements during the interview. The juror also testified that he had been drinking "a few beers" and was on a "bender," but acknowledged that he met with the attorneys voluntarily and spoke with them at length.

When the attorneys returned the following day with a draft of the sworn declaration, Juror 143 was given an opportunity to review it, initial each paragraph as read, and make necessary corrections prior to signing. In fact, changes and additions were made at the juror's request. Juror 143 testified that he

50

reviewed the declaration only briefly, and that he felt pressured as he did so.  *Id.* at 83.

Juror 143's testimony in August 2013, and particularly his denial of a mid-trial crime scene visit, was directly contradicted by multiple subsequent witnesses.  On March 18, 2014, the Court first heard testimony from Juror 143's former girlfriend, Kaulene Kelsey.  Ms. Kelsey testified that she grew up with Juror 143, dated him in the early 1980s, and starting dating him again in 2002.  In the summer of 2002, she moved from Connecticut to Vermont to live with him.  She and Juror 143 were in a relationship and living together throughout the duration of the Fell trial.

Ms. Kelsey testified that while Juror 143 was serving as a Fell juror, she accompanied him on a trip to Rutland to view the crime scenes.  The trip originated at Juror 143's home in Northfield, Vermont, and together they drove "[p]robably an hour to an hour and a half" to Rutland.  Mar. 18, 2014 Hr'g Tr. at 24. Ms. Kelsey testified that "[i]t was [Juror 143's] idea" to take the trip because "[h]e wanted to go to Rutland to see for himself, visit the crime scenes and visit the area himself."  *Id.* at 23.

According to her testimony, Ms. Kelsey and Juror 143 first viewed the home where Debra Fell and Charles Conway were murdered, as well as the surrounding neighborhood.  Ms. Kelsey

knew that these areas were relevant to the trial because Juror

143 told her which building was Debra Fell's home.  Juror 143

also told her that the neighborhood was not what he was

expecting, based upon the evidence presented at trial.

COUNSEL:  Did Juror 143 make any comments to you about the
          neighborhood surrounding the house?

KELSEY:   He did.

COUNSEL:  What did he say?

...

KELSEY:   He said he made note that the house did not look
          as he expected it to be; that he believed that
          Donald grew up in less of a neighborhood, a less
          --

COURT:    I'm sorry, I couldn't quite hear you.

KELSEY:   He believed that -- that the house we were looking
          at was more of a middle class-type house, and
          that's not how he perceived Donald Fell's
          upbringing to be.

COUNSEL:  Did he say why he -- why he was expecting
          something different?

KELSEY:   He said that -- yes, he said that he expected to
          just see less of a house than Donald portrayed
          that he was brought up in without parents and
          without supervision and with drugs and alcohol.

COUNSEL:  What, if anything, when he was making this comment
          to you, did he say about evidence that was
          introduced at Donald Fell's trial?

KELSEY:   Um, not specifically.  Just that that was the
          impression he had, that he was surprised to see
          that the house was in a halfway decent
          neighborhood.

*Id.* at 28-29.

Ms. Kelsey testified that she and Juror 143 then proceeded to the Price Chopper where Teresca King was kidnapped. When they arrived at the Price Chopper, "[i]t was getting dark, just about dark," and Juror 143 noted that it was not well lit. *Id.* at 31.

> COUNSEL: When you were at the Price Chopper, did Juror 143 make any comments to you at that point?
>
> KELSEY: Yes.
>
> COUNSEL: What did he say?
>
> KELSEY: He first noted that it didn't look very well lit in the parking lot, and he then act -- was showing me the area that he thought that -- where the crime scene was and how things took place in the parking lot.
>
> COUNSEL: Did he say anything else to you about that?
>
> KELSEY: He -- just how -- again, how things might have happened, how the -- they might have approached the car where Terry was abducted.

*Id.* at 31.

Counsel asked Ms. Kelsey whether she had any opinion at the time about "whether it was okay for [Juror 143] to be there." *Id.* at 32-33. She responded that she asked Juror 143 "specifically should he be here, that I didn't -- it didn't seem to me like this is something that he should be doing." *Id.* at 33. Juror 143 reportedly responded "that he wanted to see things for himself, and that nobody knows he is there so it didn't make any difference." *Id.*

On cross-examination by the government, Ms. Kelsey confirmed her belief that the trip was during the Fell trial, and that

being there with Juror 143 "didn't feel right." *Id.* at 40.  She
also reiterated that, when she asked Juror 143 about the
propriety of the trip, "his response was, I can do what I want to
do.  I need to see this for myself." *Id.* at 43.

The Court followed up with its own questioning about the
timing of the trip:

> COURT:    Just in your own words, tell me how you know that
>           this trip was during the trial.
>
> KELSEY:   Again, I didn't feel right about being there
>           because I knew -- I just asked -- I remember
>           asking him, like, you shouldn't -- Should we be
>           here?  Are you supposed to be here while you are a
>           juror on a case?  And he said, Nobody -- nobody's
>           here.  Nobody can see us.  I need to see this for
>           myself.

*Id.* at 44-45.  Ms. Kelsey also testified that her relationship
with Juror 143 ended acrimoniously shortly after the Fell trial,
*id.* at 40-41, as evidenced in part by a September 2005 abuse
prevention order served upon Juror 143.  Fell Hr'g Ex. 37.

The Court next heard testimony from Janice DeGoosh.  Ms.
DeGoosh met Juror 143 in March of 2005, and the relationship
became romantic in mid-to-late August of that year.  Ms. DeGoosh
testified that in the summer of 2005, Juror 143 informed her that
he was going "to go on a field trip to do some investigating of
his own." *Id.*  50.  Ms. DeGoosh reportedly had concerns about
the trip, as it seemed to her "unethical" to "go on his own to
check out the scene." *Id.* at 51-52.  As she explained in her
testimony, it was her understanding that as a juror, "you are not

54

supposed to cloud your thoughts with outside information, and to me that feels like outside information." *Id.* at 55. Although Ms. DeGoosh was initially uncertain in her testimony about the precise timing of Juror 143's trip, she eventually concluded that the trip must have taken place in the midst of the Fell trial based upon her discomfort with Juror 143 "trying to obtain information that was not given in the court." *Id.*

Fell's counsel also called as a witness Attorney Zloczower, one of the attorneys who interviewed Juror 143 at his home and subsequently drafted the juror's sworn declaration. Attorney Zloczower, formerly an associate with Cleary Gottlieb Steen & Hamilton ("Cleary Gottlieb") – the law firm representing Fell in this proceeding – is currently employed at a not-for-profit organization in New York City. Notwithstanding her past interest in the outcome of Fell's post-conviction proceeding, the Court found this witness to be highly credible.

Attorney Zloczower testified that when she and her colleague from Cleary Gottlieb first met Juror 143 at his home, she explained to the juror that they were attorneys appointed by the Court to represent Mr. Fell. Juror 143 agreed to speak with them, and the interview took between two and three hours. In the course of the interview, the attorneys asked Juror 143 what he had considered when making his determinations at trial. It was in response to this question that he revealed his trip to

55

Rutland.

