UNITED STATES DISTRICT COURT
FOR THE
DISTRICT OF VERMONT

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | ) | |
| | ) | |
| Plaintiff, | ) | No. 5:01-CR-00012 |
| | ) | |
| v. | ) | |
| | ) | |
| DONALD FELL | ) | Dept: Hon. Geoffrey W. Crawford |
| | ) | District Court Judge |
| Defendant. | ) | |

**MEMORANDUM IN SUPPORT OF DEFENDANT DONALD
FELL'S MOTION TO PRECLUDE THE DEATH PENALTY AS
A PUNISHMENT BECAUSE THE DEATH PENALTY, IN AND OF
ITSELF, CONSTITUTES AN UNCONSTITUTIONAL PUNISHMENT**

## <u>TABLE OF CONTENTS</u>

I.      INTRODUCTION . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

II.     PROCEDURAL HISTORY . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 6

III.    ARGUMENT . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 7

        A.      General Fifth and Eighth Amendment Principles . . . . . . . . . . . . . . . . . . . . . . . 7

                1.      Inherently Barbaric Punishments . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 8

                2.      Excessive and Disproportionate Punishments . . . . . . . . . . . . . . . . . . . . . 9

                3.      Arbitrary or Discriminatory Punishments . . . . . . . . . . . . . . . . . . . . . . . 11

        B.      Almost 40 Years of Studies, Surveys, and Experience Strongly Indicate That
                The Procedural Protections Built Into The Federal Death Penalty Have Failed
                To Achieve Their Goal Of Reliable, Rational, Consistent, Fair, Non-Arbitrary,
                and Non-Discriminatory Application of The Death Penalty. . . . . . . . . . . . . . . 18

                1.      "Cruel"—Lack of Reliability . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 18

                2.      "Cruel"—Arbitrariness . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 35

                        a.      The Problem in General . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 35

                        b.      More Than 25 Years Of Experience With The Federal Death
                                Penalty Has Demonstrated That It Operates In An Arbitrary,
                                Capricious, Irrational And Discriminatory Manner. . . . . . . . . . 37

                        1. Introduction: the failure of the federal death penalty experiment . . . . 37

                        2. The federal death penalty is imposed and carried out in an arbitrary
                        and capricious manner that is akin to being struck by lightning:
                        Revisiting the constitutional premise of *Furman v. Georgia* in the
                        context of the federal death penalty. . . . . . . . . . . . . . . . . . . . . . . . . . . . 39

                        3. The federal death penalty as actually sought and imposed and what the
                        figures mean. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 47

4. The absence of a principled basis for distinguishing between cases where the federal death penalty is imposed from cases where it is not imposed renders the federal death penalty unconstitutional. . . . . . . . . . 50

5. The Federal Death Penalty is unevenly applied on a regional basis and suffers from intractable problems of racial discrimination in the targeting of minority and male defendants and a demonstrated race/gender-of-victim effect. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 60

    a.      Introduction. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 60

    b.      The 2000 DOJ Study . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 62

    c.      The persistent capricious circumstance of region. . . . . . . . . . . . 68

    d.      The continuing and unabated practice of targeting males and minorities for the federal death penalty, the long-documented "white-victim effect," and the emergence of a "white female victim effect" further demonstrate the arbitrary and irrational operation of the federal death penalty. . . . . . . . . . . . . . . . . . . . . . 75

        (1)    *The law on race and the death penalty.* . . . . . . . . . . . . . 77

        (2)    *The effect of gender of defendant, and of race and gender of victim in the application of the FDPA.* . . . . . . . . . . . . 84

3. "Cruel"-Other Sources of Unreliability and Arbitrariness . . . . . . . . . . . . . . . 94

    a.      Arbitrariness Produced by Prosecutorial Discretion . . . . . . . . . 94

    b.      Arbitrariness and Unreliability Induced by Doomed Efforts to Predict Future Danger . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 101

4.    "Cruel"- Excessive Delays . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 105

5.    "Unusual"- Decline in Use of the Death Penalty Under Evolving Standards of Decency . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 112

6.    The Doctrine of *Stare Decisis* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 126

IV.    CONCLUSION . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 130

# TABLE OF AUTHORITIES

## Cases

*Andrews v. Davis*
    798 F.3d 759 (9th Cir. 2015) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 74

*Arave v. Creech*
    507 U.S. 463 (1993) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 102

*Arizona v. Rumsey*
    467 U.S. 203 (1984) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 126

*Arlington Heights v. Metropolitan Housing Dev. Corp.*
    429 U.S. 252 (1977) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 81

*Atkins v. Virginia*
    536 U.S. 304 (2002) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 9, 10, 20, 49

*Barnette v. West Virginia Board of Education*
    47 F. Supp. 251 (S.D. West Virginia) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 127

*Batson v. Kentucky*
    476 U.S. 79 (1986). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 81

*Baze v. Rees*
    553 U.S. 35, 128 S.Ct. 1520, 170 L.Ed.2d 420 (2008) . . . . . . . . . . . . . . . . 9, 16, 110, 128

*Bolling v. Sharpe*
    347 U.S. 497 (1954) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 81

*Bordenkircher v. Hayes*
    434 U.S. 357, 98 S.Ct. 663, 54 L.Ed.2d 604 (1978) . . . . . . . . . . . . . . . . . . . . . . . . . . . 95

*Bowers v. Hardwick*
    478 U.S 186 (1986) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 122

*Bullington v. Missouri*
    451 U.S. 430 (1981) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 82

*Bush v. Gore*
    531 U.S. 98, 121 S.Ct. 525, 148 L.Ed.2d 388 (2000) . . . . . . . . . . . . . . . . . . . . . . . . . . 74

*Chandler v. United States*
 193 F.3d 1297 (11th Cir. 1999) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 27

*Chandler v. United States*
 218 F.3d 1305 (11th Cir. 2000) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 27

*Chapman v. United States*
 500 U.S. 453 (1991) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 7

*Coker v. Georgia*
 433 U.S. 584 (1977) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 9

*Coleman v. Balkcom*
 451 U.S. 949 (1981) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 109, 111

*Davis v. Ayala*
 135 S. Ct. 2187 (2015) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 107

*DeGarmo v. Texas*
 474 U.S. 973 (1985) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 95, 97

*Eddings v. Oklahoma*
 455 U.S. 104 (1982) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 11, 36, 50

*Enmund v. Florida*
 458 U.S. 782 (1982) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 9, 10

*Ford v. Wainwright*
 477 U.S. 399 (1986) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 29

*Furman v. Georgia*
 408 U.S. 238 (1972) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . *passim*

*Gardner v. Florida*
 430 U.S. 349 (1977) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 5

*Gebhart v. Belton*
 87 A.2d 862 (Del. Ch. 1952) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 127

*Glossip v. Gross*
 135 S.Ct. 2726 (2015) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . *passim*

*Godfrey v. Georgia*
 446 U.S. 420 (1980) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 12, 16, 36

*Gomez v. Fierro*
　　519 U.S. 918 (1996) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 109

*Graham v. Collins*
　　506 U.S. 461 (1993) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 83

*Graham v. Collins*
　　506 U.S. 461 (1993) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 12

*Graham v. Florida*
　　560 U.S. 48 (2010) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 8-10

*Gregg v. Georgia*
　　428 U.S. 153 (1976) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . *passim*

*Hall v. Florida*
　　134 S.Ct. 1986 (2014) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . *passim*

*Hartman v. Moore*
　　547 U.S. 250 (2006) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 13

*Herrera v. Collins*
　　506 U.S. 390 (1993) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 28

*Hunter v. Erickson*
　　393 U.S. 385 (1969) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 81

*In re Kemmler*
　　136 U.S. 436 (1890) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 8

*In re Medley*
　　134 U.S. 160 (1890) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 108

*In re Morris*
　　363 F.3d 891 (9th Cir. 2004) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 98

*Johnson v. Bredesen*
　　558 U.S. 1067 (2009) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 107

*Jones v. Chappell*
　　31 F.Supp.3d 1050 (C.D.Cal.2014) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 109

*Jurek v. Texas*
　　428 U.S. 262 (1976) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 101

*Kansas v. Marsh*
548 U.S. 163 (2006) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . *passim*

*Kennedy v. Louisiana*
554 U.S. 407 (2008) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . *passim*

*Kervin v. Barnes*
787 F.3d 833 (7th Cir. 2015) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 108

*Lackey v. Texas*
514 U.S. 1045 (1995) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 111

*Lawrence v. Texas*
539 U.S. 558 (2003) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 122, 129

*Lockett v. Ohio*
438 U.S. 586 (1978) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 82

*Lowenfield v. Phelps*
484 U.S. 231 (1988) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 12

*Mario Dion Woodward v. Alabama*
134 S. Ct. 405 (2013) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 129

*McCleskey v. Kemp*
481 U.S. 279 (1987) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 13, 17, 75, 77, 78

*Miller v. Alabama*
132 S. Ct. 2455 (2012) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 58, 121

*Morgan v. Illinois*
504 U.S. 719 (1922) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 28

*Morris v. Ylst*
447 F.3d 735(9th Cir. 2006) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 97

*Obergefell v. Hodges*
135 S. Ct. 2584 (2015) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 122, 126

*Payne v. Tennessee*
501 U.S. 808 (1991) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 126, 127

*Penry v. Lynaugh*
492 U.S. 302 (1989) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 121, 129

*People v. Anderson*
    6 Cal.3d 628, 493 P.2d 880, 100 Cal.Rptr. 152 (1972) . . . . . . . . . . . . . . . . . . . . . . . . . . 109

*People v. Seumanu*
    61 Cal. 4th 1293, 355 P.3d 384, 438 (2015) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 5, 42

*Pulley v. Harris*
    465 U.S. 37 (1984) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 58, 95, 96

*Ring v. Arizona*
    536 U.S. 584 (2002) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 17

*Roberts v. Louisiana*
    428 U.S. 325 (1976) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 82

*Roper v. Simmons*
    543 U.S. 551 (2005) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . *passim*

*Rose v. Mitchell*
    443 U.S. 545 (1979) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 82

*Simmons v. South Carolina*
    512 US 154 (1994) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 101

*Solem v. Helm*
    463 U.S. 277, 103 S.Ct. 3001, 77 L.Ed.2d 637 (1983) . . . . . . . . . . . . . . . . . . . . . . . . . 96

*Stanford v. Kentucky*
    492 U.S. 361 (1989) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 120, 129

*State v. Santiago*
    318 Conn. 1, 122 A.3d 1 (Conn. 2015) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . *passim*

*Sykes v. United States*
    131 S.Ct. 2267 (2011) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 4

*Thompson v. McNeil*
    556 U.S. 1114 (2009) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 108

*Thompson v. Oklahoma*
    487 U.S. 815 (1988) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 10, 49, 109, 123

*Trop v. Dulles*
    356 U.S. 86 (1958) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3, 5, 58, 109, 112

*Tuilaepa v. California*
      512 U.S. 967 (1994) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 12, 14, 16

*Turner v. Murray*
      476 U.S. 28 (1986) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 15, 82

*United States v. Barnette*
      211 F.3d 803 (4th Cir. 2000) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 34

*United States v. Bass*
      266 F.3d 532 (6th Cir. 2001) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 65

*United States v. Bernard*
      299 F.3d 467 (5th Cir. 2002) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 33

*United States v. bin Laden*
      126 F. Supp.2d 256 (S.D.N.Y. 2000) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 65, 74

*United States v. Buckendahl*
      251 F.3d 753 (8th Cir. 2001) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 74

*United States v. Butz*
      517 F. Supp. 1167 (S.D.N.Y. 1981 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 14

*United States v. Caro*
      597 F.3d 608 (4th Cir. 2010) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 45

*United States v. Causey*
      185 F.3d 407 (5th Cir. 1999) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 34

*United States v. Chanthadara*
      230 F.3d 1237 (10th Cir. 2000) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 34, 64

*United States v. City of Philadelphia*
      644 F.2d 187 (3rd Cir. 1980) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 127

*United States v. Cooya*
      No. 4:08-CR-70, 2011 WL 3608611 (M.D. Pa. Aug. 16, 2011) . . . . . . . . . . . . . . . . . . 99

*United States v. Ebron*
      683 F.3d 105 (5th Cir. 2012) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 33

*United States v. Fell*
      217 F.Supp.2d 469 (2002) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 5, 6

*United States v. Fell*
 360 F.3d 135 (2d Cir. 2004) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 6, 33

*United States v. Fell*
 372 F. Supp. 2d 753 (D. Vt. 2005) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 6

*United States v. Fell*
 531 F.3d 197 (2d Cir. 2008) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 6, 33

*United States v. Fell*
 571 F.3d 264 (2d Cir. 2009) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 43, 67

*United States v. Hager*
 731 F.3d 167 (4th Cir. 2013) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 33

*United States v. Hammer*
 404 F. Supp. 2d 676 (M.D. Pa. 2005) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 32

*United States v. Hammer*
 564 F.3d 628 (3d Cir. 2009) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 32

*United States v. Hardy*
 762 F. Supp. 2d 849 (E.D. La. 2010) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 31

*United States v. Higgs*
 353 F.3d 281 (4th Cir.2003) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 58

*United States v. Jacques*
 2011 WL 1675417 (D.Vt. May 4, 2011) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 13

*United States v. Jacques*
 684 F.3d 324 (2nd Cir. 2012) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 33

*United States v. Johnson*
 900 F.Supp.2d 949 (N.D.Iowa,2012) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 74

*United States v. Jones*
 132 F.3d 232 (5th Cir. 1998) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 41, 42, 58

*United States v. Lighty*
 616 F.3d 321 (4th Cir. 2010) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 33

*United States v. Littrell*
 478 F. Supp. 2d 1179 (C.D. Cal. 2007) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 99

*United States v. McCullah*
  76 F.3d 1087 (10th Cir. 1996) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 34

*United States v. Mitchell*
  502 F.3d 931 (9th Cir. 2007) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 58

*United States v. Montgomery*
  635 F.3d 1074 (8th Cir. 2011) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 33

*United States v. Pepin*
  514 F.3d 193 (2nd Cir. 2008) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 33

*United States v. Purkey*
  428 F.3d 738 (8th Cir. 2005) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 33

*United States v. Quinones*
  313 F.3d 49 (2d Cir. 2002) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 7, 33

*United States v. Redondo-Lemos*
  955 F.2d 1296 (9th Cir.1992) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 97, 98

*United States v. Runyon*
  707 F.3d 475 (4th Cir. 2013) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 33

*United States v. Sampson*
  2015 WL 6511247 (D. Mass. Oct. 28, 2015) . . . . . . . . . . . . . . . . . . . . . . . . . . . . *passim*

*United States v. Sampson*
  275 F. Supp. 2d 49 (D. Mass. 2003) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . *passim*

*United States v. Sampson*
  335 F. Supp. 2d 166 (D. Mass. 2004) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 104

*United States v. Stitt*
  250 F.3d 878 (4th Cir. 2001) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 34

*United States v. Taveras*
  424 F.Supp.2d 446 (E.D.N.Y. 2006) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 101, 104

*United States v. Troya*
  733 F.3d 1125 (11th Cir. 2013) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 33

*United States v. Webster*
  162 F.3d 308 (5th Cir. 1998) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 34

*United States v. White*
   405 F.2d 838 (7th Cir. 1969)  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 127

*United States v. Whitten*
   610 F.3d 168 (2nd Cir. 2010)  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 33

*Walker v. Georgia*
   129 S.Ct. 453 (2008)  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 58

*Walton v. Arizona*
   497 U.S. 639 (1990) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 17, 45

*Wayte v. United States*
   470 U.S. 598 (1985) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 13, 95

*Weems v. United States*
   217 U.S. 349, 30 S.Ct. 544, 54 L.Ed. 793 (1910)  . . . . . . . . . . . . . . . . . . . . . . . . . . 4, 112

*Weinberger v. Wisenfeld*
   420 U.S. 636 (1975)  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 81

*Woodson v. North Carolina*
   428 U.S. 280 (1976)  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . *passim*

*Yick Wo v. Hopkins*
   118 U.S. 356 (1886) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 78

*Zant v. Stephens*
   462 U.S. 862 (1983) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 39, 83

## United States Constitution

Amendment X  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . *passim*

Amendment XIII  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . *passim*

## I.      INTRODUCTION

On the last day of the last Term, Justices Breyer and Ginsburg issued a clarion call for reconsideration of the constitutionality of the death penalty, aligning themselves with the views of several other justices who have expressed similar sentiments in the four decades since the Court reversed its earlier decision that capital punishment violates the Eighth Amendment. See *Glossip v. Gross*, __ U.S. __; 135 S.Ct. 2726, 2755-2780 (2015)(Breyer and Ginsburg, JJ., dissenting). In support of their conclusion that "the death penalty, in and of itself, now likely constitutes a legally prohibited 'cruel and unusual punishmen[t]' ", these Justices wrote:

> In 1976, the Court thought that the constitutional infirmities in the death penalty could be healed; the Court in effect delegated significant responsibility to the States to develop procedures that would protect against those constitutional problems. Almost 40 years of studies, surveys, and experience strongly indicate, however, that this effort has failed. Today's administration of the death penalty involves three fundamental constitutional defects: (1) serious unreliability, (2) arbitrariness in application, and (3) unconscionably long delays that undermine the death penalty's penological purpose. Perhaps as a result, (4) most places within the United States have abandoned its use.
>
> I shall describe each of these considerations, emphasizing changes that have occurred during the past four decades. For it is those changes, taken together with my own 20 years of experience on this Court, that lead me to believe that the death penalty, in and of itself, now likely constitutes a legally prohibited "cruel and unusual punishmen[t]." U.S. Const., Amdt. 8.

*Id.* at 2755-56.

Less than two months later, the Connecticut Supreme Court, relying extensively on the analysis of Justices Breyer and Ginsburg, held that "the death penalty… is so out of step with our contemporary standards of decency as to violate the state constitutional ban on excessive and disproportionate punishment." *State v. Santiago*, 318 Conn. 1, 45-46, 122 A.3d 1 (Conn. 2015),

reconsideration denied, 319 Conn. 912 (2015).[1] The *Glossip* dissent was cited in *Santiago* for a number of factual and legal propositions critical to the *Santiago* court's holding, including: (1) "[n]otably, by 2012, less than 2 percent of the nation's counties accounted for all of the death sentences imposed nationwide" (318 Conn. at 80); (2) "between 1973 and 1995, state and federal courts found errors in more than two thirds of the capital cases that they reviewed" (*Id.* at 93 n. 96); (3) "[s]tatistical analyses have demonstrated to a near certainty that innocent Americans have been and will continue to be executed in the post-*Furman* era" (*Id.* at 104); and (4) "court[s], not legislature[s] ultimately must determine whether capital punishment comports with evolving standards of decency because [these]  are quintessentially judicial matters ... [that] concern the infliction—indeed the unfair, cruel, and unusual infliction—of a serious punishment [on] an individual. " (*Id.* at 138-39).

The first federal death penalty case to begin to come to grips with the current realities of the death penalty as outlined in the *Glossip* dissent was *United States v. Sampson*, __F.Supp. 2d __, 2015 WL 6511247, at *21 (D. Mass. Oct. 28, 2015). There, although Judge Wolf denied the defendant's multiple challenges to the FDPA on the pre-*Glossip* record presented in that case, he nevertheless concluded, citing the *Glossip* dissent and his own prior ruling on the issue, that "[t]he court remains concerned, however, about the potential rate of error in federal capital cases generally and the risk of the execution of the innocent particularly". Judge Wolf elaborated:

> Although the court did not find in 2003 that the objective indicia of contemporary standards justified invalidating the FDPA, it did agree with other courts that "the FDPA, like state death penalty statutes, will inevitably result in the execution of innocent people." [*United States v. Sampson*, 275 F. Supp. 2d 49, 81

---

[1] Although decided on state constitutional grounds, *Santiago* expressly ruled that "when construing the state constitutional freedom from cruel and unusual punishment, we broadly adopt the framework that the federal courts have used to evaluate eighth amendment challenges." *Santiago*, at 45-46.

(D.Mass. 2003)]. Several Justices of the Supreme Court have since expressed similar concerns. See, e.g., *Glossip*, 135 S.Ct. at 2756-59 (Breyer, J., dissenting) (noting that the number of exonerations in capital cases has increased from 60 in 2002 to 115 in 2015); [*Kansas v. Marsh*, 548 U.S. 163, 207-08 (Souter, J., dissenting)] (" Today, a new body of facts must be accounted for in deciding what, in practical terms, the Eighth Amendment guarantees should tolerate, for the period starting in 1989 has seen repeated exonerations of convicts under death sentences, in numbers never imagined before the development of DNA tests.").In June 2015, Justice Breyer, joined by Justice Ginsburg, dissented from a decision finding Oklahoma's method of execution constitutional. Referencing much of the evidence that Sampson presented to this court concerning the Rate of Error Motion, Justice Breyer called for "full briefing" on the question of "whether the death penalty violates the Constitution," in part because some current information concerning alleged arbitrariness was not available when the issue was decided previously. See *Glossip,* 135 S.Ct. at 2755; see also *Id.* at 2759-64. This court, respectfully, suggests that factfinding in a district court, in an appropriate case, should precede any such "briefing".

*Id.* at *20.

Judge Wolf  therefore ruled: "Sampson has not identified disputed material facts with the specificity required to justify an evidentiary hearing on the motion alleging general arbitrariness….Nor, on the current record, has the court found that his evidence, if accepted as true, justifies finding capital punishment generally, or the FDPA particularly, unconstitutional. However, Sampson's motion for an evidentiary hearing on this issue, and therefore this motion, are being denied without prejudice to possible reconsideration if a future, focused presentation persuades the court that a hearing is justified." *Id.*

In a section of his lengthy opinion entitled "The Role of the District Court in Eighth Amendment Litigation", Judge Wolf concluded:

…[T]he Court has repeatedly held that courts must look to " 'evolving standards of decency that mark the progress of a maturing society' " in deciding whether the Eighth Amendment permits a particular punishment for a particular crime. *Hall v. Florida*, 134 S.Ct. 1986, 1992 (2014) (quoting *Trop v. Dulles*, 356 U.S. 86, 101 (1958)); *Roper v. Simmons*, 543 U.S. 551, 560-61 (2005). The question of whether standards of decency have materially changed since the Supreme Court decided an issue is a factual question. See, e.g., *Kansas v. Marsh*, 548 U.S. 163, 207-

11 (2006) (Souter, J., dissenting). Factfinding is, in the first instance at least, typically done based on evidence presented in the district courts, where the adversary process operates to test that evidence and material disputes are decided by a trial judge or jury. See *Sykes v. United States*, 131 S.Ct. 2267, 2286 (2011) (Scalia, J., dissenting); see also Allison Orr Larsen, *The Trouble with Amicus Facts*, 100 Va. L. Rev. 1757 (2014); Adam Liptak, *Seeking Facts, Justices Settle for What Briefs Tell Them*, N.Y. Times, Sept. 2, 2014, at A10.

Therefore, if there has been a material change in facts relevant to the evolving standards analysis--a question initially for the trial courts—an issue is not foreclosed by Supreme Court precedent because the Supreme Court has not decided the matter in dispute. Rather, the district court is deciding a distinguishable case and controversy. As this court wrote in 2003, when the Supreme Court held that the death penalty was not per se unconstitutional in *Gregg v. Georgia*, 428 U.S. 153 (1976), " the Court also implicitly acknowledged that future developments might challenge the basis of its decision." *Sampson* I, 275 F. Supp. 2d at 72 (citing *Gregg*, 428 U.S. at 187 (plurality op. of Stewart, Powell, and Stevens, JJ.)).Accordingly, in evaluating Sampson's 2014 challenges to the death penalty, the court has examined the alleged facts on which Sampson relies and decided whether they are significantly different than the facts in the cases in which the Supreme Court or the First Circuit decided the analogous issue. If there is no significant difference in the facts, this court must follow the higher court's holdings. If there might be a significant difference in the proven facts, this court has both the authority and the obligation to decide whether new facts have been proven and, if so, whether they are material in the sense that they require a different conclusion.

*Id.*, at *4.

Later in the opinion, the court reiterated: "The Supreme Court recently stated that "it is settled that capital punishment is constitutional." *Glossip*, 135 S.Ct. at 2732. However, as explained earlier, if there is proof that the facts on which the Supreme Court decided an issue have materially changed, then the issue is not the same and prior decisions would not dictate the outcome." *Id.* at *8.

In other words, the constitutional guarantee against excessive punishment is "not fastened to the obsolete but may acquire meaning as public opinion becomes enlightened by a humane justice." *Weems v. United States,* 217 U.S. 349, 378, 30 S.Ct. 544, 54 L.Ed. 793 (1910); see also *Hall v. Florida*, supra, 134 S.Ct. at 1992 ("[t]he Eighth Amendment's protection of dignity reflects

4

the [n]ation we have been, the [n]ation we are, and the [n]ation we aspire to be"); *United States v. Sampson*, 275 F. Supp. 2d 49, 86 (D. Mass. 2003)("It will… be incumbent on courts in future cases to monitor the reactions of legislatures and juries to the mounting evidence that death penalty statutes have resulted in death sentences and executions of innocent individuals much more often than previously understood."); *United States v. Fell*, 217 F.Supp.2d 469, 477 (2002)(The Supreme Court has " acknowledged an ongoing 'obligation to re-examine capital-sentencing procedures against evolving standards of procedural fairness in a civilized society.'")(quoting *Gardner v. Florida*, 430 U.S. 349, 357 (1977)); *State v. Santiago,* 318 Conn. at 47 ("Because the legal standard is an evolving one, it is both necessary and appropriate for us to consider the issue anew, in light of relevant recent developments, when it is raised.")(citing *Trop*, *Weems*, and *Hall); People v. Seumanu,* 61 Cal. 4th 1293, 1369, 355 P.3d 384, 438 (2015)("[A]lthough we have consistently, and recently, rejected the Eighth Amendment/delay claim, doctrine can evolve. This is especially true when interpreting the Eighth Amendment, which was ratified in 1791. The United States Supreme Court has recognized that the notion of cruel and unusual punishment is not a concept carved in 18th-century stone, instead explaining that although 'the words of the [Eighth] Amendment are not precise, ... their scope is not static. The Amendment must draw its meaning from the evolving standards of decency that mark the progress of a maturing society.'")(quoting *Trop*).

Mr. Fell asks this Court to apply this same flexible Eighth Amendment standard here, and to rule, based on the recent developments outlined in the *Glossip* and *Santiago* opinions, as supplemented by the factual showing made herein and at any evidentiary hearing to be ordered by the Court, that the federal death penalty, in and of itself, constitutes a legally prohibited cruel and unusual punishment prohibited by both the Fifth and Eighth Amendments.

## II.    PROCEDURAL HISTORY

In October 2001, the government agreed to forego capital charges against Mr. Fell based on substantial mitigating evidence that had been uncovered relating to his mental health and impaired capacity at the time of the events; his mental health history and background; his assistance to authorities; the fact that he was only 20 years old at the time of the charged crime and did not have a substantial prior criminal history. *United States v. Fell*, 531 F.3d 197, 206 (2d Cir. 2008). This agreement was reached after extensive negotiations with the United States Attorney's Office of Vermont; however, the Attorney General of the United States rejected it "upon the advice of his standing committee of the Department of Justice that reviews death-eligible prosecutions." *Id.*

Thereafter, on January 30, 2002, the government filed a Notice of Intent to Seek the Death Penalty. (Doc. 32.) On May 28, 2002, Mr. Fell's counsel moved to declare the Federal Death Penalty Act (FDPA) unconstitutional raising twelve separate challenges. (Doc. 44.) This Court granted the motion on the ground that "the FDPA's § 3593(c)'s direction to ignore the rules of evidence when considering information relevant to death penalty eligibility" violates the Sixth Amendment's guarantee of confrontation and the Fifth Amendment's guarantee of due process (Doc. 70). *See U.S. v. Fell*, 217 F. Supp. 2d 469, 473 (D. Vt. 2002).

The government appealed and the Second Circuit reversed finding the Constitution did not require adherence to the Federal Rules of Evidence. *United States v. Fell*, 360 F.3d 135 (2d Cir. 2004). On remand this Court considered the remaining issues raised in Mr. Fell's original motion, which included one of the issue presented here regarding the unconstitutional rate of error in capital punishment. At that time, 2002, Mr. Fell's counsel framed the challenge by arguing the FDPA was unconstitutional because "it fails to avoid sentences of death for the factually and legally innocent" (Doc. 44). *United States v. Fell*, 372 F. Supp. 2d 753, 755-56 (D. Vt. 2005). In 2002, the facts in

support of this argument did not exist and the claim was thus denied based on the Second Circuit's decision in *United States v. Quinones*, 313 F.3d 49 (2d Cir. 2002). *Id.*

As discussed below the facts that now exist in support of this and other claims are "significantly different than the facts" relied upon by Mr. Fell's counsel in 2002. *See United States v. Sampson*, 2015 WL 6511247, *4-5 (D. Mass. Oct. 28, 2015) (holding that if "there might be a significant difference in the proven facts, this court has both the authority and the obligation to decide whether new facts have been proven and, if so, whether they are material in the sense that they require a different conclusion.").

Facing a new trial, Mr. Fell again respectfully requests this Court to examine the issue and arguments in light of the new and overwhelming evidence of unconstitutionality in capital punishment including the Federal Death Penalty Act and strike the notice of death or, in the alternative, grant an evidentiary hearing so the facts in dispute may be developed and proven. *See Sampson*, 2015 WL 6511247, at *21 (suggesting that the district court is the appropriate place for such briefing on this issue).

## III.    ARGUMENT

### A.    General Fifth and Eighth Amendment Principles

The Due Process Clause of the Fifth Amendment prohibits the imposition of punishment on the basis of "arbitrary distinction[s]." *Chapman v. United States,* 500 U.S. 453, 465 (1991). "In the capital punishment context, 'arbitrariness' has a procedural component and a substantive component." *Sampson*, 2015 WL 6511247, at *14 . Procedurally, "[b]ecause of the uniqueness of the death penalty, *Furman* …held that it could not be imposed under sentencing procedures that created a substantial risk that it would be inflicted in an arbitrary and capricious manner." *Gregg*, 428 U.S. at 188. The high service rendered by this requirement is "to require legislatures to write

7

penal laws that are evenhanded, nonselective, and nonarbitrary, and to require judges to see to it that general laws are not applied sparsely, selectively, and spottily to unpopular groups." *Sampson*, 2015 WL 6511247, at *14. Substantively, "a defendant's sentence may still be 'arbitrary and capricious' if it is sought or imposed based on impermissible considerations of immutable characteristics, such as race." *Id.*

The Eighth Amendment imposes additional restrictions on the infliction of punishment. As summarized in *Santiago* at * 19, the Eighth Amendment establishes the minimum standards for what constitutes impermissibly cruel and unusual punishment. Specifically, the United States Supreme Court has indicated that at least three types of punishment may be deemed unconstitutionally cruel: (1) inherently barbaric punishments; (2) excessive and disproportionate punishments; and (3) arbitrary or discriminatory punishments. [2]

### 1.      Inherently Barbaric Punishments

First, the Eighth Amendment categorically prohibits the imposition of inherently barbaric punishments. *Graham v. Florida*, 560 U.S. 48, 59 (2010). This prohibition is directed toward manifestly and unnecessarily cruel punishments, such as torture and other wanton infliction of physical pain. See, e.g., *Gregg v. Georgia*, 428 U.S. 153, 170–72 (1976) (opinion announcing judgment); *In re Kemmler*, 136 U.S. 436, 447. (1890). In the context of capital punishment, the Eighth Amendment also bars particular modes of execution that present a substantial or objectively

_____

[2] In addition, some members of the United States Supreme Court have suggested that a punishment may be so unusual that it runs afoul of the Eighth Amendment on that basis alone. See, e.g., *Glossip*, 135 S.Ct. at 2774 (Breyer and Ginsburg, JJ., dissenting)(executions could be so infrequently carried out that they " 'would cease to be a credible deterrent or measurably to contribute to any other end of punishment in the criminal justice system ... when imposition of the penalty reaches a certain degree of infrequency, it would be very doubtful that any existing general need for retribution would be measurably satisfied'")(quoting *Furman v. Georgia*, 408 U.S. 238, 311(1972) (White, J., concurring).

intolerable risk of inflicting severe pain. *Baze v. Rees*, 553 U.S. 35, 50, 52, 128 S.Ct. 1520, 170 L.Ed.2d 420 (2008) (opinion announcing judgment).

