IN THE UNITED STATES DISTRICT COURT FOR THE

DISTRICT OF VERMONT

UNITED STATES OF AMERICA          )
                                  )
VS.                               )          CRIMINAL 5:01-cr-00012
                                  )
DONALD FELL                       )
                                  )

**MEMORANDUM IN SUPPORT OF DEFENDANT DONALD FELL'S MOTION TO
DISMISS THE SUPERSEDING INDICTMENT AND/OR TO STRIKE THE AMENDED
NOTICE OF INTENT TO SEEK PENALTY OF DEATH AS VIOLATIVE OF
PRINCIPLES OF LIMITED NATIONAL POWERS AND STATE SOVEREIGNTY**

"The principles of limited national powers and state sovereignty are intertwined. While

neither originates in the Tenth Amendment, both are expressed by it. [1] Impermissible

interference with state sovereignty is not within the enumerated powers of the National

Government, …, and action that exceeds the National Government's enumerated powers

undermines the sovereign interests of States. …. The unconstitutional action can cause

concomitant injury to persons in individual cases." *Bond v. United States*, __U.S.__, 131 S. Ct.

2355, 2366, 180 L. Ed. 2d 269 (2011)(citations omitted). This is such a case, and Donald Fell,

through counsel, therefore moves this Court to dismiss the Superseding Indictment (Doc. 57)

and/or to strike the Amended Notice Of Intent To Seek Penalty Of Death filed by the

government on September 8, 2015 (Doc. 609).

## I.    PROCEDURAL HISTORY

On July 8, 2002, the government filed a four count Superseding Indictment against Mr.

Fell arising out of the November 27, 2000 abduction of Teresa King in Vermont and the

---

[1] The Tenth Amendment provides:
        The powers not delegated to the United States by the Constitution, nor
prohibited by it to the States, are reserved to the States respectively, or to the
people.

subsequent murder of her in New York. [Doc. 57]. The thin federal jurisdictional premise of the capital carjacking offense charged in Count 1 is that Mr. Fell took "a motor vehicle that had been transported, shipped and received in interstate and foreign commerce…" [Doc. 57]. The equally thin federal jurisdictional premise of the capital kidnapping offense charged in Count 2 is that Mr. Fell willfully transported his victim "in interstate commerce…". Count 3, a non-capital allegation of firearm possession pursuant to 18 U.S.C. §§ 924 (c) (1) (A) (ii), incorporates and is dependent upon the validity of the allegations in Counts 1 and 2. Count 4, another non-capital charge alleged pursuant to 18 U.S.C. §§ 922 (g) (2), is that Mr. Fell transported a firearm "in interstate commerce….".

In May 2001, within months of his arrest, Mr. Fell offered to plead guilty to the second count of the indictment in exchange for a sentence of life in prison without possibility of parole. In October 2001, the United States Attorney for the District of Vermont submitted a draft plea agreement to counsel for Mr. Fell permitting him to plead to life-imprisonment, an agreement which Mr. Fell subsequently signed. The Attorney General rejected that agreement, and on January 30, 2002, following the direction of the Attorney General, the United States Attorney filed its Notice of Intent to Seek the Death Penalty. After the government filed its Notice of Intent, Mr. Fell and the United States Attorney entered into an agreement by which the penalty phase of Mr. Fell's trial was to be tried to the Court following a guilty plea to the charges. The Attorney General rejected this agreement as well.

The theory that Mr. Fell was engaged in interstate commerce is contradicted by the government's own Notice of Intent to Seek the Death Penalty (Doc. 32), filed on January 30, 2002, which alleges as a non-statutory aggravating factor that Mr. Fell's actions were motivated not by commerce, but "to facilitate his escape from the area in which he and an accomplice had

2.

committed a double murder." [Doc. 32 at 3].  On June 24, 2005, a jury found Mr. Fell guilty

[Doc. 200], and on July 14, 2005 the jury recommended a sentence of death, after finding all

statutory and non-statutory aggravating factors true, including that "Donald Fell participated in

the abduction of Teresca King to facilitate his escape from the area in which he and an

accomplice had committed a double murder" [Doc. 200].

Prior to sentencing, the government urged the Court to order that Mr. Fell be executed in

Indiana, not in Vermont, because "[t]he State of Vermont does have a lawful capital punishment

statute" and

> Vermont's archaic capital punishment law (13 V.S.A. § 7101, et seq.) pre-
> dates multiple decisions by the United States Supreme Court, beginning with
> *Furman v. Georgia*, 408 U.S. 238 (1972), striking down similar laws as
> unconstitutional. While Vermont's law remains on the books, it has been void and
> unlawful for over 30 years. Further, Vermont has no facility for implementing a
> death sentence.

Doc. 240 at 3.

The government also argued that New York was not an appropriate place to hold the execution,

in part because

> [T]he New York State Department of Corrections General Counsel's
> Office reports that New York has not executed anyone since the 1960s and is not
> equipped to do so. When the New York Court of Appeals struck down that State's
> capital statute as unconstitutional, *People v. La Valle*, 783 N.Y.S.2d 485 (2004),
> and the Legislature did not revise the statute, New York stopped work on related
> regulations, procedures and facility preparations. Consequently, according to
> DOC General Counsel's Office, an execution in New York would present "a
> million logistical problems."

Id. at 5.

On June 16, 2006, the Court granted the government's request. [Doc. 242]. Agreeing with

the government that Vermont's death penalty law has been "'void and unlawful for over 30

3.

years' ", and that in the intervening decades since *Furman*, "Vermont has not amended any part

of its death penalty statute to bring it into compliance with *Furman* or the rest of the Supreme

Court's substantial body of contemporary Eighth Amendment jurisprudence", the Court ruled

that pursuant to 18 U.S.C. 3596 (a) the execution could not take place in Vermont. [2] Id. at 3. The

Court also ruled that the execution could not take place in New York because "[a]s the

government stresses…New York's capital punishment framework is currently in a state of

uncertainty", "in June 2004, the New York Court of Appeals struck down the state's death

penalty statute", and "the future of the death penalty in New York is far from clear." Id. at 7-8. [3]

Following the imposition of his death sentence, Mr. Fell appealed on several grounds

including errors in jury selection, errors in the admission of certain evidence, prejudicial

statements by the prosecutors, and the violation of certain provisions of the Federal Death

Penalty Act ("FDPA"). The Second Circuit affirmed Mr. Fell's conviction and sentence of death.

*See United States v. Fell*, 531 F.3d 197, 208 (2008).

Pursuant to 28 U.S.C. § 2255, Mr. Fell then moved this Court to vacate, set aside, or

correct the judgment and sentence of death, and to grant him a new trial based on the claim that

juror misconduct deprived him of his Fifth, Sixth, and Eighth Amendment rights to an impartial

jury. On July 24, 2014, this Court found that Mr. Fell had been denied a fair trial and his

---

[2] Section 3596(a) provides in part that a federal execution shall take place "in the manner pre-
scribed by the law of the State in which the sentence is imposed", but that "[i]f the law of the
State does not provide for implementation of a sentence of death, the court shall designate anoth-
er state, the law of which does provide for the implementation of a sentence of death…" The
important constitutional and statutory issues arising from this provision are addressed by Mr. Fell
in a separate motion.

[3] Subsequent events have made it clear that New York is in fact a state that has abolished the
death penalty. See, *State v. Santiago*, 318 Conn. 1, 189 (2015)(" In two …states—Massachusetts
and New York—as well  as the District of Columbia, a court invalidated the existing death pen-
alty statutory scheme, which effectively banned future executions in the absence of a
statutory change. No such changes have been made.")

4.

conviction and sentence of death were vacated (Doc. 514). Retrial is now set

## II.    ARGUMENT

### A.  The Path Leading to the Abolition of The Death Penalty in Vermont

Vermont's experience with capital punishment has been one of early, sparing use and then, in 1965, abandonment. From 1778 to the present, Vermont has executed a total of twenty five men and one woman, the first on November 6, 1778 and the last on August 12, 1954 (Donald DeMag). Of these twenty six executions, only eight occurred in the twentieth century, with one execution a year in 1905, 1912, 1914, 1919, 1932, and 1947, and two in 1954. [4] Although Donald DeMag was the last person executed by Vermont, he was not the last person to be sentenced to death by a Vermont court. In 1957, Lionel Goyet was sentenced to death, but his sentence was commuted six months later and Goyet was pardoned and released in 1969. [5]

In 1819, two brothers in Manchester, Jesse and Stephen Boorn, after confessing, were convicted and sentenced to death for the alleged murder of their brother-in-law. One of the brothers had his sentence reduced to life imprisonment and the other brother was spared from execution at the last moment when the supposed "dead" man showed up in town. [6]

In 1838, Vermont's legislature defeated an abolition bill by only three votes. If the bill had passed, it would have made Vermont the first state to abolish the death penalty.[7]

---

[4] http://www.deathpenaltyinfo.org/documents/ESPYstate.pdf.

