IN THE UNITED STATES DISTRICT COURT FOR THE
DISTRICT OF VERMONT

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | ) | |
| | ) | |
| VS. | ) | CRIMINAL 5:01-cr-00012 |
| | ) | |
| DONALD FELL | ) | |
| | ) | |

**MEMORANDUM IN SUPPORT OF DEFENDANT DONALD FELL'S MOTION TO DECLARE THE FEDERAL DEATH PENALTY ACT UNCONSTITUTIONAL FOR FAILURE TO REQUIRE COMPARATIVE PROPORTIONALITY REVIEW**

**INTRODUCTION**

The Federal Death Penalty Act ("FDPA") is unconstitutional in its failure to require a reviewing court to determine whether the punishment of death is excessive or disproportionate to the penalty imposed in similar cases, taking into consideration both the crime and the defendant. The absence of a provision for proportionality review renders the FDPA unconstitutional under the Eighth Amendment and a finding to that effect is necessary to avoid the arbitrary and capricious imposition of a death sentence. *See Furman v. Georgia*, 408 U.S. 238, 313-14 (1972)[1] (White, J., concurring) (recognizing the judiciary's obligation under the Eighth Amendment to review the constitutionality of punishment); *Gregg v. Georgia*, 428 U.S. 153, 174 (1976) (the "Eighth Amendment is a restraint upon the exercise of legislative power.").

The national consensus compels recognition that comparative proportionality review is required under the Eighth Amendment. Of the thirty-one states that authorize the death penalty,

---

[1] *Furman* consisted of nine separate opinions, and one *per curiam* opinion that concluded "the imposition of and carrying out of the death penalty in [the cases before the Court] constitute cruel and unusual punishment in violation of the Eighth and Fourteenth Amendments." 408 U.S. at 239 (*per curiam*).

the majority, eighteen, require comparative proportionality review.[2] Even the Uniform Code of Military Justice requires proportionality review.[3] Such requirements are based on the long-held and recognized "precept of justice that punishment for crime should be graduated and proportioned to offense." *Weems v. United States*, 217 U.S. 349, 367 (1910).

Comparative proportionality review is the process through which a death sentence is compared with sentences imposed on similarly situated defendants to guard against disproportionate sentences. *Gregg*, 428 U.S. at 206 (opinion of White, J.) (Burger, C.J., & Rehnquist, J., concurring) (finding that proportionality review "serves as a check against the random or arbitrary imposition of the death penalty."). Meaningful comparative proportionality review helps to ensure that the death penalty is being administered in a rational, non-arbitrary manner.

A court conducting proportionality review should analyze the similarities and differences between past decisions and the case before it. To be truly effective this comparison should include cases in which a death sentence was imposed as well as cases in which the death penalty

---

[2] Proportionality review is required by statute or case law in the following states: Alabama, Ala. Code §13A-5-53(b)(3) (enacted 1981); Delaware, Del. Code Ann. Title 11 §4209(g)(2)(a); Florida, by case law, see, e.g., Sinclair v. State, 657 So. 2d 1138 (Fla. 1995); Georgia, Ga. Code Ann. §17-10-35(c)(3) (enacted 1973); Kentucky, Ky. Rev. Stat. Ann. §532.075(3)(c) (enacted 1976); Louisiana, La. Code Crim. Proc. Ann. art. 905.9.1(1)(c) (enacted 1977); Mississippi, Miss. Code Ann. §99-1-105(3)(c) (enacted 1977); Missouri, Mo. Ann. Stat. §565.035(3)(3) (enacted 1983); Montana, Mont. Code Ann. §46-18-310(1)(c) (enacted 1977); New Hampshire, N.H. Rev. Stat. Ann. § 630:5(XI)(c) (enacted 1986); North Carolina, N.C. Gen. Stat. §15A-2000(d)(2) (enacted 1977); Ohio Rev. Code Ann. §2929.05(A) (enacted 1981); South Carolina, S.C. Code Ann. §16-3-25(C)(3) (enacted 1977); South Dakota, S.D. Codified Laws §23A-27A-12(3) (enacted 1979); Tennessee, Tenn. Code Ann. §39-13-206(c)(1)(D) (enacted 1992); Utah, by case law, see, e.g. , *State v. Lafferty*, 20 P.3d 342 (Utah 2001); Virginia, Va. Code § 17.1-313(C)(2) (enacted 1998); Washington, Wash. Rev. Code Ann. §10.95.130(2)(b) (enacted 1981). *See* Brief for the Constitution Project as *Amicus Curiae* in Support of Grant of Certiorari at 8, *Holmes v. Louisiana*, No. 08-1358 (2009).