> COUNSEL:   And what did he tell you, if anything, about this
>            drive to the scene in Rutland?
>
> WITNESS:   He drove there and said that he went there for the
>            specific reason of looking at the neighborhood and
>            the street that Miss Fell lived in.  He wanted to
>            know whether it was really that bad.  He also
>            wanted to take a look at the Price Chopper.

*Id.* at 62.

In response to Juror 143's testimony that he had been
drinking prior to the interview, Attorney Zloczower testified
that he was not drunk, but that he did have a scent of alcohol on
his breath.  *Id.* at 64, 107.  At the conclusion of the interview,
she asked if he would be willing to sign a statement, to which
Juror 143 replied that he was getting tired and requested that
she and her colleague return the following day.

That next day, a Sunday, Juror 143 returned from church and
left a message for Attorney Zloczower at her work phone number,
asking that the attorneys come to his home soon so that he could
then attend his grandmother's birthday party.  When the attorneys
arrived, they engaged in small talk and offered Juror 143 the
declaration for his review.  Attorney Zloczower denied that she
or her colleague applied any pressure, testifying that they sat
approximately seven feet away from the juror and focused
primarily on a televised football game while the juror reviewed
his declaration.  She also testified that it was the juror's idea
to place his initials next to each paragraph, and that she did

56

not smell any alcohol on him at that time.

With respect to paragraph five of the sworn declaration, containing the statements about the mid-trial trip to Rutland and Juror 143's subsequent discussions with his fellow jurors, Attorney Zloczower testified that the juror had no reservations about this paragraph prior to signing the declaration.[15]  She also confirmed that Juror 143 specifically told her he had discussed his trip to Rutland with his fellow jurors during jury deliberations.  *Id.* at 74.

In response to Fell's witnesses, the government called as a witness Special Agent Michelle Delpha of the FBI.  Agent Delpha has been working on the Fell case since 2000, when King's car was first located in Arkansas.  Notwithstanding her role in the government's case, the Court also found Agent Delpha's testimony to be credible.

Agent Delpha interviewed Kaulene Kelsey twice, on November 25, 2013 in person, and on March 4, 2014 via telephone.  Ms. Kelsey reportedly told Agent Delpha that her trip to Rutland with Juror 143 was not initially intended to be investigatory, but rather that she and the juror were merely "out for a ride, and

---

[15]  The juror did have reservations about some portions of the sworn declaration, and expressed his concerns to Attorney Zloczower. Specifically, and as discussed more fully below, Juror 143 was uncertain about his statement that a gun had been brought into the jury room.  The juror's hesitation about the fact of a gun indicates that he was making an effort to be truthful in his statements.

they ended up in Rutland and that they –– they went to two crime scenes: to the Price Chopper, through the parking lot, and then also to a residence."  Mar. 19, 2014 Hr'g Tr. at 212.  Ms. Kelsey also told Agent Delpha that she was familiar with the locations of the crimes "'because of the media reporting during trial.'" *Id.* at 222.[16]  These statements, both as to the purpose of the trip to Rutland and Ms. Kelsey's awareness of media coverage at the time of trial, were inconsistent with Ms. Kelsey's hearing testimony.

On cross-examination, Agent Delpha testified that she asked Ms. Kelsey repeatedly whether the trip to Rutland took place during the Fell trial.  Ms. Kelsey reportedly confirmed that the trip did occur during trial, and that once in Rutland, it was Juror 143's idea to visit the crime scenes.

> COUNSEL:  And [Ms. Kelsey] said it to you, that she was certain [the trip took place during trial] because she had the gut reaction that the juror shouldn't be doing this at the time they were looking at the sites, correct?
>
> DELPHA:  Correct.
>
> COUNSEL:  And she further told you that when they were going to the crime scene during the time of trial, that the juror said to –– that she asked the juror why they were looking at the sites, correct?
>
> DELPHA:  Correct.

---

[16]  Attorney Zloczower testified "yes" when asked whether Juror 143 had told her in 2005 that "his girlfriend with whom he lived during the trial collected news clippings and taped televised coverage of the trial[.]"  Mar. 18, 2014 Hr'g Tr. at 109.

> COUNSEL:   And when she asked the juror why they were looking
> at the sites, the juror told her -- and during
> this trip at the time of trial -- that he just
> wanted to check things out, correct?
>
> DELPHA:    Correct.

*Id.* at 229.

Based upon the testimony of these several witnesses, the Court finds that Juror 143's denial of his mid-trial investigation was not credible. *See Gray v. Hutto*, 648 F.2d 210, 211 (4th Cir. 1981) ("With the manifestly strong pressures on the juror to exculpate herself from a quite untenable position, her self-serving statements should not count for much."). Ms. Kelsey and Ms. DeGoosh each testified that Juror 143 viewed the crime scenes in Rutland during trial in 2005. While Ms. Kelsey's account was countered in some respects by Agent Delpha's testimony, her testimony about the fact of the trip, and Juror 143's intent to view the crime scenes, was uncontroverted. Ms. DeGoosh confirmed that Juror 143 planned to visit the crime scenes during trial for the purpose of investigation. Ms. Kelsey's testimony about Juror 143's observations was also uncontested, and was consistent with the juror's sworn declaration.

The Court also finds that Juror 143's statements in his sworn declaration with respect to his trip to Rutland, and his subsequent disclosures to other jurors, were truthful. The evidence suggests that, through no wrongdoing by the Cleary

59

Gottlieb attorneys, Juror 143 may have misunderstood with whom he was speaking at the time of the interview, and was thus willing to speak truthfully.  Moreover, the declaration was not only signed and sworn, but the juror independently initialed each paragraph as read.  Attorney Zloczower testified that she accurately recorded his statements, and that when Juror 143 read through and signed the declaration, there was no evidence of alcohol or other impairment.  Furthermore, the sworn declaration conforms generally with Ms. Kelsey's testimony about the juror's reactions when he toured both the Robbins Street neighborhood and the Price Chopper.  The Court therefore finds that Juror 143 was not credible when he denied his 2005 trip to Rutland, that the juror did, in fact, conduct his own investigation during trial, and that the extra-record information gained from that investigation was, in the view of this juror, not consistent with the evidence introduced at trial.[17]

The government's post-hearing memorandum does not seriously contest whether Juror 143's investigation took place, characterizing his false testimony in August 2013 as indicative of "regret and embarrassment" after an "abrupt[] realiz[ation]

---

[17]   The Court notes that while driving through Rutland Juror 143 spoke with Ms. Kelsey about the case.  Ms. Kelsey herself had reportedly collected press clippings and videotaped news reports of the Fell trial, none of which should have been disclosed to a member of the jury.  Given their conversations while touring the crime scenes, Ms. Kelsey may have been an additional source of extra-record information.

that his foolish excursion had been identified as an embarrassing transgression." ECF No. 508 at 20, 25. The government also concedes that if Juror 143 lied in his testimony, such deceit would be "troubling." *Id.* at 20. The government argues, however, that "it is highly improbable that anything [Juror 143] saw [during his investigation] prejudiced the verdict . . . ." *Id.* at 29.