### 2.      Excessive and Disproportionate Punishments

Second, the Eighth Amendment mandates that punishment be proportioned and graduated to the offense of conviction. See *Graham v. Florida*, supra, at 59. In the capital punishment context, the United States Supreme Court has held, for example, that the death penalty is categorically excessive and disproportionate when imposed on certain classes of offenders. See, e.g., *Roper v. Simmons*, 543 U.S. 551, 568(2005) (prohibiting execution of individuals who were under eighteen years of age when they committed capital crimes); *Atkins v. Virginia*, 536 U.S. 304, 321 (2002) (execution of intellectually disabled individuals was held to be unconstitutional). The court also has concluded that capital punishment is never warranted for non-homicide crimes against individuals. See, e.g., *Kennedy v. Louisiana*, 554 U.S. 407, 446 (2008) (death penalty was held to be disproportionate punishment for child rape); *Enmund v. Florida*, 458 U.S. 782, 797(1982) (Eighth Amendment does not permit execution of defendant who did not kill or intend to kill but who played minor role in felony in course of which murder was committed by others); *Coker v. Georgia*, 433 U.S. 584, 592 and n. 4 (1977) (plurality opinion) (sentence of death for rape of adult woman was held to be grossly disproportionate and excessive punishment).

A court engages in a two stage analysis in determining whether a challenged punishment is unconstitutionally excessive and disproportionate. *Enmund v. Florida*, supra, 458 U.S. at 788–89. First, the court looks to "objective factors" to determine whether the punishment at issue comports with contemporary standards of decency. *Id.*, at 788. These objective indicia include "the historical development of the punishment at issue," legislative enactments, and the decisions of prosecutors

and sentencing juries. *Id.*; see also *Roper v. Simmons*, supra, 543 U.S. at 563; *Thompson v. Oklahoma*, 487 U.S. 815, 821–22 (1988).

This objective evidence of contemporary social mores, however, does not wholly determine the issue. "Although legislative measures adopted by the people's chosen representatives provide one important means of ascertaining contemporary values, it is evident that legislative judgments alone cannot be determinative of Eighth Amendment standards since that Amendment was intended to safeguard individuals from the abuse of legislative power." *Gregg v. Georgia*, supra, 428 U.S. at 174 n. 19 (opinion announcing judgment). Because the Eighth Amendment imposes "a restraint [on] the exercise of legislative power"; *Id.*, at 174, the United States Supreme Court repeatedly has emphasized that courts must conduct a second stage of analysis in which they bring their own independent judgments to bear, giving careful consideration to the reasons why a civilized society may accept or reject a given penalty. See, e.g., *Hall v. Florida*, __U.S. __, 134 S.Ct. 1986, 1993, 1999–2000 (2014); *Atkins v. Virginia*, supra, 536 U.S. at 312; *Thompson v. Oklahoma*, supra, 487 U.S. at 822–23. "Although the judgments of legislatures, juries, and prosecutors weigh heavily in the balance, it is for [the court] ultimately to judge whether the [constitution] permits imposition of the death penalty...." *Enmund v. Florida*, supra, 458 U.S. at 797. A court's independent analysis must be informed not only by judicial precedents, but also by its own understanding of the rights secured by the constitution. *Kennedy v. Louisiana*, supra, 554 U.S. at 434. This analysis necessarily encompasses the question of whether the penalty at issue promotes any of the penal goals that courts and commentators have recognized as legitimate: deterrence, retribution, incapacitation, and rehabilitation. E.g., *Graham v. Florida*, supra, 560 U.S. at 71. A sentence materially lacking any legitimate penological justification would be nothing more than the "gratuitous infliction of

10

suffering" and, by its very nature, disproportionate. *Gregg v. Georgia*, supra, at 183 (opinion announcing judgment).[3]

### 3.        Arbitrary or Discriminatory Punishments

Third, the Eighth Amendment prohibits punishments that are imposed in an "arbitrary and unpredictable fashion...." *Kennedy v. Louisiana*, supra, 554 U.S. at 436. The ultimate punishment must be reserved for the very worst offenders, and may not be "wantonly [or] ... freakishly imposed." *Furman v. Georgia*, supra, 408 U.S. at 310 (Stewart, J., concurring). In *Eddings v. Oklahoma*, 455 U.S. 104, 112 (1982), the Court referred to the other side of this approach, requiring "that capital punishment be imposed fairly, and with reasonable consistency, or not at all." More recently in *Kennedy v. Louisiana*, supra, the Court warned, "When the law punishes by death, it risks its own sudden descent into brutality, transgressing the constitutional commitment to decency and restraint." 554 U.S. at 420. For that reason, the Court wrote, "[C]apital punishment must 'be limited to those offenders who commit "a narrow category of the most serious crimes" and whose extreme culpability makes them 'the most deserving of execution.'" *Id.* In the context of capital punishment, the United States Supreme Court has indicated that there are two dimensions to this rule.

On the one hand, in *Furman v. Georgia*, 408 U.S. 238, 239–40 (1972), in which the Court held, in a per curiam opinion, that capital punishment as then applied violated the Eighth

---

[3] Some justices of the United States Supreme Court have suggested that these considerations—whether a punishment is excessive or disproportionate, whether it comports with contemporary standards of decency and dignity, and whether it satisfies any legitimate penological goals—represent three distinct elements or prongs of the Eighth Amendment analysis. See, e.g., *Furman v. Georgia*, 408 U.S. 238, 330–32, 92 S.Ct. 2726, 33 L.Ed.2d 346 (1972) (Marshall, J., concurring). However, as correctly pointed out in *Santiago*, "[w]hether these considerations are treated as distinct elements or merely as distinct components of a common element, however, is merely semantic and ultimately immaterial, because it is clear that a sentence's failure to satisfy any of these requirements would render it unconstitutional under the eighth amendment." *State v. Santiago*, 318 Conn. at 22 n. 18.

Amendment, and four years later in *Gregg v. Georgia*, supra, 428 U.S. 153, 96 S.Ct. 2909 in which the court held that Georgia's revamped capital punishment statute did not offend the United States constitution; *Id.*, at 206–207, 96 S.Ct. 2909 (opinion announcing judgment); the Court established the principle that a capital sentencing scheme must provide the sentencing authority sufficient guidance as to which crimes and criminals are death worthy to ensure that the death penalty is not imposed in an arbitrary or freakish manner. *Id.*, at 192–95 (opinion announcing judgment). "To pass constitutional muster, a capital sentencing scheme must genuinely narrow the class of persons eligible for the death penalty and must reasonably justify the imposition of a more severe sentence on the defendant compared to others found guilty of murder." *Lowenfield v. Phelps*, 484 U.S. 231, 244 (1988). "This means that if a [s]tate wishes to authorize capital punishment it has a constitutional responsibility to tailor and apply its law in a manner that avoids the arbitrary and capricious infliction of the death penalty. Part of a [s]tate's responsibility in this regard is to define the crimes for which death may be the sentence in a way that obviates standardless [sentencing] discretion.... It must channel the sentencer's discretion by clear and objective standards that provide specific and detailed guidance, and that make rationally reviewable the process for imposing a sentence of death." *Godfrey v. Georgia*, 446 U.S. 420, 428 (1980) (plurality opinion).

It goes without saying, moreover, that the Eighth Amendment is offended not only by the random or arbitrary imposition of the death penalty, but also by the greater evils of racial discrimination and other forms of pernicious bias in the selection of who will be executed. See, e.g., *Tuilaepa v. California*, 512 U.S. 967, 973 (1994) (guarding against bias or caprice in sentencing is "controlling objective" of court's review); see also *Graham v. Collins*, 506 U.S. 461, 484 (1993) (Thomas, J., concurring) (racial prejudice is "the paradigmatic capricious and irrational sentencing factor"); *Furman v. Georgia*, supra, 408 U.S. at 242, 92 S.Ct. 2726 (Douglas, J., concurring) (one

aim of English Declaration of Rights of 1689, in which Eighth Amendment language originated, was to forbid discriminatory penalties); *Furman v. Georgia*, supra, at 310, 92 S.Ct. 2726 (Stewart, J., concurring) ("if any basis can be discerned for the selection of these few to be sentenced to die, it is the constitutionally impermissible basis of race"). The Eighth Amendment, then, requires that any capital sentencing scheme determine which defendants will be eligible for the death penalty on the basis of legitimate, rational, nondiscriminatory factors.

On the other hand, the United States Supreme Court also has insisted that, at the sentencing stage, juries must have unlimited discretion to assess "the character and record of the individual offender and the circumstances of the particular offense as a constitutionally indispensable part of the process of inflicting the penalty of death." *Woodson v. North Carolina*, 428 U.S. 280 (1976) (opinion announcing judgment). The Court in *Woodson* held that this sort of individualized sentencing determination is necessary to arrive at a just and appropriate sentence and to honor the Eighth Amendment's "fundamental respect for humanity...." *Id.* The Court also has consistently indicated that the government has broad discretion as to whom to prosecute and what charge to file. See, e.g., *Hartman v. Moore*, 547 U.S. 250, 263 (2006); *McCleskey v. Kemp*, 481 U.S. 279, 296–97 (1987); *Wayte v. United States*, 470 U.S. 598, 607 (1985). "As currently construed, then, the federal constitution simultaneously requires that states narrowly limit and carefully define which offenders are eligible for capital punishment, while, paradoxically, also giving prosecutors and juries, respectively, virtually unfettered discretion whether actually to charge defendants with capital crimes and whether to sentence convicted offenders to death." *Santiago*, 318 Conn. at 25.

Most of the challenges to the FDPA have been met with the response that the Act is constitutional because it contains the safeguards articulated in *Gregg*. See e.g., *United States v. Sampson*, 2015 WL 6511247 * 18; *United States v. Jacques*, 2011 WL 1675417 * 3 (D.Vt. May 4,

2011). The constitutional problem with this response is that it ignores the actual experience of utilizing these particular safeguards.[4] As articulated in *Glossip*, "the Court in effect delegated significant responsibility to the States [and Congress] to develop procedures that would protect against those constitutional problems. Almost 40 years of studies, surveys, and experience strongly indicate, however, that this effort has failed." *Id.* at 2755, And as was held in *Santiago*,

> [I]t has become apparent that the dual federal constitutional requirements applicable to all capital sentencing schemes—namely, that the jury be provided with objective standards to guide its sentence, on the one hand, and that it be accorded unfettered discretion to impose a sentence of less than death, on the other—are fundamentally in conflict and inevitably open the door to impermissible racial and ethnic biases.

318 Conn. at 14.

> The question is whether this individualized sentencing requirement inevitably allows in through the back door the same sorts of caprice and freakishness that the court sought to exclude in *Furman*, or, worse, whether individualized sentencing necessarily opens the door to racial and ethnic discrimination in capital sentencing. In other words, is it ever possible to eliminate arbitrary and discriminatory application of capital punishment through a more precise and restrictive definition of capital crimes if prosecutors always remain free not to seek the death penalty for a particular defendant, and juries not to impose it, for any reason whatsoever? We do not believe that it is.

*Id.* at 108-109.

In support of this conclusion, the *Santiago* court aptly noted that "the United States Supreme Court itself has expressed serious doubts as to whether its own commandments can be reconciled." *Id.* at 109. In *Tuilaepa*, the Court recognized that "[t]he objectives of these two inquiries can be in some tension...." *Id.* at 973. Fourteen years later, in *Kennedy*, the Court again acknowledged that "[t]he tension between general rules and case-specific circumstances has produced results not

---

[4] "Indeed, in the pursuit of our judicial mission, hardly a day passes without the forceful reminder of Mr. Justice Holmes (The Common Law p. 1) that "The life of the law has not been logic: it has been experience." *United States v. Butz*, 517 F. Supp. 1167, 1168 (S.D.N.Y. 1981)

altogether satisfactory." *Kennedy v. Louisiana*, supra, 554 U.S. at 436. "Our response to this case law," the Court frankly conceded, "is still in search of a unifying principle...." *Id.*, at 437. See also, *Turner v. Murray*, 476 U.S. 28, 35(1986) (plurality opinion) ("[b]ecause of the range of discretion entrusted to a jury in a capital sentencing hearing, there is a unique opportunity for racial prejudice to operate").

"In fact, in the four decades since the United States Supreme Court struck down the death penalty (as then applied) in *Furman* and then resuscitated it four years later in *Gregg*, at least one-half dozen members of that court—jurists of all jurisprudential stripes—have concluded that the demands of *Furman*, on the one hand, and of *Woodson* and *Lockett*, on the other, are, ultimately, irreconcilable." *Santiago*, 318 Conn. at 109-110. In *Furman* itself, of the five concurring justices, two (Justices Brennan and Marshall) took the position that capital punishment is so inherently arbitrary as to constitute cruel and unusual punishment under all circumstances, and a third (Justice Douglas) opined that any nonmandatory capital sentencing scheme would be inherently subject to discrimination and hence unconstitutional. See *Furman v. Georgia*, supra, 408 U.S. at 255 (Douglas, J., concurring) ("we know that the discretion of judges and juries in imposing the death penalty enables the penalty to be selectively applied, feeding prejudices against the accused if he is poor and despised, and lacking political clout, or if he is a member of a suspect or unpopular minority, and saving those who by social position may be in a more protected position"); *Id.*, at 294 (Brennan, J., concurring) ("[n]o one has yet suggested a rational basis that could differentiate ... the few who die from the many who go to prison"); *Id.*, at 365 (Marshall, J., concurring) ("committing to the untrammeled discretion of the jury the power to pronounce life or death in capital cases is ... an open invitation to discrimination" [internal quotation marks omitted] ).

15

Justice Marshall elaborated on this "fundamental defect" in the Court's Eighth Amendment jurisprudence in *Godfrey v. Georgia*, supra, 446 U.S. at 420:

> [A]ppellate courts are incapable of guaranteeing the kind of objectivity and evenhandedness that the Court contemplated  and hoped for in *Gregg*. The disgraceful distorting effects of racial discrimination and poverty continue to be painfully visible in
> the imposition of death sentences.... The task of eliminating arbitrariness in the infliction of capital punishment is proving to be one which our criminal justice system—and perhaps any criminal justice system—is unable to perform....
> The ... inability to administer ... capital punishment ... in an evenhanded fashion is ... symptomatic of a deeper problem that is proving to be genuinely intractable....
> [T]he task of selecting in some objective way those persons who should be condemned to die is one that remains beyond the capacities of the criminal justice system. For this reason, I remain hopeful that even if the Court is unwilling to accept the view that the death penalty is so barbaric that it is in all circumstances cruel and unusual punishment forbidden by the Eighth and Fourteenth [a]mendments, it may eventually conclude that the effort to eliminate arbitrariness in the infliction of that ultimate sanction is so plainly doomed to failure that it—and the death penalty—must be abandoned altogether." (Citations omitted; footnotes omitted.)

*Id.*, at 439–42 (Marshall, J., concurring in the judgment).

Both Justices Stevens and Blackmun have reached similar conclusions. See *Baze v. Rees*, supra, 553 U.S. at 85 (Stevens, J., concurring in the judgment)(("[a] ... significant concern is the risk of discriminatory application of the death penalty"); *Tuilaepa v. California*, supra, 512 U.S. at 991–92 (Blackmun, J., dissenting) ("One of the greatest evils of leaving jurors with largely unguided discretion is the risk that this discretion will be exercised on the basis of constitutionally impermissible considerations—primary among them, race.... For far too many jurors, the most important 'circumstances of the crime' are the race of the victim or the defendant." [Citations omitted.] ).

Justice Scalia, while drawing a different legal conclusion than his more liberal brethren, has been no less persuaded by the premise that the United States Supreme Court's *Furman* and

*Woodson/Lockett* lines of jurisprudence are fundamentally incompatible: "To acknowledge that 'there perhaps is an inherent tension' between this line of cases and the line stemming from *Furman*, *McCleskey v. Kemp*, 481 U.S., at 363...(BLACKMUN, J., dissenting), is rather like saying that there was perhaps an inherent tension between the Allies and the Axis Powers in World War II. And to refer to the two lines as pursuing "twin objectives,"*Spaziano v. Florida*, 468 U.S., at 459...is rather like referring to the twin objectives of good and evil. They cannot be reconciled." *Walton v. Arizona*, 497 U.S. 639, 664 (1990)(Scalia, J., concurring in part and concurring in the judgment), overruled in part on other grounds by *Ring v. Arizona*, 536 U.S. 584(2002).

And now, Justices Breyer and Ginsburg have added their voices to this consensus, declaring that:

> Four decades ago, the Court believed it possible to interpret the Eighth Amendment in ways that would significantly limit the arbitrary application of the death sentence. See *Gregg*, 428 U.S., at 195, 96 S.Ct. 2909 (joint opinion of Stewart, Powell, and Stevens, JJ.) ("[T]he concerns expressed in *Furman* that the penalty of death not be imposed in an arbitrary or capricious manner can be met"). But that no longer seems likely.

*Glossip v. Gross*, 135 S. Ct. at 2762 (Breyer and Ginsburg, JJ., dissenting).

It is also clear, based on the analysis conducted in both the *Glossip* dissent and in *Santiago*, that there are numerous other flaws in the current administration of the death penalty. As will now be demonstrated, these flaws are not restricted to state death penalty schemes and apply specifically to the FDPA, rendering any death sentence under it unconstitutional.

17

B.    **Almost 40 Years of Studies, Surveys, and Experience Strongly Indicate That The Procedural Protections Built Into The Federal Death Penalty Have Failed To Achieve Their Goal Of Reliable, Rational, Consistent, Fair, Non-Arbitrary, and Non-Discriminatory Application of The Death Penalty. [5]**

The *Glossip* dissent and the *Santiago* opinion provide a very current roadmap of the multiple problems with the administration of the death penalty nationwide. By definition, these problems extend to the FPDA, which utilizes the same procedural mechanisms that have produced such a morass in the state death penalty systems. As Justices Breyer and Ginsburg point out, "[a]lmost 40 years of studies, surveys, and experience strongly indicate… that [the death penalty] effort has failed. Today's administration of the death penalty involves three fundamental constitutional defects: (1) serious unreliability, (2) arbitrariness in application, and (3) unconscionably long delays that undermine the death penalty's penological purpose. Perhaps as a result, (4) most places within the United States have abandoned its use." *Glossip v. Gross*, 135 S.Ct. at 2755-56.

1.    **"Cruel"—Lack of Reliability**

The Court has specified that the finality of death creates a "qualitative difference" between the death penalty and other punishments (including life in prison). *Woodson*, 428 U.S., at 305, 96 S.Ct. 2978 (plurality opinion). That "qualitative difference" creates "a corresponding difference in the need for reliability in the determination that death is the appropriate punishment in a specific case." Ib*Id.* "There is increasing evidence, however, that the death penalty as now applied lacks that requisite reliability." *Glossip v. Gross*, 135 S.Ct. at 2756 (Breyer and Ginsburg, JJ., dissenting). "Unlike 40 years ago, we now have plausible evidence of unreliability that (perhaps due to DNA evidence) is stronger than the evidence we had before. In sum, there is significantly more research-based evidence today indicating that courts sentence to death individuals who may well be actually

---

[5] If the government disputes the accuracy of the factual basis underlying this argument, a hearing is requested at which counsel will prove their assertions.

innocent or whose convictions (in the law's view) do not warrant the death penalty's application." *Id.* at 2759. See also, *Kansas v. Marsh*, 548 U.S. at 207–211(Souter, J., dissenting) (DNA exonerations constitute "a new body of fact" when considering the constitutionality of capital punishment); *State v. Santiago*, 318 Conn. at 106 ("In concluding that the death penalty is unconstitutional… we recognize that the legal and moral legitimacy of any future executions would be undermined by the ever present risk that an innocent person will be wrongly executed.").

This new research-based evidence has several different components. First, "despite the difficulty of investigating the circumstances surrounding an execution for a crime that took place long ago, researchers have found convincing evidence that, in the past three decades, innocent people have been executed." *Id.* at 2756. [6] See also, *State v. Santiago*, 318 Conn. at 104 ("Statistical analyses have demonstrated to near certainty that innocent Americans have been and will continue to be executed in the post-*Furman* era."). As was held in *Santiago*,

---

[6] Citing, Liebman, *Fatal Injustice; Carlos DeLuna's Execution Shows That a Faster, Cheaper Death Penalty is a Dangerous Idea*, L.A. Times, June 1, 2012, p. A19 (describing results of a 4–year investigation, later published as The Wrong Carlos: Anatomy of a Wrongful Execution (2014), that led its authors to conclude that Carlos DeLuna, sentenced to death and executed in 1989, six years after his arrest in Texas for stabbing a single mother to death in a convenience store, was innocent); Grann, *Trial By Fire: Did Texas Execute An Innocent Man?* The New Yorker, Sept. 7, 2009, p. 42 (describing evidence that Cameron Todd Willingham was convicted, and ultimately executed in 2004, for the apparently motiveless murder of his three children as the result of invalid scientific analysis of the scene of the house fire that killed his children). See also, e.g., *Press Release: Gov. Ritter Grants Posthumous Pardon in Case Dating Back to 1930s*, Jan. 7, 2011, p. 1 (Colorado Governor granted full and unconditional posthumous pardon to Joe Arridy, a man with an IQ of 46 who was executed in 1936, because, according to the Governor, "an overwhelming body of evidence indicates the 23–year–old Arridy was innocent, including false and coerced confessions, the likelihood that Arridy was not in Pueblo at the time of the killing, and an admission of guilt by someone else"); R. Warden, *Wilkie Collins's The Dead Alive: The Novel, the Case, and Wrongful Convictions* 157–158 (2005) (in 1987, Nebraska Governor Bob Kerrey pardoned William Jackson Marion, who had been executed a century earlier for the murder of John Cameron, a man who later turned up alive; the alleged victim, Cameron, had gone to Mexico to avoid a shotgun wedding).

Of course, all punishment is tainted by the possibility of error. Capital punishment, however, is especially problematic. When we impose capital punishment on a convicted murderer, there cannot be any room for error since the murderer can never be brought back to life afterward if error is discovered at some later date. If there remains a substantial risk of error, as demonstrated by advances in scientific testing in cases [in which] a person has been sentenced beyond a reasonable doubt in a fair trial, then we have good reason on retributivist grounds to reject capital punishment in favor of an alternative sanction.

*Id.* at 105-06.

Second, "the evidence that the death penalty has been wrongly *imposed* (whether or not it was carried out), is striking." *Glossip v. Gross*, 135 S.Ct. at 2756 (Breyer and Ginsburg, JJ., dissenting)(emphasis in original). In deciding in 2002 that it is no longer constitutional to execute the mentally retarded, the Supreme Court wrote that "we cannot ignore the fact that in recent years a disturbing number of inmates on death row have been exonerated." *Atkins*, 536 U.S. at 320 n. 25. "At that time, there was evidence of approximately 60 exonerations in capital cases…Since 2002, the number of exonerations in capital cases has risen to 115. …[or]… under a slightly different definition of exoneration, the number of exonerations since 1973 [has risen] to 154…. Last year, in 2014, six death row inmates were exonerated based on actual innocence. All had been imprisoned for more than 30 years (and one for almost 40 years) at the time of their exonerations." *Glossip v. Gross*, 135 S.Ct. at 2756.[7]

Third, "exonerations occur far more frequently where capital convictions, rather than ordinary criminal convictions, are at issue. Researchers have calculated that courts (or State Governors) are 130 times more likely to exonerate a defendant where a death sentence is at issue.

---

[7] Citing National Registry of Exonerations, Exonerations in the United States, 1989–2012, pp. 6–7 (2012), and Death Penalty Information Center (DPIC), Innocence: List of Those Freed from Death Row, online at http://www.deathpenaltyinfo.org/innocence-and-death-penalty. It should be noted that since *Glossip* was decided on June 29, 2015, two more exonerations have been listed on DPIC's List of Those Freed From Death Row.

They are nine times more likely to exonerate where a capital murder, rather than a noncapital murder, is at issue." *Glossip v. Gross*, 135 S.Ct. at 2757. [8] One factor explaining the higher rate of wrongful convictions in a capital case is that "the crimes at issue in capital cases are typically horrendous murders, and thus accompanied by intense community pressure on police, prosecutors, and jurors to secure a conviction. This pressure creates a greater likelihood of convicting the wrong person." *Id.*[9]

Other factors also create a greater likelihood of wrongful conviction and sentencing in a capital case. One is the practice of death-qualification, which " 'skews juries toward guilt and death'". *Id.* at 2758. [10] "Another is the more general problem of flawed forensic testimony." *Id.* [11] "The Federal Bureau of Investigation (FBI), for example, recently found that flawed microscopic hair analysis was used in 33 of 35 capital cases under review; 9 of the 33 had already been executed.

---

[8] Citing, Exonerations 2012 Report 15–16, and nn. 24–26.

[9] Citing Gross, Jacoby, Matheson, Montgomery, & Patil, *Exonerations in the United States 1989 Through 2003*, 95 J. Crim. L. & C. 523, 531–533 (2005); Gross & O'Brien, *Frequency and Predictors of False Conviction: Why We Know So Little, and New Data on Capital Cases*, 5 J. Empirical L. Studies 927, 956–957 (2008) (noting that, in comparing those who were exonerated from death row to other capital defendants who were not so exonerated, the initial police investigations tended to be shorter for those exonerated); see also B. Garrett, *Convicting the Innocent: Where Criminal Prosecutions Go Wrong* (2011) (discussing other common causes of wrongful convictions generally including false confessions, mistaken eyewitness testimony, untruthful jailhouse informants, and ineffective defense counsel).

[10] Quoting Rozelle, *The Principled Executioner: Capital Juries' Bias and the Benefits of True Bifurcation*, 38 Ariz. S.L.J. 769, 772–793, 807 (2006) (summarizing research and concluding that "[f]or over fifty years, empirical investigation has demonstrated that death qualification skews juries toward guilt and death")

[11] "In general, both the prosecution and the defense rely more extensively on experts in death penalty cases than in other federal criminal cases." Judicial Conference of the United States, Committee on Defender Services, Subcommittee on Federal Death Penalty Cases, *Federal Death Penalty Cases: Recommendations Concerning The Cost And Quality of Defense Representation* (May 1998) at 14.

FBI, National Press Releases, *FBI Testimony on Microscopic Hair Analysis Contained Errors in at Least 90 Percent of Cases in Ongoing Review*, Apr. 20, 2015. See also Hsu, *FBI Admits Errors at Trials: False Matches on Crime–Scene Hair*, Washington Post, Apr. 19, 2015, p. A1 (in the District of Columbia, which does not have the death penalty, five of seven defendants in cases with flawed hair analysis testimony were eventually exonerated)." *Id.*

Not cited in *Glossip*, but nevertheless highly relevant in a capital case such as the present one in which the FBI provided most, if not all, of the forensic testimony against Mr. Fell at his first trial, is another recent scandal implicating not only the FBI, but the entire Department of Justice. See, United States Department of Justice, Office of the Inspector General, *An Assessment of the 1996 Department of Justice Task Force Review of the FBI Laboratory* (July 2014)("2014 OIG Report").[12] According to this Report, in 1997, the DOJ learned that that the FBI crime lab had engaged in massive flawed forensic work, including the "use of scientifically unsupportable analysis and overstated testimony by [13] FBI Lab examiners in criminal prosecutions." *Id.* at 1. A 1997 OIG report led to the deployment of a Criminal Division Task Force to identify, review, and follow-up on some *7,609 cases* linked to the 13 problematic FBI examiners. But the Task Force's and the FBI's process moved slowly, and the Task Force's findings were not disclosed to the public and to those individuals who had been convicted by that tainted evidence. The results were staggering: It took the FBI nearly five years to identify the 64 death-row defendants whose cases involved analysis or testimony from one or more of the 13 examiners – and with respect to the cases the FBI knew of, it only notified local prosecutors and allowed them to determine what should be disclosed to defendants.

---

[12] Available at https://oig.justice.gov/reports/2014/e1404.pdf.

At least three inmates were executed before their cases were identified for further review–for one of them, it literally cost him his life. An independent scientist later determined that the FBI lab analysis that led to the 1997 execution of Benjamin H. Boyle in Texas was scientifically unsupportable and the testimony incorrect. See OIG 2014 Report at 51. Because the DOJ and the FBI did not immediately alert state authorities that Mr. Boyle's convictions might be called into question, prosecutors did not delay the execution. The OIG reports that "but for" that tainted testimony, "*Boyle would not have been convicted of the capital offense that rendered him eligible for the death penalty.*" *Id.* at 52, 66-67, 86 (emphasis added). Two other capital defendants, Michael Lockhart and Gerald Stano, were executed before their cases were identified for Task Force Review.

There was little to no public knowledge of this colossal failure until a series of articles published in the Washington Post in April 2012 generated a public outcry.[13] The account was indeed scathing:

> The documents and interviews tell a story of how the Justice Department's promise to protect the rights of defendants became in large part an exercise in damage control that left some prisoners locked away or in the dark for years longer than necessary. The Justice Department continues to decline to release the names of defendants in the affected cases. . . . .
>
> The Justice Department's decision to allow prosecutors to decide what to disclose to defendants was criticized at the time and allowed most of the process to remain secret. But by cloaking cases in anonymity, failing to ensure that defendants were notified of troubles with their cases and neglecting to publicly report problems or recommend solutions, the task force obscured problems from further study.

---

[13] See Spencer S. Hsu, *Convicted defendants left uninformed of forensic flaws found by Justice Dept.*, The Washington Post (Apr. 16, 2012), available at https://www.washingtonpost.com/local/crime/convicted-defendants-left-uninformed-of-forensic-flaws-found-by-justice-dept/2012/04/16/gIQAWTcgMT_story.html;
Spencer S. Hsu, *DOJ review of flawed FBI forensics processes lacked transparency*, The Washington Post (Apr. 17, 2012), available at https://www.washingtonpost.com/local/crime/doj-review-of-flawed-fbi-forensics-processes-lacked-transparency/2012/04/17/gIQAFegIPT_story. Html.

Hsu, *DOJ review of flawed FBI forensics processes lacked transparency*, supra n.13.

The full extent of the failures not only by the FBI, but also by the DOJ in not notifying defendants and the defense bar once it became aware that active capital convictions were jeopardized and leaving that process in the hands of prosecutors, was not known until July 2014, when the first report reviewing the Task Force's conduct was published. The report concluded that the Task Force and the FBI "did not take sufficient steps to ensure that the capital cases were the Task Force's top priority. . . . [w]e found evidence that the independent scientists' reports were forwarded to capital defendants in only two cases. The department should have handled all death penalty cases with greater priority and urgency." OIG 2014 Report, at i-ii. [14]

Perhaps more disturbingly, the report indicates that the FBI and DOJ have still not yet provided case-specific notice to all 26 defendants currently on death row or awaiting retrial that they were convicted and sentenced to death based on potentially tainted FBI evidence. See *Id.* at 82. Similarly, the report recommended that the some 2,900 currently and previously incarcerated non-capital defendants whose cases were reviewed by the Task Force be notified. See *Id.* at 83. The initial revelation of the FBI and DOJ's transgressions has already led to the exoneration of three individuals from death row: Donald Gates, Santae Tribble, and Kirk Odom. See *Id.* at 5. It appears all but certain that this information will lead to the exoneration of more individuals, including some on death row. The lesson from this critical failure of the FBI and the DOJ is apparent – people have been executed based on evidence now known to be hopelessly unreliable.

---

[14] In response to the OIG's 2014 Assessment, disturbingly, the DOJ expressed disagreement with the OIG's conclusion that it was a mistake to delegate to prosecutors the sole "responsibility for making appropriate disclosures to defendants or defense counsel" when confronted with the factthat an independent scientist had concluded that evidence in their own cases was tainted. Department Response to OIG Report, July 9, 2014 at 4, available at 2014 OIG Report at 131.

In light of these and other factors, "researchers estimate that about 4% of those sentenced to death are actually innocent." *Id.* [15] In other words, approximately 1 in 25 capital defendants in the United States are sentenced to death for crimes they did not commit. Prior to these studies, as recently as 2006, Justice Scalia expressed his belief that that rate was in fact just 0.027%. *Kansas v Marsh*, 548 U.S. 163, 182 (2006) (Scalia, J., concurring). [16] The 2014 National Academy of Science study and the 2007 Risinger study demonstrate beyond reasonable dispute that Justice Scalia's estimate is not correct. Therefore, what was unknown just ten years ago now has gained widespread acceptance in the legal and scientific communities: that there is about a 4%, or a 1 in 25, rate at which capital defendants are found guilty of crimes that they did not commit.

Given this rate of error and the sheer number of exonerations in capital cases, which is steadily increasing, there is ample basis to conclude, as Judge Wolf did recently in *United States v.*

---

[15] Citing Gross, O'Brien, Hu, & Kennedy, *Rate of False Conviction of Criminal Defendants Who Are Sentenced to Death*, 111 Proceeding of the National Academy of Sciences 7230 (2014) (full-scale study of all death sentences from 1973 through 2004 estimating that 4.1% of those sentenced to death are actually innocent); Risinger, *Innocents Convicted: An Empirically Justified Factual Wrongful Conviction Rate*, 97 J. Crim. L. & C. 761 (2007) (examination of DNA exonerations in death penalty cases for murder-rapes between 1982 and 1989 suggesting an analogous rate of between 3.3% and 5%).