[5] Amicus Yearbook 2012, *The Death Penalty in the U.S.: Vermont*, http://www.amicus-alj.org/CubeCore/.uploads/yearbook/Vermont.pdf

[6] Death Penalty Information Center: Vermont, http://www.deathpenaltyinfo.org/vermont-0#history. See also, Northwestern Law, Center for Wrongful Conviction, *First Wrongful Conviction: Jesse Boorn and Stephen Boorn*, http://www.northwestern.edu/legalclinic/wrongful convictions/exonerations/vt/boorn-brothers.html.

[7] Id.

In 1864, Vermont became the first state to regulate the death penalty in towns and counties, allowing only state-permitted executions and setting a standard for other states, almost all of which followed Vermont's example. [8]

In 1965, the legislature abolished the death penalty, except for the murder of police and prison employees or a second unrelated murder. [9] In 1987 the Vermont Legislature formally abolished the death penalty for the crime of murder and did so by amending title 13, section 2303(a) of the Vermont Statutes.[10] The current language in section 2303(a) establishes that the punishment for first-degree murder shall be imprisonment for life with a minimum of thirty-five years unless there are aggravating or mitigating factors that the court finds. From that date forward, neither Vermont's citizens nor others would be subject to the death penalty in this State. And, no longer would its citizens be required to engage in the painstaking duty of determining whether another human being lives or dies.

There have been some attempts to reinstate the death penalty since 1964, usually following particularly brutal acts of murder in the State, such as the 1998 Bill S.222, which was proposed

---

[8] William S. McFeely, *Trial and Error: Capital Punishment in U.S. History*, www.historymatters.gmu.edu (accessed November 15, 2015).

[9] 1965 Vt. Acts & Resolves 30 § I.

[10] Act effective May 16, 1987, 1987 Vt. Acts & Resolves 125–26. Currently, there is still a partial death penalty statute in Vermont. The statute applies only to the crime of treason, see VT. STAT. ANN. tit. 13, § 3401 (1996), or, relatedly, crimes committed by three or more people, acting in concert, in a time of war or of threatened war, see id. § 3484. Electrocution is used when the death penalty is imposed. Id. § 7106. However, as the government correctly pointed in Doc. 240, Vermont's death penalty was effectively rendered invalid by the U.S. Supreme Court in 1972 with its decision in *Furman v. Georgia*, 408 U.S. 238 (1972). See *Thompson v. Oklahoma*, 487 U.S. 815, 829 n.29 (1988) ("Vermont is frequently counted as a 15th State without a death penalty, since its capital punishment scheme fails to guide jury discretion, and has not been amended since our decision in Furman v. Georgia holding similar statutes unconstitutional.") (citations omitted).

"to impose the death penalty for the crimes of killing a law enforcement officer, killing a person while, at the time of killing, the defendant had escaped from confinement or police custody, and aggravated murder". However, this bill " did not pass the second reading in the State Senate." [11]

In 2006, Vermont State Representative Duncan Kilmartin introduced a bill to reinstate capital punishment in Vermont state law. [12] The bill would have permitted a jury to impose the death penalty for murder committed under certain circumstances. "Such bills are frequently introduced in the Vermont Legislature, but they have never gone anywhere. What had changed in 2006 was the death verdict the previous summer in the Donald Fell trial. The quality and seriousness of the 2006 bill were also different from previous restoration bills." [13] Nonetheless, "the bill did not pass its first reading." Amicus Yearbook 2012 at 7. From 2006 to the present, no other death penalty bill has been reintroduced in the state legislature, despite such high profile cases such as *United States v Michael Jacques*, D.VT., No. 2:08–cr–117. in which the federal government failed to deliver a death sentence and instead negotiated a plea agreement.

The actions (or inactions) of the state legislature in the death penalty arena could not happen without public support. Over the years, opposition to the death penalty by Vermonters has remained high, and in fact support for the death penalty in this state has been decreasing over time. See, Kenneth E. Shirley and Andrew Gelman, *Hierarchical models for estimating state and demographic trends in US death penalty public opinion*, 178 J. R. STATIST. SOC. A 1, 12

---

[11] Amicus Yearbook 2012 at 7.

[12] H.R. 830, 2006 Leg., Reg. Sess. (Vt. 2006), available at http://www.leg.state.vt.us/docs/legdoc.cfm?URL=/docs/2006/bills/intro/h-830.htm.

[13] Michael Mello, *Certain Blood For Uncertain Reasons: A Love Letter To The Vermont Legislature On Not Reinstating Capital Punishment*, 32 VERMONT LAW REVIEW 765, 768-69 (2008). See also, Amicus Yearbook 2012 ("In 2006, in the wake of the murders committed by Fell and Lee10, Bill H.0830 was proposed by Vermont State Representative, Duncan Kilmartin…").

7.

(2015)(sophisticated statistical analysis of extensive polling data (N=58,253) gathered in the period from 1953-2006 indicates that "[t]he three northeastern states with the fastest decreasing support for the death penalty over this time period are Massachusetts, New Jersey and Vermont."). Finally, Vermont is probably the only state in the nation in which its high elected federal officials openly espouse anti-death penalty views, and praise others who hold them. [14]

Here, the federal government has given notice that it intends to ignore the long held judgment of the citizens and elected officials of Vermont and ask twelve of them to impose the penalty of death on Mr. Fell, for crimes that began in the state of Vermont against Vermont citizens and for crimes, carjacking, kidnapping, and murder, that violate the law of Vermont and are ones which traditionally squarely falls within the police power of the State.[15]  This attempt to

---

[14] See e.g., New York Times, October 29, 2015, *On Senate Floor, Bernie Sanders Calls for Ending the Death Penalty,* http://www.nytimes.com /politics/first-draft/2015/10/29/on-senate-floor-bernie-sanders-calls-for-ending-the-death-penalty/ ("A day after Hillary Rodham Clinton said she opposed abolishing the death penalty, Senator Bernie Sanders took to the Senate floor on Thursday and declared that 'the time is now for the United States to end capital punishment.'"); Sen. Patrick Leahy Press Release (April 20, 2015), *Comment Of Senator Patrick Leahy (D-Vt.), Ranking Member, Senate Judiciary Committee, On the Misuse of Forensic Evidence,* http://www.leahy.senate.gov/press/comment-of-senator-patrick-leahy-d-vt-ranking-member-senate-judiciary-committee-on-the-misuse-of-forensic-evidence ("the Justice Department and FBI have now acknowledged that for two decades, nearly an entire unit of forensic examiners took the stand during criminal trials and exaggerated the scientific significance of important evidence.  This included the cases of 32 people who were sentenced to death.  The extent of this gross misconduct is still unknown, except perhaps to those whose lives were ruined by these irresponsible actions.   Sen. Patrick Leahy Press Release (July 17, 2014), *Vermont Senators Honor Gov. Phil Hoff* , ("In joint remarks before the U.S. Senate today, Sens. Patrick Leahy (D-Vt.) and Bernie Sanders (I-Vt.) honored former Vermont Gov. Phil Hoff [because] Phil Hoff led the way to Vermont becoming one of the first states to abolish the death penalty"). See also, John Bingham, *Unusual Punishment: The Federal Death Penalty in the United States*, 16 WASHINGTON UNIVERSITY JOURNAL OF LAW & POLICY (2004) 195, 219 ("In 2000, Senator Patrick Leahy of Vermont introduced into Congress the Innocence Protection Act of 2000, which would bar the Department of Justice from seeking the death penalty in non-death penalty states except under special circumstances.").

[15] The fact that the carjacking and kidnapping occurred in Vermont while the murder occurred in New York is without significance to the present motion for two reasons. First, it is clear that in the circumstances of this case, Vermont has jurisdiction to prosecute the murder occurring in

override the judgment of the citizens of Vermont, as expressed through their Legislature and Executive, cannot withstand analysis under the principles of limited national powers and state sovereignty embodied in the Tenth Amendment of the Constitution of the United States.