[3] Death sentences imposed under the Uniform Code of Military Justice must also be reviewed using a comparative proportionality analysis. *See United States v. Curtis*, 32 M.J. 252, 270-271 (C.M.A. 1991).

was sought but not imposed and cases in which the death penalty could have been but was not sought. *See, e.g., Walker v. Georgia*, 129 S. Ct. 453, 454-55 (2008) (Stevens, J., on the denial of certiorari) (noting that Georgia's approach to proportionality review, in which Georgia asserted that the state supreme court compared "'not only similar cases in which death was imposed, but similar cases in which death was not imposed' . . . seemed judicious because, quite obviously, a significant number of similar cases in which death was not imposed might well provide the most relevant evidence of arbitrariness in the sentence before the court") (citing *Zant v. Stephens*, 462 U.S. 862, 880 n.19 (1983)).

The "arbitrary imposition of punishment is the antithesis of the rule of law." *Glossip v. Gross*, 135 S. Ct. 2726, 2759 (2015) (Breyer, Ginsburg, JJ., dissenting). The Eighth Amendment is intended to protect against arbitrarily imposed and thus disproportionate sentences. In 1972 the Supreme Court found that the death penalty in this country was being administered in a way that violated the constitution for this very reason. *Furman*, 408 U.S. at 313 (Stewart, J., concurring) ("[T]he Eighth and Fourteenth [Fifth] Amendments cannot tolerate the infliction of a sentence of death under legal systems that permit this unique penalty to be so wantonly and so freakishly imposed."). In reaction, many states enacted statutes providing for proportionality review in an effort to protect "against the evil identified in *Furman*." *See Pulley v. Harris*, 465 U.S. 37, 54 (1984).

Four years after *Furman*, in 1976, the Supreme Court allowed the death penalty to be reinstated but warned that it would be unconstitutional if it was inflicted in an arbitrary and capricious manner. *Gregg*, 428 U.S. at 188-89 (joint opinion of Stewart, Powell, and Stevens, JJ.). Forty years after *Gregg*, however, numerous studies now "indicate that the factors that most clearly ought to affect application of the death penalty—namely, comparative egregiousness of

the crime—often do not. Other studies show that circumstances that ought *not* to affect application of the death penalty, such as race, gender, or geography, often *do*." *Glossip*, 135 S. Ct. at 2760 (Breyer, Ginsburg, JJ., dissenting) (emphasis original).

The FDPA sentencing scheme is "so lacking in other checks on arbitrariness that it [does] not pass constitutional muster without comparative proportionality review . . . ." *See Pulley*, 465 U.S. at 53. Enacted 10 years after *Pulley*, the FDPA was not mindful of the Supreme Court's warning that a failure to institute procedural safeguards such as comparative proportionality review would result in an arbitrary and capricious imposition of the death penalty in direct violation of its Eighth Amendment jurisprudence. For this reason, the FDPA should be declared unconstitutional for its failure to include or recognize the importance of comparative proportionality review in capital sentencing. For this reason, federal sentence imposed against Mr. would be unconstitutionally arbitrary and capricious in light of prevailing precedent and available evidence. *See* Ex. A., Table of Federal Death Penalty Cases; Ex. B., List of Example Cases Where Jury Returned Life Sentence or Death Authorization Withdrawn.

## PROCEDURAL HISTORY

In October 2001, the government agreed to forego capital charges against Mr. Fell based on substantial mitigating evidence that had been uncovered relating to his mental health and impaired capacity at the time of the events; his mental health history and background; his assistance to authorities; the fact that he was only 20 years old at the time of the charged crime and did not have a substantial prior criminal history. *United States v. Fell*, 531 F.3d 197, 206 (2d Cir. 2008). This agreement was reached after extensive negotiations with the United States Attorney's Office of Vermont; however, the Attorney General of the United States rejected it

4.