It is undisputed that "the law presumes prejudice from a jury's exposure to extra-record information." *United States v. Farhane*, 634 F.3d 127, 168 (2d Cir. 2011) (citing *Remmer v. United States*, 347 U.S. 227, 229 (1954)); *see Greer*, 285 F.3d at 173; *Bibbins v. Dalsheim*, 21 F.3d 13, 16 (2d Cir. 1994); *United States v. Wiley*, 846 F.2d 150, 157 (2d Cir. 1988). "[T]hat presumption may be rebutted by a 'showing that the extra-record information was harmless.'" *Farhane*, 634 F.3d at 168 (quoting *Bibbins*, 21 F.3d at 16); *see also United States v. Schwarz*, 283 F.3d 76, 99 (2d Cir. 2002). If the presumption is not rebutted, the defendant is entitled to a new trial. *See Remmer*, 347 U.S. at 230; *United States ex rel. Owen v. McMann*, 435 F.2d 813, 821 (2d Cir. 1970).

Where a juror has been exposed to an "'extraneous influence . . . the court must apply an objective test, assessing for itself the likelihood that the influence would affect a typical juror.'" *Greer*, 285 F.3d at 173 (quoting *Bibbins*, 21 F.3d at

61

17); *see also Farhane*, 634 F.3d at 169 (stating that the inquiry "focuses on . . . the nature of the information or contact at issue, and its probable effect on a hypothetical average jury"). Although "[t]he court may not inquire into 'the degree upon which the extra-record information was used in deliberations and the impression which jurors actually had about it,'" *Greer*, 285 F.3d at 173 (quoting *United States v. Calbas*, 821 F.2d 887, 897 (2d Cir. 1987)), it "'may appropriately consider the circumstances surrounding the introduction of [the] information in making [its] determination.'" *Id.* (quoting *Calbas*, 821 F.2d at 896 n.9) (alteration in original). The trial court should "assess the 'possibility of prejudice' by reviewing the entire record, analyzing the substance of the extrinsic evidence, and comparing it to that information of which the jurors were properly aware." *United States v. Weiss*, 752 F.2d 777, 783 (2d Cir. 1985) (quoting *Sher v. Stoughton*, 666 F.2d 791, 794 (2d Cir. 1981)).

Juror 143's investigation exposed him to information about the physical environment in which Debra Fell was living and the crime scenes generally. By traveling between Robbins Street and the Price Chopper, Juror 143 also viewed the area where Fell and Lee walked prior to abducting Mrs. King. As discussed below, that precise route was highlighted by the government as indicative of Fell's deliberateness and state of mind. The evidence before the Court indicates that what Juror 143 saw in

Rutland was in several respects inconsistent with the evidence presented at trial, and in all respects favorable to the government's case.

Juror 143's observations while in Rutland pertained to the government's threshold culpability factors (each of which required proof of intent), its non-statutory aggravating factors, and the defense team's mitigating factors.  When a death penalty jury is presented with both aggravating and mitigating factors, its task is to weigh those factors and determine whether a sentence of death is warranted.  *See* 18 U.S.C. § 3593(c) (jury must decide whether "all the aggravating factor or factors found to exist sufficiently outweigh all the mitigating factor or factors found to exist to justify a sentence of death").  Even in the absence of mitigating factors, the jury must determine "whether the aggravating factor or factors alone are sufficient to justify a sentence of death."  *Id.*

The government's non-statutory aggravating factors relied upon a showing of premeditation and intent.  The first such aggravating factor asked the jury to find that Fell abducted Mrs. King in order to facilitate his escape from the area.  The government also asked the jury to conclude that Fell engaged in "substantial premeditation to commit the crime of carjacking." The Court defined premeditation for the jury as "thinking or deliberating about something and deciding whether to do it

beforehand." Trial Tr. Vol. XII at 150.

The government's evidence of intentional conduct and premeditation focused in part upon the route that Fell and Lee followed after they left Debra Fell's Robbins Street home. The government portrayed the route as part of a pre-conceived plan, describing Fell's path as "a nice route down through the plaza where the Walmart and the Price Chopper were." Trial Tr. IV-1 at 61. The government further noted that upon his arrest, Fell was able to recall the exact route he took to the dark Price Chopper parking lot. *Id.* at 63. The trial evidence plotted Fell's route on an aerial photograph of downtown Rutland, and although some testimony was presented about residential and commercial areas, the immediate physical surroundings of the route were not documented in detail.

Fell's defense team disputed whether the government could prove beyond a reasonable doubt that Fell's actions were intentional. The defense argued that the "confusion and level of drinking" that night resulted in "bad decisions" that were not "planned and scripted." Trial Tr. Vol. I-1 at 56; Trial Tr. Vol. IV-1 at 72-73. Indeed, argued the defense, Fell was substantially impaired, traveled an irrational route, and together with Lee, made a series of unplanned decisions. Those decisions included walking "where anyone could see them" and conducting a kidnapping in "a parking lot that was lit." *Id.* at

64

75.

Under *Remmer* and *Farhane*, the Court must first assume that Juror 143's observations of the area where Fell and Lee walked were prejudicial. The government may rebut this presumption by demonstrating that a typical juror would not have been influenced by this extra-record information. *See Bibbins*, 21 F.3d at 16. In other words, the government is obligated to "prov[e] the negative." *United States v. Morrison*, 984 F. Supp. 2d 125, 133 (E.D.N.Y. 2013). While proving a negative is inherently difficult, the government's task is further hindered by Juror 143's refusal to admit that he traveled to the crime scenes during trial. Because Juror 143 chose to lie under oath about his actions, the parties and the Court cannot ask him about where he went, what he saw, or any of "the circumstances surrounding the introduction of [extra-record information]." *Calbas*, 821 F.2d at 896 n.9; *see also Smith*, 455 U.S. at 217 n.7 ("determinations made in *Remmer*-type hearings will frequently turn upon testimony of the juror in question").

Ms. Kelsey's testimony about Juror 143's path from Robbins Street to the Price Chopper was inconclusive, as she testified only that it was "possible" they "drove down an alley near the house," "drove along the front side of the shopping center to reach the Price Chopper," or "drove around the back alley of a shopping center to reach the Price Chopper." Mar. 18, 2014 Hr'g

65

Tr. at 30-31.[18]  Because Juror 143 has chosen to deny his actions entirely, the government cannot prove that he did not follow Fell's path, and correspondingly, that his extra-record observations of the area were harmless.  *See United States v. Vasquez-Ruiz*, 502 F.3d 700, 705 (7th Cir. 2007) (noting that under *Remmer* "it is the prosecution" that "bears the risk of uncertainty").

Even if the government did not have the burden of rebutting the presumption of prejudice, Fell's evidence shows that Juror 143's investigation was not harmless.  Fell has introduced video evidence[19] to show that anyone following his walking route would have obtained information relevant to the government's aggravating factors.  That evidence shows that after Fell and Lee left the Robbins Street home, they walked through a residential neighborhood where other activity at such an early hour was unlikely.  Fell then proceeded through portions of commercial

---

[18]   When questioned about his actions at the August 2013 hearing, Juror 143 did reference following Fell's route on a motorcycle, but the timing of that event is not clear as the juror insisted that his motorcycle trip occurred in 2010.  Ms. Kelsey testified that her trip to Rutland with the juror was not on a motorcycle.