Additional studies cited in the *Santiago* opinion ( p. 104-05) on this same point include: H. Bedau & M. Radelet, *Miscarriages of Justice in Potentially Capital Cases*, 40 Stan. L.Rev. 21, 36 (1987) (citing high rate of error in death penalty cases); D. Benson et al., *Executing the Innocent*, 3 Ala. C.R. & C.L. L.Rev., no. 2, 2013 at 3 ("We know ... that [the] intolerable event [of executing an innocent person] takes place with some regularity in ... death penalty jurisdictions" [emphasis omitted] ); U. Bentele, *Does the Death Penalty, by Risking Execution of the Innocent, Violate Substantive Due Process?*, 40 Hous. L.Rev. 1359, 1365 (2004) ("[s]ince capital punishment was given a renewed seal of approval in 1976, more than [100] people have been sentenced to death [and have been] subsequently found to be innocent").

[16] Justice Scalia arrived at this number based on a quotation from a district attorney in Oregon, who took the number of exonerations a study had found in capital and noncapital cases (340), multiplied it by "roughly a factor of ten" (4000) – to "give the professor the benefit of the doubt" – and then divided that by 15 million "felony convictions" over that time period. *Id.* at 197-198.The 2007 Risinger article persuasively discusses the several empirical errors employed in Justice Scalia's calculation, and in using it as an estimation of a capital error rate.

*Sampson*, 2015 WL 6511247, at *20, that "the FDPA, like state death penalty statutes, will inevitably result in the execution of innocent people."

The notion that the problem of wrongful capital convictions and sentences is confined to the state systems and that the federal capital punishment system is somehow immune from such problems is just plain wrong. As Judge Wolf correctly pointed out in rejecting the government's argument that "similar errors and injustices could not occur in the federal courts":

> The government's confidence that the FDPA will never lead to the execution of innocent individuals is not shared by the only federal judge to have presided over an FDPA prosecution in Massachusetts. Judge Ponsor conducted the trial of Kristen Gilbert, a nurse convicted of murdering four of her patients and attempting to murder three others. She was sentenced to life in prison in 2001. Judge Ponsor later wrote regarding the Gilbert trial that:
>
> > The experience left me with one unavoidable conclusion: that a legal regime relying on the death penalty will inevitably execute innocent people—not too often, one hopes, but undoubtedly sometimes. * * * * * *... I have a hard time imagining anything as complicated as a capital trial being repeated very often, even by the best system, without an innocent person eventually being executed.
>
> A–90, A–95, Michael Ponsor, *"Life, Death and Uncertainty,"* Boston Globe, July 8, 2001, at D2.
>
> Commonsense, the experience to date in this case, and evidence from other cases combine to persuade this court that Judge Ponsor's prediction is prophetic. Federal judges, like state judges, are human and, therefore, fallible. Indeed, many federal judges have previously been state judges. Jurors in federal cases are essentially the same citizens who serve as jurors in state cases. In addition, many federal cases, including the instant case, result from investigations conducted primarily, if not exclusively, by state and local law enforcement agents.

*United States v. Sampson*, 275 F. Supp. 2d 49, 78 (D. Mass. 2003)

Indeed, there were significant doubts about the innocence of David Ronald Chandler, the very first federal defendant to have been sentenced to death in the era of the "modern" (post-1988) death-penalty.  Mr. Chandler was originally sentenced to death in 1991.  In 1999, the Eleventh

Circuit vacated his death sentence on grounds of ineffective assistance of counsel at the penalty phase. *Chandler v. United States*, 193 F.3d 1297 (11th Cir. 1999). That opinion was itself vacated, however, by a 6-5 vote of the Court sitting en banc, and the sentence of death was re-affirmed. *Chandler v. United States*, 218 F.3d 1305 (11th Cir. 2000) (en banc). After the Supreme Court denied certiorari review, and citing Attorney General Reno's serious concerns about whether Mr. Chandler was actually innocent of the crime for which he had been prosecuted and condemned to death, President Clinton, on January 20, 2001, commuted Mr. Chandler's death sentence to one of life imprisonment, noting that "the defendant's principal accuser later changed his testimony, casting doubt on the defendant's guilt." W.J. Clinton, *My Reasons for the Pardons*, N.Y. Times, February 18, 2001

While there is likely room for argument as to whether the defendant in every cited exoneration case was factually innocent, DNA evidence, not available at the time of the *Gregg* decisions, has put the lie to any Pollyannaish view that innocent people are not convicted and sentenced to death. The notion that all these statistics and exonerations are wrong-headed is unimaginable. Innocent people have been, and there is no evidence suggesting they will not continue to be, convicted and sentenced to death - that alone should end the discussion in a democratic society. And, more disturbingly, it is likely that innocent people have been executed. See *Glossip* 136 S.Ct. at 2756. Just as the presence of one juror on the panel who would automatically vote for the death penalty is "one too many," *Morgan v. Illinois*, 504 U.S. 719, 734, n. 8 (1922), the wrongful conviction – much less execution – of even one person is "one too many." It is axiomatic that "the execution of a legally and factually innocent person would be a constitutionally intolerable event."

*Herrera v. Collins*, 506 U.S. 390, 419 (1993)(O'Connor, J., concurring). [17] Indeed, "[t]he execution

of a person who can show [that] he is innocent comes perilously close to simple murder." *State v.*

*Santiago*, 318 Conn. at 104. (Internal quotation marks omitted.)

Naturally, the unmasking of wrongful convictions through DNA or other scientific evidence

has prompted investigations to determine what went wrong. Reexamination of the DNA-exoneration

cases has brought into sharp focus the roots of many of these systemic breakdowns, including faulty

forensics, mistaken eyewitness testimony, perjury from jailhouse informants or those trying to

protect themselves or others, inadequate investigation and representation by defense counsel, the

suppression of evidence by the police or prosecution, and race prejudice. See, *State v. Santiago*, 318

Conn. at 104 ("Unfortunately, numerous studies have found that errors can and have been made

repeatedly in the trial of death penalty cases because of poor representation, racial prejudice,

prosecutorial misconduct, or simply the presentation of erroneous evidence."). The summaries of

exoneration compilations referenced above demonstrate that these flaws are not easily exposed and

the very real risk they may never be. [18]

---

[17] "In *Herrera*, a majority of the Justices stated that the execution of an innocent person would violate the Constitution." *United States v. Sampson*, 275 F. Supp. 2d 49, 76 (D. Mass. 2003).

[18] Rather than demonstrating some divined ability of the "system" to ultimately self-correct, it is clear that some exonerations occur only as the result of "fortuitous or improbable events." Warden, *How and Why Illinois Abolished the Death Penalty*, 30 Law and Ineq. (Minnesota Journal of Law and Inequality) 245, 247 (2012). When officials attempted to proffer a similar rationalization after one highly-publicized exoneration, the Chicago Tribune rejoined in an editorial by recounting the work of a network of "volunteers," whose work prevented a potentially wrongful execution. "That's not a 'system,' but happenstance: the charity of concerned strangers and sheer luck." Editorial, *Fatal Flaws of Capital Punishment*, CHI. TRIB., Feb 11, 1999, at 26, cited in Warden, supra, at 257-58. And, of course, the self-correcting arguments ignore the fact that many of those exonerated often spend years and sometimes decades on dehumanizing death rows before the miscarriage is brought to light. Infra. If "[E]ven one day in prison would be a cruel and unusual punishment for the 'crime' of having a common cold," *Robinson v. California*, 370 U.S. 660, 667 (1972), so much more so for an innocent

Further complicating matters is that most capital cases do not involve DNA testimony. Common sense debunks any pie-in-the-sky fantasy that these same problems discovered in the DNA cases do not also present an unacceptable risk of miscarriages in the numerous capital cases not involving DNA or other scientific evidence capable of providing clear-cut exonerations.

While many of these same concerns are present in any criminal case, two considerations magnify their importance in capital cases. First, as pointed out above, these reliability adulterators are more likely to present themselves in capital cases which are "typically horrendous murders, and thus accompanied by intense community pressure on police, prosecutors, and jurors to seek a conviction." *Glossip*, 135 S. Ct. at 2757-58 (Breyer, J., dissenting).

The second differentiating feature is obvious – the finality of the punishment. This qualitative difference between death and any other punishment resides at the core of the Eighth Amendment jurisprudence of capital punishment. Justice Stewart's observation in *Woodson v. North Carolina*, 428 U.S. at 305-06, that "the penalty of death is qualitatively different from a sentence of imprisonment" has been repeatedly acknowledged in the ensuing years by the Court, see e.g., *Gregg*, 428 U.S. at 187 ("the death penalty is unique in its severity and irrevocability."); *Ford v. Wainwright*, 477 U.S. 399, 411 (1986)("this especial concern is a natural consequence of the knowledge that execution is the most irremediable and unfathomable of penalties."); *Roper v. Simmons*, 543 U.S. at 568 ("Because the death penalty is the most severe punishment, the Eighth Amendment applies to it with special force.").

Finally, "if we expand our definition of 'exoneration' (which we limited to errors suggesting the defendant was actually innocent) and thereby also categorize as 'erroneous' instances in which courts failed  to follow legally required procedures, the numbers soar. Between 1973 and 1995,

---

individual being imprisoned for decades under death row conditions.

courts identified prejudicial errors in 68% of the capital cases before them. Gelman, Liebman, West, & Kiss, *A Broken System: The Persistent Patterns of Reversals of Death Sentences in the United States*, 1 J. Empirical L. Studies 209, 217 (2004). State courts on direct and postconviction review overturned 47% of the sentences they reviewed. *Id.*, at 232. Federal courts, reviewing capital cases in habeas corpus proceedings, found error in 40% of those cases. Ib*Id.*" *Glossip*, 135 S. Ct. at 2758-2759 (Breyer, J., dissenting). See also, *State v. Santiago*, 218 Conn. at 104 (Gelman study, demonstrating "extremely high error rates", was relevant to the Court's conclusion that the death penalty was unconstitutional).

 The federal system has not done better at avoiding constitutional error underlying death sentences. In *United States v. Sampson*, the court observed in 2003 that 5 of 31 federal death sentences (at the time) had been reversed. See 275 F. Supp. 2d at 78. When the court in *Sampson* returned to this issue on October 28, 2015, that number was 17 out of 73 defendants, including Mr. Fell's case. *United States v. Sampson*, 2015 WL 6511247, at *19 (D. Mass. Oct. 28, 2015) .[19] The vast majority of these reversals came after 2003: David Paul Hammer, Cr. No. 4:96-239 (M.D. Pa.) (*Brady* violation); David Lee Jackson, No. 05-CR-51 (E.D. Tex.) (*Brady* violation); John Johnson, Cr. No. 2:04-17 (E.D. La.)(trial error, including improper argument by the government); Ronell Wilson, Cr. No. 1:04-1016 (E.D.N.Y.) (trial error, including improper argument by the government); Angela Johnson, Cr. No. 01-3046 (N.D. Iowa) (ineffective assistance of counsel); Darryl Johnson, Cr. No. 96-379 (N.D. Ill.) (trial error); Richard Stitt, Cr. No. 98-47 (E.D. Va.) (ineffective assistance of counsel); George Lecco and Valerie Friend, Cr. No. 2:05-107 (S.D.W.V.) (as to both, juror

---

[19] Citing Death Penalty Information Center, Federal Death Row Prisoners, available at http://www.deathpenaltyinfo.org/federal-death-row-prisoners.

misconduct); Gary Sampson, Cr. No. 01-cr-10384 (D. Mass.) (juror misconduct); and of course this case (juror misconduct).[20]

Significantly, two of these cases were overturned upon the revelation of federal investigatory and prosecutorial misconduct. First, in 2013 it came to light that the death sentence of David Lee Jackson in 2007 in the Eastern District of Texas was tainted by a *Brady* violation. At the § 2255 stage, Jackson raised an *Atkins* claim. In connection with the discovery for that claim, it was revealed that the government did not disclose at the first trial evidence from the Bureau of Prisons that Mr. Jackson had been diagnosed by a BOP psychiatrist with paranoid schizophrenia, nor that he underwent a change in psychotropic medication. In a court filing, the government confessed to the *Brady* violation, admitting both that this information had been withheld, and that it "was relevant to multiple issues in the sentencing phase," including "allowing counsel to more effectively cross-examine certain of the government's penalty-phase witnesses" as well as constituting "relevant mitigating evidence." *Jackson v. United States*, No. 1:09-cv-1039-RC, Govt's Resp. Pet'r Supplement to Pet. For Collateral Relief, D.E. 171, at 4 (E.D. Tx. 3/22/2013). On March 25, 2013 the district court accepted the agreement of the parties to settle the case and vacated the judgment of death. See *Id.* D.E. 172.

Second, in *United States v. Hammer*, 404 F. Supp. 2d 676, 801 (M.D. Pa. 2005), the district court granted a § 2255 petition to vacate a death sentence in an FDPA case on the ground that the United States Attorney's Office violated its *Brady* obligations in failing to turn over 33 FBI 302

---

[20] For summaries of these cases, see DPIC, Federal Death Row Prisoners. Additionally, Paul Hardy had been sentenced to death in 1996, and his sentence was overturned by the Fifth Circuit in 1999. Prior to his resentencing, on November 24, 2010, the district court held that Hardy suffered from an intellectual disability, and thus Atkins prohibited his execution, and ordered he be sentenced to life in prison. See *United States v. Hardy*, 762 F. Supp. 2d 849, 905 (E.D. La. 2010).

statements that summarized interviews with prison inmates. See also *United States v. Hammer*, 564 F.3d 628, 631 (3d Cir. 2009) (summarizing procedural history). Mr. Hammer had been sentenced to death for the killing (by strangulation) of another inmate, Andrew Marti. In particular, the government had argued that the fact that Mr. Hammer braided his sheets into ropes supported the "substantial planning and premeditation" aggravating factor. The jury agreed, recommending a sentence of death in 1998. See *Hammer*, 404 F. Supp. 2d at 690, 799.

On September 29, 2005, the 29th day of an evidentiary hearing on Mr. Hammer's Third Amended § 2255 Petition, the government for the first time revealed the 33 FBI 302's that it had had in its possession since the beginning of the case, which among other things contained statements that Mr. Hammer was known to braid sheets into ropes for consensual sexual bondage. See *Id.*23 The district court found that the suppressed 302's were both exculpatory and material, because a juror reasonably could have found that the braiding sheets into ropes was evidence of his preparation for sexual activity, not the murder of Mr. Marti. See *Id.* at 798-99. On July 17, 2014, after a resentencing trial before Judge Slomsky, Mr. Hammer received a sentence of life imprisonment without possibility of parole. See Cr. No. 4:96-0239, D.E. 1770 (M.D. Pa. 7/17/2014).

Looking at the results of appellate review of federal capital cases in the Second Circuit is also a telling indication that legal errors at the district court level are a common occurrence in these legally complicated cases. In the six FDPA decisions that the Second Circuit has so far rendered, it has found that one or more legal errors occurred in the district court in all of them.  See, *United States v. Jacques*, 684 F.3d 324 (2nd Cir. 2012); *United States v. Whitten*, 610 F.3d 168 (2nd Cir. 2010); *United States v. Fell*, 531 F. 3d 197, 230 (2nd Cir, 2008); *United States v. Pepin*, 514 F.3d 193 (2nd Cir. 2008); *United States v. Fell*, 360 F.3d 135 (2nd Cir. 2004); *United States v. Quinones*, 313 F.3d 49 (2nd Cir. 2002).

In other circuits, appellate courts reviewing federal death penalty cases have also found a variety of errors at the trial level. See e.g., *United States v. Troya*, 733 F.3d 1125, 1136-38 (11th Cir. 2013)(error in excluding defense expert's testimony on future nondangerousness, which should have been admitted as both mitigation and rebuttal); *United States v. Hager*, 731 F.3d 167, 206 (4th Cir. 2013)(district court's and prosecutor's use of present tense to describe defendant's supposed lack of remorse, in jury instructions and summation, was error); *United States v. Runyon*, 707 F.3d 475, 492-99 (4th Cir. 2013)(finding error in introduction at sentencing of videotape of an interrogation of the defendant in which police confronted him with the evidence and facts of the crime and urged him to confess and show remorse by making references to his religion and ethnicity, and defendant, for the most part, kept silent.); *United States v. Ebron*, 683 F.3d 105, 153 (5th Cir. 2012)(erroneous finding of substantial-planning aggravating factor); *United States v. Bernard*, 299 F.3d 467, 484-487 (5th Cir. 2002)(jury's invalid finding of pecuniary-gain aggravating factor (based on insufficient evidence) was error.); *United States v. Montgomery*, 635 F.3d 1074, 1091-92 (8th Cir. 2011)(summation remarks criticizing the decision to have defendant's children testify in mitigation were improper); *United States v. Lighty*, 616 F.3d 321, 363 (4th Cir. 2010)(finding or assuming district court erred in excluding mitigating evidence); *United States v. Purkey*, 428 F.3d 738, 757-759 (8th Cir. 2005)(error in preventing defense psychologist from opining that defendant suffered from fetal alcohol syndrome and in refusing to allow cross examination of government expert); *United States v. Stitt*, 250 F.3d 878, 898-899(4th Cir. 2001)(erroneous admission of victim-impact evidence in rebuttal); *United States v. Chanthadara*, 230 F.3d 1237, 1264-1268 (10th Cir. 2000)(two errors — faulty instruction on pecuniary gain and six jurors' exposure to newspaper headline conveying that district judge had referred to defense theory as a "smokescreen" — were prejudicial enough to require new sentencing hearing.); *United States v. Barnette*, 211 F.3d 803, 825 (4th Cir.

2000)(erroneous exclusion of surebuttal testimony by defense mental-health expert was not harmless); *United States v. Webster*, 162 F.3d 308, 326 (5th Cir. 1998)(erroneous instruction on "substantial planning" aggravator); *United States v. Causey*, 185 F.3d 407, 423 (5th Cir. 1999)(reversing two codefendants' convictions on one of three capital counts (because of lack of evidence on an essential element); *United States v. McCullah*, 76 F.3d 1087, 1102 (10th Cir. 1996). (erroneous admission at trial of defendant's coerced statements to government informant was not harmless as to sentence).

The fact that constitutional error is discovered in so many federal capital cases, sometimes through assiduous investigation, sometimes through little more than happenstance, compels the conclusion that the federal capital sentencing system is incapable of identifying and remedying every instance of serious constitutional error. See *Sampson* I, 275 F. Supp. 2d at 79 n.12 (collecting cases in which one or more Supreme Court Justices perceived there was harmful error in a capital case, but executions occurred anyway).

Given the many sources of inaccuracy and error, whether from investigators, prosecutors, jurors, witnesses, or even the defendant's own counsel, it is simply unrealistic to believe that the federal death penalty system is capable of identifying and remedying them with the constitutionally requisite accuracy and reliability. The lack of reliability in a procedure with a demonstrated, non-negligible and potentially non-remediable risk of condemnation of factually and legally innocent targets cannot be harmonized with a 21st Century Eighth Amendment. See, *Hall v. Florida*, supra, 134 S.Ct. at 1992 ("[t]he Eighth Amendment's protection of dignity reflects the [n]ation we have been, the [n]ation we are, and the [n]ation we aspire to be").

34

## 2.    "Cruel"—Arbitrariness

### a.    The Problem in General

"The arbitrary imposition of punishment is the antithesis of the rule of law." *Glossip v. Gross*, 135 S.Ct. at 2759 (Breyer and Ginsburg, JJ., dissenting). For that reason, Justice Potter Stewart (who supplied critical votes for the holdings in *Furman v. Georgia*, 408 U.S. 238(1972) (per curiam ), and *Gregg* ) found the death penalty unconstitutional as administered in 1972:

> These death sentences are cruel and unusual in the same way that being struck by lightning is cruel and unusual. For, of all the people convicted of [death-eligible crimes], many just as reprehensible as these, the[se] petitioners are among a capriciously selected random handful upon which the sentence of death has in fact been imposed."

*Furman*, 408 U.S., at 309–310 (concurring opinion).

See also *Id.*, at 310("[T]he Eighth and Fourteenth Amendments cannot tolerate the infliction of a sentence of death under legal systems that permit this unique penalty to be so wantonly and so freakishly imposed"); *Id.*, at 313 (White, J., concurring) ("[T]he death penalty is exacted with great infrequency even for the most atrocious crimes and ... there is no meaningful basis for distinguishing the few cases in which it is imposed from the many cases in which it is not").

When the death penalty was reinstated in 1976, the Court acknowledged that the death penalty is (and would be) unconstitutional if "inflicted in an arbitrary and capricious manner." *Gregg*, 428 U.S., at 188 (joint opinion of Stewart, Powell, and Stevens, JJ.). see also *Id.*, at 189 ("[W]here discretion is afforded a sentencing body on a matter so grave as the determination of whether a human life should be taken or spared, that discretion must be suitably directed and limited so as to minimize the risk of wholly arbitrary and capricious action"); *Godfrey v. Georgia*, 446 U.S. at 428 (plurality opinion) (similar).

The Court has consequently sought to make the application of the death penalty less arbitrary by restricting its use to those whom Justice Souter called " 'the worst of the worst.' " *Kansas v. Marsh*, 548 U.S., at 206, 126 S.Ct. 2516 (dissenting opinion); see also *Roper v. Simmons*, 543 U.S. 551, 568, 125 S.Ct. 1183, 161 L.Ed.2d 1 (2005) ("Capital punishment must be limited to those offenders who commit a narrow category of the most serious crimes and whose extreme culpability makes them the most deserving of execution")

However, "[d]espite the *Gregg* Court's hope for fair administration of the death penalty, 40 years of further experience make it increasingly clear that the death penalty is imposed arbitrarily, i.e., without the 'reasonable consistency' legally necessary to reconcile its use with the Constitution's commands." *Glossip v. Gross*, 135 S.Ct. at 2760 (Breyer and Ginsburg, JJ., dissenting), quoting *Eddings v. Oklahoma*, 455 U.S. 104, 112, (1982). "Thorough studies of death penalty sentences support this conclusion….. Such studies indicate that the factors that most clearly ought to affect application of the death penalty—namely, comparative egregiousness of the crime—often do not. Other studies show that circumstances that ought *not* to affect application of the death penalty, such as race, gender, or geography, often *do*." *Id.* (emphasis in original). "Thus, whether one looks at research indicating that irrelevant or improper factors—such as race, gender, local geography, and resources—do significantly determine who receives the death penalty, or whether one looks at research indicating that proper factors—such as "egregiousness"—do not determine who receives the death penalty, the legal conclusion must be the same: The research strongly suggests that the death penalty is imposed arbitrarily." *Id.* at 2762. "The studies bear out my own view, reached after considering thousands of death penalty cases and last-minute petitions over the course of more than 20 years.  I see discrepancies for which I can find no rational explanations." *Id.* at 2763. In short, "the constitutionality of capital punishment rests on its limited

application to the worst of the worst...[a]nd this extensive body of evidence suggests that it is not so limited." *Id.* See also, *State v. Santiago*, 318 Conn. at 106-07 ("[Another] reason that our state's capital punishment system fails to achieve its retributive goals is that the selection of which offenders live and which offenders die appears to be inescapably tainted by caprice and bias…. To the extent that the ultimate punishment is imposed on an offender on the basis of impermissible considerations such as his, or his victim's, race, ethnicity, or socio-economic status, rather than the severity of his crime, his execution does not restore but, rather, tarnishes the moral order.").

As will be seen, each of the factors identified in *Glossip* and *Santiago* as determinative of the issue of arbitrariness has relevance to the constitutionality of the Federal Death Penalty Act as administered.

> **b. More Than 25 Years Of Experience With The Federal Death Penalty Has Demonstrated That It Operates In An Arbitrary, Capricious, Irrational And Discriminatory Manner.**

> **1. Introduction: the failure of the federal death penalty experiment**

A "modern" federal death penalty has been in effect for more than 25 years.[21] There are presently 59 men and 1 woman under an active federal sentence of death. (Declaration of Federal Death Penalty Resource Counsel Director Kevin McNally, Fell Motion Appendix 0080-92)(hereinafter "App.")).[22] Some of them have been there for more than 20 years. Over the past

---

[21]On November 18, 1988 Congress enacted a federal death penalty as part of the Anti-Drug Abuse Amendments ("ADAA"), authorizing capital punishment for murders occurring in the context of drug trafficking. 21 U.S.C. § 848(e). The reach of the federal death penalty was later expanded when, on September 13, 1994, President Clinton signed into law the Federal Death Penalty Act of 1994 ("FDPA"), 18 U.S.C. § 3591 *et seq.* In March, 2006, the procedural provisions of the ADAA, 21 U.S.C. §§ 848(g), were repealed.

[22] As indicated in Mr. McNally's declaration, the Federal Death Penalty Resource Counsel Project assists court appointed and defender attorneys charged with the defense of capital cases in the federal courts. The Project is funded and administered under the Criminal Justice Act by the Defender Services Office of the Administrative Office of the United States

quarter of a century, in hundreds of federal capital trials around the country, the federal death penalty has revealed itself to be arbitrary, capricious, irrational, discriminatory in impact and, in the final analysis, fundamentally incapable of answering in a rational and predictable way the profound question of who should live and who should die.  This Court should strike it down.

To summarize what is to follow:

- Only a tiny handful of those federal defendants who could face the federal death penalty ever do.

- The theoretically national federal death penalty is, in reality, a regional death penalty, heavily pursued in the South and virtually ignored in the rest of the nation.

- From its earliest days to the present, the FPD has consistently and disproportionately targeted members of minority groups.

- Of the few defendants actually targeted for death, nearly half (234/498) have been simply permitted to enter plea agreements that take death off the table.

- Of the cases that proceed to trial, two-thirds of defendants are spared the death penalty by juries or judges.

- There has been a sharp drop in the number of cases authorized by  the Attorney General for capital prosecution, a sharp drop in the number of capital trials, and an even sharper drop in the numbers of death verdicts returned by juries.

- Approximately one-third of federal death sentences have been set aside on direct appeal or in proceedings brought pursuant to 28 U.S.C. § 2255.

- Despite the fact that federal death-row inmates have only one round of direct appeal and one round of collateral review, there are federal death row inmates who have been there for more than 20 years.

- There has been a presidential clemency grant to one federal death row inmate because of concerns he was innocent.

- In the past 27 years there have been just three federal executions, the most recent of which took place more than 12 years ago, a circumstance stripping the FDP of any valid penalogical purpose.

---

Courts. Detailed information about the administration of the federal death penalty is available on the Project's website (https://www.capdefnet.org/fdprc/).

**2. The federal death penalty is imposed and carried out in an arbitrary and capricious manner that is akin to being struck by lightning: Revisiting the constitutional premise of *Furman v. Georgia* in the context of the federal death penalty.**

As indicated above, in 1972, when the Supreme Court in *Furman*, citing the arbitrary and capricious imposition of capital punishment across the land, struck down all existing death-penalty schemes as incompatible with the guarantees of the Eighth and Fourteenth Amendments to the United States Constitution, the random and capricious imposition of the penalty was best captured in the comparison drawn in *Furman* by Justice Stewart between receiving a sentence of death and being struck by lightning:

> These death sentences are cruel and unusual in the same way that being struck by lightning is cruel and unusual. For, of all the people convicted of rapes and murders, . . . many just as reprehensible as these, the petitioners are among a capriciously selected handful upon whom the sentence of death has in fact been imposed. My concurring Brothers have demonstrated that, if any basis can be discerned for the selection of these few to be sentenced to die, it is the constitutionally impermissible basis of race . . . I simply conclude that the Eighth and Fourteenth Amendments cannot tolerate the infliction of a sentence of death under legal systems that permit this unique penalty to be so wantonly and so freakishly imposed.

*Furman*, 408 U.S. at 309-10 (Opinion of Stewart, J., concurring; citations and footnotes omitted).

In *Zant v. Stephens*, 462 U.S. 862 (1983), the Court stated:

> A fair statement of the consensus expressed by the Court in *Furman* is that "where discretion is afforded a sentencing body on a matter so grave as the determination of whether a human life should be taken or spared, that discretion must be suitably directed and limited so as to minimize the risk of wholly arbitrary and capricious action."

Members of the *Furman* Court also found that the death penalty was fraught with invidious and irrational selectivity, "feeding prejudices against the accused if he is poor and despised, and lacking political clout, or if he is a member of a suspect or unpopular minority . . . ." *Furman*, 408

39

U.S. at 255 (Douglas, J., concurring).  Justice White, who concurred in the result, highlighted the infrequent utilization of the death penalty:

> That conclusion, as I have said, is that the death penalty is exacted with great infrequency even for the most atrocious crimes and that there is no meaningful basis for distinguishing the few cases in which it is imposed from the many cases in which it is not.

408 U.S. at 313 (White, J., concurring). Justice White further concluded: ""[C]ommon sense and experience tell us that seldom-enforced laws become ineffective measures for controlling human conduct and that the death penalty, unless imposed with sufficient frequency, will make little contribution to deterring those crimes for which it may be exacted." *Id.* at 312. In fact, the infrequency with which defendants were targeted for capital punishment was noted by each of the five concurring Justices in the *Furman* majority. *See, Furman*, 408 U.S. at 248 n. 11 (Douglas, J., concurring); *Id.* at 291-95 (Brennan, J., concurring); *Id.* at 309-10 (Stewart, J., concurring); *Id.* at 312 (White, J., concurring); and, *Id.* at 354 n. 124 and 362-63 (Marshall, J., concurring).

In 1972, Justice Brennan, positing a nation of 200 million people that carries out 50 executions per year, noted that "when government inflicts a severe punishment no more than 50 times a year, the inference is strong that the punishment is not being regularly and fairly applied," 408 U.S. at 294, and, "When the punishment of death is inflicted in a trivial number of the cases in which it is legally available, the conclusion is virtually inescapable that it is being inflicted arbitrarily.  Indeed, it smacks of little more than a lottery system." *Id.*  We are now a nation of 320 million people. The last time this country carried out 50 or more executions was 2009. (Death Penalty Information Center, <u>Facts About the Death Penalty</u> (October 30, 2015), <u>App</u>. at 0001). In the more than 25 years since the return of the federal death penalty, out of a universe of thousands of potential federal capital cases, there have been 81 federal death verdicts. (McNally Dec., App.

at 0083). Just three federal prisoners have been executed. (*Id.*). [23] The FDPA suffers from the same vice as the systems condemned in *Furman* in that only a handful of federal defendants who are potentially eligible for capital punishment are ever targeted. And those who are targeted are rarely sentenced to death and even more rarely are they executed.

Recently, a federal court in California struck down the California death penalty on the basis, in part, that it was so rarely carried out. *See, Jones v. Chappell,* 31 F.Supp.3d 1050 (C.D. Ca. 2014). The court concluded:

> In California, the execution of a death sentence is so infrequent, and the delays preceding it so extraordinary, that the death penalty is deprived of any deterrent or retributive effect it might once have had. Such an outcome is antithetical to any civilized notion of just punishment.

---

[23] See also, Eric A. Tirschwell and Theodore Hertzberg, *Politics and Prosecution: a Historical Perspective on Shifting Federal Standards for Pursuing the Death Penalty in Non-Death Penalty States*, 12 U. PA. J. CONST. L. 57 (2009)(hereinafter "*Politics and Prosecution*"). The lead author of this article, a former United States Attorney in the Eastern District of New York, summarizes the statistical situation as of 2001:

> Prison population figures recently published by the Bureau of Justice Statistics suggest that out of the more than 2.3 million people incarcerated in the United States, about 3,297 of them (0.1%) are awaiting execution. Of those 3,297, only fifty-five (1.7%) are on federal death row. Equally remarkable is the tiny number of federal executions compared to "stateside" executions. Since 1977, 1,173 people have been executed in the United States. Of those individuals, only three (0.3%) were federal convicts....As one commentator has noted, "the score of prisoners on federal death row are in some respects little more than a footnote."

*Id.* at 59, quoting *John Brigham, Unusual Punishment: The Federal Death Penalty in the United States*, 16 WASH. U. J.L. & POL'Y 195, 209 (2004).

Since 2001, these numbers have remained relatively the same. According to the Bureau of Prisons, "at year end 2014, the United States held an estimated 1,561,500 prisoners in state and federal correctional facilities." BOP, *Prisoners in 2014*, available at http://www.bjs.gov/content /pub/pdf/p14.pdf. According to DPIC, as of October 30, 2015, there were 3002 inmates awaiting execution (0.2 %). (App. at 0002). Of those 3002, only 61 (2 %) are on federal death row. *Id.* Since 1976, 1419 people have been executed. Of those individuals, still only three (0.2 %) were federal convicts.