Before proceeding further, Mr. Fells underscores what he is *not* arguing. Mr. Fell does not suggest that the Constitution categorically prohibits the Federal government from seeking the death penalty in any state that has jettisoned capital punishment. Nor is he advancing the broad theory rejected by Judge Sessions in a motion for reconsideration in *United States v. Jacques*, 2011 WL 3881033 * 2 (D. Vt. 2011) that because the death penalty is unlawful in Vermont it is "unusual" under the Eighth Amendment. Mr. Fell admits that the government may proceed in the face of the State's interests, where interests uniquely assigned to and enforceable by the national government are involved. *Infra*. But where, as here, the federal government asserts only the broad, overly-relaxed jurisdiction afforded by the Commerce Clause to come into a State that has abolished the death penalty and use State resources, including its citizens, to obtain that penalty for a crime that unmistakably is part and parcel of the police powers of the State, the dual sovereignty system of our federal compact, as articulated in the Tenth Amendment, prevents

---

New York. See, *State v. Harrington*, 128 Vt. 242, 250, 260 A.2d 692, 697 (1969)("Where the crime is composed of an interstate series of acts, it is jurisdictionally competent for a state to attach legal consequences to any overt act committed within its boundaries, even though the final impact and injury may occur elsewhere."), citing 13 V.S.A. § 2 ("A person who, with intent to commit a crime, does an act within this state in execution or part execution of such intent, which culminates in the commission of a crime either within or without this state, shall be punished for such crime in this state in the same manner as if the same had been committed entirely within this state."). Second, as indicated above, New York is also an abolitionist state, so the same arguments advanced herein would be applicable if the crime was prosecuted in New York. See, *United States v. Fell*, 571 F. 3d 264, 283 n. 4 (2nd Cir. 2009)(Calabresi, J., dissenting from the denial of rehearing)(" That the New York legislature has declined to pass a new death penalty law must be taken, like Vermont's failure to enact capital punishment, as some evidence of the popular will, at least today.").

the attempt to usurp the considered judgment of the state polity.  This conclusion is more patent where the penalty of life-without-parole is available to the federal government – an alternative which impairs the federal government's interest in the death penalty.

**B. Under The Facts Of This Case, The Government's Attempt To Override The Judgment Of The Citizens Of Vermont That The Death Penalty Should Be Prohibited In Their State  Cannot Withstand Analysis Under The Principles Of Limited National Powers And State Sovereignty Embodied In The Tenth Amendment.**

It is clear that beginning early and as recent as Last Term, the United Supreme Court has consistently, and more recently vigorously, restricted the reach of federal criminal laws in areas traditionally reserved to the state under its "police power", particularly as to federal statutes which impose greater punishments than comparable state or model statutes. See e.g., *Yates v. United States*, __U.S.__, 135 S. Ct. 1074, 1087-89 (2015) (rejecting "boundless reading" of a statutory offense given "deeply serious consequences" that reading would entail)(internal quotation omitted); *Bond v. United States*, 572 U.S. ——, ——, 134 S.Ct. 2077, 2093 (2014) (" Here, in its zeal to prosecute Bond, the Federal Government has displaced the public policy of the Commonwealth of Pennsylvania, enacted in its capacity as sovereign, that Bond does not belong in prison for a chemical weapons offense.")(internal quotation omitted); *Bond v. United States*, 564 U.S. ——,  131 S.Ct. 2355, 2363–2364 (2011)("Federalism secures the freedom of the individual. It allows States to respond, through the enactment of positive law, to the initiative of those who seek a voice in shaping the destiny of their own times without having to rely solely upon the political processes that control a remote central power."); *Nat'l Fed'n of Indep. Bus. v. Sebelius*, 132 S. Ct. 2566, 2578, 183 L. Ed. 2d 450 (2012)("The Federal Government has expanded dramatically over the past two centuries, but it still must show that a constitutional grant of power authorizes each of its actions."); *United States v. Lopez*, 514 U.S. 549, 555

10.

(1995)("[T]the scope of the interstate commerce power must be considered in the light of our dual system of government and may not be extended so as to embrace effects upon interstate commerce so indirect and remote that to embrace them, in view of our complex society, would effectually obliterate the distinction between what is national and what is local and create a completely centralized government."). See also, *United States v. Enmons*, 410 U.S. 396, 411, 93 S.Ct. 1007, 1015(1973)(" [I]t would require statutory language much more explicit than that before us here to lead to the conclusion that Congress intended to put the Federal Government in the business of policing the orderly conduct of strikes. Neither the language of [the statute] nor its legislative history can justify the conclusion that Congress intended to work such an extraordinary change in federal labor law or such an unprecedented incursion into the criminal jurisdiction of the States."). ("[T]he broad construction urged by the Government renders traditionally local criminal conduct a matter for federal enforcement and would also involve a substantial extension of federal police resources. Absent proof of some interstate commerce nexus in each case, [the statute] dramatically intrudes upon traditional state criminal jurisdiction.") (citations omitted)).

Application of these principles in situations closely analogous to the present case illustrate the limits of federal power and the preeminence of the state's police power. For example, in *United States v. Bass*, 404 U.S. 336, 350 (1971), the Court interpreted a statute that prohibited any convicted felon from " 'receiv[ing], possess[ing], or transport[ing] in commerce or affecting commerce ... any firearm.' " Id., at 337. The Government argued that the statute barred felons from possessing all firearms and that it was not necessary to demonstrate a connection to interstate commerce. The Court rejected that reading, which would "render[ ] traditionally local criminal conduct a matter for federal enforcement and would also involve a

11.

substantial extension of federal police resources." Id., at 350. The Court instead read the statute more narrowly to require proof of a connection to interstate commerce in every case, thereby "preserv[ing] as an element of all the offenses a requirement suited to federal criminal jurisdiction alone." Id., at 351, 92 S.Ct. 515.

Similarly, in *Jones v. United States*, 529 U.S. 848, 850 (2000), the Court confronted the question whether the federal arson statute, which prohibited burning " 'any ... property used in interstate or foreign commerce or in any activity affecting interstate or foreign commerce,' " reached an owner-occupied private residence. Once again the Court rejected the Government's "expansive interpretation," under which "hardly a building in the land would fall outside the federal statute's domain." Id., at 857, 120 S.Ct. 1904. The Court instead held that the statute was "most sensibly read" more narrowly to reach only buildings used in "active employment for commercial purposes." Id., at 855. The Court noted that "arson is a paradigmatic common-law state crime," id., at 858, and that the Government's proposed broad reading would " 'significantly change [ ] the federal- state balance,' " ibid. , "mak[ing] virtually every arson in the country a federal offense," 529 U.S., at 859.

"These precedents make clear that it is appropriate to refer to basic principles of federalism embodied in the Constitution to resolve ambiguity in a federal statute." *Bond v. United States*, 134 S.Ct. at 2090. And importantly, *Bond* held that ambiguity can derive "from the improbably broad reach of the key statutory definition given the term…being defined; the deeply serious consequences of adopting such a boundless reading; and the lack of any apparent need to do so in light of the context from which the statute arose…". Id. In this situation, present in Mr. Fell's case, the courts can "insist on a clear indication that Congress meant to reach purely local crimes, before interpreting the statute's expansive language in a way that intrudes on the

police power of the States." Id.

The issue presented by this motion is whether the Constitution permits the United States to disregard the solemn and considered judgment of the people of Vermont concerning the imposition of capital punishment for this crime – one severely punished by Vermont, long considered to fall directly within the police power reserved to the States and one which does not implicate either foreign policy or other unique national interests of the federal government.  Mr. Fells submits that it does not.

## 1. The Relationship Between The State Of Vermont And The United States In This Case

The concept of federalism and its recognition of the respective division of sovereign authority between the federal and state governments is a fundamental tenet of our constitutional form of government. *See* Friendly, *Federalism: A Forward*, 86 Yale L.J. 1019 (1977);  *Alden v. Maine*, 527 U.S. 706, 750 (1999) (noting that the Constitution recognizes "the essential sovereignty of the States").  "Federalism, central to the constitutional design, adopts the principle that both the National and State Governments have elements of sovereignty the other is bound to respect. " *Arizona v. United States,* 132 S. Ct. 2492, 2500 (2012).