"upon the advice of his standing committee of the Department of Justice that reviews death-eligible prosecutions." *Id.*

Thereafter, on January 30, 2002, the government filed a Notice of Intent to Seek the Death Penalty. (Doc. 32.) On May 28, 2002, Mr. Fell's counsel moved to declare the Federal Death Penalty Act (FDPA) unconstitutional raising twelve separate challenges. (Doc. 44.) This Court granted the motion on the ground that "the FDPA's § 3593(c)'s direction to ignore the rules of evidence when considering information relevant to death penalty eligibility" violates the Sixth Amendment's guarantee of confrontation and the Fifth Amendment's guarantee of due process (Doc. 70). *See United States v. Fell*, 217 F. Supp. 2d 469, 473 (D. Vt. 2002).

The government appealed and the Second Circuit reversed finding the Constitution did not require adherence to the Federal Rules of Evidence. *United States v. Fell*, 360 F.3d 135 (2d Cir. 2004). On remand this Court considered the remaining issues raised in Mr. Fell's original motion, which included issues presented here regarding the FDPA's violation under the Eighth Amendment. At that time, 2002, Mr. Fell's counsel framed the challenge by arguing the FDPA was unconstitutional because "it fails to narrow adequately the class of persons eligible for the death penalty" and "the use of non-statutory aggravating factors without providing for proportionality review" was also unconstitutional (Doc. 44). *United States v. Fell*, 372 F. Supp. 2d 753, 755-56 (D. Vt. 2005). In 2002, the facts in support of this argument did not exist and the claim was thus denied based on prevailing Supreme Court authority at that time. *Id*

Following the imposition of his death sentence, Mr. Fell appealed on several grounds including errors in jury selection, errors in the admission of certain evidence, prejudicial statements by the prosecutors, and the violation of certain provisions of the FDPA. On appeal, the Second Circuit did not conduct a comparative proportionality review analysis. *See generally*

5.

*United States v. Fell*, 531 F.3d 197 (2008). The Second Circuit affirmed Mr. Fell's conviction and sentence of death. *Id*.

Pursuant to 28 U.S.C. § 2255, Mr. Fell then moved this Court to vacate, set aside, or correct the judgment and sentence of death, and to grant him a new trial based on the claim that juror misconduct deprived him of his Fifth, Sixth, and Eighth Amendment rights to an impartial jury. On July 24, 2014, this Court found that Mr. Fell had been denied a fair trial and his conviction and sentence of death were vacated (Doc. 514).

Facing a new trial, Mr. Fell now moves this Court to declare the FDPA unconstitutional for its failure to provide comparative proportionality review, resulting in arbitrary and capricious death sentences.

## ARGUMENT

**I.    The Eighth Amendment Requires Proportionality Review to Safeguard Against Arbitrary and Capricious Death Sentences**

**A. The FDPA Does Not Contain a Proportionality Review Provision**

There is no indication that as currently drafted the FDPA extends proportionality review to non-juvenile defendants charged with capital offenses. To the contrary, different circuits have addressed the proportionality review issue and none has interpreted the statute to require proportionality review. *See United States v. Sampson*, 486 F.3d 13, 23-26 (1st Cir. 2007)[4]; *United States v. Barrett*, 496 F.3d 1079, 1108-09 (10th Cir. 2007); *United States v. Mitchell*, 502 F.3d 931, 980-81 (9th Cir. 2007); *United States v. Higgs*, 353 F.3d 281, 320-21 (4th Cir. 2003).

Though the Second Circuit has not addressed this issue directly, district courts within its jurisdiction have rejected the argument. *See, e.g., United States v. Williams*, 2004 WL 2980027,

---

[4] The district court in *Sampson* recently indicated that Mr. Sampson would be "entitled to proportionality review of a death sentence" but this decision has not yet been reviewed by the circuit court. *United States v. Sampson*, 2015 WL 6511247, at *7 (D. Mass. Oct. 28, 2015).