[19]   The Court previously admitted the video evidence with the provision that Fell's briefing would establish its relevance.  The Court now deems the evidence relevant to Fell's prejudice argument, and Exhibits 38-41 are admitted.  The Court also admits related records from the District 1 Environmental Commission, Exhibits 54-64, as relevant to the question of whether there were any permitted changes to the area, including the lighting outside the Price Chopper, between 2000 and 2014.  The evidence does not indicate any material changes.  Finally, the Court admits Fell's summary of the video evidence presented in Exhibit 65.

areas where, because of their precise route, he and Robert Lee were again less likely to be seen.  A juror viewing those areas would therefore have been exposed to information beyond that presented at trial, and supportive of the government's position.

The post-conviction record shows that, at a minimum, Juror 143 traveled between Robbins Street and the Price Chopper in Rutland.  While his precise route is unknown, it is plain that he viewed the Robbins Street neighborhood and the area of Rutland lying between Robbins Street and the Price Chopper.  Even those limited viewings of the relevant residential and commercial areas would have informed a typical juror about the nature of Fell's route beyond the evidence presented at trial and provided insight into Fell's ability to act in an intentional and premeditated fashion.

Furthermore, Juror 143 made observations of the lighting at the Price Chopper where Teresca King was kidnapped.  Those observations too were relevant to the government's non-statutory aggravating factors, particularly as to premeditation prior to the carjacking.  At trial, the government argued that Fell laid "in waiting in the darkness . . . for someone just like Terry King."  Trial Tr. Vol. I-1 at 18, 19.  During the penalty phase, the government asked the jury to believe that Fell was intentionally "waiting in the darkness, in the shadows . . . [and] carefully selected Terry King as the perfect victim."

67

Trial Tr. Vol. XII at 13.  As discussed previously, the defense countered that Fell and Lee were too impaired to engage in planned acts, and that they committed the kidnapping in a lit parking lot.

The lighting evidence presented at trial included daytime photographs of the Price Chopper's exterior, *see* Gov't Trial Ex. 12(a)(1)-12(a)(3), and delivery man Joseph Trapasso's testimony that on the morning of the kidnapping it was possible to "see pretty good out there."  Trial Tr. Vol. I-1 at 118.  According to Ms. Kelsey, Juror 143 observed the parking lot just before dark, at which time he would have been able to ascertain whether the lighting was adequate.  The juror concluded that the lighting was poor, and Fell's video evidence confirms that conclusion.

If, as the government claimed, Fell intentionally searched for a poorly-lit site and "lurked" in the shadows before committing the kidnapping, the level of lighting at the Price Chopper was relevant to premeditation.  Prejudice is again presumed, as the government cannot show a lack of harm from Juror 143's inspection of the parking lot.  Moreover, Juror 143's personal observations of the lighting were harmful to the defense's theory of the case, and a typical, hypothetical juror would have been similarly affected by such extra-record evidence.

As Ms. Kelsey's testimony made clear, Juror 143's mid-trial investigation also countered Fell's mitigation arguments.  Those

arguments focused heavily upon Fell's upbringing in what the
defense described as an environment of filth, substance abuse,
physical and sexual abuse, and abandonment.[20]  In support of
these mitigating factors, Fell's sister testified that she and
Donald grew up in a "violent . . . messy, [and] dirty" physical
environment.  Trial Tr. Vol. VII at 87.  Officer Christopher
Purcell likewise testified that the Fells' house in Pennsylvania
was "disheveled," with "garbage piled around" the outside of the
home and the inside littered with beer cans.  Trial Tr. Vol. VII
at 39–40.

Defense counsel argued at trial that the Robbins Street home
in Rutland was similarly "chaotic" with "cans and cans of beer,
empty cases of beer."  Trial Tr. Vol. IV-1 at 73.  Law
enforcement testimony about Robbins Street confirmed that the
home was strewn with beer cans and dirty clothes.  Trial Tr. Vol.
I-2 at 62, 67, 72.  Defense counsel also urged the jury to
consider Debra Fell's "daily intoxication" and her "corruptive"
influence on her son.  Trial Tr. Vol. XII at 86.  Physical
evidence of the Robbins Street neighborhood was limited to
primarily aerial photographs.

---

[20]  Specific mitigating factors on the Special Verdict Form
included: Donald Fell was sexually and physically abused as a child;
Donald Fell's parents were violent alcoholics who abandoned him as a
child; Donald Fell began regularly abusing alcohol and drugs as a
child; as a child, Donald Fell was forced to witness family violence,
including seeing his parents stab each other; and Donald Fell was
raised without positive role models.  ECF No. 200 at 13-14.

Juror 143 endeavored to view the neighborhood himself, and saw that Robbins Street was not consistent with the evidence presented at trial.  Specifically, the juror noted that Robbins Street was a middle class neighborhood, and not the sort of squalor depicted by the defense's presentation.  Juror 143 also linked what he saw at Robbins Street to Donald Fell's family history.  As reported by Ms. Kelsey, the juror explained that the home was "not how he perceived Donald Fell's upbringing to be . . . . [H]e said that he expected to just see less of a house than Donald portrayed that he was brought up in without parents and without supervision and with drugs and alcohol."  Mar. 18, 2014 Hr'g Tr. at 28-30.

Juror 143's conclusions were in line with the government's position that Debra Fell was a caring mother who sought to protect and provide "a safe . . . environment for her children." Trial Tr. Vol. IX-1 at 97.  Consequently, the juror's observation cast doubt upon specific defense mitigators such as the family history of violence, Fell's abuse as a child, his alleged abandonment, and the lack of positive role models.  Indeed, Juror 143 concluded after his investigation that Debra Fell was murdered while "just trying to live her life."

Turning to the hypothetical juror, prejudice is again assumed and the government has an opportunity to rebut the presumption.  *See Farhane*, 634 F.3d at 168.  Because Juror 143

70

has denied his actions, the government is at a significant disadvantage.  Indeed, the government is tasked with proving harmlessness when the full extent of Juror 143's exposure to extra-record information about Debra Fell's residence – and the corresponding extent of prejudice – is unknown.

If the Court does not presume prejudice, the harm to Fell's mitigation case is nonetheless readily apparent.  Fell's attorneys focused heavily upon his upbringing, the neglect by his parents, and the related physical characteristics of his childhood home.  Juror 143's observations caused him to dismiss some of those arguments as overstated, and he may have shared his conclusions with the jury.  Juror 143's conclusions are relevant to the prejudice inquiry.  *See United States v. Lawson*, 677 F.3d 629, 649 (4th Cir. 2012) ("the impact that the extrinsic information had on the juror who obtained the information is important in and of itself").

A typical juror visiting the Robbins Street neighborhood would have been similarly influenced by the contrast between, as Ms. Kelsey described, a "middle class" neighborhood of mostly single-family homes, and the evidence of drunkenness, drugs, and abandonment presented by Fell's defense team.  Juror 143 developed a revised opinion of Donald Fell's home life based upon his observations, and a typical juror would likewise have been tainted when reviewing such evidence outside the confines and

protections of trial.  *See, e.g., Owen*, 435 F.2d at 818 (jurors'
consideration of extra-record facts about defendant's troubled
background denied defendant due process).