*Id.* at 1063. [24]

Even more recently, the Connecticut Supreme Court in *Santiago* struck down that state's death penalty for the same reason, in language that has direct application to the unconstitutional operation of the federal death penalty in non-death penalty states like Vermont:

> In addition, aside from the inevitable delays, the sheer rarity with which death sentences are imposed and carried out in Connecticut—and, indeed, the entire northeastern United States—suggests that any conceivable deterrent value will be far less than in a state like Texas, for example, which carries out executions on a regular basis. [25]

---

[24] As noted by the California Supreme Court in its recent decision in *People v. Seumanu*, 61 Cal. 4th 1293, 1368, 355 P.3d 384, 438 (2015), "[t]he state has appealed (*Jones*) to the Ninth Circuit Court of Appeals and, as of this writing, that appeal is pending. (*Jones v. Chappell* (9th Cir., Aug. 21, 2014, No. 14–56373).)." Despite the pendency of the appeal, the California Supreme Court, citing the *Glossip* dissent, invited further litigation of this claim in future habeas corpus proceedings, pointing out that " although we have consistently, and recently, rejected the Eighth Amendment/delay claim, doctrine can evolve" and "although this court has consistently rejected the Eighth Amendment/delay argument, defendant's reliance on the recently decided *Jones...* provides an opportunity to reconsider whether our prior position on this issue remains valid and supportable." *Id.* See also, *State v. Santiago*, 318 Conn. at 99-100 ("[Another] reason the death penalty has lost its retributive mooring in Connecticut is that the lengthy  if not interminable delays in carrying out capital sentences do not just undermine the death penalty's deterrent effect; they also spoil its capacity for satisfying retribution.")(citing *Jones*).  On November 11, 2015, the Ninth Circuit decided the appeal in *Jones*, ruling that the merits of the issue could not be reached because of habeas corpus technicalities.  *Jones v. Chappell*, (9th Cir., November 11, 2015), Slip Opinion, at 28.  The court did comment that "[m]any agree with Petitioner that California's capital punishment system is dysfunctional and that the delay between sentencing and execution in California is extraordinary."  But see, *Andrews v. Davis*, 798 F.3d 759, 790 (9th Cir. 2015)(the state court's rejection of Andrews's *Lackey* delay claim was not an unreasonable application of *Furman* or *Gregg*, and reasonable jurists would not dispute the district court's conclusion to that effect.)(petition of rehearing and rehearing en banc is pending in *Andrews*).

[25] See also, *Politics and Prosecution* at 59 ("Since the creation of the American republic more than two centuries ago, the federal government has executed 340 people, whereas the State of Texas has executed more than that many in the past fifteen years."). Indeed, just since 1976, Texas has executed 530 inmates. (App. at 0003). "On the other hand, the two multi-district federal circuits in which capital punishment is least prevalent are the First and Second Circuits, both of which are located in the northeast. The seven states that make up those two circuits—Connecticut, Maine, Massachusetts, New Hampshire, New York, Rhode Island, and Vermont—have collectively executed one person since 1976." *Politics and Prosecution* at 87.

318 Conn. at 94; *Id.* at 139-140 (holding that capital punishment, as currently applied, violates the constitution of Connecticut because of "Connecticut's long, troubled history with capital punishment: the steady replacement by more progressive forms of punishment; the increasing inability to achieve legitimate penological purposes; the freakishness with which the sentence of death is imposed; the rarity with which it is carried out; and the [influence of] racial, ethnic, and socioeconomic [factors].").

As Circuit Judge Calabresi persuasively argued in this very case,

> What is going on here is that the existence of certain local values makes the imposition of the federal death penalty in states that do not have the death penalty truly uncommon. It is in that sense significantly more "unusual" than was the execution of 16- and 17-year-olds or the execution of the mentally retarded, before the Supreme Court found those practices to be "cruel and unusual" in *Roper*...and *Atkins*. In all of these categories, values that made a death sentence unusual were at work. In cases involving juvenile and mentally retarded defendants, the values were apparently related to the culpability of the offender. See, e.g., *Atkins*, 536 U.S. at 306... In cases from states without the death penalty, the constitutionally salient values are not just the "local" values, like the existence of substantial generalized opposition to capital punishment, but much more fundamentally the value and endurance of federalism itself-the recognition that we are part of a country, of a polity, that has to live with both Texan values and Northeastern values.

*United States v. Fell*, 571 F.3d 264, 289-290 (2d Cir. 2009)(Calabresi, J., dissenting from the denial of rehearing *en banc*).

According to *Santiago*, "Judge Alex Kozinski of the Ninth Circuit Court of Appeals puts the problem most plainly: 'Rather than go through the competing considerations, let's cut to the meat of the coconut. The death penalty, as we now administer it, has no deterrent value because it is imposed so infrequently and so freakishly. To get executed in America these days you have to be not only a truly nasty person, but also very, very unlucky....' *Id.* at 95, quoting, A. Kozinski & S. Gallagher, *Death: The Ultimate Run–On Sentence*, 46 Case W. Res. L.Rev. 1, 25 (1995).

This argument – that the federal death penalty should be struck down because it is so infrequently sought or imposed – should not be misunderstood as a call for more frequent use of the federal death penalty.  As Justice Brennan stated in *Furman*:

> The States claim, however, that this rarity is evidence not of arbitrariness, but of informed selectivity.
>
> Informed selectivity, of course, is a value not to be denigrated.  Yet, presumably the States could make precisely the same claim if there were 10 executions per year, or five, or even if there were but one.  That there may be as many as 50 per year does not strengthen the claim.  When the rate of infliction is at that low level, it is highly implausible that only the worst criminals who commit the worst crimes are selected for this punishment.  No one has yet suggested a rational basis that could differentiate in these terms the few who die from the many who go to prison.  Crimes and criminals simply do not admit of a distinction that can be drawn so finely as to explain, on that ground, the execution of such a tiny sample of those eligible.  Certainly the laws that provide for this punishment do not attempt to draw that distinction; all cases to which the laws apply are necessarily "extreme."

408 U.S. at 293-94 (Brennan, J., concurring).

At the time *Furman* was decided, as the opinion itself reflects, 15-20% of convicted murderers and rapists were actually sentenced to death in those jurisdictions where the death penalty was available for such offenses.  *Furman*, 408 U.S. at 386 n. 11 (Burger, C.J., dissenting, citing four sources to support the statistic).  Justice Powell, also dissenting, cited similar statistics.  *Id.* at 435 n. 19.  For his part, Justice Stewart utilized Chief Justice Burger's statistical analysis to lend further support to his ultimate conclusion that the death penalty was, indeed, in an Eighth Amendment sense, "unusual."  As stated by Circuit Judge Gregory of the Fourth Circuit, dissenting in a case where the federal death penalty was imposed:

> When the government selects a few offenders from such a large pool for execution, it cannot further its legitimate penological interests; instead it merely inflicts gratuitous pain and suffering.

*United States v. Caro*, 597 F.3d 608, 636 (4th Cir. 2010) (Gregory, Cir.J., dissenting).

In *Furman*, arbitrariness and caprice were seen as the inevitable side-effects of a rarely-imposed punishment of death.  This view is in harmony with Justice White's observations, premised on his experience reviewing hundreds of state and federal death-penalty cases in what was then 10 years on the Court:

> That conclusion, as I have said, is that the death penalty is exacted with great infrequency even for the most atrocious crimes and that there is no meaningful basis for distinguishing the few cases in which it is imposed from the many cases in which it is not.

408 U.S. at 313 (White, J., concurring); *see also*, Justice Scalia's concurring observation in *Walton v. Arizona*, 497 U.S. 639, 658 (1990), *overruled on other grounds*, *Ring v. Arizona*, 536 U.S. 584 (2002), that the key opinions in *Furman* "focused on the infrequent and seeming randomness with which, under the discretionary state systems, the death penalty was imposed."  In *Gregg*, the plurality reiterated this understanding of *Furman*, noting, "It has been estimated that before *Furman* less than 20% of those convicted of murder were sentenced to death in those States that authorized capital punishment."  *Gregg v. Georgia*, 428 U.S. 153, 182 n. 26 (plurality opinion).   This understanding was repeated in *Woodson v. North Carolina*, *supra*, 428 U.S. at 295 n.31.

After more than 25 years of experience with a post-*Gregg* federal death penalty, it is a simple truth that the federal death penalty is sought and imposed far more rarely than in the cases examined in *Furman*. Being sentenced to death in the federal system is truly akin to being struck by

lightning.[26] Indeed, as argued *infra*, no meaningful basis may be discerned for distinguishing those cases – even among the most extreme[27] – where death is imposed from those cases in which it is not.

In 2011, the Death Penalty Information Center published a report on this issue, entitled, *Struck by Lightning: The Continuing Arbitrariness of the Death Penalty Thirty-Five Years After Its Re-instatement in 1976* (Washington, DC 2011)(Copy appended at <u>App</u>. 0005.)   The report catalogues the arguments and collects the data for declaring the scheme of capital punishment that is practiced in our courts unconstitutional based on arbitrariness. It examines the facts of several extremely aggravated federal death penalty cases in which the death penalty was not sought or imposed (e.g., Eric Rudolph,  Steven Flemmi, Oscar Veal, Joseph Massino, Vincent Basciano, Theodore Kaczynski, Zacharias Moussaoui, and Terry Nichols) and rightly points out that "[e]ven

---

[26]*See*, G. Ben Cohen. & Robert J. Smith, *The Racial Geography of the Federal Death Penalty,* 85 Washington Law Rev. 425, 431 (2010) ("The infrequency of the federal death penalty – with 67 federal death sentences in the face of over 150,000 murders – makes death by lightning-strike look positively routine. Indeed, a federal death sentence is akin to winning (or in this instance losing) the lottery.") (noting that there were 424 deaths by lightning in the years 1999–2008.) In August 2006 *National Geographic* published a chart setting out the odds of dying by various means.  For example, there is a 1 in 5 chance of dying from heart disease, and a 1 in 84 chance of dying in a car accident.  Far down the list is the chance of dying by lethal injection, 1 in 62,468.  The next item on the list reported the odds of being killed by lightning as 1 in 79,746.  *Id.* at p. 21.

[27]In the District of Colorado, Timothy McVeigh was sentenced to death and executed for utilizing a truck bomb to blow up the Murrah Federal Building in Oklahoma City, killing 168 people and injuring hundreds.  In the Southern District of New York, two men associated with Usama bin Laden and al-Qaeda were spared the death penalty after being convicted of simultaneous terrorist attacks, utilizing truck bombs, that destroyed two American embassies in East Africa, killing 224 – including 12 Americans – and injuring thousands. Zacharias Moussaoui was spared the death penalty in the Eastern District of Virginia despite a jury finding that he was responsible for the thousands of deaths that occurred as a result of the September 11, 2001 terrorist attacks. Eric Rudolph – the Olympics and abortion-clinic bomber – entered a guilty plea to a life sentence, as did Theodore Kaczynski, the Unabomber, as did Jared Loughner whose mass-shooting murder victims included a child and a federal judge. In Boston, in 2015, Dzhokhar Tsarnaev was sentenced to death for the bombing of the Boston Marathon where fewer people were killed than in other terrorism cases.

46

in cases evoking national fear, a death sentence is not a predictable result." (App. at 0021). Highly relevant to cases such as Mr. Fell's involving a retrial, the Report notes that "[n]ationally, the most comprehensive study of death penalty appeals found that two-thirds of death sentences were overturned, and upon reconsideration over 80% received an outcome of less than death. In all of these re-sentencings, the judgment went from 'worst of the worst' to something less severe—the difference between life and death." (App. at 0015).[28] The Report quotes Illinois Gov. Pat Quinn's statement upon signing the  bill abolishing the death penalty in Illinois in 2011:

> I have concluded that our system of imposing the death penalty is inherently flawed. The evidence presented to me by former prosecutors and judges with decades of experience in the criminal justice system has convinced me that it is impossible to devise a system that is consistent, that is free of discrimination on the basis of race, geography or economic circumstance, and that always gets it right.

App. at 007. As will be further demonstrated below, that quote succinctly describes why  capital punishment, as currently applied in the federal system, violates the constitution.

### 3. The federal death penalty as actually sought and imposed and what the figures mean.

The current state of the post-*Gregg* federal death penalty, as it has been sought and imposed, is summarized in the following table:

---

[28] A case in point in the federal system is Angela Johnson. In 2005, Ms. Johnson was convicted of participating in the execution-style killing of two government informants, and three innocent bystanders, including a mother and her two young children, in furtherance of  a large scale drug operation. In 2012, following her unsuccessful direct appeal, her death sentence was set aside in 2255 proceedings because of ineffective assistance of counsel. See, *Johnson v. United States*, 860 F.Supp.2d 663 (N.D. Iowa). The Department of Justice originally demanded a penalty retrial, but on December 17, 2014 filed a notice withdrawing its intent to seek the death penalty.

TABLE 1:  THE STATUS AND DISPOSITION OF ALL POTENTIAL
FEDERAL CAPITAL CASES FROM 1988 TO  2015

| | |
|---|---|
| • | Total Potential Cases  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3,992 |
| • | Total defendants authorized for capital prosecution  . . . . . . . . . . . . . . . . . . . . 498 |
| • | Authorized defendants pleading guilty |
| • | and death withdrawn  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 234 |
| • | Pending Review by the Department of Justice  . . . . . . . . . . . . . . . . . . . . . . .  150 |
| • | Presently Pending or in Trial . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 11 |
| • | Trial: Life Sentence . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 154 |
| • | Trial: Death Sentence . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 81 |
| • | Executions  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3 |
| • | Clemency  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1 |
| • | Federal Death Row, Active Death Sentence  . . . . . . . . . . . . . . . . . . . . . . . . 60 |

Source: Federal Death Penalty Resource Counsel Project Fact Sheet (App. 0078);
Declaration of Kevin McNally (App. 0080); Federal Death Penalty Resource Counsel
Project  case summaries (App. 0101-0242).

Thus, subtracting those cases presently under review, the Department of Justice has authorized local prosecutors to seek the death penalty in approximately 13% of the cases where federal defendants are exposed to a capital prosecution. In *Furman*, the Court cited the infrequency with which the death penalty was sought and imposed as virtually guaranteeing the arbitrary and capricious application of the ultimate penalty. This conclusion was reached on the basis of a showing that, on a nation-wide basis, fewer than 20% of defendants convicted of capital crimes were actually sentenced to death.  In the federal system, the figure is lower by a factor of 10.  In fact, far fewer than 20% of those eligible for federal capital punishment are even *exposed* to the death penalty, by way of capital authorization, let alone actually sentenced to death. Taking the highest figure for actual death sentences returned against federal defendants by federal juries at 81, approximately 2.0% (81/3842) of all potentially death-eligible federal defendants were in fact

sentenced to death.  In terms of federal executions to date – three – the figure is infinitesimal.[29]  In terms of decisions reached by juries and judges, even in the case of defendants who qualify as the "worst of the worst" and therefore targeted for the federal death penalty, life sentences result in two-thirds of the cases that actually proceed through conviction to a penalty-phase. As noted *infra*, there are truly shocking regional variations in where death sentences are returned. Two-thirds of those who stand trial for their life in the Fifth Circuit are sentenced to death. In the Second Circuit the figure is 10 %.

Thus, utilizing an analysis that was persuasive to the Supreme Court in *Furman,* the federal death penalty is sought and imposed in an arbitrary, capricious and "unusual" manner. *Cf., Roper v. Simmons*, 543 U.S. 551, 567 (2005) (execution of juveniles violates the Eighth Amendment, in part because of "the infrequency of its use even where it remains on the books"); *Atkins v. Virginia*, 536 U.S. 304, 316 (2002) (execution of mentally retarded offenders violates the Eighth Amendment, in part because "even in those states that allow the execution of mentally retarded offenders, the practice is uncommon"); *see also*, *Thompson v. Oklahoma*, 487 U.S. 815, 822 n. 7 (1988) (plurality) ("[C]ontemporary standards, as reflected by the actions of legislatures and juries, provide an important measure of whether the death penalty is 'cruel and unusual' [in part because] whether an action is 'unusual' depends, in common usage, upon the frequency of its occurrence or the magnitude of its acceptance.").

---

[29]The baseline figure includes 11 authorized cases that are pending trial or re-trial. It is reasonable to predict that a certain number of those cases will be resolved by plea agreement and that a certain number will proceed to trial, with an overall statistical likelihood of very few resulting in death sentences.  It is also reasonable to assume that some of the 60 federal inmates now under an active sentence of death will succeed in appellate or post-conviction challenges to their convictions or sentences.

Because the federal death penalty is so infrequently sought, imposed, or carried out, it operates in an unconstitutionally arbitrary and capricious manner.  Whether the most accurate analogy is being struck by lightning or participating in, and losing, a deadly lottery, the federal death penalty does not operate in a rational manner.   On this basis, the Court should strike it down.

> **4.    The absence of a principled basis for distinguishing between cases where the federal death penalty is imposed from cases where it is not imposed renders the federal death penalty unconstitutional.**

As indicated above, the Supreme Court has held that the constitution will not tolerate sentences of death that are imposed in a manner that is arbitrary or capricious.  In *Eddings v. Oklahoma*, 455 U.S. 104, 112 (1982), the Court referred to the other side of this approach, requiring "that capital punishment be imposed fairly, and with reasonable consistency, or not at all."  More recently in *Kennedy v. Louisiana*, *supra*, the Court warned, "When the law punishes by death, it risks its own sudden descent into brutality, transgressing the constitutional commitment to decency and restraint."  128 S.Ct. 2650.  For that reason, the Court wrote, "[C]apital punishment must 'be limited to those offenders who commit "a narrow category of the most serious crimes" and whose extreme culpability makes them 'the most deserving of execution.'" *Id.* In practice, the federal death penalty has has failed to meet this constitutional standard and operates in an arbitrary and irrational manner. This point was made both in the *Glossip* dissent and in the Connecticut Supreme Court's *Santiago* opinion.

An examination of the federal death penalty in operation shows that there is no consistency or predictability in the manner in which federal juries (and in three cases, federal judges) have imposed or declined to impose the federal death penalty or, indeed, which cases are allowed to plead out to life terms or less and which proceed to trial. The Federal Death Penalty Resource Counsel Project has posted on its website the verdict sheets reflecting findings in aggravation and mitigation

in the penalty-phases of virtually all completed federal death penalty prosecutions. [30] Those 214 verdict sheets offer clear insight into the hopelessly irremediable problem of arbitrariness and caprice that marks the administration of the federal death penalty system. There is no rhyme, reason, or predictability concerning who is sentenced to death and who is spared or who simply never has to face a jury on a life-or-death decision.

This argument is not refuted by simply pointing out that there are always difficulties inherent in comparing cases. A review of summaries of the cases[31] and the verdict sheets on the Project's website should put that reflexive and simplistic argument to rest.

Some examples of the outcomes in federal capital cases follow:

- *United States v. Joseph Sablan and William Guerrero* (CDCA). Two inmates murdered a federal corrections officer at USP/Atwater in 2008. Both had prior murder convictions and were serving life sentences. One defendant had murdered a prison guard previously while serving a sentence in Guam. In 2015 both death notices were withdrawn and both defendants entered guilty pleas to life sentences.

- *United States v. Anthony Battle* (NDGA). In 1994 a federal inmate serving a life sentence for the murder of his wife on an army base killed a federal corrections officer at USP/Atlanta with a hammer. Tried, convicted, sentenced to death. Remains on death row 21 years later.

- *United States v. Roy C. Green* (CDCA). In 1997 defendant stabbed one federal corrections officer to death and seriously wounded a second. Three other officers were also seriously injured. Mr. Green has been declared incompetent and has never stood trial for this crime.

- *United States v. Naeem Williams* (D. Hawaii). From December 13, 2004, to July 16, 2005, the defendant, a member of the military, engaged with his wife in numerous acts of abuse and torture of their five year old special needs child, leading to her death from multiple injuries. On May 23, 2014, despite findings in aggravation that the defendant committed the offense in an especially heinous, cruel, or depraved manner that involved torture or serious physical abuse, that the victim was

---

[30] https://www.capdefnet.org/FDPRC/pubmenu.aspx?menu_id=803&id=5709.

[31] A summary of all authorized federal capital cases, and how each case was disposed of has been supplied as part of the appendix to these motions. (App. 0101-0242)

particularly vulnerable, and that the defendant obstructed justice, the jury was unable to agree on a penalty verdict and the defendant was sentenced to life imprisonment.

- *United States v. John McCluskey* ( D.N.M.). In 2010, McCluskey, serving a life sentence in Arizona for attempted murder, escaped and then carjacked a vehicle at gunpoint to get him to New Mexico, where he carjacked a second vehicle at gunpoint and eventually executed the two occupants- a newly retired vacationing couple in their 60s-and burned their bodies. He then travelled to the South where he committed an armed robbery. The aggravating factors in that case included two prior convictions for robbery and numerous instances of in-custody misconduct, including an assault on an investigative officer in the courtroom. Despite overwhelming aggravation, on December 11, 2013, the jury in that case hung 9-3 in favor of death, and McCluskey was sentenced to life imprisonment.

- *United States v. Larry Lujan*, (DNM).  Lujan was convicted of what the Tenth Circuit described as a "a gruesome [crime] in which Lujan (and his cohorts) severely beat [the victim] over a significant period of time, sexually assaulted [him], and engaged in other acts to terrify and isolate [the victim]." *United States v. Lujan*, 603 F.3d 850, 852 (10th Cir. 2010). In addition, at the penalty phase, the government convinced the jury beyond a reasonable doubt that Lujan had committed two additional murders which the Tenth Circuit described as "equally gruesome." (*Id.* at 853). These additional murders included the facts that after Lujan slit the throats of the two victims, he "poured gasoline over the victims' bodies, including the apparently still-breathing Alfredo, and set them on fire . . . . The victims' eleven-year-old daughter discovered the bodies the next afternoon." (*Id.*) Based on these murders and other evidence the jury specifically found that Lujan would be a danger in the future. On October 5, 2011, after the jury was unable to reach a unanimous verdict, Larry Lujan received a life sentence.

- *United States v. Dzohkhar Tsarnev* (DMA), bombing of Boston Marathon, murder of a police officer, total of 4 killed, dozens injured. Tried, convicted, sentenced to death.

- *United States v. Timothy McVeigh*, (DCO).  The Oklahoma City bombing case. 168 dead. Hundreds injured. Tried, convicted, sentenced to death, executed.

- *United States v. Terry Nichols*, (DCO). McVeigh's co-defendant.  Tried, convicted, sentenced to life.

- *United States v. Khalfan Mohamed and Daoud Rashed al`-Owhali*,  (SDNY).  Two defendants associated with Usama bin Laden and al Qaeda convicted in simultaneous terrorist truck-bombings in 1998 of two American embassies in East Africa.  224 killed, including 12 Americans; thousands injured. Tried, convicted, sentenced to life.

- *United States v. Eric Rudolph*, (NAL). The Olympic and abortion-clinic bomber. Victims included a police officer. Arrested after five-year manhunt. Described by Attorney General Ashcroft as "America's most notorious fugitive." Negotiated guilty plea for life sentence.

- *United States v. Zacharias Moussaoui*, (EDPA). Defendant convicted of causing thousands of deaths in the September 11, 2001 attacks on the United States. Sentenced to life by jury.

- *United States v. Theodore Kaczynski*, (EDPA). The Unabomber. Three murders by mailbombs. Plea agreement. Sentenced to life.

- *United States v. Jared Loughner* (DAZ). Mass shooting at public event resulting in 6 deaths including a child and the Chief Judge of the United States District Court for Arizona; 13 others shot and wounded including Congresswoman Gabriel Gifford. Plea agreement. Sentenced to life.

- *United States v. Antonio Johnson*, (WVA). Defendant indicted for a murder at USP/Lee where he was serving a virtual life sentence when he stabbed another inmate to death. On March 21, 2012 – after DOJ approval of a life plea – Antonio Johnson entered a guilty plea.

- *United States v. Basciano*, (EDNY). Mafia crime boss serving life sentence for RICO murder accused of another Mafia hit murder. On June 1, 2011, after deliberating for less than 2 hours, a unanimous jury rejected the death penalty and sentenced Basciano to life imprisonment.

- *United States v. Duong*, (NDGA). Mr. Duong was previously sentenced to death in California state court for 4 murders that occurred in a nightclub in 1999. Federal prosecutors in the Northern District of California indicted Mr. Duong in a 29-count, multi-defendant racketeering indictment, alleging 3 capital homicides (arising out of a string of robberies), and an additional 5 RICO murders. On December 15, 2010, a federal jury sentenced Anh The Duong to life in prison.

- *United States v. Edgar Diaz and Emile Fort*, (NDGA). Attorney General approved 40 year plea agreements for both defendants, in a case involving seven gang-related murders, including (in Mr. Fort's case) the murder of an innocent child.

- *United States v. Joseph Minerd,* (WDPA). Arson/pipebomb murder of pregnant girlfriend, her fetus and three-year old daughter. Tried, convicted, sentenced to life.

- *United States v. Coleman Johnson*, (WVA.). Pipe-bomb used to kill pregnant girlfriend and their unborn child to avoid child support. Tried, convicted, sentenced to life.

- *United States v. Christopher Dean*, (DVT).  Defendant sends pipebomb through the mails killing victim and disfiguring victim's mother.  Plea agreement.  Sentenced to life.

- *United States v. Billy Cooper*, (DMZ).  Car-jacking double homicide.  Tried, convicted, sentenced to life.

- *United States v. Christopher Vialva and Brandon Bernard*, (WDTX).  Car-jacking double homicide.  Tried, convicted, sentenced to death.

- *United States v. Gary Sampson*, (DMA). Two murders during separate car-jackings.  Plead guilty, sentenced to death by jury.  Later set aside. Pending re-trial.

- *United States v. David Paul Hammer,* (MDPA).  Prison inmate guilty of strangling to death cellmate at USP/Allenwood.  Sentenced to death. Sentence later vacated.  Sentenced to life on re-trial.

- *United States v. Michael O'Driscoll*, (MDPA).  Prison inmate guilty of stabbing to death fellow inmate at USP/Allenwood.  Same judge, same courtroom, same defense attorneys as *Hammer*.  Sentenced to life.

- *United States v. Storey*, (DKS). Prison inmate with Aryan Brotherhood ties kills fellow prisoner at USP/Leavenworth.  Plea agreement.  Sentenced to less than life sentence.

- *United States v. Douglas Black and Steven Riddle*, (DCO).  Inmates at USP/Florence attack two suspected "snitches," one killed one injured.  Plea agreements.  Substantially less than life sentences.

- *United States v. William Sablan and Rudy Sablan*, (DCO).  Two cousins housed at USP/Florence kill their cellmate, eviscerate his body, hang his entrails around the cell, and, on videotape, display the victim's heart and liver to responding officers.  Defendants tried separately.  Life verdicts in each case.

- *United States v. Barry Mills*, *et al*. (CDCA). A RICO mega-indictment targeting 40 members of the Aryan Brotherhood prison gang and charging 17 murders.  Initially 27 defendants were death-eligible and 14 defendants were actually authorized for capital prosecutions.  After two lengthy trials, juries spared the first four defendants facing the death penalty – the alleged leaders of the gang – and the government has withdrawn its efforts to seek death as to the remaining authorized capital defendants.

- *United States v. Fu Xin Chen, Jai Wu Chen and You Zhong Peng*, (E.D.N.Y.).  Chinese gang members who kidnap, rape and murder victims held for ransom.  Fu Xin Chen and Jai Wu Chen enter plea agreements.  Attorney General withdraws

death authorization shortly before Peng trial.   Peng convicted after trial.  All three sentenced to life.

- *United States v. Louis Jones*, (NDTX).  Decorated Gulf War veteran with no prior record abducts, rapes and kills young woman soldier.  Tried, convicted, sentenced to death, executed.

- *United States v. Chevy Kehoe and Daniel Lee*, (WDAR)  Triple murder of two adults and small child in connection with activities of white supremacist organization.  Tried and convicted together.  Kehoe – considered more culpable – sentenced to life.  Lee sentenced to death by the same jury.

- *United States v. Jacques* (DVT). Defendant with prior convictions for sexual assaults kidnaps, rapes and murders 12-year-old niece. Case authorized for federal capital punishment. Allowed to plead guilty to life sentence.

- *United States v. Gurmeet Singh Dhinsa*, (EDNY).  Millionaire Sikh businessman hires killers of two employees cooperating with authorities in criminal investigation of defendant.  Tried, convicted, sentenced to life.

- *United States v. Trinity Ingle and Jeffrey Paul*, (WDAR).  Murder of elderly retired National Parks employee.  Victim shot while bound and gagged.  At separate trials, Ingle is convicted and sentenced to life; Paul is convicted and sentenced to death.

- *United States v. Kristen Gilbert*, (DMA).  VA nurse murders four patients and attempts to murder three more.  Tried, convicted, sentenced to life.

- *United States v. LaFawn Bobbitt and Rashi Jones*, (EDPA).  Fatal shooting of bank teller during robbery.  Security guard also shot and blinded.  Tried, convicted, sentenced to life.

- *United States v. Bille Allen and Norris Holder*, (WDMO).  Fatal shooting of bank teller during robbery.  Tried, convicted, and both defendants sentenced to death.

The disparities are particularly striking in cases where murder has taken place in the context of drug-dealing.

- *United States v. Alexis Candelario* (DPR). Defendant with 13 prior murder convictions released from prison engineers and participates in massacre at rival drug-dealer's drinking establishment where eight people and unborn fetus are killed, 20 wounded. Tried, convicted, sentenced to life.

- *United States v. Azibo Aquart*, (DCT). Three drug-related murders. Tried, convicted, sentenced to death.

- *United States v. Azikiwi Aquart* (DCT). Same three drug-related murders committed with his brother Azibo. Pled guilty to all three murders with no cooperation agreement, sentenced to life.

- *United States v. Corey Johnson, James Roane, and Richard Tipton*, (EDPA). Eleven drug-related murders.  Tried, convicted, sentenced to death.

- *United States v. Dean Anthony Beckford*, (EDPA).  Six drug-related murders.  Tried, convicted, sentenced to life.

- *United States v. Clarence Heatley and John Cuff*, (SDNY).  Fourteen drug-related murders.  Plea agreement.  Sentenced to life.

- *United States v. Alan Quinones and Diego Rodriguez*, (SDNY)  Torture murder of suspected informant. Tried, convicted, sentenced to life.

- *United States v. Elijah Williams and Michael Williams* (SDNY).  Execution-style triple murder by father and son.  Tried, convicted, sentenced to life.

- *United States v. Thomas Pitera*, (EDNY). Nine drug-related murders in organized crime and large-scale drug trafficking context.   Victims tortured and bodies dismembered.  Tried, convicted, sentenced to life.

- *United States v. German Sinisterra and Arboleda Ortiz*, (WDMO).  One drug-related murder and one attempted murder. Tried, convicted, sentenced to death.

- *United States v. John Bass* (EDMI). Four drug-related murders.  Tried, convicted, sentenced to life.

- *United States v. Kevin Grey and Rodney Moore*, (DDC).  Thirty-one drug-related murders.  Tried, convicted, sentenced to life.

- *United States v. Daryl Johnson*, (NDIL).  Allegedly directed two murders as a leader in a drug-dealing gang-one victim was a confidential government witness against Johnson-and was alleged to have directed four more.  Tried, convicted, sentenced to death. Death sentence overturned. While retrial was pending, death notice withdrawn.

- *United States v. Peter Rollock*, (SDNY). Eight drug-related murders, including some ordered by defendant while incarcerated.  Plea agreement.  Sentenced to life.

- *United States v. Tommy Edelin*, (DDC).  Fourteen drug-related murders.  Tried, convicted, sentenced to life.

- *United States v. Reynaldo Villarreal and Baldemar Villarreal*, (EDTX). Drug-related murder of law enforcement officer. Tried, convicted, sentenced to life.

- *United States v. Shahem Johnson and Raheem Johnson*, (EDPA). Brothers tried for five drug-related murders. Tried, convicted, sentenced to life.

- *United States v. Juan Raul Garza*, (SDTX). Three drug-related murders. Tried, convicted, sentenced to death, executed.

- *United States v. Claude Dennis*, (EDPA). Six drug-related murders. Tried, convicted, sentenced to life.

- *United  States v. Emile Dixon*, (EDNY).Two drug-related murders, including machine-gunning death of suspected informant. Tried, convicted, sentenced to life.

- *United States v. Anthony Jones*, (DMD.). Six drug-related murders. Tried, convicted, sentenced to life.

- *United States v. Walter Diaz and Tyrone Walker* (NDNY). Two defendants kill a drug-dealer and flee to New York City where, in a failed effort to steal a car, they shoot and kill a woman in lower Manhattan. Later in same day the defendants fired at, but missed, a retired school teacher in Coney Island in a failed armed robbery. Defendant Walker was also found by the jury to have beaten to death an elderly man during a burglary when Walker was 19 years-old. Both defendants tried, convicted, sentenced to life.

These are just selected cases from the larger pool of potential and authorized federal capital cases. This argument draws further force from the cumulative effect gained from reviewing the summaries of authorized cases compiled by the Federal Death Penalty Resource Counsel Project (A-101-0242) and the verdict sheets on the Project Website. By definition, since all of these cases were authorized by the Attorney General of the United States for capital prosecution, these are (or should have been) the "worst of the worst" the federal system has to offer. Indeed, it is likely there is not a crime on the list as to which a prosecutor could not argue in summation, "If this case doesn't call for the death penalty, what case does?" And yet, in case after case – indeed, in the overwhelming *majority* of such cases – juries (and in three instances judges) returned life verdicts and, to an even greater extent, plea agreements were offered and accepted.

The point is that one cannot read these chronicles of the many ways in which man can demonstrate his inhumanity to his fellow man without coming to the realization that *all* of the cases are by their own terms horrible, and *all* involved the infliction of agony on victims and survivors. Yet, for indiscernible reasons, some defendants were sentenced to death, while an overwhelming majority were not.  If any basis can be discerned, it is, as the following discussion illustrates, race, region, and gender.