The Founding Fathers framed this sovereign division of power between separate sovereigns as a means to ensure the protection of individual liberty threatened by the concentration of power in one body. *Gregory v. Ashcroft*, 501 U.S. 452, 458 (1991) ("a healthy balance of power between the States and the Federal Government will reduce the risk of tyranny and abuse from either front.").

"The document [Constitution] sets forth, and rests upon, innovative principles original to the American experience, such as federalism; a proven balance in political mechanisms though

separation of powers; specific guarantees for the accused in criminal cases; and broad provisions to secure individual freedom and preserve human dignity. These doctrines and guarantees are central to the American experience and remain essential to our present-day self-definition and national identity." *Roper v. Simmons*, 543 U.S.  551, 578 (2005).

"An essential attribute of the States' sovereignty [is] that they remain independent and autonomous."  *Printz v. United States*, 521 U.S. 898, 928 (1997). This constitutional scheme "accord[s] States the dignity that is consistent with their status as sovereign entities." *Fed. Mar. Comm'n v. S.C. State Ports Auth.*, 535 U.S. 743, 760 (2002).

"The Constitution also creates a national government with defined and enumerated powers." *United States v. Lopez*, 514 U.S. at 552 .  "[R]ather than granting general authority to perform all the conceivable functions of government, the Constitution lists, or enumerates, the Federal Government's powers."  *National Federal of Independent Bunsiness v. Sebelius*, 132 S. Ct. 2566, 2577 (2012).   "The powers delegated by the proposed Constitution to the federal government are few and defined. Those which are to remain in the State governments are numerous and indefinite." The Federalist No. 45, pp. 292–293, *quoted in Lopez*, 514 U.S. at 552.

 This critical role of state sovereignty in our federal system is enshrined by the Tenth Amendment, which provides: "The powers not delegated to the United States by the Constitution, nor prohibited by it to the States, are reserved to the States respectively, or to the people." U.S. CONST. amend. X. "Any doubt regarding the constitutional role of the States as sovereign entities is removed by the Tenth Amendment, which, like the other provisions of the Bill of Rights, was enacted to allay lingering concerns about the extent of the national power. The Amendment confirms the promise implicit in the original document."  *Alden v. Maine*, 527 U.S. at 713-14.  "The Amendment expressly declares the constitutional policy that Congress may

14.

not exercise power in a fashion that impairs the States' integrity or their ability to function effectively in a federal system." *Fry v. United States*, 421 U.S. 542, 558, n.7 (1975).

"The limitations that federalism entails are not . . . a matter of rights belonging only to the States." *Bond v. United States*, 131 S. Ct. at 2364 .  Because "federalism protects the liberty of the individual from arbitrary power . . . [and because]  . . . [a]n individual has a direct interest in objecting to laws that upset the constitutional balance between the National government and the State," *id*., an aggrieved individual has standing to raise 10th Amendment objections.  "Fidelity to the principles of federalism is not for the States alone to vindicate."  *Ibid*.

Among the enumerated powers not delegated to the federal government in Article One, Section 8 of the Constitution is the Police Power. From the earliest days of the republic, it was accepted that the Police Power was assigned to the states under the Tenth Amendment. *See Cohens v. Virginia*, 6 Wheat. 264, 426, 428 (1821)(Marshall, C.J.) (Congress has no power to punish murder within the States or felonies generally).  That principle persists through modern constitutional interpretation.  *United States v. Lopez*, 514 U.S. 549, 566 ("The Constitution withholds from Congress a plenary police power.").  Accordingly, States have "primary authority for defining and enforcing criminal law." *Brecht v. Abrahamson*, 507 U.S. 619, 635 (1993) (internal citation omitted).  "The wisdom of assigning the States the "core police power . . . includ[ing] authority to define criminal law and to protect the health, safety, and welfare of their citizens," *Gonzales v. Raich*, 545 U.S. 1, 42-43 (2005) (J. O'Connor, dissenting), is that it permits the States to "perform their role as laboratories for experimentation to devise various solutions" to difficult issues of policy regarding the punishment of crime. *United States v. Lopez*, 514 U.S. at 581-83 (J. Kennedy, concurring).

These principles apply with particular force to violent crimes. *United States v. Morrison*,

15.

529 U.S. at 618 ("Indeed, we can think of no better example of the police power, which the Founders denied the National Government and reposed in the States, than the suppression of violent crime and vindication of its victims."). Thus, when Congress creates federal jurisdiction over criminal conduct historically within the Police Power of the States, it intrudes on the "sensitive balance" of power allocated between the two sovereign governments. *Lopez*, 514 U.S. at 561, n. 3 (1995). See also, *Bond v. United States*, 134 S. Ct. at 2083 ("Because our constitutional structure leaves local criminal activity primarily to the States, we have generally declined to read federal law as intruding on that responsibility, unless Congress has clearly indicated that the law should have such reach.").

Another consequence of state sovereignty is that the federal government is prohibited from requisitioning State resources to implement objectives of the national government.  *See New York v. United States*, 505 U.S. 144, 156-57 (1992) (freedom from federal commandeering is "an incident of state sovereignty").  The Constitution does not invest Congress with the power "to impress the state executive into its service." *Printz,*  521 U.S. at 898 (holding that provision of Brady Act requiring "state law enforcement officers to participate, albeit only temporarily, in the administration of a federally enacted regulatory scheme," *id.* at 904, violates the Tenth Amendment.).

Although the Police Power resides at the heart of state sovereignty, there are overlapping areas where both sovereigns may legislate.  In such cases, the Supremacy Clause provides that the United States Constitution, federal statutes, and treaties are "the supreme law of the land." U.S. CONST. art. VI, cl. 2.  A state law must therefore give way to federal law in three situations:  (a) when the federal law contains an express preemption provision; (b) where Congress, acting within its proper authority, has determined that a particular field must be

regulated by it exclusively; and (c) where the state law conflicts with federal law. *Arizona v. United States,* 132 S. Ct. 2492, 2501. In determining whether a state criminal law is preempted by a federal law "courts should assume that 'the historic police powers of the States' are not superseded 'unless that was the clear and manifest purpose of Congress.'" *Id.* (citations omitted).

### 2. The Relative State and Federal Interests

#### a. Introduction

"In determining whether the Tenth Amendment limits the ability of Congress to subject state governments to generally applicable laws, the Court *has* in some cases stated that it will evaluate the strength of federal interests in light of the degree to which such laws would prevent the State from functioning as a sovereign; that is, the extent to which such generally applicable laws would impede a state government's responsibility to represent and be accountable to the citizens of the State." *New York v. United States*, 505 U.S. 144, 177-78 (1992) (citations omitted)(emphasis in original). As recounted above, the State of Vermont banned imposition of the death penalty in the state many years ago. The interests of Vermont in protecting its citizens, both as putative defendants and jurors in capital prosecutions, is magnified where the federal government is prosecuting a violent local crime, long regarded as falling within the Police Power. In contrast, the interest of the federal government in pursuing the death penalty is minimal in light of the absence of considerations unique to its sovereignty and the availability of life without parole. Where the relative interests are as lopsided as here, the Tenth Amendment precludes the federal government's attempt to override the will of the people of Vermont.

### b.  The State Interests

The federal government's attempt to seek the death penalty against Mr. Fell seriously intrudes on the sovereignty of the State of Vermont.  The essence of the Police Power reserved to the States is its duty to protect the "health, safety and welfare of its citizens."  *Gonzales* v. *Raich*, *supra*.  Stated otherwise, the Police Power represents the State's "broad authority to enact legislation for the public good."  *Bond v. United* States, 134 U.S. 2077, 2086 (2014).  At its core it is the State's "unqualified interest in the preservation of human life."  *Cruzan v. Director, Missouri Department of Health*, 497 U.S. 261, 282 (1990).  The protection of the lives of citizens legally residing within the state is as much a "defining characteristic of sovereignty" as the "power to exclude from the sovereign's territory people who have no right to be there." *Arizona v. United States,* 132 S. Ct. at 2511 (Scalia, J., dissenting).  Thus, Vermont's very considered and deliberate decision that the imposition of capital punishment for a crime committed within its jurisdiction is no longer consonant with its values and its duty to protect the lives of all its citizens, while not controlling, is entitled to great weight.