6.

at *15 (S.D.N.Y. 2004); *United States v. Perez*, 2004 WL 935260, at *15-16 (D. Conn. 2004); *United States v. Frank*, 8 F. Supp. 2d 253, 272-73 (S.D.N.Y. 1998). Other district courts have likewise found that the FDPA does not provide for proportionality review. *See, e.g., United States v. Briseno*, 2015 WL 163526, at *3 (N.D. Ind. Jan 12, 2015); *United States v. Williams*, 18 F. Supp. 3d 1065, 1072-76 (D. Haw. 2014); *United States v. Montgomery*, 2014 WL 1453527, at *15-16 (W.D. Tenn. 2014); *United States v. Hall*, 2014 WL 1356698, at *11-12 (W.D. Mo. 2014).

Moreover, the fact that the FDPA does not extend to juveniles indicates that applying proportionality review in the broader context was considered by our policymakers but rejected despite the Supreme Court's Eighth Amendment jurisprudence of the 1970's, which, as discussed above, specifically called for such safeguards in any death penalty scheme. *See Roper v. Simmons*, 543 U.S. 551, 567 (2005) ("Congress considered [capital punishment for juveniles] when enacting the Federal Death Penalty Act in 1994, and determined that the death penalty should not extend to juveniles."). The majority of States heeded and respected the Supreme Court's decisions which held that the death penalty violates the Eighth Amendment if it is arbitrarily imposed[5] and in response instituted comparative proportionality review into their statutory schemes. Yet the federal death penalty statutory scheme failed to institute such a safeguard thereby rendering its imposition unconstitutionally arbitrary and capricious in violation of the Eighth Amendment.

### B. Because the FDPA Does Not Contain a Proportionality Review Provision, any Death Sentence Imposed under it Violates the Fifth and Eighth Amendments

---

[5] *See Gregg*, 428 U.S. at 187; *Proffitt v. Florida*, 428 U.S. 242, 247 (1976) (joint opinion of Stewart, Powell, and Stevens, JJ.); *Jurek v. Texas*, 428 U.S. 262, 268 (1976) (joint opinion of Stewart, Powell, and Stevens, JJ.)

The Constitution forbids a capital-punishment scheme in which the sentence is being imposed arbitrarily and capriciously. In *Furman*, Justice Stewart concluded:

> These death sentences are cruel and unusual in the same way that being struck by lightning is cruel and unusual. For, of all the people convicted of . . . murders . . . . many just as reprehensible as these, the petitioners are among a capriciously selected random handful upon whom the sentence of death has in fact been imposed . . . . I simply conclude that the Eighth and Fourteenth Amendments cannot tolerate the infliction of a sentence of death under legal systems that permit this unique penalty to be so wantonly and so freakishly imposed.

*Furman*, 408 U.S. at 309-10 (Stewart, J., concurring) (citations and footnotes omitted).

In 1976, the Court approved Georgia's new statute, which was meant to cure the constitutional problems identified in *Furman*. *Gregg*, 428 U.S. at 195. In 1987, the Supreme Court once again considered whether Georgia's capital scheme had resulted in constitutionally disproportionate sentencing patterns. *McCleskey v. Kemp*, 481 U.S. 279 (1987). The Court noted that it had approved the "facial validity" of the state's statute in *Gregg*, based on several features, including one "important . . . safeguard" absent from the FDPA: proportionality review. That safeguard had been implemented in McKleskey's case, with the state supreme court finding that his death sentence "was not disproportionate to other death sentences imposed in the State," and "support[ing] this conclusion with an appendix containing citations to 13 cases involving generally similar murders." *Id*. at 303-06.

In *McKleskey*, the Supreme Court also independently considered whether the system was "arbitrary and capricious *in application*." *Id*. at 308. An empirical study of Georgia death sentences "in fact confirms that the Georgia system results in a *reasonable level of proportionality* among the class of murderers eligible for the death penalty . . . . the system sorts out cases where the sentences of death is highly likely and highly unlikely, leaving a midrange of cases where the imposition of the death penalty in any particular case is less predictable." *Id*. at

8.

313 n.36 (emphasis added). Thus, McKleskey's case was deemed a "far cry" from the disparities confronted in *Furman*. *Id*. at 313.