The prejudice from Juror 143's misconduct may have carried
not just to one hypothetical juror, but perhaps to the whole
panel, as Juror 143 reportedly shared his observations during
deliberations.  "[I]f even a single juror's impartiality is
overcome by an improper extraneous influence, the accused has
been deprived of the right to an impartial jury." *See Fullwood
v. Lee*, 290 F.3d 663, 678 (4th Cir. 2002) (citing *Parker*, 385
U.S. at 366).  Here, the entire jury room may have been affected.

While the jurors in this case endorsed many of the defense
team's arguments with respect to mitigating factors, their
verdict forms do not reveal the weight assigned to those various
factors.[21]  The weighing of such factors is a fundamental part of
deciding whether a death sentence is warranted, and Juror 143's
access to extra-record information undoubtedly altered that

_____

[21]   The defense presented nineteen mitigating factors to the
jury, and the Special Verdict Form allowed jurors to write in
additional factors as appropriate.  Having heard not only the evidence
from trial, but also about Juror 143's observations, ten of twelve
jurors found that Fell was raised without positive role models, while
eight believed that as a child he witnessed family violence.  Ten
jurors also highlighted Fell's "total life experience" and the failure
of state support systems to intervene.  ECF No. 200 at 12-14.  Only
one juror believed that Fell did not plan to kill Mrs. King when she
was kidnapped, and none of the jurors found that his capacity to
appreciate his conduct was significantly impaired.  The jurors were
unanimous as to Fell's experiences of sexual and physical abuse as a
child, his abandonment by alcoholic parents, and his own abuse of
drugs and alcohol.

calculus.   Indeed, Juror 143's comments to Ms. Kelsey indicated
that he was less inclined to give weight to the defense's
mitigation evidence, and "a hypothetical average" juror would
have been similarly impacted.  *Farhane*, 634 F.3d at 169.

Mitigation was a critical part of Fell's effort to avoid the
death penalty.  As the Supreme Court has noted, "consideration of
the character and record of the individual offender and the
circumstances of the particular offense [is] a constitutionally
indispensable part of the process of inflicting the penalty of
death."  *Woodson*, 428 U.S. at 304.  Accordingly, a capital
defendant is entitled to present any relevant mitigating evidence
in support of a sentence less than death.  *Payne v. Tennessee*,
501 U.S. 808, 822 (1991).  The importance of mitigation evidence
is highlighted by the FDPA, which encourages the defendant to
list each mitigating factor separately for the jury's
consideration, and requires jurors to make an individual finding
regarding each mitigating factor proposed by the defense, based
upon the evidence presented at trial.  *See* 18 U.S.C. § 3593(c),
(d).

Furthermore, the Supreme Court has long held that "[t]he
requirement that a jury's verdict 'must be based upon the
evidence developed at the trial' goes to the fundamental
integrity of all that is embraced in the constitutional concept
of trial by jury," and that the Constitution requires "at the

very least that the 'evidence developed' against a defendant shall come from the witness stand in a public courtroom where there is full judicial protection of the defendant's right of confrontation, of cross-examination, and of counsel." *Turner v. Louisiana*, 379 U.S. 466, 472-73 (1965); *see also Pointer v. Texas*, 380 U.S. 400, 405 (1965) ("There are few subjects, perhaps, upon which this Court and other courts have been more nearly unanimous than in their expressions of belief that the right of confrontation and cross-examination is an essential and fundamental requirement for the kind of fair trial which is this country's constitutional goal."). Consequently, "it is inappropriate for a juror to view a crime scene without court permission or bring extraneous materials to the jury's deliberations." *Helmig v. Kemna*, 461 F.3d 960, 962 (8th Cir. 2006).

Here, Juror 143 violated the "fundamental integrity" of Fell's trial by undertaking his own investigation. For Fell, the integrity of his trial was a matter of life and death. As the Court noted previously, the judiciary in this country has long recognized that death cases are "different." *Gardner*, 430 U.S. at 357. The Court therefore needs to ensure that the verdict against Fell, as to both guilt and his ultimate penalty, was reliable and issued by an impartial jury. The Court must also ensure that mitigating factors were fairly and appropriately

74

considered, as those factors are "constitutionally indispensable" when "inflicting the penalty of death." *Woodson*, 428 U.S. at 304.  Given the revelations about Juror 143's exposure to extra-record information, the relevance of that exposure to the aggravating and mitigating factors presented by the parties, and the Court's conclusions as to both presumed and actual harm, the Court finds that Fell did not receive a fair and reliable trial.

### 2.   Juror Bias

The Court's analysis regarding Juror 143 does not end there, however.  The juror's misconduct also compels relief on an additional ground: the bias implicit in his intentional efforts to seek out extra-record information, his defiance of the Court's instructions, and his repeated false statements to the Court. Indeed, Juror 143's brazen disobedience, dishonesty, and unwillingness to decide the case based upon the evidence presented at trial demonstrate a partiality that would have resulted in his eviction from the panel during trial, and now invalidates Fell's conviction.

The *McDonough* ruling determined that when a juror is found to have been dishonest during voir dire, and an honest response would have provided grounds for a valid cause challenge, the seating of that dishonest juror justifies granting a new trial. Here, a juror was dishonest *during* trial and remained on the jury panel through deliberations and, ultimately, the issuance of a

death sentence.  It has also been revealed that the juror engaged in misconduct that would have provided cause for his removal. *See United States v. Thomas*, 116 F.3d 606, 613 (2d Cir. 1997) (explaining that a juror may be dismissed during trial "where the trial court f[inds] that a juror [i]s no longer capable of rendering an impartial verdict").  It is therefore appropriate to examine Juror 143's non-disclosures and omissions under the *McDonough* framework to determine whether juror bias provides an additional basis for relief.  *See Morrison*, 984 F. Supp. 2d at 133, 135-36 (applying *McDonough* analysis in discussion of juror nondisclosure during course of trial).

The Supreme Court held in *McDonough* that a party moving for a new trial based on juror non-disclosure must satisfy a two-part test: first, the party must show that "a juror failed to answer honestly a material question" and second, that "a correct response would have provided a valid basis for a challenge for cause."  464 U.S. at 556; *Greer*, 285 F.3d at 170.  Here, the Court has found that Juror 143 did in fact visit the crime scenes during trial, in direct contravention of the Court's explicit orders.  It follows that he was thereafter dishonest with the Court, as the Court asked the jurors each day of trial whether they had been exposed to any extra-record information.  The Court thus finds that Juror 143 failed to answer honestly a material question, satisfying the first prong of *McDonough*.

76

The Court must then determine whether, if the juror had provided honest answers at the time, this would have provided justification for dismissal from jury service.  In other words, the Court must determine whether the information Juror 143 failed to disclose and the reasons behind his non-disclosure demonstrate bias.  *Torres*, 128 F.3d at 43 (finding that a juror may be dismissed for cause on the basis of actual, implied, or inferred bias).  "The outcome of this inquiry depends on whether a reasonable judge, armed with the information that the dishonest juror failed to disclose and the reason behind the juror's dishonesty, would conclude under the totality of the circumstances that the juror lacked the capacity and the will to decide the case based on the evidence."  *Sampson II*, 724 F.3d at 165-66 (citing *McDonough*, 464 U.S. at 554).