In *Walker v. Georgia*, 129 S.Ct. 453 (2008), Justice Stevens, dissenting from the denial of *certiorari*, noted that Georgia had sharply curtailed the scope of its statutory proportionality review of death sentences, and noted, "[t]he likely result of such truncated review . . . is the arbitrary or discriminatory imposition of death sentences in contravention of the Eighth Amendment."  *Id.* at 457. And yet despite this criticism, numerous cases have held, following the decision in *Pulley v. Harris*, 465 U.S. 37 (1984),  that proportionality review is not a necessary constitutional component of the Federal Death Penalty Act. See e.g., *United States v. Mitchell*, 502 F.3d 931, 981 (9th Cir. 2007); *United States v. Higgs*, 353 F.3d 281, 320–21 (4th Cir.2003); *United States v. Jones*, 132 F.3d 232, 240-241 (5th Cir. 1998). But see, *Miller v. Alabama*, 132 S. Ct. 2455, 2463(2012)("The concept of proportionality is central to the Eighth Amendment" and must be viewed " less through a historical prism than according to 'the evolving standards of decency that mark the progress of a maturing society.'")(*Trop*). As Justices Breyer and Ginsburg point out in *Glossip v. Gross*, "since this Court held that comparative proportionality review is not constitutionally required..., it seems unlikely that appeals can prevent the arbitrariness I have described." But if such proportionality review is not required, then what we are left with are the conflicting procedural mechanisms put into place in 1976, and everyone seems to agree that such discretionary mechanisms have failed to cure the problem of arbitrariness. As summarized in B. Sarma, *Furman's Resurrection: Proportionality*

*Review and the Supreme Court's Second Chance to Fulfill Furman's Promise*, 2009 CARDOZO L.

REV. DE NOVO 238 (2009):

> Almost forty years have passed since *Furman*, and nobody seriously argues that the Court's decision to regulate procedure has solved the constitutional problem of arbitrariness.  In fact, evidence indicates that the application of the death penalty is just as arbitrary today as it was when the Court decided *Furman*.  If *Furman* inspired positive changes in its immediate wake, those changes have been all but eviscerated in the past two decades.

*Id.* at 242.

Consequently, this Court should follow the lead of the Connecticut Supreme Court and

conclude, as that court did, in language only slightly modified from that court's opinion to focus on

the federal system, that

> After thoroughly reviewing the operation of [the federal] capital sentencing scheme over the past [twenty five years], we are persuaded that these critiques are well founded and that the opportunity for the exercise of unfettered discretion at key decision points in the process has meant that the ultimate punishment has not been reserved for the worst of the worst offenders. There is no doubt that our death row has counted among its residents the perpetrators of some of the most heinous crimes in [national] history. It is equally clear, however, that the process of selecting offenders for execution has been both under inclusive and over inclusive. Many who commit truly horrific crimes are spared, whereas certain defendants whose crimes are, by all objective measures, less brutal are condemned to death....To the extent that the population of death row has been chosen on grounds other than the atrocity of the offenders' crimes, this would undermine all confidence that capital punishment, as applied, is morally proportionate and serves a legitimate retributive function in [the federal system].

*Santiago*, 318 Conn. at 114-15.

5. **The Federal Death Penalty is unevenly applied on a regional basis and suffers from intractable problems of racial discrimination in the targeting of minority and male defendants and a demonstrated race/gender-of-victim effect.**

a. <u>Introduction</u>.

From the earliest days of the government's efforts to enforce a nation-wide death penalty, patterns of uneven and apparently discriminatory application appeared.  From the very outset, the federal death penalty was utilized almost exclusively by federal prosecutors in the South and, not surprisingly, federal death verdicts were returned almost exclusively in those traditional "death-belt" jurisdictions.  Added to this arbitrary factor was the invidious circumstance of race, since the federal death penalty, as it was rolled out in the 1990's, targeted a disproportionately large number of minority groups, particularly African-Americans and Hispanics.

By 1994 – barely six years after the return of a "modern" federal death penalty – obvious racial disparities surfaced in the Justice Department's prosecution of federal death penalty cases. In response, the House Subcommittee on Civil and Constitutional Rights initiated an investigation and concluded as follows:

> Race continues to plague the application of the death penalty in the United States.  On the state level, racial disparities are most obvious in the predominant selection of cases involving white victims.  On the federal level, cases selected have almost exclusively involved minority defendants.

*Racial Disparities in Federal Death Penalty Prosecutions 1988-1994*, Staff Report by the Subcommittee on Civil and Constitutional Rights, Committee on the Judiciary, 103rd Congress, 2nd Session, March 1994.[32]  That report found that as of 1994 there had been 37 defendants authorized for capital punishment under the § 848(e) (ADAA) scheme, of whom 33 (87 per cent) were black

_____

[32] Available at https://www.ncjrs.gov/pdffiles1/153840.pdf.

or Hispanic. *Id.* Presently the figure is 74 per cent (McNally Dec., App. at 0084), hardly an "improvement" to boast of.

Earlier evidence of the potential race-effect of the death penalty had also been provided by the agency formerly known as the General Accounting Office (now the Government Accountability Office). At the time Congress enacted the § 848(e) (ADAA) death penalty, the GAO was directed to undertake a study of the potential influence of race on the death penalty. 21 U.S.C. § 848(o)(2) (Repealed). The GAO in fact undertook that study in 1990 and concluded as follows:

> Our synthesis of the 28 studies shows a pattern of evidence indicating racial disparities in the charging, sentencing and imposition of the death penalty after the *Furman* decision.
> In 82 percent of the studies, race-of-victim was found to influence the likelihood of being charged with capital murder or receiving the death penalty, i.e. those who murdered whites were found to be more likely to be sentenced to death than those who murdered blacks. This finding was remarkably consistent across data sets, states, data collection methods and analytic techniques. The finding held for high, medium, and low quality studies.

United States General Accounting Office, Report to Senate and House Committee On The Judiciary, *Death Penalty Sentencing: Research Indicates Pattern of Racial Disparities* (Feb. 1990) at 5. [33] In a 1999 law review article, Professor Rory Little, writing with the perspective of one who had actually served on Attorney General Reno's Capital Case Review Committee, noted that serious questions about regional and racial disparities had not been ameliorated by the administrative process within the Justice Department. Rory K. Little, *The Federal Death Penalty: History and Some Thoughts About the Department of Justice's Role*, 26 FORDHAM URB. L.J. 347, 450-90. (1999). See also, Rory K. Little, *What Federal Prosecutors Really Think: The Puzzle of Statistical Race Disparity Versus Specific Guilt, and the Specter of Timothy McVeigh*, 53 DEPAUL L. Rev. 1591, 1613-14 (2004)("Statistical race disparity does not prove purposeful racial discrimination in

---

[33] Available at http://www.gao.gov/assets/220/212180.pdf.

federal capital prosecutions. Nevertheless, it is a persistent and disturbing fact. Lingering doubts remain that it occurs due to subconscious or attenuated systemic biases impossible to isolate or detect, but which are harmful nevertheless.")

Thus, from the very beginning of the modern federal death penalty, the government has been on notice that its targeting and enforcement patterns are problematical.

> b.      The 2000 DOJ Study.

In a press conference that took place on June 28, 2000, President Clinton was asked about a highly-publicized execution that had taken place the previous week in Texas and whether he believed it was time "for the American people to stop and reassess where we stand on implementation of the death penalty."  In response, the President said the following about the application of the federal death penalty, acknowledging concerns about race and regional practices:

> The issues at the federal level relate more to the disturbing racial composition of those who have been convicted and the apparent fact that almost all the convictions are coming out of just a handful of states, which raises the question of whether, even though there is a uniform law across the country, what your prosecution is may turn solely on where you committed the crime.  I've got a review underway of both those issues at this time.

(Transcript   of   the   President's   6/28/2000   press   conference:   available   at http://www.presidency.ucsb.edu/ws/index.php?pid=1666 (Last visited November 10, 2015).

On September 12, 2000, the Department of Justice released the comprehensive study alluded to by President Clinton in his remarks.  The study detailed how the federal death penalty had been administered for the 12 years from 1988 to the summer of 2000.[34]  The essence of the 2000 DOJ

---

[34] See. United States Department of Justice, *The Federal Death Penalty System: A Statistical Survey (1988-2000),* http://www.justice.gov/dag/selected-publications. The Department filed a supplemental report on June 6, 2001 after the change in administration. See, *The Federal Death Penalty System: Supplementary Data, Analysis and Revised Protocols for Capital Case Review* (June 2001), http://www.justice.gov/archive/dag/pubdoc/deathpenalty study.htm. Additionally, on June 7, 2007, the Justice Department transmitted statistics and more

Study's findings was that the federal death penalty had been disproportionately sought against minority-group defendants and irrationally sought on a regional basis.  The Study reported that federal death row consisted of 19 men, of whom four were white, 13 black, one Hispanic and one "other."  Consistent with the historical roots of the death penalty, 12 of the 19 defendants on federal death row at the time of the DOJ Study had been sentenced to death in the South. Virginia and Texas had contributed four defendants apiece.  No other jurisdiction, at the time of the Study's release, had sentenced more than a single defendant to death.[35]

In terms of which defendants actually faced the federal death penalty, the 2000 Study showed that of the 159 cases where the Attorney General had authorized a capital prosecution, 44 defendants where white (27.7%), 71 were black (44.7%), 32 were Hispanic (20.1%) and another 12 were categorized as "other" (7.5%).  *See,* Table 1A at p. T-2 of DOJ Study.  Thus, as of the summer of 2000, more than 70% of the federal defendants targeted for the death penalty had been non-whites.

In addition to the racial disparity in federal death-penalty prosecutions, the study found a regional bias in the enforcement of the federal death penalty.  The DOJ Study revealed the following on the issue of regional disparity:

- From 1995 onward, of the 94 separate federal districts in the federal system, only 49 had ever submitted a case recommending capital prosecution.  (DOJ Study at 14.)[36]

recent findings on the administration of the federal death penalty to Senator Feingold in the course of oversight hearings, http://www.deathpenaltyinfo.org/DOJResponses6-07.pdf.

[35]In terms of percentages across the board, the race and region figures have not changed appreciably in the 15 years since the 2000 DOJ Study's release.

[36]As of the present time, there are still 23 of the 94 federal districts that have never had an authorized capital case. (McNally Dec., App. 0085-86.) This includes entire districts in California, Alabama, Minnesota, Delaware, the Eastern and Western Districts of Washington, Nebraska, Oklahoma, and the Eastern and Western Districts of Wisconsin, South Dakota, Utah, Wyoming and Montana.

- Twenty-two federal districts had never submitted a case for review at all.[37]  (DOJ Study at T-59.)

- Twenty-one federal districts, although submitting one or more cases for review, had never sought permission to seek the death penalty in any case.[38]

*Id.*

The release of the report drew the following public comment from officials at the Justice Department and the White House:

Saying she was "sorely troubled" by stark racial disparities in the federal death penalty, Attorney General Janet Reno today ordered United States attorneys to help explain why capital punishment is not applied uniformly across ethnic groups.

M. Lacey and R. Bonner, "Reno Troubled by Death Penalty Statistics," *N.Y. Times*, September 13, 2000.  The *Times* also reported the reaction of then Deputy Attorney General Eric Holder, who was, at the time, the highest-ranking African American at the Justice Department:

_____

[37]The potential universe of federal capital prosecutions is vast. Virtually any murder committed in the course of a federal firearms violation is a potential federal death penalty case. 18 U.S.C. § 924(j).  In *United States v. Chanthadara,* 230 F.3d 1237 (10th Cir. 2000), where the government proceeded on a Hobbs Act theory of federal prosecution, the defendant was sentenced to death for a murder committed in the course of the robbery of a restaurant, an unfortunately garden variety type of criminal behavior.  That sentence of death was vacated on appeal on other grounds (and the defendant later sentenced to life imprisonment), but the potential number of cases that could be prosecuted on this theory is staggering.  Any murder committed while engaged in a narcotics conspiracy involving more than 50 grams of crack cocaine or 5 kilograms of heroin remains a potential federal capital case.  21 U.S.C. § 848(e).

[38]The recommendation that accompanies a submission is of great importance.  In 91% of cases where the local United States Attorney did not want to prosecute the case as a death-penalty case, that recommendation was followed by the Attorney General.  (DOJ Study at 43.)  In 83% of cases where death-penalty authorization was requested, that recommendation was also followed by the Attorney General.  *Id.*  These figures are based on the 575 defendants whose cases were reviewed by the Attorney General from 1995-2000.  In the "pre-protocol" period – November 1988 through January 27, 1995 – the only cases reviewed were those where the local United States Attorney affirmatively had requested capital-authorization.  The approval rate for those cases was 90%.  (DOJ Study at 10.)

"I can't help but be personally and professionally disturbed by the numbers that we discuss today," Deputy Attorney General Eric Holder sa*Id.* "To be sure, many factors contributed to the disproportionate representation of racial and ethnic minorities throughout the federal death penalty process. Nevertheless, no one reading this report can help but be disturbed, troubled, by this disparity."

*Id.* [39] CNN reported that Attorney General Reno wanted "a broader analysis."[40] White House deputy press secretary Jake Siewert responded to the release of the report in the following manner: "'At first glance, those numbers are troubling. We need to know what's behind the numbers.'"[41] During his confirmation hearings the year following the Study's release, Attorney General Ashcroft also noted that evidence of racial disparity in the federal death penalty "troubled [him] deeply." Quoted in *United States v. Bass, supra*, 266 F.3d at 538 n.1.

A former member of the Department of Justice Capital Case Review Committee turned law professor announced in 2004 that "[s]tatistical race disparity...is a persistent and disturbing fact." Rory K. Little, *What Federal Prosecutors Really Think: The Puzzle of Statistical Race Disparity Versus Specific Guilt, and the Specter of Timothy McVeigh*, 53 DEPAUL L. Rev. 1591, 1613-14 (2004). He suggested two specific reforms to address the problem. First, he recommended that "we

---

[39] As indicated in the *Politics and Prosecution* article, "during his confirmation hearing, Holder said that the Department of Justice's 2000 report on the death penalty 'raised some very disturbing questions about not only the racial identity of people who were in the death system—in the federal death system, but also the geographic distribution of those people.'" *Politics and Prosecution* at 96, quoting Confirmation Hearing on the Nomination of Eric H. Holder to be Attorney General of the United States: Hearing Before the S. Comm. on the Judiciary, 111th Cong. 67 (2009).

[40] In *United States v. Bass,* 266 F.3d 532 (6th Cir. 2001), *reversed*, 532 U.S. 1035 (2002) (per curium), the Sixth Circuit quoted at length from the public statements of Attorney General Reno and Deputy Attorney General Holder in response to the release of the DOJ Study. 266 F.3d at 538.

[41] Considering the impact of the study, Judge Sand in *United States v. bin Laden*, 126 F. Supp.2d 256, 258 (S.D.N.Y. 2000) found the statistical evidence "indeed troubling," but ultimately rejected a challenge to that capital prosecution.

should restrict capital punishment to 'high-end' cases with defined, extremely aggravating, factors. This could be done statutorily or as a matter of prosecutorial policy. But it would necessitate removing certain vague or too easily manipulated statutory 'aggravating' factors that are commonly used today, such as 'heinous or atrocious,' 'committed for pecuniary gain,' or 'committed in conjunction with another felony.'" *Id.* at 1611. A review of the death notice in Mr. Fell's case, as well as a review of the case summaries at App. 0101-0242 and of the verdict forms on the FDPRC website clearly demonstrates that this suggested reform never gained traction at the DOJ.

Second, noting that "[t]here is anecdotal information emerging to suggest that the current administration under Attorney General John Ashcroft may be lowering the standard of aggravation for approval of federal capital prosecutions", he recommended that "there must be strict enforcement of the 'substantial federal interest' requirement for federal capital prosecutions, and the Ashcroft amendment to the protocols that allow the availability of the death penalty itself to fulfill this requirement should be abolished. Most murder cases should remain at the state level, and the simple fact that a state has chosen not to enact a death penalty should not be sufficient without a more identifiable 'federal' interest to drive a case into the federal system." [42]  *Id.* at 1606 n. 17, 1613. Accord, John Gleeson, *Supervising Federal Capital Punishment: Why the Attorney General Should Defer When U.S. Attorneys Recommend Against the Death Penalty*, 89 Va. L.Rev. 1697, 1716 (2003) ("In a federal system that rightly accords great deference to states' prerogatives, the federalization of the death penalty should be limited to cases in which there is a heightened and demonstrable federal interest, one that justifies the imposition of a capital prosecution on

---

[42] As pointed out by Little, under Attorney General Janet Reno, the DOJ Capital Case Protocols provided that "the fact that the maximum Federal penalty is death is insufficient, standing alone, to show a more substantial interest [than a state's] in federal prosecution." *Id.* at 1613 n. 95. This provision was repealed in 2001 under Attorney General Ashcroft. The current DOJ Death Penalty Protocol does not contain the abolished provision.

communities that refuse to permit them in their own courts."). Once again, Mr. Fell's case is proof positive that this reform never took hold, since both Attorney General Ashcroft and Holder insisted, over the recommendation of the local United States Attorney, that the death penalty be sought (Ashcroft) and re-sought (Holder) against Mr. Fell in the non-death penalty state of Vermont in a case in which the lack of a substantial federal interest is plainly evident. [43] See, *United States v. Fell*, 571 F.3d 264, 286 (2d Cir. 2009)(Calabresi, J., dissenting from the denial of rehearing *en banc*)("In fact, the draft plea agreement reflected the judgments of Vermont-based law enforcement enforcers on what was appropriate locally, and its overruling by Main Justice reflected a centralist, and in this case decidedly anti-federalist, decision.")

In sum, absent real reforms of this type, "troubled" and "disturbed" public officials do not cure constitutional violations or remedy arbitrary and invidious practices. As this discussion continues, it will be seen that more than 15 years later, nothing has changed. If anything, to quote the title of Mr. McNally's DePaul Law Review article, a "non-existent" problem has gotten worse.

---

[43] The thin federal jurisdictional premise of the capital Count 1 in this case is that Mr. Fell took "a motor vehicle that had been transported, shipped and received in interstate and foreign commerce, and the death of Teresca King resulted from such taking of the automobile." [Doc. 57]. The equally thin federal jurisdictional premise of capital Count 2 is that Mr. Fell willfully transported his victim, while she was alive, "in interstate commerce from the State of Vermont to the State of New York, resulting in the death of Teresca King." However, directly contradicting this allegation that the purpose of the transport was "interstate commerce", in its Notice of Intent to Seek the Death penalty, the government alleged as a non-statutory aggravating factor that "Donald Fell participated in the abduction of Teresca King to facilitate his escape from the area in which he and an accomplice had committed a double murder." [Doc. 32 at 3]. There simply is no substantial federal interest in this case. See, United States Department of Justice, *The Federal Death Penalty System: Supplementary Data, Analysis and Revised Protocols for Capital Case Review* (June 2001)("A factor of particular importance is the focus of federal enforcement efforts on drug trafficking enterprises and related criminal violence. The prosecution of drug crimes has generally been a key priority both of Congress and of federal law enforcement for many years., http://www.justice.gov/archive/dag/pubdoc/deathpenaltystudy.htm.

See, Kevin McNally, *Race and the Federal Death Penalty: A Nonexistent Problem Gets Worse*, 53 DePaul L. Rev. 1615 (2004).

c.    The persistent capricious circumstance of region.

As to the regional bias of federal capital prosecutions, the FDPA remains a largely Southern phenomenon.  Nearly two-thirds of federal death verdicts have come out of the traditional "death belt" states. Additionally, these states sentence federal defendants to death at a significantly higher rate than elsewhere in the country.

TABLE II: 1988-2015
STATES WITH MORE THAN ONE FEDERAL DEATH VERDICT

| STATE | AUTHORIZED | CASES | DEFENDANTS TRIED | DEATH SENTENCES | RATE |
|---|---|---|---|---|---|
| Texas | 31 | | 21 | 14 | 66 % |
| Missouri | 29 | | 21 | 10 | 50% |
| Virginia | 57 | | 35 | 8 | 23% |
| Louisiana | 11 | | 6 | 5 | 83% |
| North Carolina | 10 | | 5 | 4 | 80% |
| Georgia | 9 | | 6 | 3 | 50% |
| Oklahoma | 6 | | 5 | 3 | 60% |
| Maryland | 26 | | 10 | 2 | 20% |
| Pennsylvania | 23 | | 9 | 2 | 22% |
| Arkansas | 7 | | 5 | 2 | 40% |
| California | 44 | | 10 | 2 | 20% |
| Florida | 15 | | 7 | 2 | 29% |
| Illinois | 12 | | 5 | 2 | 40% |
| Iowa | 4 | | 2 | 2 | 100% |
| Massachusetts | 5 | | 3 | 2 | 66% |
| New York | 45 | | 24 | 2 | 8% |
| South Carolina | 3 | | 2 | 2 | 100% |
| West Virginia | 8 | | 3 | 2 | 66% |

(Source: McNally Declaration – App. 0085-92.)

In *Santiago*, noting the regional caprice of the death-penalty on a nation-wide basis, the Connecticut Supreme Court examined the death-penalty sentencing rates of the 13 states that made up the Confederacy and concluded that those states were responsible for 75% of the executions carried out in the United States since 1976. *State v. Santiago*, 318 Conn. at 81.[44] In terms of federal death verdicts and the confederacy (the number of federal executions – three – are not enough to reach a meaningful conclusion, nonetheless two out of the three were cases from Texas) shows that 49 of 81 federal death verdicts have come out of the states that formed the confederacy, more than 62% of all federal capital verdicts. Just three of those former confederate states – Texas, Missouri and Virginia – account for 32 federal death verdicts, 40 per cent of the total.

When one examines the numbers on a circuit basis, as outlined in the McNally Declaration, the results reflect the same regional bias. To put it bluntly, if we have a national death penalty it should not matter where you are tried in terms of the likelihood of receiving a death sentence but that very much is the reality.

TABLE III: 1988-2015
DEATH SENTENCING RATES BY CIRCUIT

| CIRCUIT | AUTHORIZED DEFENDANTS TRIED | SENTENCED T0 DEATH | PER CENT |
|---|---|---|---|
| First | 12 | 2 | 17% |
| Second | 31 | 3 | 10% |
| Third | 17 | 2 | 12% |
| Fourth | 70 | 14 | 20% |

---

[44]The states of the Confederacy were: Alabama, Arkansas, Florida, Georgia, Kentucky, Louisiana, Mississippi, Missouri, North Carolina, South Carolina, Tennessee, Texas, and Virginia.

| CIRCUIT | AUTHORIZED DEFENDANTS TRIED | SENTENCED T0 DEATH | PER CENT |
|---|---|---|---|
| Fifth | 29 | 19 | 66% |
| Sixth | 19 | 3 | 16% |
| Seventh | 9 | 3 | 33% |
| Eighth | 31 | 15 | 48% |
| Ninth | 22 | 4 | 18% |
| Tenth | 18 | 5 | 28% |
| Eleventh | 20 | 6 | 30% |
| DC | 4 | 0 | 0% |

(SOURCE: McNALLY DECLARATION at App. 0085-92.)

Historically, the death penalty has been a largely Southern phenomenon; that remains the case today. As of October 30, 2015, there had been 1,419 post-*Gregg* executions carried out in the United States. (DPIC, Facts About The Death Penalty, App. 0001.) Of these, 1,153 – or 81% – have been carried out by Southern states. (App. 0003.) Three states alone – Texas, Oklahoma and Virginia – have accounted for 753 executions, more than half (53%) of all post-*Gregg* executions. (*Id.*). [45] With this historical perspective in mind, it is no surprise that those federal jurisdictions in states with an established "culture of death" reflect that culture, consciously or not, in decisions to pursue the death penalty. Neither is it surprising that federal juries accustomed to seeing death sentences routinely returned in their own communities would do the same. Regional bias, however, is inimical to a national penalty that is, theoretically at least, that death is sought and imposed using consistent national standards. The Attorney General's Capital Case Protocol, published as part of

---

[45] A recent study conducted by the Death Penalty Information Center concluded that "[t]he South has carried out 82% of the executions, the Northeast, less than 1%", and that more than half of this nation's *post-Furman* executions came as a result of cases prosecuted in two per cent of the nation's counties. *See*, "The 2% Death Penalty: How a Minority of Counties Produce Most Death Cases at Enormous costs to All" (Death Penalty Information center 2013). Copy reproduced at App. 0043.

the United States Attorneys Manual, touts national consistency as one of its goals in deciding whether to authorize a capital prosecution in a given case. [46] See e.g. § 9-10.030 - Purposes of the Capital Case Review Process ("Each such decision must be based upon the facts and law applicable to the case and be set within a framework of consistent and even-handed national application of Federal capital sentencing laws."); § 9-10.140 - Standards for Determination ("The standards governing the determination to be reached in cases under this Chapter include fairness, national consistency, adherence to statutory requirements, and law-enforcement objectives."). As the next table shows, the Department has failed miserably at this.

///

///

///

///

---

[46] Available at http://www.justice.gov/usam/usam-9-10000-capital-crimes.

CHART I

STATES WHERE FEDERAL DEATH VERDICTS HAVE BEEN RETURNED
(as of 10-27-15) [47]



The failed "ideal" of a "national consistency" aside, the federal death penalty into 2015 continues

to be a Southern phenomenon and federal districts from the South predictably "lead the charge" in

seeking and receiving authorization to take cases capital and in convincing juries to return death

verdicts.  Thus, "[o]f the 81 federal death sentences imposed by juries since 1988, 51 [64 %] have

_____

[47] Provided by the Federal Capital Habeas Project and available at: https//www.capdefnet
.org/2255/pubmenu.aspx?menu_id=32&id=334.

come from the traditional 'death belt' states, the states that have historically executed the most people." (McNally Declaration at App. 0086.)  In a study of this issue published in 2010, the authors note:

> Geographic disparities . . . persist. To promote uniformity, United States Attorneys submit all death-eligible federal cases to the United States Attorney General for death-authorization. Yet the geography of the federal death penalty is anything but uniform. Six of the ninety-four federal judicial districts account for one-third of death-authorizations. More than half of all death-authorizations come from fourteen federal districts. Seven federal districts are responsible for approximately 40% of the individuals on federal death row. Two-thirds of districts have not sentenced anyone to death. Nearly one-third of federal districts have not sought a death sentence. Fewer than 20% of federal districts have sentenced more than one person to death.

G. Ben Cohen. & Robert J. Smith, *The Racial Geography of the Federal Death Penalty,* 85 WASHINGTON LAW REV. 425, 429-430 (2010). As of 2015 25% of the 94 federal districts have *never* had an authorized federal capital case. (App. at 0086.)

The reality is there has been no appreciable change since the 2000 DOJ Study, and the federal death penalty remains a disproportionately Southern phenomenon. It thus appears – whether one takes a micro or macro view – that the irrational caprice of geographical location has as much to do with facing the federal death penalty as does the crime committed. This is the essence of arbitrariness and caprice. To quote former President Clinton, "[W]hat your prosecution is may turn solely on where you committed the crime." [48] See also, *Glossip v. Gross*, 135 S. Ct. at 2761 (Breyer and Ginsburg, JJ., dissenting)(" Geography also plays an important role in determining who is

---

[48]It also appears that trying to "fix" one part of a the geography problem may give rise to others.  *See*, B. Weiser and W. Glaberson, *Ashcroft Pushed Executions in More Cases in New York*, *N.Y. Times,* 2/6/03 (Reporting on efforts by the Attorney General to require federal prosecutors in New York and Connecticut to seek death more often;);  B. Weiser and W. Glaberson, *Decisions on Death Cases Raise Questions of Race*, *N.Y. Times*, 2/14/03 (Pointing out that the 12 defendants as to whom Attorney General Ashcroft overruled a New York area federal prosecutor's decision not to seek the death penalty were all black or Hispanic).

sentenced to death."); *State v. Santiago*, 318 Conn. at 85 ("In the case of capital punishment, the regional disparities are both instructive in their character and striking in their magnitude.").

A death penalty that operates on an arbitrary basis is unconstitutional under both the Eighth Amendment and the due process and equal protection guarantees of the Fifth Amendment. *See*, *Bush v. Gore*, 531 U.S. 98, 106, 121 S.Ct. 525, 148 L.Ed.2d 388 (2000) (equal protection and due process violations found where "the standards for accepting or rejecting contested ballots might vary not only from county to county but indeed within a single county from one recount team to another. This is not a process with sufficient guarantees of equal treatment."); see also, *United States v. Bin Laden*, 126 F. Supp. 2d 256, 263 (S.D.N.Y. 2000) (finding that the Eighth Amendment would be violated if the federal government had decided to seek the death penalty on the basis of geographic considerations); accord, *United States v. Jacques*, 2011 WL 3881033 * 4 (D. Vt. Sept. 2, 2011); *United States v. Johnson*, 900 F.Supp.2d 949, 962-963 (N.D.Iowa,2012). What is true with respect to non-capital sentencing is equally true and more disturbing with respect to the federal death penalty: "Regrettably, there is as much regional disparity in sentencing now as there was prior to the creation and enactment of the Sentencing Commission and Guidelines. The origin of that disparity, however, has shifted from the judiciary to politically appointed prosecutors." *United States v. Buckendahl*, 251 F.3d 753, 764-65 (8th Cir. 2001).

As these cases teach, the Eighth Amendment and the Fourteenth Amendment's due process and equal protection clauses prohibit allowing or disallowing the death penalty based solely on the arbitrary factor of geography, or on the equally arbitrary and related geographic factor that a particular state does not endorse the death penalty. See *Politics and Prosecution* at 57, 87(the lead author, a former United States Attorney in the Eastern District of New York who "participated in committee meetings advising the U.S. Attorney on the disposition of capital cases" admits that

74

beginning with Attorney General Ashcroft's administration and his modification of the death penalty Protocol, non-death penalty states such as Vermont were "seemingly targeted by the Department of Justice.")[49]

> d. <u>The continuing and unabated practice of targeting males and minorities for the federal death penalty, the long-documented "white-victim effect," and the emergence of a "white female victim effect" further demonstrate the arbitrary and irrational operation of the federal death penalty</u>.[50]

After more than 25 years of a federal death penalty, it is undeniable and clear that the patterns of race and region that disturbed and troubled government officials 15 years ago persist. It seems undeniable that these problems are intractable and part of the DNA of capital punishment, including the federal version. The following tables reflect the present state of affairs:

---

[49] The authors point to Ashcroft's change in the Protocol, the firing of local United States Attorneys who disagreed with DOJ's death penalty policies, and the experience in Vermont, Massachusetts, New York, and Puerto Rico as stark evidence of this geographic targeting. With respect to Puerto Rico, the authors note:

> Puerto Rico's deep-seated opposition to capital punishment is reflected in its Constitution, which declares bluntly that "[t]he death penalty shall not exist." Nonetheless, Puerto Rico has been a virtual repository for the Department of Justice's capital prosecution efforts and once had the greatest number of pending death penalty cases in the entire federal system.

*Id.* at 95.

[50] The victims in this case are white, as is Mr. Fell. Mr. Fell has standing to raise the present argument. See, *McCleskey v. Kemp*, 481 U.S. 481 U.S. 279, 291 n. 8 (1987)("It would violate the Equal Protection Clause for a State to base enforcement of its criminal laws on "an unjustifiable standard such as race, religion, or other arbitrary classification.... Because McCleskey raises such a claim, he has standing."); *United States v. Sampson*, 275 F. Supp. 2d 49, 69, 87 (D. Mass. 2003).

TABLE IV: 1988-2015

THE RACE OF THE 498 FEDERAL DEFENDANTS
TARGETED FOR FEDERAL EXECUTION

| RACE OF DEFENDANT | NUMBER | PER CENT |
|---|---|---|
| AFRICAN-AMERICAN | 251 | 50% |
| CAUCASIAN | 131 | 26% |
| HISPANIC/ LATINO | 92 | 26 |
| OTHER | 24 | 5% |

(Source: McNally Declaration at App. 0084.) In terms of targeting decisions, therefore, 73% of those selected for capital prosecutions are members of minority groups.  At the time of the 2000 DOJ Study, the figure was 70%.

As the chart on the following page demonstrates, the disproportionate targeting of minorities for the federal death penalty has had what would be the expected effect on the population of death row. Thus, as of the spring of 2015, 60 percent of those presently on federal death row are non-white. This is an unacceptable state of affairs and, bluntly, one that should be a source of intense concern to the Justice Department.



CHART II: RACIAL COMPOSITION OF
FEDERAL DEATH ROW (as of MAY 27, 2015) [51]



(1)     *The law on race and the death penalty.*

Twenty-eight years ago, dissenting in *McCleskey v. Kemp*, 481 U.S. 279 (1987), Justices

Brennan, Marshall, Blackmun and Stevens hypothesized an attorney-client conversation where an

African-American defendant charged with capital murder asked his attorneys what the chances were

that he would be sentenced to death and what would factor into that process. Based on the statistical

analysis presented to the Court in *McCleskey*, it was the four dissenters' conclusion that, at some

---

[51] Provided by the Federal Capital Habeas Project and available at:
https://www.capdefnet .org/2255/pubmenu.aspx?menu_id=32&id=332.

point in the dialogue, defense counsel would have to level with their client and tell him that his race would play an important role – perhaps a determinative one – in whether he lived or died:

> The story could be told in a variety of ways, but [the client] could not fail to grasp its essential narrative line: there was a significant chance that race would play a prominent role in determining if he lived or died.