Vermont also has an interest in protecting the reputation of and public confidence in the judicial system in the state. *Cf. Washington v. Glucksberg*, 521 U.S. at 731 (State of Washington's interest in "protecting the integrity and ethics of the medical profession.").  The sweeping media coverage of miscarriages in the administration of capital punishment, as recounted at pp. 18-34 of Mr. Fell's *Motion To Preclude The Death Penalty As A Punishment Because The Death Penalty, In And Of Itself, Constitutes An Unconstitutional Punishment (hereinafter "Preclusion Motion")* , run the risk of generating public ridicule of, and disrespect for, the administration of justice, particularly with respect to public trust in the reliability of judicial procedures designed to take the life of one of its citizens. As stated in *Glossip v. Gross*,

__ U.S. __; 135 S.Ct. 2726, 2755-2780 (2015)(Breyer and Ginsburg, JJ., dissenting), "the evidence that the death penalty has been wrongly *imposed* (whether or not it was carried out), is striking." (emphasis in original).  And, it is no answer to say that a federal rather than a state court is handing down the death sentence in Vermont.  The difference is unlikely to resonate with the public.

Vermont also has an interest in "protecting vulnerable groups . . . from mistakes [and] prejudice."  *See Washington v. Glucksberg*, 521 U.S. at 731-32.  The current push to end the death penalty was jump-started by the exposure of consistent mistakes in sending innocent men to death row.  Even if the mistakes were rare (which they were not), Vermont has a strong interest in avoiding the unthinkable execution of an innocent person.  Its decision that even one such judicial misfire is unacceptable when it results in the wrongful taking of a life of one of its citizens is entitled to great deference.  By taking the irrevocable penalty of execution off the table, Vermont furthers its interest in having the ability to at least partially correct mistakes whenever they occur and to assure its citizens that this is the case.

In rejecting the death penalty Vermont is also expressing its strong interest in protecting vulnerable defendants from the effects of prejudice and bias.  It is no secret that the administration of capital punishment in this country at a minimum raises serious questions as to racial, gender and geographical bias.  See *Preclusion Motion* at 35-94.  Irrespective of how these issues are resolved in an individual case, Vermont has a strong interest in protecting capital defendants from these vulnerabilities.

In prohibiting capital punishment in the state, Vermont is also protecting the health and welfare of three other groups of its citizens – the jurors who are called upon to make the agonizing decision of whether to sentence another human being to death, the judges who are

19.

forced to preside over these trials, and the governors who must agonize over the clemency decision.  No longer does a citizen in Vermont have to wade into a tangle of legal and ethical considerations for which they may well feel ill-equipped and which have the potential for serious psychological consequences.  In considering applications for stays in capital cases, Former Governor Ryan remarked on the difficulty of "hold[ing] in your hands the life of any person." *See Warden, How and Why Illinois Abolished the Death Penalty, 30 Minnesota Journal of Law and Inequity* 245, 260 (2012)..  Others have said the same.  Former California governor Pat Brown, who considered and denied several applications for clemency (while granting others) has recounted the toll these decision took on him:

> It was an awesome, ultimate power over the lives of others that no person or government should have, or crave.  And looking back over their names and files now, despite the horrible crimes and the catalog of human weaknesses they comprise, I realize that each decision took something out of me that nothing – not family or work or hope for the future – has ever been able to replace.

Edmund G. "Pat" Brown with Dick Adler, *Public Justice, Private Mercy*: A Governor's Education on Death Row 44 (New York: Weidenfeld and Nicholson,1989), *quoted in The Weight of Capital Punishment on Jurors, Justice, Governors, and Executioners*, *available at* https://verdict.justia.com/2013/10/25/weight-capital-punishment-jurors-justices-governors-executioners .  Justice Ginsburg has offered similar comments concerning last-minute stay applications, describing them as the "hardest part of the job I do" and a "dreadful part of the business." [16]  These are professional politicians and legal professionals who are often charged with making life-or-death decisions.  It is hardly surprising that the effect on lay citizens who are suddenly called to make such decisions can be even more momentous.  See Dr. Carla Morgan,

---

[16] http://abcnews.go.com/blogs/politics/2011/09/ruth-bader-ginsburg-death-penalty-gender-equality-and-that-elephant-ride-with-scalia/ .

Living with PTSD After Serving as a Juror, Interview, Nov. 11, 2012, (describing PTSD symptoms often influenced by capital jurors after service), *available at* http://obviousanswers.presspublisher.org/issue/fall-2012/article/living-with-ptsd-after-serving-as-a-juror;  Clarence Watson, JD, Spencer Eth, MD and Gregory B. Leong, MD, *Commentary: Pursuing Justice in Death Penalty Trials*, 40 J Am Acad Psychiatry Law, 50  51-52 ("The scientific literature confirms that jurors experience stress-related symptoms that are amplified in capital trials . . .  [and] . . .  jurors may be profoundly affected by their experience even years after the trial."), *available at* http://www.jaapl.org/content/40/1/50.full.pdf  (visited  8-23-15); Robert Schopp, Richard L. Wiener, Brain H. Brnstein, Steven L. Willborn, <u>Mental Disorder and Criminal Law:  Responsibility, Punishment and Competence</u> 61 (Springer Science & Business Media 2008) (Citing studies that when the death penalty is at stake, juror stress levels are higher than in non-capital cases, even when the facts of the cases are comparable."); Paul Mitchell, *The Weight of Capital Punishment on Jurors, Justices, governors, & Executioners*, Justicia, p. 2, Oct. 25, 2013 (quoting conclusion of social worker who has debriefed and counseled jurors in death penalty cases for over a decade that for some jurors the experience "results in a variety of symptoms related to post-traumatic stress, and the problem may remain with them for a long time . . .  the trauma is not mitigated and may even be exacerbated when the defendant's execution occurs."), *available at* https://verdict.justia.com/2013/10/25/weight-capital-punishment-jurors-justices-governors-executioners . Another study has shown that interviews of 1,200 jurors from 353 capital trials revealed that 62.5% of the female jurors and 37.5% of male jurors sought counseling afterwards and 81% of the female jurors and 18% of the males later regretted their decisions. *Id*.

  While juror stress is likely present to some extent in all trials, Vermont has a strong

interest in removing the added stress inherent in a capital case.  And, of course, although Mr. Fell will be tried in federal court, the jurors who will be called upon to decide his fate are citizens of Vermont.

Vermont's decision to abolish the death penalty also reflects its strong interest in protecting the rights of its citizens as jurors in another way. "Jury service is an exercise of responsible citizenship by all members of the community, including those who otherwise might not have the opportunity to contribute to our civil life." *Powers v.* Ohio 499 U.S. 400, 402 (1991).  The death-qualification procedure in a capital case excludes a large number of jurors who would otherwise be qualified to serve. *See* Richard C. Dieter, *A Crisis of Confidence: Americans Doubts About the Death Penalty*, at 2, Death Penalty Information Center, June, 2007 (reporting poll results "that nearly 40% of the public believes that they would be disqualified from serving on a jury in a death penalty case."), http://www.deathpenaltyinfo.org/CoC.pdf (visited 8-23-15). And studies have consistently shown that the death qualification process impacts the demographics of the jury. See, Kenneth E. Shirley and Andrew Gelman, *Hierarchical models for estimating state and demographic trends in US death penalty public opinion*, supra, 178 J. R. STATIST. SOC. A at 4 ("The basic relationships between demographic variables and death penalty support have been well understood for decades…[Studies show]… higher support for the death penalty was associated with respondents who were male, white, old and less educated."  Setting aside the argument that death qualification unfairly skews toward guilt, these jurors are cut out by means of a process which says they are not entitled to sit as jurors in a particular case because of their otherwise protected views about an issue of public importance and concern.  Vermont has a strong interest in ensuring that the right of its citizens to sit as jurors not be abridged in this manner. As Judge Calabresi eloquently wrote in this very

case,

> The question is particularly crucial when it arises in a state like Vermont that lacks the death penalty not because of court action but because of legislative decision.  In such a state, there is presumably a large portion of the population that is opposed to the death penalty. This must be so if the legislature's judgment reflects the will of the people, an assumption that, rightly or wrongly, we routinely make. Notably, the ability of juries to represent the will of the people in capital sentencing is no less important than the power of legislatures to reject the death penalty all together.

*United States v. Fell*, 571 F. 3d 264, 283 (2nd Cir. 2009)(Calabresi, J., dissenting from the denial of rehearing).