The lack of a comparative proportionality review provision creates a death penalty scheme with disparities similar to those found in *Furman* and which cannot satisfy the Eighth Amendment. *See generally* Sam Kamrin & Justin Marceau, *Waking the Furman Giant*, 48 U.C. Davis L. Rev. 981 (2015). Federal death-sentencing patterns, as in *Furman*, reveal "no meaningful basis" for distinguishing the few defendants who are condemned to die from the vast majority who are spared, *Furman*, 408 U.S. at 313 (White, J., concurring). Death sentences under the FDPA are no more predictable than "a lottery system." *Id*. at 293 (Brennan, J., concurring). Receiving a federal death sentence remains comparable to being "struck by lightning," a rare and freakish event. *Id*. at 309-10 (Stewart, J., concurring). *See* Exhibits A & B.

## II.     The FDPA Operates in an Arbitrary and Capricious Manner

Justice Brennan summarized the constitutional problem: "When the punishment of death is inflicted in a trivial number of the cases in which it is legally available, the conclusion is virtually inescapable that it is being inflicted arbitrarily . . . . it is highly implausible that only the worse criminals or the criminals who commit the worst crimes are selected for this punishment." *Furman*, 408 U.S. at 293-94 (Brennan, J., concurring). When "[t]he death penalty is exacted with great infrequency even for the most atrocious crimes, and that there is no meaningful basis for distinguishing the few cases in which it is imposed from the many cases in which it is not" there is no disagreement that it is "unusual" under the Eighth Amendment. *Furman*, 408 U.S. at 313 (Opinion of White, J., concurring).

In fact, the infrequency of death sentences was noted by each of the five concurring Justices in the *Furman* majority. *Id.* at 248 n. 11 (Douglas, J., concurring); *id*. at 291-95 (Brennan, J., concurring); *id.* at 309-10 (Stewart, J., concurring); *id*., at 312 (White, J.,

9.

concurring); *id*. at 354 n. 124, 362-63 (Marshall, J., concurring). Members of the *Furman* Court also took note that the death penalty was often sought selectively, "feeding prejudices against the accused if he is poor and despised, and lacking political clout, or if he is a member of a suspect or unpopular minority . . . ." *Furman*, 408 U.S. at 255 (Douglas, J., concurring).

Justice White cited the infrequent utilization of the death penalty as an important factor contributing to his vote to strike down capital punishment:

> That conclusion, as I have said, is that the death penalty is exacted with great infrequency even for the most atrocious crimes and that there is no meaningful basis for distinguishing the few cases in which it is imposed from the many cases in which it is not.

408 U.S. at 313 (White, J., concurring); *see also Walton v. Arizona*, 497 U.S. 639, 658 (1990) (Scalia, J., concurring), *overruled on other grounds by*, *Ring v. Arizona*, 536 U.S. 584 (2002) (noting the key opinions in *Furman* "focused on the infrequent and seeming randomness with which, under the discretionary state systems, the death penalty was imposed.").

The Court rejected mandatory sentencing schemes from North Carolina and Louisiana, requiring "that there be taken into account the circumstances of the offense together with the character and propensities of the offender" to insure that "the system . . . function in a consistent and a rational manner." *Id*. at 153; *Proffitt v. Florida*, 428 U.S. 242 (1976); *Jurek v. Texas*, 428 U.S. 262 (1976); *Woodson v. North Carolina*, 428 U.S. 280, 309 (1976); *Roberts v. Louisiana*, 428 U.S. 153 (1976). The Court approved, but did not require, a bifurcated trial procedure, but did insist that a jury's discretion be channeled by "guidance regarding the factors about the crime and the defendant that the State, representing organized society, deems particularly relevant to the sentencing decision." *Gregg*, 428 U.S. at 189.

Four years after *Furman*, in 1976, the Supreme Court allowed the death penalty to be reinstated but warned that it would be unconstitutional if inflicted in an arbitrary and capricious

manner. *Gregg*, 428 U.S. at 188-89 (joint opinion of Stewart, Powell, and Stevens, JJ.). This ruling began the process of various states crafting capital sentencing schemes that sought to operate in a constitutionally acceptable "consistent and rational manner." *Id*. at 190; *see also Glossip*, 135 S. Ct. at 2759.