Juror 143's mid-trial investigation and subsequent non-disclosures are both profound indicators of actual bias, or "bias in fact."  *Torres*, 128 F.3d at 43-44 ("[A] finding of actual bias is based upon determinations of demeanor and credibility that are peculiarly within a trial judge's province.") (internal quotation marks omitted).  That Juror 143 deliberately disobeyed the Court's instructions, in particular instructions regarding extra-record evidence, strongly indicates that he was "unwilling or unable 'to apply the law as instructed by the court to the evidence presented by the parties' and therefore, suggest[s]

77

partiality." *Daugerdas*, 867 F. Supp. 2d at 473 (quoting *Thomas*, 116 F.3d at 617); *see also Sampson II*, 724 F.3d at 169 ("Jurors who do not take their oaths seriously threaten the very integrity of the judicial process.").

Juror 143's dishonesty itself is also a "powerful indicator of bias." *Id.* at 167 (citing *Colombo*, 869 F.2d at 151; *McDonough*, 464 U.S. at 556 (Blackmun, J., concurring) ("[I]n most cases, the honesty or dishonesty of a juror's response is the best initial indicator of whether the juror in fact was impartial"); *see also Colombo*, 869 F.2d at 149 (finding that a juror's "willingness to lie . . . exhibit[s] an interest strongly suggesting partiality").  This is because "[f]ew, if any, prospective jurors would willfully violate their oath, and knowingly subject themselves to prosecution for perjury, without a strong personal interest in the outcome of the case." *Daugerdas*, 867 F. Supp. 2d at 473 (citing *Colombo*, 869 F.2d at 151); *see also Morrison*, 984 F. Supp. 2d at 134 ("Surely [the juror] recognized that his willful failure to abide by his oath exposed him to some type of significant sanction should his abhorrent conduct later be uncovered.").

In *Colombo*, the Second Circuit found bias where the juror in question failed to honestly answer a question because she believed it might "lead to her dismissal from the case" and thus her "willingness to lie about it exhibited an interest strongly

suggesting partiality." *Colombo*, 869 F.2d at 151-52.  Here,
Juror 143 brashly ignored the Court's directives, telling Ms.
Kelsey: "I can do what I want to do. I need to see this for
myself." Mar. 18, 2014 Hr'g Tr. at 43.  When asked by Ms. Kelsey
about the propriety of his independent investigation, Juror 143
did not provide any sort of legitimate justification for the
trip, instead responding, "[n]obody's here.  Nobody can see us."
*Id.* at 44-45.  These statements indicate that Juror 143 knew his
actions were not allowed, and that he risked dismissal from the
jury if he revealed his conduct to the Court.  Thereafter, Juror
143 lied to the Court specifically in order to stay on the jury,
thereby evidencing the same partiality that the Second Circuit
found so problematic in *Colombo*.

This does not mean that every time a juror breaks his or her
oath, that juror is necessarily biased.  The Court concludes that
bias is established here, however, due to the extent of Juror
143's misconduct and the context in which it occurred.  Juror
143's disobedience was not only prolonged and significant, but it
occurred under uniquely serious circumstances.  This juror
disregarded the Court's instructions, obtained extra-record
evidence, and shared his findings with his fellow jurors.  His
misconduct was clear, deliberate, and in plain violation of his
juror oath.  Furthermore, the jury in this case was tasked with
deciding whether Fell would live or die.  While "there are no

perfect trials," *McDonough*, 464 U.S. at 553, the Court again notes that in a trial where the defendant's life is at stake, particular scrutiny is required.  *See Woodson*, 428 U.S. at 305 (finding that the death penalty creates a heightened "need for reliability" in sentencing).  The Court was thus especially sensitive to eliminating bias from Fell's jury; indeed, the Court gave repeated instructions and sat four alternate jurors for this very reason.  The Court necessarily concludes that only a truly biased juror would engage in such deliberate misconduct under these circumstances.

Donald Fell had a constitutional right to a fair trial.  As the Supreme Court made clear in *McDonough*, a fair trial requires a jury that is "'capable and willing to decide the case solely on the evidence before it.'" *McDonough,* 464 U.S. at 554 (quoting *Smith*, 455 U.S. at 217).  *McDonough* determined the proper remedy when, after trial, it is discovered that juror dishonesty violated that basic right, and established the test for juror dishonesty during voir dire.  In this case, Juror 143's misconduct and dishonesty occurred during trial.  Nonetheless, the fundamental principles underlying *McDonough* apply, and Fell is entitled to an appropriate remedy.  Indeed, it is well established that due process requires a new trial where actual juror bias has been shown.  *See Smith*, 455 U.S. at 217.  While such cases are decidedly rare, Juror 143's extraordinary defiance

of the Court's instructions, his subsequent failure to disclose his misbehavior, and his continued dishonesty before the Court render this such a case.   The motion for habeas corpus relief on the basis of Juror 143's collection of extra-record information and related misconduct is therefore GRANTED.

### 3.   Juror Coercion

Fell also alleges the Juror 143 coerced another juror by pointing a weapon at her head.   The claim arises out of Juror 143's sworn declaration, in which he stated that a female juror "pointed out the fact that Fell's shotgun was not loaded."    A member of the United States Marshals Service allegedly brought the gun into the jury room, whereupon Juror 143 "made sure that the gun was unloaded . . . cocked and pointed it a[t] her and she squirmed.   I said, 'That's what they did, you were scared even though you knew it wasn't loaded.'"   Fell Hr'g Ex. 1, ¶ 8.   Fell believes that this demonstration persuaded the juror to change her vote to death.

The Sixth Amendment provides that "'[a]ny criminal defendant . . . being tried by a jury is entitled to the uncoerced verdict of that body.'"   *Anderson v. Miller*, 346 F.3d 315, 326 (2d Cir. 2003) (quoting *Lowenfield v. Phelps*, 484 U.S. 231, 241 (1988).

> [Q]uestions of jury coercion 'strike[] at the root of
> the right to a trial by jury.   No person may lawfully
> be convicted by a jury unless every juror actually
> agrees that upon the evidence and the law of the case
> that person is guilty.   If a verdict of guilty is

81

returned for any other reason, it is a perversion of
the constitutional guaranty to a jury trial.'

*Anderson*, 346 F.3d at 326 (quoting *United States v. Pleva*, 66

F.2d 529, 532 (2d Cir. 1933)).

Here, the evidence of juror coercion is weak.  At the August

15, 2013 juror inquiry, the Court asked Juror 143 about his

reference to a shotgun in the sworn declaration.  The juror

responded: "There was no gun pointed at anybody.  During the

deliberations, we didn't have any firearm in there.  When there

was a discussion over things, somebody had mentioned that it

wasn't even loaded, and I simulated, simulated pointing a gun at

somebody."  Aug. 15, 2013 Hr'g Tr. at 28.  Fell's counsel also

confronted Juror 143 about the shotgun, and Juror 143 again

denied the accuracy of the sworn declaration, stating: "I don't

know what I was thinking at the time, but I know I think it's

wrong right now . . . .  I don't think it's wrong.  I know it's

wrong."