*McCleskey*, 481 U.S. at 322 (Opinion of Brennan, Marshall, Blackmun and Stevens, J.J., dissenting).[52] In *McCleskey*, a rigorous statistical study of Georgia's capital sentencing practices found that killers of whites, regardless of their own race, were more likely to be sentenced to death than killers of African-Americans.  One of the major statistical models relied on by McCleskey showed that "defendants charged with killing white victims (whatever their own race) were 4.3 times as likely to receive a death sentence as defendants charged with killing blacks." 481 U.S. at 287.

More than a century ago, in *Yick Wo v. Hopkins*, 118 U.S. 356 (1886), the Court observed that application of seemingly neutral laws "with an evil eye and an unequal hand, so as practically to make unjust and illegal discrimination between persons in similar circumstances" amounts to a denial of equal protection.  *Id.* at 373-74. The historical truth is that in the United States capital punishment and race have always  been inextricably intertwined.  That state-of-affairs is likely to continue, regrettably, until we can say honestly that racism has disappeared from our society. *See, e.g.*, C. J. Ogletree (Ed.) and A. Sarat, *From Lynch Mobs to the Killing State: Race and the Death Penalty in America* (New York University Press 2006); R. K. Little, *What Federal Prosecutors Really Think: The Puzzle of Statistical Race Disparity Versus Specific Guilt, and the Specter of Timothy McVeigh*, 53 DEPAUL L. REV. 1591 (2004); K. McNally, *Race and the Federal Death Penalty: A Nonexistent Problem Gets Worse*, 53 DEPAUL L. REV. 1615 (2004); C. J. Ogeltree, *Black Man's Burden: Race*

---

[52]After his retirement from the bench, Justice Powell wrote that he regretted both voting with the majority, and authoring the Court's 5-4 opinion upholding the death-penalty in *McCleskey*.  *See,* Jeffries, *Justice Lewis F. Powell, Jr.* (1994) at pp. 451-52.

*and the Death Penalty in America*, 81 OREGON L.REV. 15 (2002); G. L. Pierce, M. L. Radlet, *Race, Region, and Death Sentencing in Illinois*, 81 OREGON L.REV. 39 (2002); S. Bright, *Discrimination, Death and Denial: The Tolerance of Racial Discrimination in the Infliction of the Death Penalty*, 35 SANTA CLARA L.REV. 433 (1995); D. Baldus, *Reflections on the 'Inevitability' of Racial Discrimination in Capital Sentencing and the 'Impossibility' of its Prevention, Detection and Correction*, 51 WASH. & LEE L.REV. 359 (1994); Bienen, Weiner, Denno, Allison and Mills, *The Reimposition of Capital Punishment in New Jersey: The Role of Prosecutorial Discretion*, 41 RUTGERS L.REV. 27, 100-57 (1988).

In Connecticut's recent *Santiago* decision, the issue of race and the death penalty in that affluent northeastern state was examined with the following conclusion:

> [D]ata from three authoritative governmental sources . . . all suggest that the death penalty in Connecticut continues to be imposed disproportionately based on the race and ethnicity of the offender and the victim. The alleged disparities are significant and hold across hundreds of cases. We are not aware of any study or report to have reached a contrary conclusion.

*State v. Santiago*, 318 Conn. at 151.

79

In *Furman*, Justice Douglas had explored the correlation between race and the death penalty[53]

and concluded:

> In a Nation committed to equal protection of the laws there is no permissible "caste" aspect of law enforcement.  Yet we know that the discretion of judges and juries in imposing the death penalty enables the penalty to be selectively applied, feeding prejudices against the accused if he is poor and despised, lacking political clout, or if he is a member of a suspect or unpopular minority, and saving those who by social position may be in a more protected position.  In ancient Hindu law, a Brahman was exempt from capital punishment, and in those days, "[g]enerally, in the law books, punishment increased in severity as social status diminished." We have, I fear, taken in practice the same position . . . .

*Furman*, 408 U.S. at 255 (Douglas, J., concurring; footnotes omitted.)  As recently as 1991, the

execution of a white man for the murder of a black man was front-page news as an event that had not

occurred in the nation for 50 years.  *See*, D. Margolick, *Rarity for U.S. Executions: White Dies for*

---

[53]A study of death verdicts returned in Philadelphia illustrates the invidious and odious nature of the problem of race and the death penalty. The study concluded that convicted murderers with stereotypical African-American features (flat noses, large lips, kinky hair) and dark skin were more likely to receive the death penalty for killing a white person than lighter-skinned African-American defendants with more Caucasian features.  J. Eberhardt, P.G. Davies, V. J. Purdie-Vaughns, S.L. Johnson, *Looking Deathworthy: Perceived Stereotypicality of Black Defendants Predicts Capital-Sentencing Outcomes*,  17 PSYCHOLOGICAL SCIENCE 383 (Spring 2006). *See also*, Justin D. Levinson, Robert J. Smith & Danielle M. Young, *Devaluing Death: an Empirical Study of Implicit Racial Bias on Jury-Eligible Citizens in Six Death Penalty States*, 89 NEW YORK UNIVERSITY LAW REVIEW 513 (2014)("[W]e conducted a study on 445 jury-eligible citizens in six leading death penalty states. We found that jury-eligible citizens harbored two different kinds of the implicit racial biases we tested: implicit racial stereotypes about Blacks and Whites generally, as well as implicit associations between race and the value of life. We also found that death-qualified jurors— those who expressed a willingness to consider imposing both a life sentence and a death sentence—harbored stronger implicit and self-reported (explicit) racial biases than excluded jurors."); Mona Lynch and Craig Haney, *Mapping the Racial Bias of the White Male Capital Juror: Jury Composition and the "Empathic Divide''*, 45 LAW & SOCIETY REVIEW 69, 91 (2011)("[T]he white male jurors in this study judged a black defendant whom they tended to view as driven by the defendant's own depraved predispositions, and as someone whose criminal behavior they were reluctant to interpret as the product of the defendant's dysfunctional and psychologically damaging background.") As Justices Breyer and Ginsburg recently acknowledged, "racial and gender biases may, unfortunately, reflect deeply rooted community biases (conscious or unconscious), which, despite their legal irrelevance, may affect a jury's evaluation of mitigating evidence." *Glossip v. Gross*, 135 S.Ct at 2763.

*Killing Black*, *N.Y. Times*, September 7, 1991, p.1, col. 1.  DPIC reports that since executions resumed in the wake of *Gregg*, there have been 31 executions of a white defendant for killing a black victim; but there have been 295 executions of black defendants who killed a white victim. (App. 0002.)

Mr. Fell's showing in this motion is sufficient to establish a case of arbitrariness and invidious discrimination in the enforcement of the federal death penalty. See, *United States v. Sampson*, 275 F. Supp. 2d 49, 89 (D. Mass. 2003)(" If the sentences of similarly situated defendants based on these three factors [the race of the defendant, the race of the victim, and the geographic location of the prosecution] were so great as to make the imposition of the death penalty arbitrary and capricious, the Eighth Amendment would be violated. The first two factors, the race of the defendant and the race of the victim, also implicate the Fifth Amendment's guarantee of equal protection of the law.")  It is difficult to imagine how, other than racism, one can explain the arbitrary manner in which the federal death penalty has been administered in terms of the race of those who are targeted. *See, Batson v. Kentucky*, 476 U.S. 79, 93-94 (1986).  To all appearances, there is "a clear pattern, unexplainable on grounds other than race." *Arlington Heights v. Metropolitan Housing Dev. Corp.*, 429 U.S. 252, 266 (1977).

The Supreme Court has repeatedly emphasized that "the core of the Fourteenth Amendment is the prevention of meaningful and unjustified official distinctions based on race." *Hunter v. Erickson*, 393 U.S. 385, 391 (1969).  This case, as a federal prosecution, is subject to the Due Process Clause of the Fifth Amendment which has long been held to embody a guarantee of equal protection. *Bolling v. Sharpe*, 347 U.S. 497, 499 (1954); *see Weinberger v. Wisenfeld*, 420 U.S. 636, 638 n.2 (1975) ("[Our] approach to Fifth Amendment equal protection claims has . . . been precisely the same as to equal protection claims under the Fourteenth Amendment.")  In the area of criminal justice,

where racial discrimination "strikes at the fundamental values of our judicial system and our society as a whole," *Rose v. Mitchell*, 443 U.S. 545, 556 (1979), the Supreme Court has "consistently" articulated a "strong policy . . . of combating racial discrimination." *Id.* at 558. That the federal death penalty operates with an impermissible racist effect is powerful evidence that it operates fundamentally unfairly and with arbitrariness and caprice. Accordingly, Mr. Fell has standing pursuant to the Eighth Amendment and Fifth Amendment Due Process Clause not to be subjected to an arbitrary system of capital punishment.

There is strong and consistent evidence that minority and male defendants are many times more likely than white defendants to face the death penalty at the hands of the federal government. This is a problem that demands our government's  "most rigid scrutiny" of the kind described in *Loving*.

The Eighth Amendment's prohibition of the arbitrary use of the death penalty imposes constitutional limitations on capital punishment that do not apply to lesser punishments.  *See*, e.g., *Woodson v. North Carolina*, 428 U.S. 280 (1976) and *Roberts v. Louisiana*, 428 U.S. 325 (1976) (mandatory death sentences – but not other mandatory sentences – are unconstitutional); *Lockett v. Ohio*, 438 U.S. 586 (1978) (sentencer must be free to give  "independent mitigating weight" to any fact about the defendant or the offense, in a capital case); *Bullington v. Missouri*, 451 U.S. 430 (1981) (imposition of a death sentence after reversal of a sentence of life imprisonment is unconstitutional, although there is no similar *per se* ban on harsher sentencing on retrials of other criminal cases); *Turner v. Murray*, 476 U.S. 28 (1986) (capital defendants in interracial murders – but not non-capital murder defendants – are automatically entitled to have potential jurors questioned about the effects of possible racial biases).

Secondly, it is obvious that racial discrimination is a species of the arbitrariness condemned in *Furman*. This is apparent from the opinions of the Justices in the majority and of those in dissent alike. For example, Justice Douglas concluded that the capital statutes before him were "pregnant with discrimination," 408 U.S. at 157, and thus ran directly counter to "the desire for equality . . . reflected in the ban against `cruel and unusual punishments` contained in the Eighth Amendment." *Id.* at 255. Similarly, Justice Stewart lamented that "if any basis can be discerned for the selection of these few sentenced to die, it is the constitutionally impermissible basis of race." *See Id.* at 364-366 (Marshall, J., concurring); *Id.* at 389 n.12 (Burger, C.J. dissenting); *Id.* at 449-50 (Powell, J., dissenting). Later Supreme Court cases have applied this interpretation. Thus, for example, in *Zant v. Stephens*, *supra*, the Court explained that *Furman* would be violated if a state based its capital sentencing on "factors that are constitutionally impermissible or totally irrelevant to the sentencing process, such as . . . the race . . . of the defendant." 462 U.S. at 885.

Taken together, then, these two points can be summarized as follows: The Cruel and Unusual Punishments Clause of the Eighth Amendment imposes a constitutional prohibition against racial or gender discrimination in the use of the death penalty that is at least as strict as the general proscription of racial and gender discrimination in the (implicit) equal protection clause of the Fifth Amendment. In *Graham v. Collins*, 506 U.S. 461 (1993), Justice Thomas' concurring opinion summed this point up succinctly when he noted that racial prejudice or bias in the context of capital punishment "is the paradigmatic capricious and irrational sentencing factor." *Id.* at 484. Where a death penalty appears to operate so as to institutionalize racism, it offends the same constitutional values that yielded *Furman* and this nation's abandonment of capital punishment.

(2)     *The effect of gender of defendant, and of race and gender of victim in the application of the FDPA.*

For obvious reasons, a capital punishment scheme which explicitly provided that the death penalty is more appropriate where the defendant is a male, or where the victim is white or white and female would not be constitutional. A scheme that operates in practice to the same effect is no better. On the question of race-of-victim, research that is consistent across several decades has demonstrated that those who kill whites are more likely to face a sentence of death and to be sentenced to death than those who kill members of minority groups.[54] A race-of-victim effect has been repeatedly found to be present in capital prosecutions, including the federal system.[55] In their *Glossip* dissent, Justices Breyer and Ginsburg noted, "Numerous studies have concluded that individuals accused of murdering white victims, as opposed to other black or minority victims, are more likely to receive a death penalty."[56] *Glossip* dissent, 135 S.Ct. at 2760.

---

[54]Figures compiled by the Federal Death Penalty Resource Counsel Project, current as of September 22, 2105, reflect that 57% of those on federal death row were convicted of murdering white victims. (App. 0079.)

[55] For a comprehensive discussion of the white-victim effect, *see* D. Baldus and G. Woolworth, *Race Discrimination and the Legitimacy of Capital Punishment: Reflections on the Interaction of Fact and Perception*, 53 DePaul L. Rev. 1411, 1423-1428 (2004).  Utilizing statistics current at the time of the study, the authors noted that the nation-wide average for execution of those who killed whites was in the 83% range, while whites were victims of murder in only approximately 45% of such cases.  *Id* at 1423.  *See also,* K. McNally, *Race and the Federal Death Penalty: A Non-Existent Problem Gets Worse*, 53 DePaul L. Rev. 1615, 1623-24 (2004)("Between January 27, 1995 and July 20, 2000, Attorney General Reno's approval rate for capital prosecutions was .37 (61/167) in white-victim cases and .21 (81/383) in minority-victim cases-a 16 percentage point difference that is statistically significant at the .001 level."); *Id.* at 1626 ("Under Attorney General Ashcroft, the probability of being targeted for a capital prosecution are: 34% (38 of 112) if the defendant is accused of killing a white victim...but only 24% (64 of 267) if the defendant is charged with killing a nonwhite victim.").

[56] Citing GAO, Report to the Senate and House Committees on the Judiciary: *Death Penalty Sentencing* 5 (GAO/GGD–90–57, 1990) (82% of the 28 studies conducted between 1972 and 1990 found that race of victim influences capital murder charge or death sentence, a "finding ... remarkably consistent across data sets, states, data collection methods, and analytic techniques"); Shatz & Dalton, *Challenging the Death Penalty with Statistics: Furman, McCleskey, and a Single County Case Study*, 34 Cardozo L. Rev. 1227, 1245–1251 (2013) (same

Recent studies have begun to demonstrate that there is a gender-based irrationality to capital punishment schemes as well, with the net effect that those who are guilty of murdering white females are substantially more likely to face the death penalty and be sentenced to death than those who kill non-whites and males. This is further evidence of the arbitrary, capricious and biased nature of the death penalty.

Studies of state capital schemes have uniformly detected a significant race-of-victim effect. *See, e.g.* Marcia Wilson, *The Application of the Death Penalty in New Mexico, July 1979 Through December 2007: an Empirical Analysis*, 38 N.M. L. REV. 255, 260 (2009) ("The data strongly suggest that the race and ethnicity of the victims and the defendants affected the determination of who would live and who would die."); State Bar of New Mexico, Task Force on the Administration of the Death Penalty in New Mexico: Final Report (2004) p. 13 ("[S]ome states have done studies in an effort to determine what factors make it more or less likely that an individual defendant will receive the death penalty. These studies have found that the race of the defendant and the race of the victim affect to a significant degree whether a particular defendant convicted of first-degree murder will be sentenced to die.") See also, Pierce and Radelet, *Death Sentencing in East Baton Rouge Parish*, 1990-2008, 71 LOUISIANA LAW REV. 671 (2011) (In Louisiana, the odds of a death sentence were 97 % higher for those whose victim was white than for those whose victim was black.); G. Ben Cohen. & Robert J. Smith, *The Racial Geography of the Federal Death Penalty,* 85 WASHINGTON LAW REV. 425, 428 (2010) ("Statistics suggest that defendants are more likely to be sentenced to death for killing a white victim than a black victim."); R. Paternoster, G. Pierce, & M. Radelet, *Race and Death Sentencing in Georgia, 1989-1998*, in American Bar Association, Evaluating Fairness And Accuracy In State Death Penalty Systems: The Georgia Death Penalty Assessment Report," (with

---

conclusion drawn from 20 plus studies conducted between 1990 and 2013).

respect to capital prosecutions in Georgia, "[t]he data show that among all homicides with known suspects, those suspected of killing whites are 4.56 times as likely to be sentenced to death as those who are suspected of killing blacks"); Andrew Welsh-Huggins, *Death Penalty Unequal - Study: Race, Geography Can Make a Difference*, *The Cincinnati Enquirer* (May 7, 2005) (analysis of death penalty verdicts in the state of Ohio from 1981 to 2002 reveals that "[o]ffenders facing a death penalty charge for killing a white person were twice as likely to go to death row [compared to those charged with having] killed a black victim. Death sentences were handed down in 18 percent of cases in which the victims were white, compared with 8.5 percent of cases when victims were black"); G.L. Pierce & M. Radelet, *The Impact of Legally Inappropriate Factors on Death Sentencing in California Homicides*, 46 SANTA CLARA L. REV. 1 (2005) noting that the killers of whites were over three times more likely to be sentenced to death than those who killed blacks and 4 times as likely than those who killed Latinos.

In addition, research commissioned by state governments in, for example, California, Maryland, Nebraska and Illinois has consistently found that defendants convicted of killing white victims are more frequently sentenced to death than defendants convicted of killing non-white victims. See, e.g., *Maryland Commission on Capital Punishment: Final Report To the General Assembly* (2008), p. 10 ("The evidence shows that the troublesome factor of race plays a dominant role in the administration of the death penalty in Maryland. Research presented to the Commission showed that cases in which an African-American offender killed a Caucasian victim are almost two and a half times more likely to have death imposed than in cases where a Caucasian offender killed a Caucasian victim."); State of Illinois, *Report of the Governor's Commission on Capital Punishment* (2002), p. 196 ("When certain facts in aggravation, such as previous criminal history of the defendant, are controlled for, there is evidence that the *race of the victim* influences who is sentenced

86

to death. In other words, defendants of any race who murder white victims are more likely to receive

a death sentence than those who murdered black victims.")(emphasis in original).

Not surprisingly, the studies of the operation of the federal death penalty system replicate the

race of victim findings of the state court studies. [57] As indicated supra at n. 55, K. McNally, *Race and*

*the Federal Death Penalty: A Non-Existent Problem Gets Worse*, 53 DEPAUL L. REV. 1615, 1623-24

(2004) was one of the first studies to report a significant race of victim effect in federal death penalty

cases. The study noted that in 2004 "The persistent presence of statistical disparity not only

continues, it is getting worse." *Id.* at 1616. The current situation is documented in Mr. McNally's

Declaration:

> Since 2000, in a grossly disproportionate number of cases juries have imposed
> the death penalty when the victim was a white female As of September 8, 2015, white
> female victim cases constituted 38% (23 of 60) of federal death row but only 8% (202 of
> 2470) of the available pool of potential defendants since the year 2000 Moreover, 45% (25
> of 55) of all death sentences between 2000 and 2014 have involved white female victims.
> This many times greater than one would expect given the pool of white female victim
> cases.

(App. 0084).

---

[57] Contrary to all of the studies discussed in this section, one study purported to find no
race of victim effect in the federal death penalty system. See, Rand Corporation, *Race and the
Decision to Seek the Death Penalty in Federal Cases* (2006), available at
http://www.rand.org/content/dam/rand/pubs/technical_reports/2006/RAND_TR389.pdf. The
study itself, based on data from 1995-2000, notes that the authors "agreed that their analytic
methods cannot provide definitiveanswers about race effects in death-penalty cases", that
"[r]esults could be different with other variables, methods, and cases", and that "[e]xtrapolating
beyond the data we analyzed here to other years, other defendants, other points in the
decisionmaking process, or other jurisdictions would be even more problematic." *Id.* at xx.
Commenting on this study in 2009, Senator Feingold, in support of his bill to abolish the Federal
Death Penalty Act, pointed out that "the long anticipated study did not address the root question
about the application of the Federal Death Penalty: it did not study the decison-making process
for bringing defendants into the Federal system in the first place. Of course this study only
covers 1995-2000. So we still have very little information about racial disparities from 2001
forward." 115 Congressional Record-Senate 8071-72 (May 19, 2009).

As a result of these studies, and others, it is clear that "[d]eath row's racial disparity, however, is not the result of race-neutral application of the death penalty or a perverse form of affirmative action to favor black defendants. Rather, a racial hierarchy clearly exists among cases based upon who the victim is." *See* J. Blume, T. Eisenberg, and M. T. Wells, *Explaining Death Row's Population and Racial Composition*, 1 JOURNAL OF EMPIRICAL LEGAL STUDIES 1, 167 (March 2004).

The dissenting justices in *Glossip* also noted that "many... studies have found that the gender of the defendant or the gender of the victim makes a not-otherwise-warranted difference." [58] *Id.* at 2761. Justice Marshall addressed the gender of the defendant issue in Furman. See, Furman v. Georgia, 408 U.S. at 365 (Marshall, J., concurring) ("There is . . . overwhelming evidence that the death penalty is employed against men and not women . . . . It is difficult to understand why women have received such favored treatment since the purposes allegedly served by capital punishment seemingly are equally applicable to both sexes."). One of the studies on this issue referenced in the Shatz & Dalton article cited in *Glossip* is Victor L. Streib, *Rare and Inconsistent: The Death Penalty for Women*, 33 FORDHAM URB. L.J. 609, 621–22 (2006). Streib, who has tracked the issue for many years, reports that, in terms of raw numbers, women homicide defendants receive more favorable treatment at each stage of the criminal process, so that, although women constitute 10% of those arrested for murder, they constitute only 2% of those sentenced to death at trial, and only 1% of those actually executed. See also, Steven F. Shatz & Naomi R. Shatz, *Chivalry Is Not Dead: Murder, Gender, and the Death Penalty*, 27 BERKELEY J. GENDER L. & JUST. 64 (2012)(while women constituted 5.3% of defendants convicted of first-degree murder and death-eligible, they constituted only 1.2% of those sentenced to death.)

---

[58] Citing the "many studies" discussed in the Shatz & Dalton article at page 1251-53.

In the federal system, since 1790, there have been 343 federal executions, two (0.5 %) of which were women.[59] Both women were executed in 1953.[60] Since the federal death penalty was reinstated in 1988, only nine women have faced a federal capital trial: Kristen Gilbert, D. MA CR No. 98-30044-MAP [61], Angela Johnson, N.D. Iowa, No. No. 3:01-CR-03046-MWB [62], Donna Moonda, N.D. OH No. 1:06-CR-00395-DDD [63], Valerie Friend, No. S.D. WV CR No. 2:05-00107

---

[59] Death Penalty Focus, *The Federal Death Penalty: An Overview*, available at http://deathpenalty.org/article.php?id=46.

[60] DPIC, Women Executed In The United States Since 1900 (noting that Ethel Rosenberg was executed on 6/19/53, and Bonnie Heady was executed on 12/18/53), available at http://www.deathpenaltyinfo.org/women-executed-us-1900.

[61] "[T]he killing of four patients at a Department of Veterans Affairs Hospital, on federal property, and the attempted killing of three others. Ms. Gilbert, 31, used epinephrine, a drug that can overstimulate the heart, on her patients. Federal prosecutors said Gilbert murdered one patient, a 41-year-old invalid, after asking a supervisor if she could "leave early if he died." All involved are Caucasian. The jury deadlocked and Gilbert was sentenced to life in prison." (App. 0113)

[62] " [F]ive murders in 1993 of a potential witness, his girlfriend (both meth dealers) and two daughters, in a drug conspiracy case. The fifth victim is Angela Johnson's former boyfriend, another dealer turned informant, who disappeared in November of 1993. Johnson attempted suicide in jail after she was tricked by a jailhouse informant into revealing the location of the bodies. Attorney General Ashcroft rejected Honken's attempt to enter a plea to a life sentence. Attorney General Gonzales rejected Johnson's attempt to enter a plea to a life sentence. Finding ineffective assistance of counsel, the district court in 2012, reversed Johnson's death sentence. 860 F.Supp.2d 663 (ND IA 2012). A resentencing trial was scheduled for 2015 but Attorney General Holder withdrew the Notice of Intent to seek the death penalty. All involved are white." (App. 0151)

[63] "[A] 2005 "interstate stalking,' 18 U.S.C. §2261A, §924 domestic gun murder of a millionaire urologist while he was driving on the Ohio Turnpike. Co-defendant Bradford, a black male, allegedly traveled from Pennsylvania to Ohio to kill Dr. Gulam Moonda. Bradford struck a deal for 17 years in return for testimony that Mrs. Moonda offered him money to kill her husband. He was having an affair with the doctor's wife. The deceased was 69 and of Indian descent. Mrs. Moonda, 47, faced the death penalty for charges of murder for hire. [Life sentence from jury]." (App. 0140)

89

[64], Tamara  Llamas, No. E.D. NC CR No. 7:97-CR-63-1-H [65], Lorie Ann Taylor-Keller [66], Barbara

Brown, No. N.D. WV CR No. 1:98CR34 [67], Janette A. Able, N.D. WV CR No. 1:98CR34 [68] and Lisa

Montgomery, W.D. MO No. 5:05-CR-06002-GAF [69]. Although reasonable minds might differ on the

issue of whether the murders by Moonda, Friend, and Llamas are more or less aggravated than Mr.

---

[64] "[A] 2005 gun murder-for-hire of a cooperating witness/informant in a drug (cocaine) prosecution. Lecco asked Burton, who asked Friend to help kill the female victim who was shot and beaten to death and buried in a shallow grave. Attorney General Gonzales required a death penalty prosecution. Lecco and Friend were sentenced to death at a joint trial but a new trial was granted by the trial judge when the government revealed that a juror was under federal investigation for child pornography. 634 F.Supp.2d 633 (SD WV 2009). Friend entered into a plea agreement approved by Attorney General Holder and testified against Lecco, who was sentenced to life in prison at a retrial. Friend received 35 years. All involved are white." (App. 0159)

[65] "[A] murder-for-hire of an informant in a marijuana conspiracy. Llamas, a white female, allegedly ordered the killing of a drug informant.The triggerman was Wakefield. The drug informant was carelessly named in a warrant, and was murdered a month later. The marijuana conspiracy involved North and South Carolina, Texas and Oregon. [Authorized capital case that resulted in a guilty plea and a non-death sentence]." (App. 0212)

[66] "Interstate domestic gun and arson triple murders of three; an ex-husband of Lorie Keller, his new wife and her five year old child. They were shot and the house burned. All involved are white. [Authorized capital case that resulted in a guilty plea and a non-death sentence]  (App. 0233)

[67] "[A]rson/murder by their parents of five children, after an insurance policy was issued on the dwelling and the Brown's children. Federal charges were based on the use of the mail and phones. However, the capital counts were dismissed after the Supreme Court's decision in United States v. Jones, 592 U.S. 848 (2000). After a non-capital trial, the Browns were acquitted. Ables pled guilty and became a government witness. All involved are Caucasian. State charges were also filed." (App. 0247)

[68] Co-defendant of Barbara Brown.

[69] "[A] baby girl was cut out of her murdered mother's womb and taken across state lines. She was found alive in the possession of a Kansas woman, who police charged with interstate kidnapping resulting in death. Kevin and Lisa Montgomery have two older children, but she had recently lost a baby. The victim was eight months pregnant and strangled with a rope. Montgomery confessed. [A death sentence was imposed in 2008 and upheld on appeal]. All involved are white. A 28 USC §2255 motion is pending.

Fell's allege crimes, and there was a legal bar in the Brown and Abel cases, by any measure of aggravation, the number  and nature of the murders by Johnson, Gilbert, and Taylor-Keller are far more aggravated than Mr. Fell's crimes, yet he faces death and these female defendants do not. Examining the verdict forms in these cases leads to the conclusion that there is no rhyme or reason for this discrepancy other than arbitrariness or sex discrimination.   And although it is not ascertainable from Mr. McNally's Declaration how many of the 3842 federal capital eligible defendants he identifies are women, the Bureau of Justice Statistics reports that from 1990-2008 women constituted 11.2 % of all homicide offenders. [70] Using this percentage to gain a rough idea of how many female offenders are in the pool of 3842 federal capital eligible defendants yields an estimate of 430 female defendants. Yet Ms. Montgomery is the lone person in this pool who currently faces a death sentence. .   A sample and description of 110 cases from this pool of death eligible female capital defendants, compiled by the Resource Counsel Project in 2011, is included at App. 0243-0270. A comparison of these cases with the facts of Mr.  Fell's case will reveal that there are many cases involving federal female defendants that are comparable to or more aggravated than Mr. Fell's case, yet none of these female defendants are facing the death penalty. Again, there is no rhyme or reason for this discrepancy other than arbitrariness or sex discrimination.

Although the significance of the victim's race in death sentencing outcomes has been discussed for at least 40 years, very little prior research has examined whether the combined effect of victim race and gender improperly skews sentencing outcomes in capital cases. This area has only recently gained the attention of researchers.[71]  Research has identified just three empirical studies,

---

[70] Bureau of Justice Statistics, Homicide Trends in the United States, 1980-2008, available at http://www.bjs.gov/content/pub/pdf/htus8008.pdf.

[71] As noted earlier, in the *Glossip* dissent, it was observed, that "[M]any studies have found that the gender of the victim makes a not- otherwise-warranted difference." *Glossip*, 135

all very recent, that considered the joint effects of victim race and gender in capital prosecutions. Relying on state court data in Colorado, Georgia and Ohio, each study found that defendants were treated most harshly when a white female victim was present. A Colorado study examined prosecutors' decisions to seek the death penalty after conviction, while Georgia and Ohio studies looked at capital sentencing outcomes.

In a 2006 study of Colorado death penalty cases spanning the two decades from 1980 to 1999, researchers found that prosecutors were more likely to seek the death penalty in cases involving white, female victims than they were in cases involving victims of any other race/gender combination. S*ee* Hindson, Potter and Radelet, *Race, Gender, Region and Death Sentencing in Colorado, 1980- 1999*, 77 COL. L. REV. 549 (2006). The authors concluded:

> the death penalty is sought for defendants who kill white females at a rate much higher than it is sought for any other victims. White females, who account for only 17.9 percent of all homicide victims, make up 34.5 percent of victims in death penalty cases. Thus, death sentences are pursued against those who kill white women at almost twice the rate as their rate of homicide victimization.

*Id.* at 577.

A November 2007 study[72] analyzed state court data from Georgia cases in the 1970's and concluded:

> Defendants who murder females are more likely to receive a death sentence than defendants who murder males. Furthermore, we show that large differences exist in the likelihood of receiving a death sentence when the variables "victim race" and "victim gender" are considered jointly. Cases that involve white female victims are treated the most harshly . . . ."

---

S.Ct. at 2761.

[72] Williams, DeMuth and Holcomb, *Understanding the Influence of Victim Gender in Death Penalty Cases: The Importance of Victim Race, Sex-Related Victimization and Jury Decision Making*, 45 CRIMINOLOGY 4, 865 (2007).

Williams, DeMuth, Holcomb, 45 CRIMINOLOGY 885. In a 2004 Ohio study, the same research group found that death sentences were a product of a strong association between one victim race-gender group – white female victims – and the imposition of a death sentence. Holcomb, Williams, DeMuth, *White Female Victims and Death Penalty Research*, 21 *Justice Quarterly* 877-902 (2004).

In December 2008,[73] the defendants in *United States v. Valerie Friend and George Lecco* , 05-cr-00107 (S.D.W.Va.), a case involving the murder of a white female victim, brought a motion to bar the death penalty on the basis of an asserted arbitrary and discriminatory victim-related race and gender effect.   Based on an analysis of over 400 authorized federal capital cases, it was determined by a qualified expert statistician, Lauren Cohen Bell, Ph.D., that defendants in federal capital cases whose victims were white females were more than three times as likely to be sentenced to death than other federal capital defendants. (App. 0093-98.) This finding was, moreover, found to be "highly statistically significant, systemic, and not the result of chance."  The examination of the cases revealed, as well, that as of December 2007, federal capital cases involving white female victims constituted 43% (26 of 61) of those sentenced to death in the federal system, but only 9% (61/626) of all potential defendants since 2000.  Thus, the death-sentencing rate is many times higher than the death-sentencing rate for non-white female victim cases.

As stated previously, the issue of the "white victim effect" has been studied and found to exist before. It now also appears that there is a "white female victim effect." When the gender of the victim is considered, the evidence of an arbitrary and capricious operation of the federal death penalty becomes apparent. When the penalty decisions of juries are examined, the results are nothing short of astonishing.

---

[73]Efforts are underway to update the findings, but there is no reason to believe that the passage of 51  months has appreciably altered 20 years of data.