Vermont also has an interest in its state resources not being used in a manner incompatible with its goals.  Here, its resources are being taxed by the federal government with both its citizens as jurors, its law enforcement officers as investigators and possible witnesses, and its state agencies as custodians commandeered to search for voluminous and sometimes stale records, being called upon to further an interest which its legislature has expressly renounced. This impacts on state sovereignty. *See Printz*, 521 U.S. at 922 ("The power of the Federal Government would be augmented immeasurably if it were able to impress into its service – and at no cost to itself – the police officers of the 50 States.").  Mr. Fell does not contend that this use of state resources in a federal criminal trial constitutes a *per se* violation of the commandeering prohibition of the Tenth Amendment but this doctrine does recognize that the States have a recognizable interest in the federal government's use of their resources.

Finally, by virtue of our national compact alone, Vermont has an overriding interest in the federal government respecting its judgment on a matter of such importance to its interests. "At least as far back as *Martin v. Hunter's Lessee,* 1 Wheat. 304, 324, 4 L.Ed. 97 (1816), . . . questions 'of great importance and delicacy' [have been presented] whether particular sovereign powers have been granted by the Constitution to the Federal Government or have been retained

23.

by the States." *New York v. United States*, 505 U.S. 144, 155 (1992). The issue of the death penalty in Vermont is precisely such a question of "great importance and delicacy."

As noted, "[T]he Constitution. . . contemplates that a State's government will represent and remain accountable to its own citizens." *Printz*, 521 U.S. at 922. In abolishing capital punishment Vermont was doing precisely that.

### c.  The Federal Interest

Measured against the strong interests of Vermont, the federal interest pales.

### 1.  This Case Does not Involve the Federal Government's Interest in Protecting its National Officers or Foreign Policy, Terrorism or Other Unique Interests

First, unlike a large number of federal statutes that provide for the death penalty, the interests unique to the federal government are not in play here. *See e.g.*: 18 U.S.C. §  351 (murder of members of Congress, certain executive officials or Supreme Court justices); § 1114 (officers or employees of the United States engaged in official duties); § 1116 (murder of foreign officials, official guests or internationally protected persons); § 1751 (death during kidnaping or assassination attempt on the President or Vice-President); § 1111 & 7 (murders within the special maritime and territorial jurisdiction of the United States;  § 794 (espionage); § 2381 (treason)[17]; 2332 (terrorist murder of a U.S. nationalist in a foreign country).  While the list is not exhaustive, these statutes implicate the national government's heightened interest in protecting its officers and territorial jurisdiction, as well as implicating important foreign relations interests uniquely assigned to the federal government.  A killing in the course of a carjacking and

---

[17] While treason and espionage are matters of unique importance to the national government, in the absence of resulting deaths, it is not clear that imposition of the death penalty for these of-fenses survives *Kennedy v. Louisiana*, 554 U.S. 407, 437 (2008), *as modified in denial of Petition for Rehearing*, 554 U.S. at 945 (2008)(Eighth Amendment bars death penalty for rape where the offense did not result, and was not intended to result, in death).

kidnapping does not implicate such unique interests.  Unlawful killings, whether classified as murder or felony-murder, are against the laws of, and severely punished by, every state, including Vermont. See, Michael Mello, *Certain Blood For Uncertain Reasons: A Love Letter To The Vermont Legislature On Not Reinstating Capital Punishment*, 32 VERMONT LAW REVIEW 765, 779 (2008)("Currently the punishment [in Vermont] for aggravated murder is life imprisonment with no possibility of parole.").

In *The Federal Death Penalty System: Supplementary Data, Analysis and Revised Protocols for Capital Case Review* 1 (June 2001) [18],  the Department of Justice explains their death penalty priorities as follows:

> A factor of particular importance is the focus of federal enforcement efforts on drug trafficking enterprises and related criminal violence. The prosecution of drug crimes has generally been a key priority both of Congress and of federal law enforcement for many years. Federal authorities are often better able to carry out effective prosecutions in this area for such reasons as the complexity of drug enterprise cases, their multi- jurisdictional character, and the availability to federal prosecutors of greater investigative resources or more effective legal tools.

None of these factors are at play here.

It is also telling that the Department of Justice opposed the carjacking provision of the Anti-Car Theft Act. The Department's view was that "although in recent months there has been an increase in the number of armed robberies of motor vehicles, it has long been the view of [the] Department that crimes arising out of street violence normally are best handled by state and local law enforcement authorities… we cannot support the extension of federal jurisdiction over

---

[18] http://www.justice.gov/archive/dag/pubdoc/deathpenalty study.htm

robberies of all motor vehicles." [19]

In sum, as  Federal District Court Judge John Gleeson has correctly concluded,

> Where the local U.S. Attorney has determined that a federal capital charge is inappropriate in the everyday murder case, leaving the decision whether to seek capital punishment in the hands of state prosecutors is consistent with our history. Murder is, and always has been, "an oft and competently prosecuted state crime," and the decision to federalize it is modern, controversial even among conservatives, and expensive. As a general rule, U.S. Attorneys who choose to leave the prosecution and punishment of murderers to the states do not offend any legitimate federal interest.

John Gleeson, *Supervising Federal Capital Punishment: Why the Attorney General Should Defer When U.S. Attorneys Recommend Against the Death Penalty*, 89 Va. L.Rev. 1697, 1721 (2003).

### 2.  Commerce Clause Jurisdiction

Even though murder, kidnapping, and robbery are all severely punished crimes under Vermont law, Mr. Fell assumes for purposes of the present argument that Congress does not lack power under the Commerce and Necessary and Proper Clauses, U.S. CONST., art. I, § 8, cl. 3, 18, to criminalize and punish severely the crimes at issue here. But see, Point IV, infra.  Rather, he contends that any marginally incremental interest the government may have under either Clause in obtaining a sentence of death rather than life without parole is constitutionally diminished when, as here, it impinges on a State's sovereignty and the State's unique and particularized interests.

Congress' power under the Commerce Clause has "judicially enforceable outer limits." *United States v. Lopez*, 514 U.S. at 566.  "[E]ven under our modern, expansive interpretation of

---

[19] *Anti–Car Theft Act of 1992: Hearings on H.R. 4542 Before the Subcomm. on Crime and Criminal Justice of the House Comm. on the Judiciary,* 102d Cong., 1st and 2d Sess. 3 (Mar. 31, 1992) (prepared statement of Deputy Assistant Attorney General Criminal Division DOJ John C. Keeney)

the Commerce Clause, Congress' regulatory authority is not without effective bounds." *United States v. Morrison*, 529 U.S. 598, 608 (2000).  The scope of the Commerce Clause power "is necessarily one of degree." *Lopez*, 514 U.S. at 555, *quoting Jones & Laughlin Steel*, 301 U.S. 1, 37 (1937).   The striking down of the Gun-Free School Zones Act in *Lopez*, and the Violence Against Women Act in *Morrison* reflect limitations imposed on Commerce Clause jurisdiction and illustrate the Constitution's rejection of a general federal police power. *See Gonzales v. Raich*, 545 U.S. 1, 44 (2005)(O'Connor, J., dissenting).

In both *Lopez* and *Morrison*, the Court was "conscious of the danger . . . to obliterate the distinction between what is national and what is local," posed by overly expansive interpretations of Commerce Clause jurisdiction.  *Gonzales,* 545 U.S. *at* 35-36 (Scalia, J., concurring).

And there are other restraints upon the Necessary and Proper Clause authority.  As Chief Justice Marshall wrote in *McCulloch v. Maryland*, even when the end is constitutional and legitimate, the means must be "appropriate" and "plainly adapted" to that end. [citation omitted].  Moreover, they may not be otherwise "prohibited" and must be "consistent with the letter and spirit of the Constitution. [citation omitted].   These phrases are not merely hortatory.  For example, cases such as *Printz v. United States*, [citation omitted], and *New York v. United States*, [citation omitted], affirm *that a law is not "'proper for carrying into Execution the Commerce Clause,'"* *"[w]hen [it] violates [a constitutional principle of state sovereignty"*. [citations omitted].

*Id.* at 39 (Scalia, J., concurring)(emphasis added); *id.* at 52 ("Congress must use its authority under the Necessary and Proper Clause in a manner consistent with basic constitutional principles . . . [it] cannot use its authority under the Clause to contravene the principle of state sovereignty embodied in the Tenth Amendment.")(O'Connor, J., dissenting).