Connecticut's Supreme Court recently analyzed this issue, finding that the death penalty was unconstitutional. *State v. Santiago*, 318 Conn. 1, 23-26 (Aug. 25, 2015). A punishment that is arbitrarily and discriminatorily imposed is unconstitutionally cruel; "[i]t goes without saying . . . that the eighth amendment is offended not only by the random or arbitrary imposition of the death penalty, but also by the greater evils of racial discrimination and other forms of pernicious bias in the selection of who will be executed." *Id.* at 24-25 (citing *Tuilaepa v. California*, 512 U.S. 967, 973, 114 (1994) (guarding against bias or caprice in sentencing is "controlling objective" of court's review)).

Justice Breyer joined by Justice Ginsburg also analyzed this inevitable feature of the death penalty in their dissenting opinion in *Glossip v. Gross*, noting that the Supreme Court "has consequently sought to make the application of the death penalty less arbitrary by restricting its use to those whom Justice Souter called 'the worst of the worst.'" *Glossip*, 135 S. Ct. at 2760 (citing *Kansas v. Marsh*, 548 U.S. 163, 206 (2006) (Souter, J., dissenting)). Reiterating the precept of *Roper v. Simmons*, 543 U.S. at 568, that "[c]apital punishment must be limited to those offenders who commit a narrow category of the most serious crimes and whose extreme culpability makes them the most deserving of execution." However, Justice Breyer and Justice Ginsburg conclude that:

> Despite the *Gregg* Court's hope for fair administration of the death penalty, 40 years of further experience make it increasingly clear that the death penalty is iimposed arbitrarily, *i.e.*, without "reasonable consistency" legally necessary to reconcile its use with the Constitution's commands.

*Id.* at 2760 (citing *Eddings v. Oklahoma*, 455 U.S. 104, 112 (1982)).

In addition to its lack of adherence to the Supreme Court's Eighth Amendment jurisprudence, the FDPA's vague and ambiguous statutory language is unconstitutional under the Fifth Amendment. Recently, the Supreme Court emphasized this constitutional mandate finding that an arbitrarily drafted or vague statute would no doubt result in arbitrarily imposed sentencing. In *Johnson v. United States*, 135 S. Ct. 2551 (June 26, 2015), the Supreme Court held that a section of the Armed Career Criminal Act of 1984 was unconstitutional because it was vague in violation of the Fifth Amendment. *Id*. at 2556. Justice Scalia explains:

> The Fifth Amendment provides that "no person shall . . . be deprived of life, liberty, or property, without due process of law." Our cases establish that the Government violates this guarantee by taking away *someone's life*, liberty, or property *under a criminal law so vague* that it fails to give ordinary people fair notice of the conduct it punishes, or so standardless that it invites *arbitrary enforcement*. The prohibition of vagueness in criminal statutes "is a well-recognized requirement, consonant alike with ordinary notions of fair play and the settled rules of law," and a statute that flouts it "violates the first essential of due process." These principles apply not only to statutes defining elements of crimes, but also *statutes fixing sentences*."

*Johnson*, 135 S. Ct. at 2556-57 (citations omitted) (emphasis added).

In sum, the Federal Death Penalty is imposed arbitrarily and discriminatorily and under this analytical rubric or through this lens of history, it must be seen as unconstitutionally cruel and declared as such.

**III. The Federal Death Penalty Act Has no Basis for Distinguishing the Few Cases in Which the Federal Death Penalty was Imposed from the Many Cases in Which it is Not, Thereby Rendering it Unconstitutional as Applied to Mr. Fell**

Congress reinstated the federal death penalty through the 1988 Anti-Drug Abuse Amendments ("ADAA"), authorizing capital punishment for murders occurring in the context of drug trafficking. 21 U.S.C. § 848(e). The scope of federal death penalty was expanded with the addition of numerous new capital crimes, including carjacking, in the Federal Death Penalty Act

12.

of 1994, 18 U.S.C. § 3591 *et seq*. The FDPA also set out procedures intended to provide the fairness and consistency required by the Supreme Court, including "gateway" criteria, 18 U.S.C. § 3591(a)(2)(A)-(D), and statutory aggravators, 18 U.S.C. § 3592, to narrow the pool of death eligible defendants, along with a separate sentencing trial before a jury, 18 U.S.C. § 3593(b). However, in practice the federal death penalty scheme consists of an extremely large "pool" of capital-eligible offenders that fall within its scope.