> COUNSEL:   And then you go on to say, "I cocked and pointed
>            it at her and she squirmed."  That was a –
>
> JUROR:     False.
>
> COUNSEL:   – truthful statement, sir, wasn't it?
>
> JUROR:     No.
>
> COUNSEL:   That's what --
>
> JUROR:     I have never aimed a firearm at anybody, not in
>            this court, not out of this court.  I simulated
>            pointing a firearm.  There was no firearm left in

82

the jury room.

COUNSEL:   You picked up the gun and you pointed it at the juror.

JUROR:     No.

COUNSEL:   You saying you didn't do that?

JUROR:     That's what I'm saying.  There was no firearm in the jury room pointed at anybody.

COUNSEL:   You just happen to be mistaken.

JUROR:     That's right.

*Id.* at 54-55.

Given Juror 143's lack of credibility, the Court must consider other relevant testimony before deciding whether the coercion claim is adequately supported.  As noted above, the sworn declaration was drafted after Juror 143's interview with Attorney Zloczower and her colleague from Cleary Gottlieb.  On direct examination at the March 18, 2014 hearing, Attorney Zloczower testified that when Juror 143 reviewed the written declaration, he was not entirely sure about the presence of the shotgun in the jury room: "He said that now that he's looking at this, he wasn't sure whether or not he in fact pointed the actual shotgun at the -- at his fellow juror or whether he used his arm and his hand to symbolize the shotgun."  Mar. 18, 2014 Hr'g Tr. at 72.  Attorney Zloczower asked him to "put down what he remembers best," whereupon Juror 143 "looked at it again and said, No, I think that's okay [as written]."  *Id.*  Accordingly,

83

even at the time the declaration was signed, Juror 143 was
equivocal about the accuracy of this statement.

At the August 15, 2013 hearing, Juror 162 was asked whether
she remembered a firearm in the jury room.  She responded: "I
never saw a firearm in the jury room, no."  Aug. 15, 2013 Hr'g
Tr. at 198.  When asked more specifically whether she saw a
shotgun in the jury room, the juror answered: "I don't recall
that."  *Id.*  This juror's testimony, in conjunction with Attorney
Zlocwozer's recollection of her conversations with Juror 143 and
Juror 143's outright denial, each weigh against a finding of
coercion by means of an actual weapon.

The government contends that the claim of juror intimidation
or coercion is speculative.  The government also contends that
Juror 143's statements about what occurred in the jury room are
inadmissible under Federal Rule of Evidence 606(b).  Given the
state of the evidence, the Court need not resolve these
questions.  Where "a juror's safety was threatened by fellow
jurors," the threat "raise[s] serious constitutional concerns
with respect to a defendant's right to a fair trial."  *Anderson
v. Miller*, 346 F. Supp. 2d 352, 360 (E.D.N.Y. 2002).  The
evidence does not support finding such a threat in this case, and
the Court thus declines to grant relief on this basis.[22]

---

[22]  Fell further contends that Juror 143 falsely represented
during voir dire that he had never been accused of a crime.  This
allegation arises out of an incident in which Juror 143 was accused of

## C.    Juror 26

Finally, Fell alleges that Juror 26 failed to disclose material information during voir dire, and was exposed to prejudicial extra-record information prior to trial.

### 1.    Non-disclosures

When asked on the juror questionnaire, "Have you or has a family member or close friend ever been charged with a crime," Juror 26 answered "No."  Fell has established that Juror 26 was convicted in April 1996 of unlawful mischief, a misdemeanor, for which he received a fine of $100.  In January 1995, he was convicted in New Hampshire for driving under the influence. Juror 26 was also charged in 1992 with a misdemeanor for failing to pay one of his workers.  Fell further claims that Juror 26 failed to reveal his son's prior criminal history, failed to mention family involvement in various civil suits, and withheld the fact that his father served in local government.

At the juror inquiry in September 2013, the Court questioned Juror 26 about his own criminal history.  The juror responded:

---

removing a picnic table from a public recreation area.  The complainant stated that he followed Juror 143 and tried to overtake him in his vehicle at a high rate of speed, but departed when Juror 143 displayed a handgun.  The police determined that the picnic table in the back of Juror 143's truck was not the stolen item, and no charges were filed.  The Court finds that when responding to the juror questionnaire, this juror may not have perceived questioning by law enforcement as the equivalent of a criminal accusation.  Accordingly, Fell is not entitled to relief on the basis of this claim.

> I think it – it was a long time ago, but I think you're
> right, yes.  I didn't . . . .  I – I didn't think that
> I had – well, I didn't think they were serious enough
> to be like – I didn't think of it as any more than a
> speeding ticket or, you know . . . .

Sept. 27, 2013 Hr'g Tr. at 4-5.  Juror 26 also explained that the
unlawful mischief charge occurred after he cut a phone line that
he himself had installed.  His wife filed the complaint, and
according to Juror 26, he was issued a citation and the matter
was thereafter dismissed.  His wife subsequently filed a second
complaint, and Juror 26 paid a $100 fine.

When the Court asked Juror 26 about his failure to disclose
the DWI conviction, Juror 26 responded: "No, I really didn't
think about it at the time."  *Id.* at 12.  With respect the wage
payment matter, Juror 26 testified that he ultimately paid the
worker, and believed that once payment was made the charge would
not be reflected on his criminal record.  *Id.* at 32.  He also
stated that he did not mention the incident because he did not
think it was important.  *Id.* at 33.

Based upon Juror 26's testimony, there is insufficient
evidence that this juror intentionally withheld information, or
that his responses were evidence of bias.  *See McDonough*, 464
U.S. at 556.  With respect to his criminal violations, the juror
likened them to "a speeding ticket," and in some instances
believed that the offenses had been removed from his record.
Nothing in these responses demonstrates dishonesty.  *See, e.g.,*

*Green v. Vacco*, 961 F. Supp. 46, 50 (W.D.N.Y. 1997) (finding no misconduct where juror failed to disclose past criminal conviction based upon information provided by her attorney).  The same is true of the juror's other non-disclosures involving civil suits and his son's criminal history.  *See, e.g., Stewart*, 433 F.3d at 305-06 (district court did not err in declining to hold hearing where juror failed to disclose recent $11,000 adverse judgment and information about son's criminal record). Accordingly, no relief is warranted on the basis of Juror 26's non-disclosures during voir dire.

### 2.   Extra-Record Information

Fell also claims that his trial was tainted by Juror 26's exposure to extra-record information.  In a post-trial interview with Fell's habeas counsel, Juror 26 revealed that at the time of trial, he was aware of Robert Lee's death, and was under the impression from a news report that Lee had committed suicide. Fell claims that this exposure was prejudicial, noting that Lee's name was used multiple times throughout trial and the Court granted a defense motion to exclude any evidence relating to Lee's death.  *See* Op. & Order 8, May 25, 2005, ECF No. 131.