Accordingly, this Court should find that the existence of gender of defendant discrimination, in combination with  a "white female victim" effect renders any death sentence in this case unconstitutional and/or in violation of 18 U.S.C. §§3593(f).

### 3.      "Cruel"-Other Sources of Unreliability and Arbitrariness

In addition to the sources of unreliability and arbitrariness surveyed in the *Glossip*  dissent and in the *Santiago* opinion, there are at least two other sources of unreliability and arbitrariness that have particular significance to the operation of the federal death penalty .

### a.      Arbitrariness Produced by Prosecutorial Discretion

As one commentator has noted:  "[T]he selection process for imposition of the death penalty begins in the prosecutor's office."  William Schabas, The Death Penalty as Cruel Treatment and Torture: Capital Punishment 74 (1996) (discussing effect of plea bargaining on arbitrariness problem in capital cases).  Another commentator notes that the most important factor in determination of a sentence in a capital case is prosecutorial discretion in both the decision to charge a capital crime and the decision whether to offer a plea bargain less than death.  *See* Elisabeth Semel, *Reflections on Justice John Paul Stevens's Concurring Opinion in Baze v. Rees: A Fifth Gregg Justice Renounces Capital Punishment*, 43 *U.C. Davis L. Rev.* 783, 788 (2009).

Reform commissions have also noted the problem of arbitrariness created by prosecutorial discretion:  See *Report and Recommendation on the Administration of the Death Penalty in California*, California Commission on the Fair Administration of Justice, 102-04, JUNE 30, 2008 (Finding "great variation in the practices for charging special circumstances, a lack of racial diversity among the individuals who made the decision, great variation in when the decision was made, and

significant variation in the involvement of the defense in the process.") [74]; *Report of the Governor's Comm. On Capital Punishment* (April 15, 2002) at 82 (noting criticisms that Illinois' procedure "contains no standards elucidating the criteria to be considered in determining whether or not to seek the death penalty in a particular case.") [75]

Although the discretion afforded prosecutors in selecting who to prosecute and what charges to bring is extremely broad, "there are undoubtably constitutional limits upon its exercise." *Bordenkircher v. Hayes*, 434 U.S. 357, 365, 98 S.Ct. 663, 54 L.Ed.2d 604 (1978). A decision to prosecute may not be "based upon an unjustifiable standard such as race, religion, *or other arbitrary classification*." *Id.* at 364, 98 S.Ct. 663 (emphasis added). Where a claim of such selective prosecution is made, it will be judged "according to ordinary equal protection standards." *Wayte v. United States*, 470 U.S. 598, 608, 105 S.Ct. 1524, 84 L.Ed.2d 547 (1985).

In *DeGarmo v. Texas*, 474 U.S. 973 (1985)(Brennan and Marshall, JJ., dissenting from denial of certiorari) the Court was presented with a case where a female co-defendant who was as equally guilty of capital murder as her male co-defendant received a sentence of only 10 years' deferred probation while her male accomplice received a death sentence. Justices Brennan, writing for himself and Justice Marshall protested the denial of certiorari because

> I remain convinced that the Court deludes itself when it insists that the infliction of the death penalty, as currently administered, is not arbitrary or capricious under any meaningful definition of those terms. See *Pulley v. Harris*, 465 U.S. 37, 59, 104 S.Ct. 871, 884, 79 L.Ed.2d 29 (1984) (BRENNAN, J., dissenting). This case demonstrates just one way in which capital sentencing schemes have failed to eliminate arbitrariness in the choice of who is put to death.

---

[74]*http://deathpenalty.org/downloads/FINAL%20REPORT%20DEATH%20PENALTY%20 ccfaj%20June%2030.2008.pdf*

[75]http://illinoismurderindictments.law.northwestern.edu/docs/Illinois_Moratorium_Comm ission_complete-report.pdf

With the aid of Helen Mejia, Roger DeGarmo kidnaped and murdered a young woman. DeGarmo was subsequently convicted of capital murder and condemned to die by lethal injection. As part of a plea bargain, Mejia-whose participation made her equally subject to prosecution under the capital murder statute-received a sentence of only 10 years' deferred probation. In other words, while the State sought and may soon succeed in putting DeGarmo to death, it did not care to see his accomplice serve even a day in jail for participating in the same offense. This gross disparity in treatment is solely a product of the prosecutor's unfettered discretion to choose who will be put in jeopardy of life and who will not.

*Id.* at 973-74.

Justice Brennan continued:

I believe that such a disparity in treatment is alone sufficient grounds to set aside DeGarmo's death sentence as disproportionate under the circumstances. Cf. *Pulley v. Harris*, supra, 465 U.S., at 43, 104 S.Ct., at 875; *Solem v. Helm*, 463 U.S. 277, 103 S.Ct. 3001, 77 L.Ed.2d 637 (1983). More importantly, however, this disparity in treatment highlights the utter failure of the elaborate sentencing schemes approved by the Court in Gregg and its companion cases to meaningfully limit the arbitrary infliction of death by the States. When *Gregg* was decided several Members of the Court expressed the belief that channeling juror discretion would minimize the risk that the death penalty "would be imposed on a capriciously selected group of offenders," thereby making it unnecessary to channel discretion at earlier stages in the criminal justice system. See *Gregg, supra*, 428 U.S., at 199, 96 S.Ct., at 2937 (opinion of Stewart, POWELL, and STEVENS, JJ.). But discrimination and arbitrariness at an earlier point in the selection process nullify the value of later controls on the jury. The selection process for the imposition of the death penalty does not begin at trial; it begins in the prosecutor's office. His decision whether or not to seek capital punishment is no less important than the jury's. Just like the jury, then, where death is the consequence, the prosecutor's "discretion must be suitably directed and limited so as to minimize the risk of wholly arbitrary and capricious action." 428 U.S., at 189, 96 S.Ct., at 2932.

Instead, the decisions whether to prosecute, what offense to prosecute, whether to plea bargain or not to negotiate at all are made at the unbridled discretion of individual prosecutors. The prosecutor's choices are subject to no standards, no supervision, no controls whatever. There are, of course, benefits associated with granting prosecutors so much discretion, but there are also costs. Some of these costs are simply accepted as part of our criminal justice system. But if the price of prosecutorial independence is the freedom to impose death in an arbitrary, freakish, or discriminatory manner, it is a price the Eighth Amendment will not tolerate.

*Id.* at 475-476.

Citing Justice Brennan's opinion in *DeGarmo*, Ninth Circuit Judge Ferguson, in a thoughtful concurring opinion in *Morris v. Ylst*, 447 F.3d 735(9th Cir. 2006), concluded that "[a]s long as a prosecutor's discretion in seeking the ultimate penalty-death-remains thus unbridled, the administration of the death penalty in the United States will violate the guarantees of due process and freedom from cruel and unusual punishment enshrined in the Constitution." *Morris v. Ylst*, 447 F.3d at 746 (Ferguson J., concurring). He wrote:

> Over thirty years ago, the Supreme Court declared that death is different. The death penalty must be imposed fairly, without prejudice or whim, or it may not be imposed at all. *Furman v. Georgia*, 408 U.S. 238, 92 S.Ct. 2726, 33 L.Ed.2d 346 (1972); see *Gregg v. Georgia*, 428 U.S. 153, 188, 96 S.Ct. 2909, 49 L.Ed.2d 859 (1976) (interpreting Furman ). In the years since Furman, legislatures and courts have struggled to meet this daunting challenge, yet "the death penalty remains fraught with arbitrariness, discrimination, caprice, and mistake." *Callins v. Collins*, 510 U.S. 1141, 1144, 114 S.Ct. 1127, 127 L.Ed.2d 435 (1994) (Blackmun, J., dissenting from denial of writ of certiorari). The problems today are not identical to those of thirty years ago. Rather, those problems that were originally "pursued down one hole with procedural rules and verbal formulas have come to the surface somewhere else, just as virulent and pernicious as they were in their original form." *Id.* Even as the courts have tried to limit the jury's discretion to impose the death penalty, "discrimination and arbitrariness at an earlier point in the selection process nullify the value of later controls on the jury." *DeGarmo v. Texas*, 474 U.S. 973, 975, 106 S.Ct. 337, 88 L.Ed.2d 322 (1985) (Brennan, J., dissenting from denial of writ of certiorari).
>
> Here, the prosecutor's unbridled discretion to single out Morris for prosecution under the death penalty, when the guilt is equally spread among his co-defendants, is a rank example of "arbitrariness at an earlier point in the selection process." *Id.* This sort of gross disparity in the treatment of equally guilty defendants "highlights the utter failure of the elaborate sentencing schemes approved by the [Supreme] Court in Gregg and its companion cases to meaningfully limit the arbitrary infliction of death by the States." *Id.* at 974-75, 106 S.Ct. 337. Such arbitrariness in the administration of the death penalty violates the Eighth Amendment and the Due Process Clause. See *Gregg*, 428 U.S. at 188-89, 96 S.Ct. 2909 (arbitrary infliction of the death penalty violates the Eighth Amendment); *United States v. Redondo-Lemos*, 955 F.2d 1296, 1298-99 (9th Cir.1992), overruled on other grounds by *United States v. Armstrong*, 48 F.3d 1508 (9th Cir.1995), rev'd 517 U.S. 456, 116 S.Ct. 1480, 134 L.Ed.2d 687 (1996) (arbitrary charging decisions violate due process).

*Id.* at 747.

In *United States v. Redondo-Lemos*, 955 F.2d 1296, 1300 (9th Cir.1992), overruled en banc on other grounds by *United States v. Armstrong*, 48 F.3d 1508 (9th Cir.1995), *896 rev'd, 517 U.S. 456, 116 S.Ct. 1480, 134 L.Ed.2d 687 (1996), the Ninth Circuit distinguished between the general right "not to have charging or plea bargaining decisions made in an arbitrary or capricious manner" and a specific claim that prosecutorial decisions were made on the basis of sex, race, religion, or similar characteristics. The latter case was held to raise both Due Process and Equal Protection problems, and a judicial inquiry into whether protected classes of people were being treated differently was found to be manageable. *Id.* at 1301. Consequently, the Circuit wrote, "the Supreme Court has concluded that courts do indeed have the authority to inquire into charging and plea bargaining decisions to determine whether the prosecutor is abusing her awesome power to favor or disfavor groups defined by their gender, race, religion, or similar characteristic." *Id.*

"However, where exercise of prosecutorial discretion is arbitrary but there is no hint of class-based discrimination, the *Redondo-Lemos* majority said that there was no judicial remedy available to the defendant-even while acknowledging that such an arbitrary exercise of power would be a Due Process violation. *Id.* at 1300. The majority justified this result on separation-of-powers grounds: for the courts to inquire into prosecutors' decision-making processes would entangle them "in the core decisions of another branch of government." *Id. In re Morris*, 363 F.3d 891, 896 (9th Cir. 2004)(Ferguson, J., concurring). This Court's ability to regulate unbridled prosecutorial discretion is thus limited at best.

One court in the Ninth Circuit has decided otherwise in a federal death penalty case, striking a notice of intent to seek the death penalty because in light of the government's actions with respect to other co-defendants "it is clear that no rational decision-maker would continue to seek to execute Gary Joe Littrell. Accordingly, the Government's continued intention to seek the death penalty is

arbitrary and capricious, and must be stricken." *United States v. Littrell*, 478 F. Supp. 2d 1179, 1192 (C.D. Cal. 2007). The district court in that case concluded that "[i]t is vital to the constitutional protections of due process and to the moral authority of the Government … that the decision to seek death is neither arbitrary and capricious nor wholly divorced from reason." *United States v. Littrell*, 478 F.Supp.2d 1179 (C.D. Cal. 2007). The court applied *Furman's* prohibition arbitrary and capricious jury decision-making to the government's initial decision to seek the death penalty. In particular, the Court ruled:

> *Furman* mandates that where discretion is afforded a sentencing body on a matter so grave as the determination of whether a human life should be taken or spared, that discretion must be suitably directed and limited so as to minimize the risk of wholly arbitrary and capricious action." *Gregg*, 428 U.S. at 189, 96 S.Ct. 2909. *Furman* and its progeny are concerned solely with the imposition of the death penalty by the judge or jury. The cases make no comment on the breadth of the discretion afforded to the Government to seek the death penalty against a particular defendant. However, it would be fundamentally inconsistent with the constitutional prohibition on the arbitrary *imposition* of the death penalty to say that an arbitrary decision *to seek* the death penalty is constitutionally permissible. The Fifth Amendment requires that every aspect of the process by which the Government seeks to put a defendant to death is consistent with due process of law. At a bare minimum, the protections of the Fifth Amendment must guarantee that the Government's decision to seek the death penalty is rational. When the Government's decision to seek death is wholly divorced from reason and arbitrarily disregards the totality of the relevant evidence, a capital prosecution based on that decision would be repugnant to the Constitution.

(*Id.* at 1186-1187)(emphasis in original)

For the most part, however, this courageous and correct decision has not found favor with other courts. See e.g., *United States v. Cooya*, No. 4:08-CR-70, 2011 WL 3608611, at *3 (M.D. Pa. Aug. 16, 2011)("The decision in *Littrell*...appears to be in direct contrast to every other decision, including United States Supreme Court decisions, that have considered the issue.")(collecting cases). The problem of unbridled prosecutorial discretion in the charging of federal capital cases therefore remains. See, *State v. Santiago*, 318 Conn. at 25 ("As currently construed, then, the federal

constitution simultaneously requires that states narrowly limit and carefully define which offenders are eligible for capital punishment, while, paradoxically, also giving prosecutors and juries, respectively, virtually unfettered discretion whether actually to charge defendants with capital crimes and whether to sentence convicted offenders to death.").

The results of that unbridled discretion is further arbitrariness. Like the seemingly random results of federal death penalty trials, a comparison of the facts of other capital-eligible federal cases, where the death penalty was either not authorized, or the defendant was nonetheless allowed to plead to a lesser sentence, are equally probative of arbitrariness, as suggested by the cases described at App. 0181-0234, 0234-0270.  As can be seen, as a group there is little to distinguish the facts in these cases from those at App. 0101-0180  where federal prosecutors proceeded to trial and sought the death penalty. See, *State v. Santiago*, 318 Conn. at 114 ("[W]e are persuaded that these critiques are well founded and that the opportunity for the exercise of unfettered discretion at key decision points in the process has meant that the ultimate punishment has not been reserved for the worst of the worst offenders."). In light of this new evidence, this Court should therefore conclude that the FDPA has failed to eliminate arbitrariness in the choice of who is put to death, that if the price of prosecutorial independence is the freedom to impose death in an arbitrary, freakish, or  discriminatory manner, it is a price the Eighth Amendment will not tolerate, and that as long as a prosecutor's discretion in seeking the ultimate penalty-death-remains thus unbridled, the administration of the death penalty by the United States government will violate the guarantees of due process and freedom from cruel and unusual punishment enshrined in the Constitution.

### b.      Arbitrariness and Unreliability Induced by Doomed Efforts to Predict Future Danger

A disturbing trend has developed since *Gregg* of relying heavily on a jury's ability to forecast an offender's "future dangerousness" to quarantine those selected to die from those not selected. This futile exercise has introduced another level of arbitrariness and unreliability into the federal death penalty process.

In some states juries are required by statute to make a finding concerning future dangerousness. *See e.g. Jurek v. Texas*, 428 U.S. 262, 269 (1976),  Although the phrasing may vary, the inquiry is basically the same – jurors are asked to predict whether the defendant will likely engage in violence in the future.  In other states, and in the federal system, future dangerousness is frequently cited as a non-statutory aggravating factor.  In a federal case in which the only alternative to death is life without parole, the aggravating factor of future dangerousness is limited to how the defendant would behave in a prison setting if incarcerated for life.  *See Simmons v. South Carolina*, 512 US 154, 166, n. 5 (1994).

Between 1995 and 2006, future danger was alleged as a non-statutory aggravating factor in 77 % of federal capital prosecutions and a death sentence occurred in over 80% of the federal cases where the jury found that future prison violence was likely.[76] Currently, as of November 3, 2015, future danger has been alleged in 352 (70.6 %) of the 498 federal capital  cases that have been filed.[77] See also, *United States v. Taveras*, 424 F.Supp.2d 446, 454 (E.D.N.Y. 2006)(Weinstein,

---

[76] Cunningham, Mark D., Sorensen, Jon R. & Reidy, Thomas J.,  *Capital Jury Decision-Making: The Limitations of Predictions of Future Violence*, Psychol. Pub. Pol'y & L. 15:223, 225, 244. (2009).

[77] Federal Death Penalty Resource Counsel Project, *Aggravation Alleged in Federal Death Penalty Cases* (November 3, 2015), available at https://www.capdefnet.org/FDPRC/pubmenu.aspx?menu_id=94&id=1902.

J.)("Frequently, future dangerousness is alleged as an aggravating circumstance. See Decl. of David Bruck of June 14, 2004 Bruck of June 14, 2004 at ¶ 5-6 (available at www.capdefnet.org, last visited on March 14, 2006) (future dangerousness has been alleged in more than three-quarters of the federal capital trials since 1995). Much less often is it found to exist. *Id.* (future dangerousness found in one-third of trials in which it is alleged). ") [78]

Such data suggests the ascendant importance of a jury's attempt to assess future danger.  But, the attempt to predict future conduct is a challenging assignment, at best.  It is especially so when attempting to forecast the future danger posed by a defendant in a controlled prison environment where so many unforeseeable variables are at play, including correction officials' decisions as to where, and the conditions under which, the offender will be housed.  As to this task, detailed studies show that juries are routinely being asked to do the undoable.  *See e.g,* Reidy, T. J., Sorensen, J. R., & Cunningham, M. D*., Probability of acts of criminal violence: A test of jury predictive accuracy*, 31 Behavioral Sciences & the Law 286-305 (2013)("Consistent with prior studies demonstrating a very low base rate of serious prison violence among capital offenders in other jurisdictions... the current findings demonstrate that assaultive acts among aggravated murderers in Oregon, particularly those involving significant injuries, are quite rare, with the prevalence decreasing with the severity of injury....These low base rates are a key factor in the poor predictive performance of Oregon juries, i.e., it is very difficult to predict a low base rate behavior."); Cunningham, Mark D., Sorensen, Jon R. & Vigen, Mark P, *Life and Death in the Lone Star State: Three Decades of Violence Predictions*

---

[78] The fact that this allegation is so frequently made provides a compelling reason why it should be struck in this case, a point that will be raised when Mr. Fell's second round of death penalty motions will be filed. As Judge Weinstein points out, " '[i]f the sentencer fairly could conclude that an aggravating circumstance applies to every defendant eligible for the death penalty, the circumstance is constitutionally infirm.'" *Id.*, quoting  *Arave v. Creech*, 507 U.S. 463, 474 (1993).

*by Capital Juries*, 29 Behav. Sci.& L. 29 (2011)("[J]uror estimates of future homicide are inflated 50- to 250-fold as compared with the observed prevalence of prison homicide perpetration among capital offenders... which range from 0.2% ..., to 0.5%..., to 1%..... The proportions of their estimation error suggest that these jurors are reacting out of irrational fears as opposed to reasoned analysis.")(discussing the studies); Cunningham, M.D., Reidy, T.J. & Sorenson, J.E., *Assertion of "Future Dangerousness" at Federal Capital Sentencing: Rates and Correlates of Subsequent Prison Misconduct and Violence*, 32 Law and Hum. Behav.  46, 55-57, 59, 61 (2008)(finding no significant difference in the rates of serous disciplinary infractions between those against whom the government alleged future danger as an aggravating factor and those against whom it did not); Cunningham, M.D., Reidy, T.J. & Sorenson, J.E., *Capital Jury Decision-Making: The Limitations of Predictions of Future Violence*,  15 Psychology, Public Policy & Law, 223, 239-240, 243 & Table 4 (2009) (among defendants found to be a future danger but sentenced to life, jurors positive predictions proved wrong more than 2/3 of time); Eugenia T. La Fontaine, *A Dangerous Preoccupation with Future Danger: Why Expert Predictions of Future Dangerousness in Capital Cases are Unconstitutional*, 44 B.C.L. Rev. 207, 233-36 (2002)(citing studies establishing unreliability of such predictions by mental health professionals); Future Dangerousness Predictions Wrong More Than 95% of the Time, Death Penalty Information Center, http://www.deathpenaltyinfo.org/node/1099 . The bottom line is clear - there is no proven methodology from which jurors, or anyone else, can reliably determine which few offenders will engage in violent conduct in prison.  Cunningham, et. al.,  *Capital Jury Decision-Making*, at 227-228, 246.

      To an experienced jurist like Judge Weinstein it was obvious that "[p]rojections of future dangerousness are precarious. They require jurors to predict, beyond a reasonable doubt, future

conduct based on an often uncertain pattern of past behavior." *United States v. Taveras*, 424 F.Supp.2d at 455.

Another very experienced federal jurist declared as far back as 2004 that " the fact that there now seems to be increasing reason to be concerned that experts cannot reliably predict future dangerousness also generates, for this court at least, increased concern that jurors cannot do so." *United States v. Sampson*, 335 F. Supp. 2d 166, 221 (D. Mass. 2004). Reviewing some of the relevant scientific literature on this issue, Judge Wolf noted that "there are relatively recent studies that suggest that it is not just difficult for jurors to predict reliably whether a murderer is likely to commit violent crimes again, but that it is impossible." *Id.* at 222.

The court quoted an article by Jonathan R. Sorenson, Rocky L. Pilgrim, *An Actuarial Risk Assessment of Violence Posed by Capital Murder Defendants*, 90 J.Crim. & Criminology, 1251, 1254 (2000), as follows:

> Recent research on jury deliberations has shown that jurors' assessments of future dangerousness is highly subjective. Influenced by stereotypical images of the violent recidivist—the psychopathic serial killer disproportionately portrayed in the media and the new "true crime" genre of television shows—jurors seldom realize research has consistently found the true incidence of recidivism among murderers released from prison to be much lower than for other types of parolees.

*Id.* at 222.

The court commented that in Mr. Sampson's case "the court carefully considered and limited the government's proffered evidence on future dangerousness." *Id.* The Court continued:

> Nevertheless, the court's experience in the case causes it to wonder whether it is impossible for lay jurors, as well as for trained experts, to predict future dangerousness with the level of reliability necessary to ensure that the death penalty is not being "wantonly and ... freakishly imposed." *Furman v. Georgia*, 408 U.S. 238, 310, 92 S.Ct. 2726, 33 L.Ed.2d 346 (1972) (Stewart, J., concurring).

*Id.*

Indeed, asking a jury to make a critical determination concerning a factor that cannot be determined with any reasonable degree of accuracy is, by definition, likely to produce arbitrariness. And, asking a juror to make such troublesome forecasts in a death penalty case has constitutional implications under the Eighth Amendment. *See Roper v. Simmons*, 543 U.S. at 573 (concerning experts' inability to diagnose whether a juvenile offender is acting from immaturity or with more malignant mindset: "If trained psychiatrists with the advantage of clinical testing and observation refrain, despite diagnostic expertise . . . from [such] assess[ments] . . . we conclude that the State should refrain from asking jurors to issue a far graver condemnation.").

### 4.    "Cruel"- Excessive Delays

"The problems of reliability and unfairness almost inevitably lead to a third independent constitutional problem: excessively long periods of time that individuals typically spend on death row, alive but under sentence of death. That is to say, delay is in part a problem that the Constitution's own demands create....[U]nless we abandon the procedural requirements that assure fairness and reliability, we are forced to confront the problem of increasingly lengthy delays in capital cases. Ultimately, though these legal causes may help to explain, they do not mitigate the harms caused by delay itself." *Glossip v. Gross*, 135 S. Ct. at 2764 (Breyer and Ginsburg, JJ., dissenting). See also, *State v. Santiago*, 318 Conn. at 99 ("[Another] reason the death penalty has lost its retributive mooring in Connecticut is that the lengthy if not interminable delays in carrying out capital sentences do not just undermine the death penalty's deterrent effect; they also spoil its capacity for satisfying retribution."). See also, see also *Jones v. Chappell*, supra, 31 F.Supp.3d at 1064.

The Eighth Amendment's prohibition on "cruel and unusual" punishment reaches beyond the arbitrary and capricious concerns of *Furman* and *Gregg*. Widely- acknowledged uneasiness with the unreliability and fairness of the death penalty process has resulted in years of delay from conviction

to execution, contemplated neither by *Gregg* nor the Founding Fathers when the Eighth Amendment was adopted in 1790.  This, in turn, has resulted in years of dehumanizing incarceration on death rows that presents an additional Eighth Amendment snare, especially in light of the availability of alternative sentences of life without parole, which do not involve such protracted delay and which undermine marginal penological justifications for the death penalty.

The average time between conviction for a capital offense and executions in 2014 was almost 18 years, an increase of more than 50% just in the last decade and a nine-fold increase since 1960, when the average interval was two years. [79]  And it is not unusual for a death sentence, if ever carried out, to be done so 25 years or more years after the conviction. *Glossip*, 135 S. Ct. at 2764-65, (Breyer and Ginsburg, JJ., dissenting)(citing sources).[80]

These delays are unavoidable, "given the special need for reliability and fairness in capital cases." *Id.*, at 2770-72 (citing examples where DNA evidence exonerated defendants who otherwise would have been wrongly executed years before but for the delays occasioned by necessary appellate and post-conviction review). accord, *Santiago*, 318 Conn. at 93 n. 96 ("Delays, then, are indispensable if the ultimate punishment is to be reliably applied, and, if the constitution did not mandate such close scrutiny, the execution of innocent persons would inevitably result."). Justice Breyer described real-life cases in the Supreme Court where these lengthy delays have avoided

---

[79] As the Court is well aware, Mr. Fell has been in custody on the current charges since November 30, 2000. If again convicted and sentenced to death, his case will  undoubtedly  again be tied up in direct and collateral review proceedings for many years to come. Indeed, three inmates on Federal Death Row (Cory Johnson, James Roane, and Richard Tipton) still have active appellate proceedings pending although all were sentenced to death in 1993, some 22 years ago.

[80] *See also*, Tr. Oral Argument, *Hall v. Florida*,  Case # 12-10882, March 3, 2013, at 46 (Justice Kennedy pointing out that "the last ten people Florida has executed have spent an average of 24.9 years on death row."), *available at* http://www.supremecourt.gov/oral_arguments/argument_transcripts/12-10882_6kh7.pdf .

unthinkable mistakes but the need to avoid sacrificing reliability for swift execution was perhaps even more eloquently expressed by Gordon (Randy) Steidl, who was exonerated after 17 years of incarceration, 12 of which were on Illinois' Death Row. *See* Hal Dardick, *Inmates Free After 17 Years*, CHI. TRIB., May 29, 2004 (Metro), at 16.  Testifying before Illinois legislators some seven years after his release, Mr. Steidl pointed out: "If you want to kill John Wayne Gacy, you have to kill me, as well." *See Warden*, supra, 245, 269-270 (2012).  Translated:  the price of a rush to execution increases the specter of irremediable miscarriage.

Such prolonged delays have an Eighth Amendment corollary.  Defendants sentenced to death are normally housed under brutal, approaching barbaric, conditions on "death rows." *Johnson v. Bredesen*, 558 U.S. 1067, 1069 (2009)(statement of Stevens, J., respecting denial of certiorari)(after recounting petitioner's confinement in a solitary cell awaiting his execution for nearly 29 years: "the delay itself subjects death row inmates to decades of especially severe, dehumanizing conditions of confinement."); *accord Glossip*, 135 S. Ct. at 2764-65 (Breyer and Ginsburg, JJ., dissenting).  This often entails what functionally amounts to solitary confinement for years and sometimes decades. *See Davis v. Ayala*, 135 S. Ct. 2187, 2208-2210 (2015)("[I]f his confinement follows the usual pattern, it is likely respondent has been held all or most of the past 20 years or more in a windowless cell no larger than a typical parking spot for 23 hours a day; and in the one hour when he leaves he likely is allowed little or no opportunity for conversation or interaction with anyone.").

"[I] is well documented that such prolonged solitary confinement produces numerous deleterious harms." *Glossip*, 135 S. Ct. at 2765 (Breyer and Ginsburg, JJ., dissenting). [81] See *also In*

---

[81] Citing Haney, *Mental Health Issues in Long–Term Solitary and "Supermax" Confinement*, 49 Crime & Delinquency 124, 130 (2003) (cataloguing studies finding that solitary confinement can cause prisoners to experience "anxiety, panic, rage, loss of control, paranoia, hallucinations, and self-mutilations," among many other symptoms); Grassian, *Psychiatric Effects of Solitary Confinement*, 22 Wash U. J. L. & Policy 325, 331 (2006) ("[E]ven a few days

*re Medley,* 134 U.S. 160, 167-68 (1890) (describing psychiatric harm occasioned by solitary confinement: "A considerable number of the prisoners fell, after even a short confinement, into a semi-fatuous condition, from which it was next to impossible to arouse them, and others became violently insane; others, still, committed suicide . . ."). *Kervin v. Barnes,* 787 F.3d 833, 836 (7th Cir. 2015) (citing studies documenting the "serious psychological consequences" of solitary confinement). As is discussed extensively in *Santiago,* 318 Conn. at 87-103, decades-long delay also undermines the deterrence and retribution rationales for capital punishment. "The penological justifications for the sentencing practice are ...relevant to the [Eighth Amendment] analysis. *Graham v. Florida*, 560 U.S. at 71. *Thompson v. McNeil*, 556 U.S. 1114, 1115 (2009)(Statement of Stevens, J., respecting denial of certiorari)("[D]elaying an execution does not further public purposes of retribution and deterrence . . ."); *Jones v. Chappell*, 31 F.Supp.3d at 1053 ("[F]or most [individuals on death row], systemic delay has made their execution so unlikely that the death sentence carefully and deliberately imposed by the jury has been quietly transformed into one no rational jury or legislature could ever impose: life in prison, with the remote possibility of death. As for the random few for whom execution does become a reality, they will have languished for so long on [d]eath [r]ow that their execution[s] will serve no retributive or deterrent purpose and will be arbitrary.").

As to deterrence, the idea that the unlikely prospect of being executed some 20 or more years in the future provides more of a deterrent than the far more immediate one of a definite sentence of life without parole is implausible.  Although expressed in the context of juveniles, the likelihood that an adult offender engages in this kind of  "cost-benefit analysis . . . is so remote as to be virtually nonexistent." *Thompson v. Oklahoma*, 487 U.S. 818, 837 (1988).  Fanciful reasoning, such as this,

---

of solitary confinement will predictably shift the [brain's] electroencephalogram (EEG) pattern toward an abnormal pattern characteristic of stupor and delirium")

is blunted by the severity of life-without-parole sentences. *See Roper v. Simmons*, 543 U.S. at 572. And, there is little question that the Eighth Amendment has a role in constraining punishments justified by deterrence arguments.  The execution of offenders at noon in the public square, al la Saudi Arabian style, would likely increase the deterrent effect, but such a public spectacle would hardly be tolerable in light of the Eighth Amendment's concern for the "dignity of man." *See Trop v. Dulles*, 356 U.S. at 100.

"The deterrent value of any punishment is, of course, related to the promptness  with which it is inflicted." *Coleman v. Balkcom*, 451 U.S. 949, 952 (1981) (Stevens, J., concurring in the denial of certiorari); see also *Gomez v. Fierro*, 519 U.S. 918, 918 (1996) (Stevens, J.,dissenting) ("[d]elay in the execution of judgments imposing the death penalty frustrates the public interest in deterrenceand eviscerates the only rational justification for that type of punishment"); *Furman v. Georgia*, supra, 408 U.S. at 302 (Brennan, J., concurring) ("[a] rational person contemplating a murder or rape is confronted, not with the certainty of a speedy death, but with the slightest possibility that he will be executed in the distant future"); *Jones v. Chappell*, 31 F.Supp.3d 1050, 1064 (C.D.Cal.2014)(law and common sense dictate that "long delays preceding execution frustrate whatever deterrent effect the death penalty may have"); *People v. Anderson*, 6 Cal.3d 628, 652, 493 P.2d 880, 100 Cal.Rptr. 152 (1972)("capital punishment can have a significant deterrent effect only if the punishment is swiftly and certainly exacted"); L. Powell, commentary, "Capital Punishment," 102 Harv. L.Rev. 1035, 1035 (1989) ("years of delay between sentencing and execution ... [undermine] the deterrent effect of capital punishment and [reduce]public confidence in the criminal justice system"); *State v. Santiago*, 218 Conn. at 93 ("[T]he fact that one who commits the most heinous of crimes can expect to spend decades in prison prior to any execution suggests that capital punishment promises little if any deterrence over and above life imprisonment.")