These principles have even more force when Congress is using the Commerce Clause to

regulate violent crimes, which, as noted above traditionally fall within the State's Police Power. *See Morrison*, 529 U.S. at  618 ("no better example of the police power, which the Founders denied the National Government and reposed in the States, than the suppression of violent crime and vindication of its victims.").   These constraints resonate even more when Congress is attempting to prohibit an activity that the Founding Fathers likely never would have imagined within the ambit of the national government. When the First Congress enacted nationwide criminal statutes in 1790, it did not rely on any purported Commerce Clause jurisdiction but only on "direct grants of authority found in the Constitution," such as its territorial jurisdiction. *Lopez*, 514 U.S. at 596-7, n. 6 (Thomas, J., concurring).

Irrespective of whether these principles, standing alone, bar the federal government's attempt to impose the death penalty in this case, at a minimum they suggest the government's diminished interest in seeking in seeking death rather than life without parole in the face of the State's strong interests otherwise.

### 3.  The Alternative of Life Without Parole

Life without parole is "the second most severe penalty permitted by law." *Harmelin v. Michigan*, 501 U.S. 957, 996 (1991).   The sentence is physically incapacitating, mentally crippling and as close to death as the Eighth Amendment permits:

> Life without parole sentences share some characteristics with death sentences that are shared by no other sentences.  The State does not execute the offender sentenced to life without parole, but the sentence alters the offender's life by a forfeiture that is irrevocable.  It deprives the convict of the most basic liberties without giving hope of restoration, except perhaps by executive clemency – the remote possibility of which does not mitigate the harshness of the sentence.  [citation omitted].  As one court observed in overturning a life without parole sentence for a juvenile . . . this sentence "means denial of hope; it means that good behavior and character improvement are immaterial; it means that whatever the future might hold in store for the mind and spirit of [the convict], he will remain in prison for the rest of his days." [citation omitted].

*Graham v. Florida*, 560 U.S. 48, 69-70 (2010).

The only cognizable interest the federal government can assert here is its unsound insistence on a sentence of death rather than life without parole.  *Cf.* United States Attorney's Manual, § 9-2.031 – Dual and Successive Prosecution Policy ("Petite Policy), Subsection D (presumption of no successive federal prosecution overcome where state sentence was "manifestly inadequate" or "trivialized" the federal offense.)[20]  It cannot proffer a financial justification, as unseemly as that otherwise would be, as the data strongly suggests that a capital prosecution with its associated trial, appeal and post-conviction costs is far more of a burden on the national treasury than the alternative. *See Considering the Death Penalty: Your Tax Dollars at Work*: Forbes, Apr. 30, 2014 (citing statistics showing significantly higher costs both in death penalty litigation and expenses associated with death rows as opposed to sentences of life without parole),[21] And, as discussed in Mr. Fell's *Preclusion Motion*, justifications based on deterrence or retribution in a case as old as his add little weight, especially when stacked against the State of Vermonts' interest.

### d.  Conclusion

In sum, for all of the reasons stated above, the government should be barred from seeking the death penalty in this case because it is offensive to the federalism at the heart of the Constitution

---

[20] Mr. Fell recognizes that this federal prosecution does not follow a state one and that, in any event, a defendant may not invoke the "Petite Policy" to bar a federal prosecution. *See United States v. Hutul*, 416 F.2d 607 (7th Cir. 1969). But, the point is that there is nothing "manifestly inadequate" or "trivial" about a sentence of life without parole.

[21] http://www.forbes.com/sites/kellyphillipserb/2014/05/01/considering-the-death-penalty-your-tax-dollars-at-work/. See also, Michael Mello, *Certain Blood For Uncertain Reasons: A Love Letter To The Vermont Legislature On Not Reinstating Capital Punishment*, 32 VERMONT LAW REVIEW 765, 768-69 (2008)(analyzing the cost issue in detail).

to require the citizens of a state to participate in a system of capital punishment, when those citizens and the state officials that represent them have rejected that penalty.

"Federalism is more than an exercise in setting the boundary between different institutions of government for their own integrity. 'State sovereignty is not just an end in itself: "Rather, federalism secures to citizens the liberties that derive from the diffusion of sovereign power.'" *Bond v. United States*, 131 S. Ct. 2355, 2364 (2011) (quoting *New York v. United States*, 505 U.S. 144, 181 (1992) (quoting *Coleman v. Thompson*, 501 U.S. 722, 759 (1991) (Blackmun, J., dissenting))). "By denying any one government complete jurisdiction over all the concerns of public life, federalism protects the liberty of the individual from arbitrary power." *Id*. at 2364.

As the Court explained in *Bond*, "Some of these liberties are of a *political* character." *Id*. (emphasis added). Federalism "allows local policies 'more sensitive to the diverse needs of a heterogeneous society,' permits 'innovation and experimentation,' enables *greater citizen 'involvement in democratic processes*,' and makes government 'more responsive by putting the States in competition for a mobile citizenry.'" *Id.* (emphasis added) (quoting *Gregory v. Ashcroft*, 501 U.S. 452, 458 (1991)).

While voting is the most common means by which citizens exercise political liberties, jury service is a critical part of political liberty as well. "'[S]haring in the administration of justice,'" through service on a jury, "'is a phase of civic responsibility.'" *Taylor v. Louisiana*, 419 U.S. 522, 531 (1975) (quoting *Thiel v. So. Pac. Co.*, 328 U.S. 217, 227 (1946) (Frankfurter, J., dissenting)).

The federal government impermissibly compromises that form of political liberty when it foists capital punishment on the citizens of a state that has rejected it, particularly in a case

involving offenses of a kind traditionally prosecuted in state court, such as the offenses in Mr. Fell's case.

Remarkably, the federal government seeks to enlist Vermont citizens in its broken death penalty system even though the federal government is itself unwilling to make hard choices about executions. First, Congress has chosen not to adopt *any* method of execution, but instead to look to state law. *See* 18 U.S.C. § 3596(a). It has embraced the death penalty only in the abstract. In a case like this, Congress leaves it to the court to choose another state's law. In 2006, the government requested that Indiana be designated the state in which Mr. Fell's sentence be implemented (Doc. 240); this Court granted that request. (Doc. 242).

Further, the federal government has suspended its execution "protocol." On July 27, 2011, in *Roane v. Holder*, a lawsuit challenging the federal government's lethal injection protocol, the government informed the United States District Court for the District of Columbia that "the Federal Bureau of Prisons has decided to modify its lethal injection protocol but that the protocol revisions had not yet been finalized." *Roane v. Holder*, No. 05-2337, Doc. 288.

So, the federal government has not selected a method of execution, and it does not have an execution protocol. The federal government has not made the hard choices about executions, but it is ready to tell the citizens of a state that has abolished the death penalty that they must take part in the determination of whether a defendant will be sentenced to die.

No sanction is more severe than the death penalty, and no other penalty is remotely comparable. And capital trials are taxing, draining, emotional affairs, requiring jurors to devote months of their lives and often to endure enormous stress. These burdens should not be imposed on citizens of a state that rejects the notion of punishing crime by death. When a citizen is called

upon to take his or her turn in "'the administration of justice'" by serving as a juror,[22] it should not be to administer a penalty that the citizen's community has definitively rejected.

"'Just as the separation and independence of the coordinate branches of the Federal Government serve to prevent the accumulation of excessive power in any one branch, a healthy balance of power between the States and the Federal Government will reduce the risk of tyranny and abuse from either front.'" *United States v. Lopez*, 514 U.S. 549, 552 (1995) (quoting *Gregory*, 501 U.S. at 458). That balance of power does not permit the government's effort here to force Vermont citizens to impose a uniquely severe and irrevocable penalty, which their state has rejected, for crimes of a kind long prosecuted in state court.

### IV.   Under The Facts Of This Case, None Of The Crimes Charged Here Are Valid Federal Crimes

The crimes charged here, all premised on Commerce Clause jurisdiction, are not valid federal crimes because under the facts of this case the extension of federal jurisdiction is not a valid exercise of congressional power. As indicated above, it is axiomatic that the power of Congress is not absolute; rather, Congress may exercise only those powers enumerated in the Constitution. *McCulloch v. Maryland*, 17 U.S. 316, 323-24 (1819). Among these powers, is Congress's ability "[t]o regulate Commerce with foreign Nations, and among the several States, and with the Indian Tribes." U.S. Const., art. I, § 8, cl. 3. Although the Second Circuit has alluded in a footnote in *United States v. Trupin*, 117 F.3d 678, 685 (2nd Cir. 1997) to the fact that the Third Circuit upheld the carjacking statute against a Commerce Clause challenge in *United States v. Bishop*, 66 F. 3d 569, 585-83 (3rd Cir. 1995), no case from the Supreme Court or the Second Circuit has considered the implications of the Court's most recent rulings, discussed

---

[22] *Taylor*, 419 U.S. at 531 (quoting *Thiel*, 328 U.S. at 227 (Frankfurter, J., dissenting)).

above, in a case involving the charges and facts alleged here.