Between 1972, when *Furman* was decided, and 1988, Congress prescribed the death penalty for just a handful of narrowly-specified federal crimes. *See Jones v. United States*, 527 U.S. 373, 407 n.3 (1999) (Ginsburg, Breyer, Stevens & Souter, JJ., dissenting). The passage of the FDPA in 1994, however, created at least 60 different statutes making a myriad of federal crimes punishable by death.

The scheme applies to all 50 states and all U.S. territories, regardless of whether the state forbids the death penalty; tribal members charged with crimes in Indian Country; crimes against U.S. nationals abroad; crimes against foreign nationals outside the U.S. jurisdiction; and crimes that do not involve U.S. nationals or property but where the perpetrator was "found" within U.S. jurisdiction. *See* Congressional Research Service, *Capital Punishment: An overview of Federal Death Penalty Statutes* (Jan. 5, 2005). In other words, the federal capital sentencing scheme embraces a wide sweep of factual scenarios that subject a large pool of offenders to punishment by death. As one former federal prosecutor once responsible for administering the death penalty explained:

> When the generality of these statutory aggravating factors and [their] commonality in many murders are considered together with the added authority to invoke non-statutory aggravators, it is the rare federal defendant that could not, in theory, be sentenced to death simply upon conviction of any killing offense.

13.

Rory K. Little, *The Federal Death Penalty: History and Some Thoughts About the Department of Justice's Role*, 26 Ford. Urb. L.J. 347, 403 (1999). Not surprisingly, under this expansive capital scheme, a very large number of offenders prove eligible for federal death-penalty prosecutions. In the quarter century since 1988 (when the Anti-Drug Abuse Act was enacted), at least 3,924 offenders have fallen into this category. *See* Federal Death Penalty Resource Counsel Website https://www.capdefnet.org/fdprc/. Of that large group of offenders, the federal government has authorized a capital prosecution in only 495 death-eligible case or about 13 percent. Of those cases, the government withdrew its authorization in over half of them. Of the remaining 233 cases that proceeded to a capital sentencing hearing, the government obtained approximately 80 death verdicts (against 77 defendants, three of whom were sentenced to death twice). Of those, at least 16 have been judicially vacated. Another defendant had his death sentence commuted by the President. Therefore, though at least 3,924 offenders were eligible for the federal death penalty, only 62 are actually on death row. *Id*.; Death Penalty Information Center, http://www.deathpenaltyinfo.org/federal-death-row-prisoners#cases

When considered as a proportion of the pool of 3,911 federal death-eligible cases that have been resolved to date (that is 3,924 total, less the 13 death-authorized cases that are pending trial), that yields a death-sentence rate of only 2.0%, even if all 80 death verdicts are used—and 1.6%, if the 63 non-invalidated death sentences are used. This is below the 15-20% rate found to be unconstitutional by the Supreme Court in *Furman*.

"To pass constitutional muster, a capital sentencing scheme must genuinely narrow the class of persons eligible for the death penalty and must reasonably justify the imposition of a more severe sentence on the defendant compare to others found guilty of murder." *Santiago*, 318 Conn. at 23-24 (citing *Lowenfield v. Phelps*, 484 U.S. 231, 244 (1988)). The federal death

14.

penalty system must be held to at least the standards required by states, i.e., "it has a constitutional responsibility to tailor and apply its law in a manner that avoids the arbitrary and capricious infliction of the death penalty . . . [it must] define the crimes for which death may be the sentence in a way that obviates standardless [sentencing] discretion . . . [i]t must channel the sentencer's discretion by clear and objective standards that provide specific and detailed guidance, and that make rationally reviewable the process for imposing a sentence of death." *Id*. (citing *Godfrey v. Georgia*, 446 U.S. 420, 428 (1980) (plurality opinion)).