On the last day of the penalty phase, the government read the following stipulation into the record:

> It is stipulated and agreed by and between the
> undersigned parties that on February 1st, Robert Lee
> and Donald Fell were charged by grand jury indictment

> with the same crimes.  On September 20, 2001, Lee died
> in his cell at the Northwest Correctional Facility in
> St. Albans, Vermont.  His death was determined to be
> accidental.  At the time of his death, Lee faced the
> same charges as Fell.

Trial Tr. Vol. XI at 93.  Aside from "accidental," there was no

mention in the stipulation, or elsewhere at trial, of the cause

of Lee's death.

Unlike Juror 143, Juror 26 has admitted to his knowledge of

extra-record information during trial.  In his testimony before

the Court during the post-trial hearings, Juror 26 stated that

when Lee's name was mentioned at trial, he remembered that he

"had heard it on the news that [Lee] had committed suicide."

Sept. 27, 2013 Hr'g Tr. at 28.  He also testified that he heard

this news report "quite a while before [trial]."  *Id.* at 14.

When asked by the Court whether he thought that memory was

relevant, Juror 26 stated: "I never thought that it was that

relevant other than – because he wasn't on trial, and he was

actually passed away."  *Id.* at 16.  After a brief recess, the

Court again asked Juror 26 whether he thought his knowledge of

Lee's death was important, to which the juror responded, "No, I

didn't at the time think it was important to anything."  *Id.* at

28.

Fell has thus established that Juror 26 was exposed to

extra-record information.  The law presumes prejudice from

exposure to such information unless the government can show that

"'the extra-record information was harmless.'"  *Farhane*, 624 F.3d at 168 (quoting *Bibbins*, 21 F.3d at 16).  As set forth above, in making this determination the Court must apply an objective test to determine whether the extraneous information would affect a hypothetical juror.  *See Greer*, 285 F.3d at 173.

Here, the Court finds that the government has met its burden to show harmlessness.  The evidence indicates that Juror 26 was exposed to a news report regarding Lee's suicide long before trial.  He was then informed at trial that the parties had stipulated Lee's death was "determined to be accidental."  A typical juror would not have disregarded the stipulation in favor of a half-forgotten news report, particularly given the Court's repeated instructions to the jury that they were to render a decision solely on the evidence heard at trial.  Moreover, unlike Juror 143's extra-record exposure, which was plainly harmful to the defense's case and helpful to the government's, the extraneous information here was inconsistent with a stipulation.  Indeed, as the Court recognized at voir dire, both parties arguably had an interest in keeping the fact of the suicide from the jury.  *See* Juror Voir Dire 1 at 77 (observing that knowledge of suicide affects the "fairness to this defendant, as well as the government").

Fell argues that prejudice can nonetheless be established by the fact that another prospective juror was excused before trial

in part because he knew about the details of Lee's death.   In
excusing the juror, the Court stated:

> Second, he has got some information about this case
> which no one else has, and that is that Mr. Lee
> committed suicide.  And if he is allowed to sit on a
> jury, that means the entire jury gets to know that Mr.
> Lee committed suicide.  And that is of grave concern to
> me, in terms of fairness to this defendant, as well as
> the government, for that matter . . . .

*Id*.  Based on the Court's statements, Fell submits that Juror
26's knowledge of Lee's fate was prejudicial.  However, the fact
that a juror was excused on this basis does not establish that
Juror 26's extra-record exposure would prejudice the hypothetical
juror.  This is because, unlike the dismissed juror, the actual
jury was ultimately informed at trial that the parties had
stipulated to Lee's cause of death.  The stipulation minimizes
any risk of prejudice.

The Second Circuit has warned that "[a] district court must
be careful that it does not itself 'create prejudice by
exaggerating the importance and impact' of extra-record
information." *Farhane*, 634 F.3d at 169 (quoting *United States v.
Abrams*, 137 F.3d 704, 708 (2d Cir. 1998)).  Here, in contrast
with the circumstances regarding Juror 143, the low risk of
prejudice to the hypothetical juror does not justify a new trial.
The Court therefore finds no grounds for granting relief on the
basis of Juror 26's extra-record knowledge.

**IV.  Conclusion**

The United States Constitution provides that every defendant is entitled to a fair trial before an impartial jury. A fair trial requires a jury that is "'capable and willing to decide the case solely on the evidence before it.'" *McDonough,* 464 U.S. at 554 (quoting *Smith*, 455 U.S. at 217). This requirement "goes to the fundamental integrity of all that is embraced in the constitutional concept of trial by jury," ensuring that "at the very least the 'evidence developed' against a defendant shall come from the witness stand in a public courtroom where there is full judicial protection of the defendant's right[s]." *Turner*, 379 U.S. at 472-73. The right to a fair trial also guarantees a jury free of bias. *See Morgan*, 504 U.S. at 729 ("If even one [partial] juror is empaneled" and the death sentence is imposed, "the [government] is disentitled to execute the sentence.").

Juror 143 violated the fundamental integrity of Fell's trial by deliberately undertaking an independent investigation. This is definitively established by Juror 143's own sworn declaration, the testimony of his domestic partner who traveled with him to the crime scenes, and a later partner with whom he shared his plans. The juror traveled over two hours to view the crime scenes in knowing violation of the Court's orders. While there, he viewed extra-record information that was highly relevant to the aggravating and mitigating factors presented at trial. After breaching his oath as a juror, he returned to the courtroom where

he purposefully neglected to inform the Court of his transgressions.  And years later, during a post-trial proceeding convened specifically to assess the fairness of Fell's trial, Juror 143 openly lied to the Court about whether he had committed these acts.

Whether Juror 143's falsehoods were driven by his "regret and embarrassment," as proffered by the government, or were a result of intentional and flagrant disregard of the judicial process, there is no question that Juror 143 was exposed to prejudicial information that was never introduced at trial nor subjected to the judicial safeguards of cross-examination, confrontation, and counsel.  This information implicated the aggravating and mitigating factors that were central to the jury's death penalty determination, and thus would have impacted a hypothetical juror's sentencing deliberations.  Juror 143's extraordinary and continuous defiance of the Court's directives also evidences a partiality that tainted the integrity of Fell's trial and violated his constitutional right to an unbiased jury.

Because of Juror 143's deliberate misconduct, Fell had a jury that was not capable, nor willing, to decide his case solely on the evidence before it.  He was therefore denied a fair trial, and his conviction and sentence must be vacated.  While the Court is reluctant to turn back the clock on a matter that has required such significant resources in terms of time, effort, and, for

some, emotion, it sees no alternative given Juror 143's actions. In particular, the Court is mindful of the impact upon Mrs. King's family, which has suffered for so long as a result of this tragedy.

Fell's amended Section 2255 motion on the basis of juror misconduct is GRANTED, and Fell is entitled to a new trial.  The Court notes, however, that there are remaining claims in Fell's amended motion.  The parties shall confer and inform the Court through briefing of their respective positions as to how this matter should proceed.  Such briefing shall be filed on or before September 30, 2014.

DATED at Burlington, in the District of Vermont, this 24th day of July, 2014.

/s/ William K. Sessions III
William K. Sessions III
United States District Judge