Execution of offenders after the necessarily drawn-out judicial proceedings also erodes retributive arguments where the identity and feelings of both the community and offender may have changed. *Glossip*, 135 S. Ct. 2769 (Breyer, J., dissenting). If "justice delayed is justice denied," the prompt imposition of life without parole arguably satisfies retribution more than an execution years after many family members may have passed. *Id.* And, like deterrence, the Eighth Amendment has something to say about the limits of retribution, as it forbids punishments that are "cruel and unusual" regardless of proffered retribution justifications. This is demonstrated by the fact that no current Justice seemingly questions the Eighth Amendment's bar on the deliberate and infliction of unnecessary pain in executions. *See Baze v. Rees*, 553 U.S. 35 (2008); *Glossip v. Gross,* 135 S. Ct. 2726 (2015). After reviewing the Court's jurisprudence on methods of execution in *Baze v. Rees*, *supra*, Chief Justice Roberts summed up the governing principle: "What each of the forbidden punishments had in common was the deliberate infliction of pain for the sake of pain – 'superadd[ing]' pain to the death sentence through torture and the like." 553 U.S. at 48. Retribution, without constitutional constraint, could justify, again a la Saudi Arabian style, cutting off the hands of thieves, or, as applied to capital punishment, some equally unacceptable violation of human dignity.

Justice Kennedy perhaps said it best when he warned of the danger of using the retribution card in the capital punishment context:

> "It is the last of these, retribution, that most often can contradict the law's own ends. This is of particular concern when the Court interprets the meaning of the Eighth Amendment in capital cases. When the law punishes by death, it risks its own sudden descent into brutality, transgressing the constitutional commitment to decency and restraint."

*Kennedy v. Louisiana*, 554 U.S. at 420. See also, *Valle v. Florida*, ––– U.S. ––––, 132 S.Ct. 1, 2, (2011) (Breyer, J., dissenting from the denial of stay of execution) ("I would ask how often [the]

community's sense of retribution would forcefully insist [on] a death that comes only several decades after the crime was committed"); *Lackey v. Texas*, 514 U.S. 1045, 1045–46 (1995) (mem. respecting the denial of certiorari) (expressing doubt whether execution following extended imprisonment satisfies state's interest in retribution); *Coleman v. Balkcom*, *supra*, 451 U.S. at 960 (Rehnquist, J., dissenting from the denial of certiorari) ("[t]here can be little doubt that delay in the enforcement of capital punishment frustrates the purpose of retribution").

> "What then remains of retribution when one who commits a heinous crime is not executed until after he has spent half a lifetime or more on death row, if ever? Unlike with deterrence, the retributive value of an execution defies easy definition and quantification, shrouded as retribution is in metaphysical notions of moral restoration and just deserts. What is clear, however, is that the most tangible retributive fruit of capital punishment—providing victims and their families with a sense of respite, empowerment, and closure—is grievously undermined by the interminable delays in carrying out the sentence imposed....Psychologically, the capital punishment system actually may impede the healing process."

*State v. Santiago*, 318 Conn. at 101-02.

In sum, "[t]hese lengthy delays create two special constitutional difficulties.... First, a lengthy delay in and of itself is especially cruel because it subjects death row inmates to decades of especially severe, dehumanizing conditions of confinement. the great and insurmountable "constitutional difficulty resulting from lengthy delay." *Glossip*, 135 S. Ct. at 2766, (Breyer and Ginsburg, JJ., dissenting)(internal quotation omitted). "The second constitutional difficulty resulting from lengthy delays is that those delays undermine the death penalty's penological rationale, perhaps irreparably so." *Id.* at 2767. "The upshot is that lengthy delays both aggravate the cruelty of the death penalty and undermine its jurisprudential rationale." *Id.* at 2769. And the Supreme Court has said that, if the death penalty does not fulfill the goals of deterrence or retribution, "it is nothing more than the purposeless and needless imposition of pain and suffering and hence  an unconstitutional punishment." *Atkins*, 536 U.S., at 319.

### 5. "Unusual"- Decline in Use of the Death Penalty Under Evolving Standards of Decency

"The Eighth Amendment forbids punishments that are cruel and *unusual*. Last year, in 2014, only seven States carried out an execution. Perhaps more importantly, in the last two decades, the imposition and implementation of the death penalty have increasingly become unusual." *Glossip v. Gross*, 135 S. Ct. at 2772 (Breyer and Ginsburg, JJ., dissenting)(emphasis in original)

The "evolving standards of decency that mark the progress of a maturing society"[82] have reached that point where the federal death penalty is out of place with current societal values and is therefore constitutionally "unusual" within the meaning of the Eighth Amendment. In the lengthy discussion above, Mr. Fell documented the arbitrary, capricious, irrational, and invidious manner in which the federal death penalty operates in practice. But there is more to the argument than a reiteration of the same historical state of affairs that existed at the time of *Furman*. In essence, society's acceptance of  a death penalty as such has waned to the point that present standards of decency decree an end to capital punishment.

Justices Breyer and Ginsburg in their *Glossip* dissent, pointed to eleven specific recent developments in support of their conclusion that in the last two decades the death penalty has become constitutionally "unusual":

1. The trajectory of the number of annual death sentences nationwide is that "approximately 15 years ago, the numbers began to decline, and they have declined rapidly ever since." *Id.* at 2772-73; 2777 (Appendix A, graph showing number of death sentences from 1977-2014);

---

[82] As pointed out above, the idea that the Eighth Amendment is not static has long been a key element of Eighth Amendment analysis. *See, e.g., Hall v. Florida*, 134 S.Ct. 1986, 1992 (2014); *Trop v. Dulles*, 356 U.S. 86, 101 (1958) (plurality opinion); *Weems v. United States,* 217 U.S. 349, 378 (1910).

2.      That trend, a significant decline in the last 15 years, also holds true with respect to the number of annual executions. *Id.* at 2773, 2777 (Appendix B, graph showing executions from 1977–2014);

3.      30 States have either formally abolished the death penalty or have not conducted an execution in more than eight years. Of the 20 States that have conducted at least one execution in the past eight years, 9 (Delaware, Idaho, Indiana, Kentucky, Louisiana, South Dakota, Tennessee, Utah, Washington) have conducted fewer than five in that time, making an execution in those States a fairly rare event. That leaves 11 States in which it is fair to say that capital punishment is not "unusual." And just three of those States (Texas, Missouri, and Florida) accounted for 80% of the executions nationwide (28 of the 35) in 2014. Indeed, last year, only seven States conducted an execution.. In  other words, in 43 States, no one was executed. *Id.* at 2773-74;

4.      In terms of population, if we ask how many Americans live in a State that at least occasionally carries out an execution (at least one within the prior three years), the answer two decades ago was 60% or 70%. Today, that number is 33%. *Id.* at 2774, 2778 (Appendix C);

5.      The use of the death penalty has become increasingly concentrated geographically, and by the early 2000's, the death penalty was only actively practiced in a very small number of counties. In short, the number of active death penalty counties is small and getting smaller. And the overall statistics on county-level executions bear this out. Between 1976 and 2007, there were no executions in 86% of America's counties. *Id.* at 2774, 2779 (Appendix D);

113

6.   In sum, if we look to States, in more than 60% there is effectively no death penalty, in an additional 18% an execution is rare and unusual, and 6%, i.e., three States, account for 80% of all executions. If we look to population, about 66% of the Nation lives in a State that has not carried out an execution in the last three years. And if we look to counties, in 86% there is effectively no death penalty. *Id.* at 2774;

7.   It " is not so much the number of these States that is significant, but the consistency of the direction of change. " *Roper*, 543 U.S., at 566. Seven States have abolished the death penalty in the last decade, including (quite recently) Nebraska. And several States have come within a single vote of eliminating the death penalty. Eleven States have not executed anyone in eight years. And several States have formally stopped executing inmates. *Id.* at 2774-2775;

8.   The direction of change is consistent. In the past two decades, no State without a death penalty has passed legislation to reinstate the penalty. Indeed, even in many States most associated with the death penalty, remarkable shifts have occurred. In Texas, the State that carries out the most executions, the number of executions fell from 40 in 2000 to 10 in 2014, and the number of death sentences fell from 48 in 1999 to 9 in 2013 (and 0 thus far in 2015). Similarly dramatic declines are present in Virginia, Oklahoma, Missouri, and North Carolina. *Id.* at 2775;

9.   A majority of Americans, when asked to choose between the death penalty and life in prison without parole, now choose the latter. *Id.* at 2775;

10.   In 2009, the American Law Institute withdrew the Model Penal Code section on capital punishment from the Code, in part because of doubts that the American Law Institute could "recommend procedures that would" address concerns about the

114

administration of the death penalty. *Id.* at 2776. cf. *Gregg*, 428 U.S., at 193–194 (joint opinion of Stewart, Powell, and Stevens, JJ.) (relying in part on Model Penal Code to conclude that a "carefully drafted statute" can satisfy the arbitrariness concerns expressed in *Furman* ); and,

11.   Many nations—indeed, 95 of the 193 members of the United Nations—have formally abolished the death penalty and an additional 42 have abolished it in practice. In 2013, only 22 countries in the world carried out an execution. No executions were carried out in Europe or Central Asia, and the United States was the only country in the Americas to execute an inmate in 2013. Only eight countries executed more than 10 individuals (the United States, China, Iran, Iraq, Saudi Arabia, Somalia, Sudan, Yemen). *Id.*, at 2. And almost 80% of all known executions took place in three countries: Iran, Iraq, and Saudi Arabia. *Id.* at 2775-76.

Based on the combination of these compelling and recent developments, "[i]t seems fair to say that it is now unusual to find capital punishment in the United States, at least when we consider the Nation as a whole." *Id.* at 2774, citing *Furman*, 408 U.S., at 311(White, J., concurring) (executions could be so infrequently carried out that they "would cease to be a credible deterrent or measurably to contribute to any other end of punishment in the criminal justice system ... when imposition of the penalty reaches a certain degree of infrequency, it would be very doubtful that any existing general need for retribution would be measurably satisfied"). See also. *State v. Santiago*, 318 Conn. at 78-86 (concluding, on the basis of many of these same recent developments that "Connecticut now stands as an outlier, the sole remaining New England state in which execution remains a legal and potentially viable option", and that " '[t]he evolution of this punishment...evidences, not that it is an inevitable part of the American scene, but that it has proved

progressively more troublesome to the national conscience.' ". *Id.* at 84-85, quoting *Furman v. Georgia*, supra, 408 U.S. at 299 (Brennan, J., concurring).

Certainly these national trends are relevant to the issue of whether the federal death penalty has become constitutionally "unusual". But it is important to stress that these trends are mirrored in the federal system itself. In the federal system, there have only been three executions since 1988. There have been none since 2003. In terms of nation-wide execution rates, that figure has also declined precipitously. From a high in 1999 of 98 executions , the figure has dropped almost every year to a low of 25 executions as of October 30, 2015. (App. 0001.)

In terms of the regional nature of the death penalty nationwide, that point has been made earlier in this brief that both the death penalty in general and the federal death penalty in particular are largely unknown outside the south. The  following three charts supplied by the Federal Death Penalty Resource Counsel Project illustrate the sharp decline in federal authorizations, federal trials, and federal death sentences:

# NUMBER OF DEFENDANTS TRIED BY CALENDAR YEAR – 9/22/15



# AUTHORIZED FEDERAL CAPITAL DEFENDANTS
## BY CALENDAR YEAR – 9/22/15





NUMBER OF DEATH VERDICTS BY
CALENDAR YEAR – 9/22/15

What these charts document is the dramatic fading away of the federal death penalty from its "heyday" in 2003 when 49 defendants were authorized for a federal capital prosecution, to 2014 when just four defendants were authorized. In 2005, 32 federal defendants went on trial in capital cases. In 2015, there were two such trials and none are scheduled for the remainder of the year. In 2009, there were nine defendants sentenced to death. So far in 2015 there has been one and he (Dzhokhar Tsarnaev) will be the only one since there are no federal capital cases scheduled to begin trial for the remainder of 2015. As the Court has indicated, it is not just the raw numbers that are important here, "but the consistency of the change." *Roper*, 543 U.S., at 566. See also, *Kennedy*, 554 U.S. at 431 ("Consistent change might counterbalance an otherwise weak demonstration of consensus.")

Although "[t]he clearest and most reliable objective evidence of contemporary values is the legislation enacted by the country's legislatures", "[t]here are measures of consensus other than legislation....Actual sentencing practices are an important part of the[c]ourt's inquiry into consensus." *Graham v. Florida*, supra, 560 U.S. at 62. accord *Kennedy v. Louisiana*, 554 U.S. at 433 ("Statistics about the number of executions may inform the consideration whether capital punishment . . . is regarded as unacceptable in our society.").

When one examines the recent statistics about the operation of the federal death penalty, and also takes into account relevant Supreme Court cases and the nationwide legislative and other trends documented in *Glossip* and *Santiago*, it is clear that the time has come to declare the federal death penalty both cruel and unusual.

The trends discussed above compare favorably to the shift on execution of juveniles under the age of 18 at the time of their offenses where only 5 states had shifted their position between the Supreme Court's decision sustaining the practice in *Stanford v. Kentucky*, 492 U.S. 361 (1989), and

its ruling sixteen years later in *Roper* that the practice was prohibited by the Eighth Amendment. *See Roper*, 543 U.S. at 565; *Kennedy v. Louisiana*, 554 U.S. at 432. And, although this change was significantly less than the 16 states that had changed their position on mental retardation from the Court's decision in *Penry v. Lynaugh*, 492 U.S. 302 (1989), to its overruling in *Atkins v. Virginia*, *supra*, the change of 5 states from *Stanford* to *Rope*r was nonetheless characterized as "telling" because of its direction. *Roper*, 543 U.S. at 565.

Further corroborating the capital punishment trend is that "in the last two decades, no State without a death penalty has passed legislation to reinstate the death penalty." *Glossip*, 135 S. Ct. at 2775 (Breyer, J., dissenting). This "carries special force in light of the general popularity of anticrime legislation." *Roper*, 543 U.S. at 566. And, the fact that somewhat less than half of the states now prohibit capital punishment similarly compares with the statistics in *Atkins* and *Roper*. In both, after discounting the 12 states that at the time of those decisions barred the death penalty across-the-board, less than half of the remaining barred the execution of mentally retarded offenders (*Atkins*) or offenders less than 18 years old at the time of their offense. (*Roper*).[83]

The number of states that currently retain the death penalty is also similar to the number that maintained life-without-parole sentences for juveniles when the Supreme Court ruled such sentences violate the Eighth Amendment, *see Miller v. Alabama*, 132 S. Ct. 2455, 2471 (2012) (28 states and the Federal Government provided for life-without-parole sentences for some juveniles convicted of murder); and significantly less than the 39 jurisdictions that provided for such sentences in non-

---

[83] The statistics were identical in both cases: In each, 12 states barred capital punishment. Of the 38 remaining capital punishment states only 18, or less than ½, precluded execution of mentally retarded offenses. *Atkins*, 536 U.S. at 313-15. And, the same held true in *Roper* with only 18 of 38 death penalty states barring execution of juveniles under 18 at the time of their offense. 543 US at 564.

homicide cases at the time of the Court's similar decision in *Graham v. Florida*, 560 U.S. 48, 97 (2011)(Thomas, J., dissenting).

These statistics are also comparable to the Court's decisions in the consensual same-sex and right-to-marry cases.  See *Lawrence v. Texas*, 539 U.S. 558, 573 (2003)(finding constitutional right of same-sex adults to engage in consensual sex: number of states that prohibited this activity had been reduced approximately in half since the Court's contrary decision in *Bowers v. Hardwick*, 478 U.S 186 (1986); *Obergefell v. Hodges*, 135 S. Ct. 2584, 2615 (2015) (Roberts, C.J., dissenting)(finding constitutional right of same-sex couples to marry even though the practice was sanctioned by the legislatures of only 11 states and the District of Columbia).

This directional change is telling in another way.  Regarding capital punishment statutes, inertia is often the safer political course.  Political expediency based on fears of a vocal minority trumpeting tough crime measures and resorting to attack ads against anyone purported to be "soft" on crime makes repeal of capital punishment statutes a hazardous undertaking even though the statutes may no longer be used, or rarely so.  As a consequence, the *practice* of death penalty states is as important an indicator as the fact that the statutes are still on the books. In this regard, the federal statistics summarized above are highly relevant and complement the national statistics which show that the number of persons sentenced to death in this country declined from an average of 286 a year between 1986 and 1999, to 73 in 2014 and executions declined from 98 in 1999, to 35 in 2014. Further, in 11 states with death penalty, there has been no execution for more than 8 years. *Glossip*, 135 S. Ct. at 2773 (Breyer, J., dissenting).  This, again, is telling.  *See Atkins*, 536 US at 316 (noting the infrequency of executions of mentally retarded offenders in the 20 states that did not formally prohibit the practice).

While constitutional rights are not determined by polls, they offer additional evidence that public support for the death penalty in this country is trending downwards.  *See* National Polls and Studies, Death Penalty Information Center, http://deathpenaltyinfo.org/national-polls-and-studies#Pew;CBS (collecting polls, which clearly show declining public support for capital punishment).[84] This is especially true where the shortcomings and miscarriages in the administration of capital punishment have received extensive media coverage, as in Illinois.  When, in March 2007, the *Chicago Tribune* reversed the editorial position it had maintained for 138 years and called for an end to capital punishment, the paper noted three weeks later that "there [had been] barely a ripple" in opposition. Timothy J. McNulty, *Opinion Shift Passes Quietly*, CHI. TRIB., Apr. 10, 2007, at 13.  When given the option of the death penalty or life without parole, a joint June 2014 poll by ABC News and the Washington Post showed that Americans preferred the latter by a 52%-42% margin.  *See* Damila Ergun, New Low In Preference for the Death Penalty, June 5, 2014, available at http://abcnews.go.com/blogs/politics/2014/06/new-low-in-preference-for-the-death-penalty/.[85]

Finally, the views of the international community shine light on the "evolving standards of decency that mark the progress of a maturing society." *Thompson v. Oklahoma,* 487 U.S. 815, 830

---

[84] *See* e.g.: Poll conducted in April 2015 by Pew Research Center and CBS News showing support in favor of death penalty at 56%, a "near historic low." http://deathpenaltyinfo. org/national-polls-and-studies#Pew;CBS. See also, Kenneth E. Shirley and Andrew Gelman, *Hierarchical models for estimating state and demographic trends in US death penalty public opinion*, 178 J. R. STATIST. SOC. A 1-28 (2015)(sophisticated statistical analysis of extensive polling data (N=58,253) gathered in the period from 1953-2006 indicates "high support in the 1980s (during which time a national concern about crime made the death penalty a prominent political issue) and, finally, decreased support since the mid-1990s (when five states either explicitly illegalized or indirectly suspended the death penalty in part because of the exoneration of numerous death row inmates due to DNA evidence)") , available at http://onlinelibrary.wiley. com/doi/10.1111/rssa.12052/full.

[85] Without the life without parole alternative, 61% expressed support for the death penalty. *Id.*

(1988) (plurality opinion noting that prohibition on executing offenders less than 16 years old is consistent with the views expressed by "other nations that share our Anglo-American heritage, and by leading members of the Western European community."); *Roper v. Simmons*, 543 U.S. at 575-76 (noting "relevance of the views of the international community in determining whether a punishment is cruel and unusual," and referencing UN Conventions and other international agreements). *Roper* notes that the United Kingdom's experience "bears particular relevance here in light of the Eighth Amendment's own origins." *Id.*, at 577.

While the death penalty remains in use in many countries, the trend internationally is progressing to abolition. *See Glossip*, 135 S. Ct. at 2775-76 (Breyer J., dissenting). In resisting this trend, the United States is keeping company neither with its "Anglo-American heritage," nor the "leading members of the Western European community." The United Kingdom abolished the death penalty in 1965, *see generally* Frederick C. Millett, *Will the United States Follow England (and the Rest of the World) in Abandoning Capital Punishment?*, 6 Pierce L. Rev. 3 548, 549. And the death penalty is banned under Article 2 of the Charter of Fundamental Rights of the European Union, 2012/C 326/02, *available at* http://www.europarl.europa.eu/charter/pdf/text_en.pdf (visited 8-19-15). Instead, in executing more than ten people in 2013, the United States' fellow-travellers were China, Iran, Iraq, Saudi Arabia, Somalia, Sudan and Yemen. *Glossip*, 135 S. Ct. at 2776 (Breyer J., dissenting), a collection of countries that hardly reflect contemporary public opinion in this country as to what constitutes "evolving and maturing" societies.

Finally, it is a telling indication of the evolving standards of decency on the death penalty that on November 4, 2015, the Wall Street Journal, not especially known for promoting cutting edge liberal ideology, published an Opinion/Commentary article co-authored by Christof Heyns, U.N. special rapporteur on extrajudicial, summary or arbitrary executions and a law professor at the

University of Pretoria in South Africa, and Juan Mendez, U.N. special rapporteur on torture and a law professor at American University in Washington. The article, entitled *Time to Kill the Federal Death Penalty* [86] summarizes the main points in the *Glossip* dissent and then urges:

> While executions are becoming less frequent—with 35 executions in 2014 compared with 98 in 1999—the U.S. is still one of the five most prolific executing countries in the world, in the company of China, Iran, Saudi Arabia and Iraq. This has high symbolic value world-wide. Countries with much less circumspection in their legal processes invariably justify their use of the death penalty by citing the U.S....

> Clearly [for the reasons stated in the *Glossip* dissent], even with modern advancements, the death penalty is inherently flawed. U.S. government officials often say their hands are tied, since this is a matter largely decided by state law. Yet the U.S. could declare a moratorium on the death penalty for federal crimes. Some would argue that an unofficial moratorium is already in place. The federal government hasn't executed anyone in 12 years, since Louis Jones Jr. in 2003, despite 50 federal death sentences having been handed down since then.

> Adopting an official federal moratorium on the death penalty, through executive order if need be, would send a powerful message about the value of life and the inhumane and flawed nature of executions.

Reading this article might prompt the Court to ask a question that Justices Breyer and Ginsburg asked themselves in *Glossip*: "We are a court. Why should we not leave the matter up to the people acting democratically through legislatures [or the executive branch] ?" *Glossip*, 135 S.Ct. at 2776. The Justices responded to their own question:

> The answer is that the matters I have discussed, such as lack of reliability, the arbitrary application of a serious and irreversible punishment, individual suffering caused by long delays, and lack of penological purpose are quintessentially judicial matters. They concern the infliction—indeed the unfair, cruel, and unusual infliction—of a serious punishment upon an individual. I recognize that in 1972 this Court, in a sense, turned to Congress and the state legislatures in its search for standards that would increase the fairness and reliability of imposing a death penalty. The legislatures responded. But, in the last four decades, considerable evidence has accumulated that those responses have not worked.

---

[86] http://www.wsj.com/articles/time-to-kill-the-federal-death-penalty-1446682783.

Thus we are left with a judicial responsibility. The Eighth Amendment sets forth the relevant law, and we must interpret that law. See *Marbury v. Madison*, 1 Cranch 137, 177, 2 L.Ed. 60 (1803); *Hall*, 572 U.S., at ——, 134 S.Ct., at 2000 ("That exercise of independent judgment is the Court's judicial duty"). We have made clear that " 'the Constitution contemplates that in the end our own judgment will be brought to bear on the question of the acceptability of the death penalty under the Eighth Amendment.' " *Id.*, at ——, 134 S.Ct., at 1999 (*quoting Coker v. Georgia*, 433 U.S. 584, 597, 97 S.Ct. 2861, 53 L.Ed.2d 982 (1977) (plurality opinion)); see also *Thompson v. Oklahoma*, 487 U.S. 815, 833, n. 40, 108 S.Ct. 2687, 101 L.Ed.2d 702 (1988) (plurality opinion).

*Id.* at 2776.[87]

## 6.      The Doctrine of *Stare Decisis*

Experience over 40 years has shown that the *Gregg* approach has not tamed the arbitrariness problem identified in *Furman*.  But, the question remains:  In light of *Gregg*, what can this Court do about it?

Mr. Fell acknowledges the Court's obligation to apply the doctrine of *stare decisis*.  But the protections afforded by the Eighth Amendment's prohibition of cruel and unusual punishment require reconsideration when necessary to ensure that its underlying values have not become moribund by later developments and knowledge.  This Court can discount precedent when "special justifications" are present.  *Arizona v. Rumsey*, 467 U.S. 203, 212 (1984).

Such justifications include the advent of "subsequent changes or development in the law" that undermine a decision's rationale, *Patterson v. McLean Credit Union, supra* . . . the need "to bring [a decision] into agreement with experience and with facts newly ascertained," *Burnet v. Coronado Oil & Gas Co., supra* . . . ; and a showing that a particular precedent has become a "detriment to coherence and consistency in the law . . . " (citations omitted)

---

[87] A majority of the Court shares this view. See, *Obergefell v. Hodges*, 135 S. Ct. 2584, 2605 (2015)("[T]he freedom secured by the Constitution consists, in one of its essential dimensions, of the right of the individual not to be injured by the unlawful exercise of governmental power.' [citation omitted].  Thus, when the rights of persons are violated, 'the Constitution requires redress by the courts,' [citation omitted], notwithstanding the more general value of democratic decisionmaking.  This holds true even when protecting individual rights affects issues of the utmost importance and sensitivity.")

126

*Payne v. Tennessee*, 501 U.S. 808, 849 (1991) (Marshall, J. dissenting).

While the above relates to the Supreme Court reconsidering its own precedents, the doctrine of anticipatory overruling, which allows a lower court to reject precedent where circumstances have changed, applies to both courts of appeals, *see United States v. City of Philadelphia*, 644 F.2d 187, 191-92 (3rd Cir. 1980) (declining to follow *Wyandotte Transportation Co. v. United States*, finding it "merely one step in the development of current standards" and refusing to be "blind to subsequent developments. . ."); *United States v. White*, 405 F.2d 838, 847-48 (7th Cir. 1969) (declining to follow *On Lee v. United States*, even though factually "directly on point" because of subsequent developments); and to lower courts, especially when called upon to reconsider issues of overriding constitutional importance. *See Barnette v. West Virginia Board of Education*, 47 F. Supp. 251 (S.D. West Virginia) (1942) (refusing to follow Supreme Court decision in *Minersville School District v. Gobitis*, 310 U.S. 586 (1940), holding that public schools could require students to salute the flag and recite the *Pledge of Allegiance* over their religious objections as Jehovah's Witnesses), *affirmed in West Virginia State Board of Education v. Barnette*, 319 U.S. 643 (1943) (overruling *Minersville School District*); *Gebhart v. Belton*, 87 A.2d 862 (Del. Ch. 1952), *affirmed* 91 A.2d 137 (De. 1952) (Delaware Chancellor Collins Seitz (later Chief Judge of the Third Circuit) orders public schools integrated despite Supreme Court decision in *Plessy v. Ferguson*, 163 U.S. 537 (1896)), *affirmed in Brown v. Board of Education*, 347 U.S. 483 (1954).[88]

---

[88] Judge Seitz did not directly rule *Plessy* was no longer good law but instead held that the evidence did not support *Plessy*'s underlying assumption that the segregated schools in New Castle, Delaware were equal.  Similarly, there is no need for this Court to say *Gregg* is no longer applicable.  The Court need only rule that the now-available evidence does not support its underlying assumption that the death penalty can be imposed in a non-arbitrary and non-capricious manner.

Finally, this Court would not be a voice in the wilderness in ruling the death penalty is no longer consistent with the Eighth Amendment.  Comments of several Justices since *Gregg* support the anticipatory view that, upon reconsideration, it will be overruled.  When Justice Stevens announced his view, based on "countless" cases, that the death penalty is "patently excessive and cruel and unusual punishment violative of the Eighth Amendment," *see Baze v. Rees*, 553 U.S. 35, 86 (2008)(Stevens, J., concurring in judgment)(citation omitted), he became the fifth *Gregg* justice to ultimately come to this conclusion, joining *Gregg* dissenters, Justices Brennan and Marshall; Justice Blackmun who announced his view, changed after 20 years of experience with capital cases, that the death penalty no longer comports with the Eighth Amendment and that he would "no longer tinker with the machinery of death," *see Callins v. Collins*, 510 U.S. 1141, 1145 (Blackmun, J., dissenting from denial of certiorari); and Justice Powell, who expressed a similar change of heart to his biographer. John C. Jeffries, Jr., Justice Lewis F. Powell, Jr.: A Biography 451 (1994)(Quoting Justice Powell: "I have come to think that capital punishment should be abolished."); *see generally* John Paul Stevens, Six Amendments: How and Why We Should Change the Constitution, 107-123 (2014); Semel, *Reflections on Justice John Paul Stevens' Concurring Opinion in Baze v. Rees: A Fifth Gregg Justice Renounces Capital Punishment*, *supra*.

Former Justice Souter also came to doubt the continued constitutionality of the death penalty in this age of DNA.  *See Kansas v. Marsh*, 548 U.S. 163, 207-08 (2008)("Today, a new body of fact must be accounted for in deciding what, in practical terms, the Eighth Amendment guarantees should tolerate, for the period starting in 1989 has seen repeated exonerations of convicts under death sentences, in numbers never imagined before the development of DNA tests.").[89]

---

[89] Among the examples of exonerations, Justice Souter cited the Illinois experience, where, at the time of his writing, 13 death row inmates had been exonerated between 1977 and 2000, while only 12 had been executed during this period.  And, like Justices Breyer and

Current Justices have announced similar skepticism.  In their dissenting opinion in *Glossip*, *supra*, Justices Breyer and Ginsburg all but said the death penalty cannot in this day of time be reconciled with the Eighth Amendment.

Similarly, Justice Sotomayor has expressed a willingness to reconsider prior death penalty decisions.  See *Mario Dion Woodward v. Alabama,* 134 S. Ct. 405 (2013) (Sotomayor, J., dissenting from denial of certiorari)("[T]he time has come for us to reconsider" opinions in *Spaziano v. Florida*, 468 U. S. 447 (1984), and *Harris v. Alabama*, 513 U. S. 504 (1995) (both upholding judicial override statutes)).  As Justice Sotomayor pointed out in *Roper v. Simmons*, *supra*, the Supreme Court reconsidered and reversed its decision on the execution of juveniles who committed offenses under the age of 18 after the passage of only 16 years from *Stanford v. Kentucky*, *supra*; and in *Atkin*s v. *Virginia*, *supra*, reversed its decision concerning the application of the Eighth Amendment to those suffering from mental retardation only 13 years after *Penry v. Lynaugh*, *supra*. *Woodward,* 134 S. Ct. at 407.  As noted, here 39 years have passed since *Gregg*.  Like the issue concerning the relationship between *stare decisis*, the passage of time and changing cultural values, presented in *Lawrence v. Texas*, *supra*, "our laws and traditions in the past half century are of most relevance here."  539 U.S. at 558.

## IV.    CONCLUSION

Rather than a slow burn, arbitrariness in the administration of capital punishment has metastasized into an out-of-control wildfire.  No matter the direction one looks, capital punishment presents seemingly intractable problems.  Decisions such as *Rope*r*, Simmons* and *Kennedy*, show that

---

Ginsburg in their *Glossip* dissent, 135 S.Ct. at 2757-58, Justice Souter also observed the data show that "false verdicts" are "probably disproportionately high in capital cases." *Marsh*, at 210.

the death penalty is now wobbling on its last Eighth Amendment leg.  Mr. Fell therefore asks this

Court to enter an order declaring  that the federal death penalty, in and of itself, constitutes a legally

prohibited cruel and unusual punishment prohibited by both the Fifth and Eighth Amendments, and

striking the government's Notice of Intent to Seek Death.

      Dated at San Francisco, California, this 15th day of November, 2015.

Dated: November 15, 2015             Respectfully Submitted,
                                    MICHAEL N. BURT
                                    KERRY B. DeWOLFE
                                    JOHN T. PHILIPSBORN

                                    By:  */s/ Michael N. Burt*
                                    Michael N. Burt
                                    Law Office of Michael N. Burt
                                    1000 Brannan Street, Suite 400
                                    San Francisco, CA 94102
                                    (415) 522-1508 phone
                                    (415) 522-1506 fax
                                    mb@michaelburtlaw.com
                                    Counsel for DONALD FELL

## CERTIFICATE OF SERVICE

I hereby certify that on November 16, 2015, I electronically filed with the Clerk of

**MEMORANDUM IN SUPPORT OF DEFENDANT DONALD FELL'S MOTION TO PRECLUDE THE DEATH PENALTY AS A PUNISHMENT BECAUSE THE DEATH PENALTY, IN AND OF ITSELF, CONSTITUTES AN UNCONSTITUTIONAL PUNISHMENT**

using the CM/ECF system. The CM/ECF system will provide service of such filing(s)

via Notice of Electronic Filing (NEF) to the following NEF parties:

      Michael N. Burt, Esq.
      Kerry B. DeWolfe, Esq.
      John Phillipsborn
      William B. Darrow, Esq., Assistant United States Attorney
      Bruce R. Hegyi, U.S. Dept. Of Justice

I also caused to be served, by U.S. Postal Service, the following non-NEF party:

      Donald Fell
      Register Number 05306-010
      The Metropolitan Detention Center
      P.O. Box 329002
      Brooklyn, NY 11232

Dated at San Francisco, California, this 16th day of November, 2015.

By: */s/ Michael N. Burt*

Law Office of Michael Burt
1000 Brannan Street
Suite 400
San Francisco, California 94103
415-522-1508 (phone)
415-522-1506 (fax
mb@michaelburtlaw.con
Counsel for DONALD FELL

3.