The Second Circuit has said in a recent case that "[t]he legislative history is …equivocal with respect to the intended scope of the carjacking statute." *United States v. Soler*, 759 F.3d 226, 230 (2d Cir. 2014). In this situation, recent Supreme Court precedent makes it clear that "it is appropriate to refer to basic principles of federalism embodied in the Constitution to resolve ambiguity in a federal statute." *Bond v. United States*, 134 S.Ct. at 2090. And those principles, discussed above, weigh in favor of state sovereignty in the prosecution of the types of crimes of violence at issue in this case.

Regarding the kidnapping charge, as was the case in *Chatwin v. United States*, 326 U.S. 455, 464 (1946):

> The stipulated facts of this case reveal a situation quite different from the general problem to which the framers of the Federal Kidnapping Act addressed themselves. This statute was drawn in 1932 against a background of organized violence. 75 Cong.Rec. 13282-13304. Kidnaping by that time had become an epidemic in the United States. Ruthless criminal bands utilized every known legal and scientific means to achieve their aims and to protect themselves. Victims were selected from among the wealthy with great care and study. Details of the seizures and detentions were fully and meticulously worked out in advance. Ransom was the usual motive. 'Law enforcement authorities, lacking coordination, with no uniform system of intercommunication and restricted in authority to activities in their own jurisdiction, found themselves laughed at by criminals bound by no such inhibitions or restrictions * * * The procedure was simple—a man would be kidnapped in one State and whisked into another, and still another, his captors knowing full well that the police in the jurisdiction where the crime was committed had no authority as far as the State of confinement and concealment was concerned.' Fisher and McGuire, 'Kidnapping and the So-called Lindbergh Law,' 12 New York U.L.Q. Rev. 646, 653. See also Hearing before the House Committee on the Judiciary (72d Cong., 1st Sess.) on H.R. 5657, Serial 4; Finley, 'The Lindbergh Law,' 28 Georgetown L.J. 908.

The present case, where Vermont clearly has criminal jurisdiction of all charged offense, is as far removed from the purpose of the federal kidnapping statute as the petty crime at issue in *Bond* was from the Chemical Weapons Convention Implementation Act. *Bonds*, 134 S. Ct. at 2084. To

33.

only slightly modify the language of *Bond,* " [h]ere, in its zeal to prosecute [Fell], the Federal Government has displaced the public policy of the [State] of [Vermont], enacted in its capacity as sovereign, that [Fell] does not belong in [a death chamber] for a [criminal] offense….see also *Jones*, supra, at 859…(Stevens, J. concurring)(federal prosecution of a traditionally local crime 'illustrates how the criminal law like this may effectively displace a policy choice made by the state.')". Id. at 2093.

Finally, as indicated at the outset of this motion, all four of the counts in this case are premised on specific language that Mr. Fell, his alleged victim, and his alleged weapon were somehow involved "in interstate commerce…" There is no allegation here, as there was in *United States v. Jacques*, 2011 WL 1706765 (D. Vt. May 4, 2011), where Judge Sessions denied a Commerce Clause challenge, that Mr. Fell " used means, facilities, and instrumentalities of interstate commerce, namely, cell phone text messages, internet email messages, and an internet MySpace posting, in committing or in furtherance of the commission of the offense, which resulted in the death of [his victim].

As the Court has repeatedly emphasized, Congress is aware of the "distinction between legislation limited to activities 'in commerce,' and an assertion of its full Commerce Clause power so as to cover all activity substantially *affecting* interstate commerce." *United States v. American Bldg. Maint. Indus.*, 422 U.S. 271, 280(1975) (emphasis added). Thus, the phrase "in commerce" is a more narrow and restrictive jurisdictional requirement than the phrase "affecting interstate commerce," and denotes "only persons or activities within the flow of interstate commerce—the practical, economic continuity in the generation of goods and services for interstate markets and their transport and distribution to the consumer." Id. at 276, 95 S.Ct. at 2154 (emphasis added) (quoting *Gulf Oil Corp. v. Copp Paving Co.*, 419 U.S. 186, 195, 95 S.Ct.

392, 398, 42 L.Ed.2d 378 (1974)). Here, there is simply  no way in which Mr. Fell's alleged crimes can reasonably be considered "within the flow of interstate commerce—the practical, economic continuity in the generation of goods and services for interstate markets and their transport and distribution to the consumer."

In both *Morrison* and *Jones*, the Court expressly opted against the interpretation of the statute at issue that would permit Congress to regulate every form of the thing or activity in question. Id. at 857 ("Were we to adopt the Government's expansive interpretation of § 844(i), hardly a building in the land would fall outside the federal statute's domain."); Morrison, 529 U.S. at 615 ("[I]f Congress may regulate gender-motivated violence, it would be able to regulate murder or any other type of violence since gender-motivated violence ... "). The same compelling logic applies here

Accordingly, all Counts of the Superseding Indictment must be dismissed, as well as the Special Findings dependent upon those counts.

## V.     CONCLUSION

"One of federalism's chief virtues, of course, is that it promotes innovation by allowing for the possibility that 'a single courageous State may, if its citizens choose, serve as a laboratory; and try novel social and economic experiments without risk to the rest of the country.' *New State Ice Co. v. Liebman*, 285 U.S. 262 (Brandeis, J., dissenting)." *Gonzales v. Riach*, 546 U.S. 1, 42 (O'Connor, J., dissenting); *see also United States v. Lopez*, 514 U.S. at 581-83 (J. Kennedy, concurring)(federalism permits the States to "perform their role as laboratories for experimentation to devise various solutions" to difficult issues of policy regarding the punishment of crime.).  After due deliberation, the elected officials of Vermont

35.

determined that the interests of both the public in combatting violent crime and victims in receiving justice would not be compromised by abolition of the death penalty.  Under the circumstances of this case, this is a decision that the Tenth Amendment requires the federal government to respect. For the foregoing reasons, Mr. Fell respectfully requests that this Court dismiss the Superseding Indictment (Doc. 57) and/or to strike the Amended Notice Of Intent To Seek Penalty Of Death filed by the government on September 8, 2015 (Doc. 609).

   Dated at San Francisco, California, this 16th day of November, 2015.

        Respectfully Submitted,

        MICHAEL N. BURT
        KERRY B. DeWOLFE
        JOHN T. PHILIPSBORN

        By: */s/ Michael N. Burt*

        Law Office of Michael Burt
        1000 Brannan Street
        Suite 400
        San Francisco, California 94103
        415-522-1508 (phone)
        415-522-1506 (fax
        mb@michaelburtlaw.con
        Counsel for DONALD FELL

## CERTIFICATE OF SERVICE

I hereby certify that on November 16, 2015, I electronically filed with the Clerk of

**DEFENDANT DONALD FELL'S MOTION TO DISMISS THE SUPERSEDING INDICTMENT AND/OR TO STRIKE THE AMENDED NOTICE OF INTENT TO SEEK PENALTY OF DEATH AS VIOLATIVE OF PRINCIPLES OF LIMITED NATIONAL POWERS AND STATE SOVEREIGNTY**

using the CM/ECF system. The CM/ECF system will provide service of such filing(s)

via Notice of Electronic Filing (NEF) to the following NEF parties:

 Michael N. Burt, Esq.
 Kerry B. DeWolfe, Esq.
 John Phillipsborn
 William B. Darrow, Esq., Assistant United States Attorney
 Bruce R. Hegyi, U.S. Dept. Of Justice

I also caused to be served, by U.S. Postal Service, the following non-NEF party:

 Donald Fell
 Register Number 05306-010
 The Metropolitan Detention Center
 P.O. Box 329002
 Brooklyn, NY 11232

Dated at San Francisco, California, this 16th day of November, 2015.

      By: */s/ Michael N. Burt*

      Law Office of Michael Burt
      1000 Brannan Street
      Suite 400
      San Francisco, California 94103
      415-522-1508 (phone)
      415-522-1506 (fax
      mb@michaelburtlaw.con
      Counsel for DONALD FELL