### IV. An Evidentiary Hearing is Warranted

The Second Circuit has recognized the importance of evidentiary hearings and the district court's "broad" discretion in determining whether to conduct one. *See Drake v. Portuondo*, 321 F.3d 338, 347 (2d Cir. 2003); *Campbell v. Vaughn*, 209 F.3d 280, 287 (3d Cir. 2000); *see also Lopez v. Miller*, 906 F. Supp. 2d 42, 52-54 (E.D.N.Y. 2013). An evidentiary hearing on this motion is justified. *United States v. Irwin*, 612 F.2d 1182, 1187 (9th Cir. 1980) (holding that an evidentiary hearing is required if a "material issue of fact were raised 'which if resolved in accordance with (appellant's) contentions would entitle him to relief', an evidentiary hearing would be required."); *United States v. Howell*, 231 F.3d 615, 620 (9th Cir. 2000) (a defendant seeking an evidentiary hearing must "allege facts with sufficient definiteness, clarity, and specificity to enable the trial court to conclude that contested issues of fact exist."); *United States v. LaRouche Campaign*, 682 F. Supp. 610, 620 (D. Mass. 1987) (discussing factors to be considered by a court presented with a request for an evidentiary hearing, including: "Are the allegations before the court supported by a showing of factual circumstances in which there is at least a substantial likelihood that full exploration of the facts will show that the alleged violation

of that cognizable right has caused some substantial (or 'not insubstantial') impairment of that right?"

The lack of a comparative proportionality review provision renders the FDPA unconstitutional because it results in the "lack of guided discretion" and consequently arbitrarily imposed sentences of death. *See United States v. Sampson*, 2015 WL 6511247, at *22 (finding that it is not the rarity of capital sentences under the FDPA but rather the lack of guided discretion that constitutes arbitrariness).

The foregoing legal arguments and cited authority in conjunction with the statistical evidence in Exhibits A & B attached hereto, satisfies the standard for granting an evidentiary hearing on this issue and this Court has broad discretion to order one.

## CONCLUSION

For the foregoing reasons, it is respectfully requested that this Court hold that the FDPA is unconstitutional on its face and strike the amended notice of death (Doc. 609). In the alternative, an evidentiary hearing is warranted on this issue and counsel seeks the opportunity to present data and expert testimony in support of his arguments.

Dated at San Francisco, California, this 16th day of November, 2015.

17.

          Respectfully Submitted,

          MICHAEL N. BURT
          KERRY B. DeWOLFE
          JOHN T. PHILIPSBORN

          By: */s/ Michael N. Burt*

          Law Office of Michael Burt
          1000 Brannan Street
          Suite 400
          San Francisco, California 94103
          415-522-1508 (phone)
          415-522-1506 (fax
          mb@michaelburtlaw.con
          Counsel for DONALD FELL

**CERTIFICATE OF SERVICE**

I hereby certify that on November 16, 2015, I electronically filed with the Clerk of

**DEFENDANT DONALD FELL'S MEMO IN SUPPORT OF MOTION TO DECLARE THE FEDERAL DEATH
PENALTY ACT UNCONSTITUTIONAL FOR FAILURE TO
REQUIRE COMPARATIVE PROPORTIONALITY REVIEW RESULTING IN
<u>ARBITRARY & DISCRIMINATORY DEATH SENTENCES</u>**

using the CM/ECF system. The CM/ECF system will provide service of such filing(s)

via Notice of Electronic Filing (NEF) to the following NEF parties:

   Michael N. Burt, Esq.
   Kerry B. DeWolfe, Esq.
   John Phillipsborn
   William B. Darrow, Esq., Assistant United States Attorney
   Bruce R. Hegyi, U.S. Dept. Of Justice

I also caused to be served, by U.S. Postal Service, the following non-NEF party:

   Donald Fell
   Register Number 05306-010
   The Metropolitan Detention Center
   P.O. Box 329002
   Brooklyn, NY 11232

Dated at San Francisco, California, this 16th day of November, 2015.

                                                      By:  */s/ Michael N. Burt*

                                                      Law Office of Michael Burt
                                                      1000 Brannan Street
                                                      Suite 400
                                                      San Francisco, California 94103
                                                      415-522-1508 (phone)
                                                      415-522-1506 (fax
                                                      mb@michaelburtlaw.con
                                                      Counsel for DONALD FELL