UNITED STATES DISTRICT COURT
FOR THE
DISTRICT OF VERMONT

U.S. DISTRICT COURT
DISTRICT OF VERMONT
FILED

2016 DEC 13  AM 9: 10

CLERK

BY_____
DEPUTY CLERK

UNITED STATES OF AMERICA )
)
)
v. )   Case No. 5:01-cr-12-01
)
DONALD FELL )

**OPINION AND ORDER ON CONSTITUTIONALITY OF THE
FEDERAL DEATH PENALTY ACT
(Docs. 668, 670, 673 and 674)**

**INTRODUCTION**

In 2015, the U.S. Supreme Court issued its decision in *Glossip v. Gross*, 135 S. Ct. 2726. The case concerned challenges under the Eighth Amendment to execution by lethal injection of four defendants sentenced to die by state courts in Oklahoma.

Justice Breyer, joined by Justice Ginsburg, issued a dissent calling "for full briefing on a more basic question: whether the death penalty violates the Constitution." *Id*. at 2755. The dissent identified a series of systemic shortcomings in the administration of the death penalty in the United States, especially as it is applied by the states. It divided these into four categories: "(1) serious unreliability, (2) arbitrariness in application, (3) unconscionably long delays that undermine the death penalty's penological purpose [and] (4) most places in the United States have abandoned its use." *Id*. at 2756.

In response, Justice Scalia and Justice Thomas wrote two strongly worded concurring opinions which defended the death penalty as the legitimate exercise of democratic authority. Both justices pointed to the shocking cruelty of the crimes which led to the death sentences in these and other death penalty cases. Both questioned the authority of the judiciary to interpose

its own philosophical concerns about the death penalty. And both identified utilitarian purposes such as deterrence which may justify executions.

The dissent and concurring opinions in *Glossip* offer a particularly vivid account of the long-running dispute over the constitutionality of the death penalty within the Supreme Court. A federal trial judge is without authority to rewrite the law so as to overrule the majority position at the Supreme Court. The current state of the law is that the death penalty is a constitutional punishment for murder committed by adults not disqualified for reasons of intellectual disability who have received a trial which meets the standards set by *Gregg v. Georgia*, 428 U.S. 153 (1976) and *Ring v. Arizona*, 536 U.S. 584 (2002). Changing forty years of decisional law raises questions that can only be settled by the Supreme Court itself.

But a trial court has its own contribution to make to the debate. The court can hold a hearing and permit witnesses to testify. In *Glossip*, Justice Breyer raised a series of questions about whether the death penalty is imposed fairly or in an incurably arbitrary manner. The questions he raised are troubling. They are essentially empirical. They require consideration of what has actually happened in the United States since the restoration of the death penalty following the *Gregg* decision.

Over the course of two weeks last summer this court sought to develop a factual record based on live testimony and supporting exhibits sufficient to answer the question of whether the constitutional requirements for a death penalty statute set out in *Gregg* have been met in practice. As the court's findings indicate, the Federal Death Penalty Act, 18 U.S.C. §§ 3591, et seq. ("FDPA"), falls short of the standard required in *Furman v. Georgia,* 408 U.S. 238 (1972), and in *Gregg* for identifying defendants who meet objective criteria for imposition of the death

2

penalty. Like the state statutes enacted after *Furman*, the FDPA operates in an arbitrary manner in which chance and bias play leading roles.

The trial court's obligation does not end with a review of the facts. The court is required to address the legal issues raised by the parties. That resolution may be no more than an acknowledgment that the law has been settled on a particular question. Alternatively, the new factual record may require a fresh look at the manner in which existing principles are applied to a factual record which continues to develop   The court has sought to undertake this new look in a manner consistent with existing authority which comes principally from the Supreme Court.

To get right to the point, the court has sought to follow the method expressed in *Atkins v. Virginia*, 536 U.S. 304 (2002) in considering the proportionality of the death penalty. The court has also considered the separate argument that application of the death penalty has become arbitrary.

The disproportionality challenge falls short because of the absence of proof of a national consensus to abolish the death penalty. As the law stands now, proof of consensus is a prerequisite for finding the death penalty unconstitutional as applied to particular crimes or particular types of defendants. By assessing public opinion, especially as it is expressed through legislation in the states, the Supreme Court finds a basis for determining evolving standards of decency for the nation as a whole. If the requirement of consensus applies to the limited challenges brought in cases like *Atkins*, then it must also apply to the claim of disproportionality which the defense levels against the imposition of the death penalty in all cases.

The court has also considered the problem of arbitrary application of the death penalty to small numbers of defendants whose crimes are indistinguishable from the far greater number

who receive life sentences.  The court has followed existing law in declining to rule that "arbitrariness" is an independent constitutional violation.

## Scope of the Evidentiary Hearing

In this case, the defense filed extensive motions challenging the constitutionality of the FDPA, (Docs. 668, 670, 673 and 674).  The issues raised followed the *Glossip* dissent closely. The questions raised by Justice Breyer's dissent are:

I.    **Unreliability**

    A.  Mistaken Conviction and Exoneration

    B.  Bias Through "Death Qualification" of the Pool of Prospective Jurors

    C.  Flawed Forensic Testimony

    D.  Identifiable Rate of Erroneous Conviction

II.   **Arbitrariness**

    A.  Rarity and "Freakish" Imposition of the Death Penalty

    B.  Continuing Impact of Race, Gender and Geography

    C.  Underfunding of Capital Defense

    D.  Political Pressure on Elected Judges

    E.  Systemic Failure to Identify the "Worst of the Worst" Defendants

III.  **Excessive Delay**

    A.  18 – 25 Year Delays Between Conviction and Execution

    B.  Solitary Confinement and Uncertainty of Outcome

    C.  Volunteering for Death and Rates of Suicide on Death Row

    D.  Undermining of the Penological Rationales of Deterrence and Retribution

IV.    **Unusual – Decline in Use of the Death Penalty**

      A.  Reduction in Annual Death Sentences and Executions

      B.  State-Wide Abolishment Through Legislative Change

      C.  State-Wide Lack of Use

      D.  Concentration of Death Sentences in a Few States and Counties

      E.  Direction of Change at the Level of the States

      F.  Declining Public Support

      G.  Practice by Other Nations

The witnesses called at the hearing addressed many of these issues.  Because this is a federal prosecution and the defense motion challenges the constitutionality of the FDPA, some of the issues raised in the *Glossip* dissent arising in the context of state cases had little or no application.  The funding of a legal defense is generally not an issue in federal death penalty cases in which the amounts expended for the defense of the accused are both enormous in actual amount and largely unlimited as to purpose and strategy adopted by defense counsel.  Political pressure on elected state judges has no relevance to a federal judiciary with life tenure.  In this case, the parties have addressed concerns about the potential unreliability of certain forensic evidence through a separate series of *Daubert* motions and hearings tailored to the needs of this case.  But in general, most of the *Glossip* critique applies with equal force to the experience of federal death penalty practice.

### Organization of this Decision

The court will address the motions in two stages.  First, it will review the testimony and exhibits.  To the extent possible, the court will make specific findings about the subject areas

addressed by the parties.  Second, the court will address the legal issues raised by the defendant's

motions.  The findings follow the outline above.

One preliminary point is important.  Through two weeks of hearings, only three issues

were contested through the admission of conflicting testimony and other evidence.  These were

bias arising from the race of the victim (Part II (B)), the effects of solitary confinement on death

row (Part III (B)), and the statistical evidence of a deterrent effect on the murder rate achieved

through capital punishment (Part III (D).  With respect to deterrence in particular, the parties

demonstrated the existence of a lively and continuing debate among statisticians, economists and

other social scientists about the deterrent effect of the death penalty.  In all other areas, however,

the evidence was one-sided and came only from the defense.

This imbalance occurred not through lack of notice or effort by either side.  In February,

2016, the court stated its intention to hold an evidentiary hearing tailored to the issues raised in

the *Glossip* dissent.  (Doc. 724)  Rather, in working through these factual issues and the available

scholarship, one realizes that the criticism of the death penalty published during the modern,

post-*Furman* era rests on studies and analysis which are largely uncontroverted in academic

circles.

## FINDINGS

### I.    Unreliability

#### A.    Mistaken Conviction and Exoneration

Richard Dieter, former director of the Death Penalty Information Center ("DPIC"),

testified concerning the risk of execution of innocent people.  He testified that DPIC maintains a

list of people who were convicted and sentenced to death and subsequently exonerated either

through retrial and acquittal or by dismissal of all charges by the prosecution. Dieter Tr. 116.[1] The list also includes five people who were pardoned by governors for reasons of factual innocence. Between 1973 and 2015, 156 state death row prisoners have been exonerated in the United States. Dieter Ex. 9. DNA played a substantial role in 20 of these cases.

There are no federal defendants on the DPIC list. In his declaration provided in preparation for testifying, Mr. Dieter noted that there have been 14 acquittals at the guilt phase since enactment of the FDPA. The FDPA operates on a much smaller scale than death penalty prosecution in the states. Identifiable errors leading to exoneration have not been a feature of FDPA litigation.

### B.    Jury Bias Through "Death Qualification" of Prospective Jurors

Since the origins of the Republic, jury selection in capital cases has featured some form of "death qualification" during which potential jurors who are opposed to the death penalty are identified and excused. *See United States v. Cornell*, 25 F. Cas. 650 (C.C.R.I. 1820) (No. 14, 868). The Supreme Court considered the issue in *Logan v. United States*, 144 U.S. 263, 628 (1892) in a decision permitting the exclusion of jurors with "conscientious scruples in regard to the infliction of the death penalty for crime." (internal quotation omitted). Many states adopted statutes which excluded jurors who admitted to such scruples at jury selection.

The Supreme Court altered this standard in *Witherspoon v. Illinois*, 391 U.S. 510 (1968), when it restricted the excusal of potential jurors for cause to those "who stated in advance of trial that they would not even consider returning a verdict of death." *Id.* at 520. In the view of the Court, the exclusion of all jurors "who expressed conscientious or religious scruples against capital punishment and all who opposed it in principle" crossed the line of neutrality and

---

[1] Citations are to the page of the transcript on the day a witness testified. Dates are provided when a witness testified on two successive days.

"stacked the deck against the [defendant.]" *Id*. at 522.  Only potential jurors who were unalterably opposed to the death penalty were subject to removal for cause.

The standard was further refined in *Wainwright v. Witt*, 469 U.S. 412 (1985).  The decision defines the qualification standard as whether "the juror's views [in opposition to the death penalty] would prevent or substantially impair the performance of his duties as a juror in accordance with his instructions and his oath." *Id*. at 424 (internal quotations omitted).  The requirement which lower courts had drawn from *Witherspoon* – that a juror could be excused only if he or she would vote against the death penalty *automatically* – was removed.  See also *Lockhart v. McCree,* 476 U.S. 162 (1986).

The social science studies presented at the hearing in this case considered whether the process of determining whether jurors suffer from "substantial impairment" in their ability to reach a verdict in favor of death is itself a cause of bias in favor of conviction at the guilt phase as well as subsequent imposition of the death penalty.  The principal witness on this issue was Craig Haney who is a social psychologist at the University of California at Santa Cruz.

Dr. Haney testified that the process of death qualification results in capital juries which are biased in favor of the prosecution.  There are five reasons for this opinion.  (1) Death qualification tends to exclude women and minorities who are more likely to oppose the death penalty than white men.  (2) The jurors who emerge from the death qualification process tend to be more conservative than average on issues related to criminal justice.  (3) Due to these inherent biases, a death penalty qualified jury is more likely to convict on the issue of guilt than juries that sit on other criminal cases.  (4) Jurors who are "death qualified" are more likely to impose the death penalty than other jurors.  (5) The process of death qualification itself tends to promote

death penalty verdicts because of the psychological effect of the questions asked and the answers provided by prospective jurors. Haney Ex. 2 (Rule 16 disclosure, pp. 42-43).

Dr. Haney's testimony supported all of these conclusions as did the exhibits admitted in connection with his testimony. The first claim is that identifying and excluding jurors who hold views against the death penalty stacks the deck in the words of Justice Stewart in *Witherspoon*. This was precisely the issue which also concerned the Court in *Wainwright* and *Lockhart*. A substantial portion of the American population opposes the death penalty. In recent years, the percentage has ranged from 47 percent (1967) to a low of 16 percent (1995) to a more recent figure of 33 percent (2015). See Haney Ex. 2 (Gallup poll results 1937-2015). If these jurors are excluded as "substantially impaired" in their willingness to impose the death penalty, then the remainder of the population no longer represents the views of the general population.

The *Witherspoon* decision expressed a concern that social science data was "too tentative and fragmentary to establish that jurors not opposed to the death penalty tend to favor the prosecution in favor of guilt." 391 U.S. at 517. In 1986, in the *Lockhart* decision, Justice Rehnquist offered a similar criticism. He observed that the petitioner had offered only six studies which "purported to deal with the central issue in this case, namely, the potential effects on the determination of guilt or innocence of excluding 'Witherspoon-excludables' from the jury." 476 U.S. at 170. Of these, three were previously before the Court in *Witherspoon*. The new studies were of randomly selected subjects, not actual jurors who had served in death penalty cases. None considered the problem of "nullifiers" who harbored "deep-seated opposition to the death penalty." 476 U.S. at 171. The majority found the social science to be unpersuasive. The question for this court is whether new research since *McCree* supports reexamination of the issue.

Since at least 1980, Dr. Haney has worked to fill in the gap in the scientific record. With respect to the compositional bias of the death-qualified jury, it can no longer be seriously questioned that panels who have announced their openness to a death penalty verdict and have been selected on that basis are more likely to convict than jurors who more closely mirror the full range of moral values in our society. Since 1986, the social science literature includes the following:

    a.  Moran and Comfort, "Neither 'Tentative' nor 'Fragmentary': Verdict Preference of Impaneled Felony Jurors as a Function of Attitude Toward Capital Punishment," 71 Journal of Applied Psychology (1986) (Haney, Ex. 10).

The Moran article surveyed the existing studies of mock jurors commencing with the three studies considered in *Witherspoon* and bringing the survey current to 1986. On the basis of ten studies conducted over as many years, the researchers concluded that "[i]n our opinion, there is abundant evidence to conclude that death qualifiable persons are more likely to hold attitudes that alter their behavior as mock jurors and incline them toward conviction. It is also probable that the death qualification process activates such attitudes and/or socializes venire members to a conviction prone culture." *Id.* at 148. Echoing the nearly contemporaneous criticism in the *Lockhart* majority opinion, the authors expressed doubt over the validity of attitudinal findings from mock trials. They turned their attention to two studies of actual jurors.

One study conducted in 1978 considered the attitudes of jurors who had served on state felony juries in Miami, Florida. Three hundred and nineteen (319) out of 1,500 jurors returned their questionnaires. The authors found that jurors who strongly favor capital punishment are "differentially authoritarian in the classical sense; hold authoritarian, anti-civil libertarian attitudes toward jurisprudential issues, are more conventionally socialized, that is, regard the rules, values, and prohibitions of conventional society as personally mandatory, and have more

anomie, that is, regard themselves as relatively powerless and isolated in a normless society." *Id.* at 150. Women who strongly favor capital punishment "evidence additional characteristics consonant with authoritarianism. They are more rigid, belong to more dogmatic churches, and believe in imminent justice, that is, that one gets what one deserves." *Id.* at 150. The study focused on the relation of the likelihood of conviction and attitudes toward the death penalty. Women, but not men, who favored the death penalty were more inclined toward guilty verdicts. The authors described the "marginally significant association of attitude toward the death penalty and conviction proneness in the whole sample of impaneled jurors as converging with other mentioned findings to support the contention that death qualified jurors are conviction prone." *Id.* at 150.

The second study was based on questionnaires mailed to Miami, Florida felony jurors in 1982-83 who had recently served on capital juries. Eight hundred and seventy-five (875) surveys went out; 346 responded. The results were broadly consistent with the prior study. Jurors who favored the death penalty "were more likely to be male, wealthier, white, married, home owning, Republicans of conservative political persuasion. They are less likely to report any unpleasant experience with the police. These jurors who favored capital punishment also perceived themselves to have participated more in their juries' deliberations." *Id.* at 152. They were also "predeliberationally inclined to convict in felony trials." *Id.* at 152.

In reviewing the results of both studies the authors concluded that "jurors from undifferentiated felony trials who more strongly favor capital punishment are significantly more likely to favor conviction." *Id.* at 153.

> b.  Haney, Hurtado and Vega, 'Modern' Death Qualification, Law and Human Behavior," Vol. 18, No. 6 (1994) (Haney Ex. 12).

This article describes an opinion survey conducted by telephone of 498 residents of California. They were asked approximately 40 questions concerning their attitudes toward the death penalty. The study sought to determine the percentage of potential jurors who would be excluded under the more relaxed standard of "substantial impairment" adopted by the Supreme Court in *Wainwright*. It was also one of the first studies to consider the exclusion in percentage terms of potential jurors who automatically favored the death penalty in all capital cases. The total excludable group was just below 20 percent, roughly evenly divided between people who strongly favored and opposed the death penalty. The authors found that members of minority groups were disproportionally represented among the excludable group because of views opposing the death penalty.

    c.  Allen, Mabry, and McKelton, "Impact of Juror Attitudes about the Death Penalty on Juror Evaluations of Guilt and Punishment: A Meta-Analysis, Law and Human Behavior," vol 22, no. 6 (1998) (Haney Ex. 14).

The authors conducted a methodical survey (meta-analysis) of the social science literature concerning the compositional effect (bias arising from death penalty qualification) as well as bias arising from participation in the voir dire process. The meta-analysis is a formal, statistically-based method of studying the convergence of research results.

Fourteen studies met criteria for examination. The authors concluded that "[t]he average effect indicates that persons favoring the death penalty were more likely to favor conviction of a defendant … This average effect was significantly different from 0…". *Id.* at 723. The authors hedged their bets due to the variation in studies and methods. "Heterogeneity indicates that the average effect should be interpreted with caution since the presence of a moderator variable is likely." *Id.* at 723.

In summarizing the outcome of their study, the authors expressed confidence that attitudes toward the death penalty affect the likelihood of conviction. "The results indicate that the more a person favors the death penalty, the more likely that person is to vote to convict a defendant." *Id*. at 724. The literature does not reveal the cause of the bias. The authors echoed the criticism of studies of *potential* juror attitudes expressed by the majority in *McCree*. They found support across the literature for a conviction-prone bias arising from the exclusion of jurors based on personal views in opposition to the death penalty. "The conclusion flowing from previous research in this area is that the systematic exclusion of a part of the juror pool more likely to acquit biases the process of deliberation in favor of conviction." *Id*. at 724. These findings relate to juror bias at the outset of the case – prior to deliberations. The authors found inadequate data to determine whether the initial bias of the jury in favor of conviction could be expected to diminish through the process of deliberation. They were also unable to identify the underlying beliefs which "cause both a belief in the death penalty as well as a conviction proneness." *Id*. at 726. But despite these unanswered questions about the cause of the bias in favor of conviction, the authors were unequivocal in their determination that social science studies have established that "the use of screening during *voir dire* creates a jury more likely to convict a defendant than would normally occur if the question were not used to screen potential jurors." *Id*.

These three studies are consistent with the work that preceded and has followed them. More recent research has focused on racial imbalance and the effective exclusion of African-Americans from capital juries. See Haney Ex. 2, p. 46 (Rule 16 disclosure). There are no studies before the court which suggest that this compositional bias effect is exaggerated or incorrect. The defense has established as a factual matter that death-qualified juries have a

13

disposition towards conviction which is significantly greater than the attitude of juries who have not passed through the filter of death qualification.

The second factual claim made by Dr. Haney is that the experience of death penalty voir dire makes jurors more likely to impose the death penalty. Several studies before the court address this issue.

> d. Haney, "On the Selection of Capital Juries: The Biasing Effects of the Death-Qualification Process," Law and Human Behavior, Vol. 8, Nos. 1/2 (1984) (Haney Ex. 9).

In this article, Dr. Haney describes a study of sixty-seven men and women eligible for jury service. They were shown one of two videotapes intended to simulate the experience of voir dire. One videotape included the process of death penalty qualification, including the exclusion in front of the rest of the panel of two pool members who expressed opposition to the death penalty. The study concluded that "exposure to death qualification increased subjects' belief in the guilt of the defendant and their estimate that he would be convicted. It also increased their estimate of the prosecutor, defense attorney, and judge's belief in the guilt of the defendant. And it led jurors to choose the death penalty as an appropriate punishment much more frequently than persons not exposed to it." *Id.* at 128-129.

> e. The Capital Jury Project

In addition to Dr. Haney's testimony, Dr. Wanda Foglia testified concerning the work of the Capital Jury Project ("CJP"). Dr. Foglia is a law professor at Rowan University who conducts social science research in the area of criminology. Over the course of some 15 years, members of the CJP interviewed 1,198 jurors who had served in 353 capital trials. This work was funded by the National Science Foundation and occurred in fourteen states. The empirical research was exhaustive and painstaking. It was performed through detailed questionnaires and

14

interviews with actual jurors. The research provides very strong evidence of three primary findings derived from seven specific problems. First, the process of death qualification at voir dire produces juries which are biased in favor of imposing the death penalty. This occurs both because jurors who are opposed to the death penalty are excluded and because the voir dire discussion itself creates an expectation in the minds of many jurors that the outcome of the case is likely to be the death penalty. Second, in the course of trial, a majority of jurors make up their minds about the death penalty *before* completing the conviction phase. In many cases, the later balancing of aggravating and mitigating factors which *Gregg* relied upon to distinguish defendants who truly deserve death from those who do not does not actually take place. Finally, jurors demonstrated a consistent inability to understand and apply the courts' instructions concerning the two phases of the trial, the different burdens of proof for aggravating and mitigating factors, and the other protections intended to guide the jury's discretion.

The court will review the seven problems raised by the CJP studies one at a time:

### 1.      Premature Decision-Making

The CJP studies concluded that half of the capital jurors interviewed had decided on the death penalty (30.3 %) or a life sentence (18.9 %) before determining whether the defendant was guilty of the offense. Jurors who chose death were absolutely convinced (70.4 %) or pretty sure (27 %) of their decision on penalty before rendering a decision on guilt. Foglia Tr. 163-182 (7/13/16).

### 2.      Bias in Jury Selection

The questionnaires revealed high numbers of jurors who believed that death was the only appropriate sentence for six specific capital offenses. With one exception, the percentage of jurors who had actually served who believed death was the only acceptable punishment ranged

from a thirteen state average of 71.6 % (defendants previously convicted of murder) to 46.2 %

(murder by a drug dealer). The high percentage of jurors holding these beliefs is troubling since

one of the purposes of voir dire was to exclude such people. The questionnaires also provided

confirmation of the studies conducted by Dr. Haney in the 1980's which showed that the voir

dire process itself created a bias in favor of the death penalty. Foglia Tr. 186-200 (7/13/16).

### 3.    Failure to Understand Instructions

The CJP studies demonstrated that many jurors fail to understand and therefore apply the

distinctions between the burden of proof and requirements of unanimity which distinguish

aggravating and mitigating factors. Nearly half of the jurors did not understand that they must

consider relevant mitigating evidence. Two-thirds did not understand that a mitigating factor did

not need to be found unanimously. Half did not understand the lower standard of proof for

mitigating factors and nearly one-third did not understand the burden of proof for aggravating

factors. The results may not be surprising – these complicated ideas were new to the jurors and

they only heard one case – but the results undermine confidence that the process developed in

*Gregg* and subsequent Supreme Court decisions to guide the jury's deliberative process is

followed in actual practice in the jury room. Foglia Tr. 7-13 (7/14/16).

### 4.    Erroneous Belief that Death is Required

Substantial numbers of jurors who found that certain aggravating circumstances were

present also believed that a death sentence was then required. In the case of "future

dangerousness," one-third of jurors believed that death was mandatory. For "heinous, vile and

depraved," the percentage rose to 44 percent. These findings are both consistent with a

widespread failure to understand jury instructions and a bias in actual juries towards death

sentences. Foglia Tr. 14-15 (7/14/16).

### 5.    Responsibility for the Death Decision

Large numbers of jurors consistently believed that other actors, such as the judge, were ultimately responsible for the death decision when case law requires that they bear sole responsibility for making that determination.  Foglia Tr. 16 (7/14/16).

### 6.    Racial Influence

Ms. Foglia relied on work outside of the CJP research to conclude that white defendants who killed white victims were more likely to receive the death penalty than defendants of either race who killed black victims.  The CJP findings were more limited on this issue.  They concerned the difference in jury outcomes depending on differences between the race of the defendant and the victim and the presence of black and white jurors.  Foglia Tr. 17-22 (7/14/16).

### 7.    Underestimating the Alternative Punishment of Life Without Parole

The CJP found that jurors frequently did not understand or believe that defendants sentenced to life without parole would not be released in the future.  Foglia Tr. 23-27 (7/14/16).

Ms. Foglia testified credibly that because the state and federal death penalty requirements established by the Supreme Court apply equally to both legal systems, the CJP findings drawn primarily from interviews with state court jurors apply with equal validity to federal death penalty cases.

Scott Sundby, a law professor active for many years in CJP research, also testified about the results of the investigation of capital juror behavior.  He has sought for several decades to answer the question of whether it is possible to create a jury system which reliably and predictably identifies the crimes and perpetrators for which the death penalty is justified.  Sundby Tr. 164.  Professor Sundby was drawn to the question through a statement by Justice Harlan in *McGautha v. California*, 402 U.S. 183, 209 (1971) that "to identify before the fact

17

those characteristics of criminal homicides and their perpetrators which call for the death

penalty, and to express these characteristics in language which can be fairly understood and

applied by the sentencing authority, appear to be tasks which are beyond present human ability."

Professor Sundby testified that "it is beyond human present ability to formulate a capital

punishment scheme which would get us the type of non-arbitrary, non-capricious decisions that

the Supreme Court has said we must have after *Furman*." Sundby Tr. 167.

      In reaching this conclusion, Professor Sundby used the CJP data in the following ways:

1.   Based on hundreds of hours of juror interviews, he came to appreciate that the penalty phase

     determination "is ... at the bottom, inevitably ... a moral, spiritual, religious value judgment.

     It is not like the guilt phase judgment.... The ultimate question in the capital punishment

     context ... is does this defendant deserve to live or die. And there is absolutely no way to

     make that decision other than looking at your own values." Sundby Tr. 168. In contrast to

     the guilt phase (or all other criminal cases) in which the jury is making a fact-based decision,

     the penalty phase decision depends upon the jurors' subjective moral values. Because the

     determination is not fact-based, it is inherently unpredictable and ungovernable by legal

     standards.

2.   Interviews with jurors about the votes in the jury room reveal that if three or fewer jurors

     favor life at the first vote, the ultimate decision is almost always for death. If four favor life,

     then 60 percent of penalty verdicts are for death. If five or more favor life, then the ultimate

     decision is almost always for life. From this evidence, Professor Sundby concluded that the

     views of one or two jurors are enough to determine the outcome of a divided jury.

     Consequently, the exclusion of potential jurors at voir dire through death qualification has a

     large effect on the outcome of the case. Sundby, Tr. 171.

3. Professor Sundby found evidence of unpredictable, unguided decision-making in many aspects of the juror interviews. These included the search by jurors for evidence of remorse by the defendant through his facial expression and manner of speaking, a subjective inquiry into his future dangerousness, and a belief by jurors that defendants who insist upon their right to a trial on guilt and later introduce mitigating evidence at the penalty phase have tried to "trick" the jury into an outright acquittal. Sundby Tr. 174-177.

4. Professor Sundby identified juror uncertainty over the application of many potential mitigating factors which both support and count against a life sentence as an additional source of arbitrary decision-making. Factors such as mental illness, neurological deficits such as fetal alcohol syndrome, a bad childhood, and youth at the time of offense can support mitigation but they can also be understood to support future dangerousness. Sundby Tr. 184, 188. A young, disturbed person can be seen as less responsible for an offense. Conversely, he can also be seen as likely to grow more violent as he matures. Although the latter argument may be unsupported by psychological research, it remains as a belief in some jurors' minds and undermines the constitutional requirement of proof of aggravating and mitigating circumstances. In Professor Sundby's view, the jurors' difficulty in applying mitigation factors to reduce rather than increase the likelihood of a life sentence is strong evidence that in many cases a death sentence will be returned instead of life. This persistent difficulty undermines the constitutional requirement of heightened reliability in death penalty decision-making. Sundby Tr. 191.

In considering testimony about the level of inherent bias generated by the process of jury selection, the court finds that the social science studies conducted since 1980 have converged on a common conclusion that the process by which jurors are selected does not measure up to

the standards of detached objectivity required by *Gregg*.  The exclusion of many people opposed to the death penalty on religious or moral grounds and the implicit process of persuasion at voir dire that death is the likely outcome create jury populations which stack the deck against defendants.  This suspicion originally expressed by Justice Stewart has been shown to be true.  The most telling evidence is the absence of contrary research results.  The studies brought to the court's attention supported the position of the defense that jury selection since *Gregg* is not the solution to inherent jury bias but rather a substantial part of the problem.

### C. Flawed Forensic Testimony

With the assistance of both sides, the court has conducted an extensive *Daubert* inquiry into the reliability of the forensic evidence in this case.  This takes the place of the more generalized concerns expressed in the *Glossip* dissent about the use of suspect forensic methods in other cases.

One exception is the testimony of Thomas Reidy who testified concerning the unreliability of expert testimony on the risk that a defendant would be dangerous in the future. This is not a subject on which the court has conducted a hearing on reliability because the testimony concerns penalty, not guilt.  Unlike the other forensic issues, the testimony goes primarily to the unreliability of the jurors' understanding of the information.  Dr. Reidy is a clinical and forensic psychologist who maintains a private practice in California.  He testified credibly that forensic opinions of future dangerousness have an impact on a lay jury which greatly exceeds their real predictive value.  Empirical testing of conduct in prison reveals little difference between capital defendants and those convicted of lesser offenses.  In particular, individual characteristics such as impulsivity, lack of remorse, criminal lifestyle, and aberrant

personality characteristics do not function as valid predictors of violence in the prison setting. Similarly, the seriousness of the offense in general and homicide in particular have little predictive value.   In Dr. Reidy's opinion, intuitive opinions held by many potential jurors tend to exaggerate in the jurors' minds the danger presented by a capital defendant.

Dr. Reidy's opinion is plausible and went unchallenged by contrary testimony at the hearing.  But standing alone, it is an insufficient body of research from which to draw a conclusion that expert testimony regarding future dangerousness should be excluded at trial or that it presents a systemic criticism of the FDPA.  Like any proposed expert testimony, the reliability of testimony about future dangerousness must be considered on an individual basis in each case.

### D.  Identifiable Rate of Erroneous Conviction

Michael Radelet, a psychology professor at the University of Colorado at Boulder, testified that research demonstrates that state court death penalty prosecution results in an erroneous conviction rate of approximately four percent.  Radelet Tr. 170-171.  This result is drawn from several thousand cases over 40 years.   By contrast, the FDPA with a total of  503 cases authorized since its enactment in 1988 operates on a far smaller scale.   There are no known claims of factually erroneous convictions on federal death row.

In *United States v. Quinones*, 313 F.3d 49 (2d Cir. 2002), the Second Circuit rejected the claim of erroneous conviction as a basis for holding the FDPA to be unconstitutional.

> [T]he Supreme Court has upheld state and federal statutes providing for capital punishment for over two hundred years, and it has done so despite a clear recognition of the possibility that, because our judicial system – indeed, any judicial system – is fallible, innocent people might be executed and, therefore, lose any opportunity for exoneration.

*Id.* at 64.

The court rejected a claim that the risk of erroneous conviction in a capital case violated the Due Process clause. The decision makes clear that this claim will fare no better under the Eighth Amendment. For these reasons, the court enters no findings on this aspect of the *Glossip* dissent.

In summary, the court finds that the evidence introduced at the hearing supports a finding that the procedures for conducting jury trials mandated by the *Gregg* decision have not cured systemic shortcomings in jury selection and jury deliberations. The death qualification process continues to weight jury panels in favor of conviction and in favor of the death penalty through the exclusion of a large portion of the community which holds views opposed to the death penalty. When surveyed, jurors who actually served in capital cases had great difficulty in following the trial courts' instructions. It is an inadequate response to presume that juries follow our instructions when the evidence is to the contrary. The evidence introduced at the hearing demonstrates that despite efforts to create a more just death penalty regime, the FDPA – like the very similar state death penalty statutes enacted after *Furman*– remains inherently unreliable as it seeks to identify those cases in which death is the just outcome.

## II.     Arbitrariness

### A.     Rarity and "Freakish" Imposition of the Death Penalty

Several defense witnesses testified concerning the issue of whether the death penalty is imposed in an arbitrary manner. This issue lay at the heart of many of the *Furman* concurring opinions and was preserved for all time in Justice Stewart's famous "struck by lightning" simile. 408 U.S. at 309.

The court starts with the evidence provided by Kevin McNally, Director of the Federal Death Penalty Resource Counsel Project ("FDPRCP"). Mr. McNally's testimony about the

effects of race, geography, and the absence of discernible standards for the determination of who is sentenced to life imprisonment and who is sentenced to death focused entirely on the application of the FDPA. For present purposes, it is more relevant than a broader examination of how the death penalty is applied by the states.

Since enactment of the FDPA in 1988 and current as of September 2015, the Attorney General has authorized the government to seek the death penalty in 503 cases. McNally, Ex. 1, 5. These cases were drawn from a larger group of 3,470 completed cases which the FDPRCP identified as potentially subject to the death penalty as of June 2016. McNally, Ex. 1, 4, Tr. 164. These cases have resulted in 154 life sentences and 81 death sentences. Other defendants avoided a capital trial by entering a plea or through withdrawal of the capital authorization, or a judicial dismissal decision barring the death penalty. Three defendants have been tried and sentenced to death twice. Since 1988, three have been executed, most recently in 2003. Excluding clemency, death while awaiting execution, retrials following appeals, or relief under §2255, fifty-nine defendants remained on federal death row in July 2016. McNally, Ex. 12, p. 340. Because the Government continues to authorize and seek the death penalty, the numbers change very slightly over time, but the extreme rarity of the imposition of the death penalty and actual executions has been present since enactment of the FDPA.

Although the Attorney General authorizes the death penalty on a national basis through a capital review committee, federal death penalty cases since 1988 have been concentrated in three states (Virginia, Texas, and Missouri) in a pattern consistent with the concentration of state death penalty cases. The most likely explanation is that although death penalty authorization occurs at the national level, the request for authorization originates with local U.S. Attorneys offices and

reflects the legal culture of the states in which they are located.[2]  A review of racial

characteristics of death penalty authorizations and death sentences shows that cases involving

white female victims are disproportionately represented in both groups.

The most striking evidence of arbitrary application of the death sentence provided by Mr.

McNally was his review of all cases like the present case in which there were multiple victims.

The death of multiple victims is a statutory aggravating factor for homicide, 18 U.S.C. §

3592(c)(16), and a frequent feature of cases authorized for the federal death penalty.  Mr.

McNally reviewed 3,554 federal cases which the FDPRCP had identified as potentially subject to

the FDPA.  Three hundred and forty-nine (349) cases involved multiple victims.  Twenty of

these cases resulted in federal death sentences.  Mr. McNally prepared a table which set out a

summary of the offense conduct and the statutory and non-statutory aggravating factors.

McNally, Ex 4.  His work was not statistical.  It is a narrative account of the actual application of

the FDPA in 349 cases which share the aggravating factor of multiple victims.  It owes more to

the study of history than to mathematics.

In reviewing Mr. McNally's table, it becomes obvious that there are no identifiable,

objective criteria which distinguish one multiple homicide which resulted in the death penalty

from the great majority which did not.  Defendants involved in drug and gang-related violence

were relatively more likely to receive life sentences than death, but there were instances of death

sentences for some gang leaders.  Two political terrorists responsible for multiple bombing

deaths (McVeigh and Tsarnaev) received the death penalty but the Unabomber (Kaczynski) did

not.  The more carefully one reviews the chart and the underlying case summaries, the more

---

[2] This case presents anecdotal support for this view since the Vermont U.S. Attorney's
Office has consistently sought permission from the Department of Justice to accept a guilty plea
with a life sentence.

arbitrary the distinctions between cases become.  In its cross-examination of Mr. McNally, the

Government developed its view that the decisions in individual cases are based on multiple

factors unique to each case:

> Q. . . . how could you possibly quantify strength of evidence in a given case?
> How do you mathematically assess the value of cooperator testimony by one
> cooperator versus cooperator testimony by two or three who corroborate each
> other?  How do you quantify corroborator testimony as compared to independent
> facts on the ground that can corroborate the color of the car or the type of gun that
> was used?  The point I am asking you to consider is there are enumerable myriad
> factors that go into the decision making process that are simply unquantifiable?

McNally Tr. 212-213 (7/15/16).

The defense could not have made the point more clearly:  the decision to impose death is

subjective, multi-factorial, unreproducible, and, for these reasons, irremediably arbitrary.  Mr.

McNally is not a statistician and his work was criticized by other witnesses, including witnesses

called by the defense, as statistically unsophisticated.  His work has an historical reality which

overcomes methodological criticism.   It is undeniable that there is no principled way to

distinguish the few cases in which death is the result from the many equally abhorrent cases in

which it is not.   The prosecution is not wrong when it insists that every case is different and that

in comparing any two cases, one can find enumerable distinctions which may explain the

difference in outcome.  But Mr. McNally is absolutely correct when he surveys the entire field

of multiple victim cases and can find no objective basis to explain the different outcomes for

similar crimes.

### B.      Continuing Impact of Race, Gender, and Geography

The defense called Dr. Lauren Bell, a political scientist familiar with statistical methods,

to review one aspect of Mr. McNally's work.  Dr. Bell considered whether the gender and race of

the victim influenced whether a defendant received the death penalty.  She assessed whether

defendants who are convicted of killing white female victims are sentenced to death at a higher

rate than defendants whose victims are not white women.  She reviewed a spreadsheet containing a database showing the race and gender of victims in 489 federal death penalty cases.  She excluded a treason case with no identified victim and five bombings with mass numbers of victims.  Through the application of statistical procedures used in the social sciences, she determined that "defendants who kill white female victims receive the death penalty at a substantially higher rate than defendants whose victims are not white women and that this correlation between white female victims and death sentencing is not the result of chance."  Bell, Ex. 2, 19.  A defendant charged with killing a white female victim was 2.7 times more likely to be sentenced to death than a defendant charged with killing a victim of another race.  Bell Tr. 28.

The group of 483 authorized cases which Dr. Bell analyzed included cases which were resolved without trial.  She also considered the smaller set of cases which proceeded through capital sentencing.  Again, defendants in cases involving white female victims were over twice as likely to receive the death penalty as those in cases without such victims.  She concluded that defendants who killed white female victims are "overrepresented among federal death sentenced defendants."  Bell Ex. 2, 22.  Her findings were highly unlikely to be explained by other variables or conditions.  Dr. Bell performed a similar analysis for victims in multiple homicides and determined that the presence of a white victim increased the odds of a death penalty outcome by a factor of 2.89.  Bell Ex. 7.

The Government called Dr. Matthias Schonlau to testify concerning the issue of race effect in the decision of the prosecution to seek the death penalty under the FDPA.  Dr. Schonlau is a very capable statistician currently employed on the faculty at the University of Waterloo in Ontario, Canada.

Dr. Schonlau led one of three teams of researchers who conducted a study by the Rand Corporation entitled "Race and the Decision to Seek the Death Penalty in Federal Cases." Gov't Ex. 2c (the "Rand Report"). The Rand Report issued in 2006. The three teams employed different statistical measures to consider the race of the defendant and the victim in FDPA cases authorized between 1995 and 2000. The teams reviewed 312 cases involving 652 individual defendants in which data was available for the race of defendant and victim.

The Rand Report determined that "[m]ost homicides were within racial groups (e.g. white defendants were usually charged with killing white victims and nonwhite defendants were usually charged with killing nonwhite victims." *Id*. p. xvi. In raw numbers, white defendants were over-represented in the group authorized for capital prosecution. *Id*. p. xvi. "Regardless of their race, defendants who murdered whites were more likely to have a seek [the death penalty] decision than were defendants who murdered nonwhites." Ex. 2c, p. xvi. The work of the teams focused on whether this disparity could be explained by differences in the heinousness of the crimes.

Two of the three teams (including Dr. Schonlau's group) found no race effect after correcting for the relative severity of the offenses. A third team found " statistically significant effect of white victim on the [Attorney General's] decision to seek the death penalty in …cases where the seek [the death penalty] decision was most probable." Gov't Ex., 2(b), p. 2. In their conclusion, the Rand researchers dismissed this finding as based on "snooping," which is the selective consideration of particular findings after completion of a study. *Id*. p. 2.

On the separate issue of capriciousness, the Rand Report found that the prosecution's decision to seek the death penalty in any particular case was predictable when the researchers considered the presence of aggravating and mitigating factors. Schonlau Tr. 169 (7/18/2016).

Cases with more serious aggravating factors were statistically more likely to be chosen for capital prosecution.

The Rand Report was guarded in its findings. It concluded that "large race effects in the raw data" were eliminated when case characteristics were considered. This finding was tempered by a candid appreciation of the limits of the study. Some aggravating factors are quite rare and statistically difficult to measure. Other subjective factors such as witness credibility are not present in the case files. The charging decision is complex and depends on many factors. The Rand Report found little evidence of racial bias in the cases they examined but urged that their results "need to be interpreted cautiously." Gov't Ex. 2(c), p. xx.

Both sides as defined by the testimony of Dr. Bell and Dr. Schonlau contribute to the court's understanding of the problems of race and capricious selection. Dr. Bell's determination that cases with white victims are significantly more likely to be authorized for the death penalty remains correct. This finding is essentially what the Rand Report terms the "raw data." The strength of the Rand researchers' application of aggravating factors to this raw data is undeniable. Obviously race of the victim is not the only or even the primary factor in the decision to seek the death penalty. Severity of the offense is a highly predictive factor. As the conclusions of the Rand Report concede, however, social science cannot answer the question of race effect with finality or great accuracy. One of three teams found some evidence of evidence of a victim effect. Since Dr. Bell and Dr. Schonlau agree that cases involving white victims are more likely to result in the death penalty, the area of disagreement between them relates to causation. As the Rand Report admits, statistical analysis "can seldom prove or disprove causation." Gov't Ex. 2(c), p. xx. The court concludes that victim race remains a factor in the series of decisions from authorization to verdict which result in federal death sentences.

The evidence that the charging decision is not capricious was persuasive. Statistical evidence often is, especially to the non-statistician. But it is inconsistent with a first-hand, subjective examination of the multiple victim cases offered by Mr. McNally. Obviously Dr. Schonlau is telling the truth when he testifies that his methods (and those of the other two teams) could identify with considerable accuracy which cases would be authorized and which declined based on offense conduct. These distinctions are not apparent, however, when cases are compared one to the next in the subjective, narrative manner in which the legal system operates. That the outcomes can be predicted on the basis of measures of offense severity is a favorable finding for the FDPA. It demonstrates that the decisions which lead to a death sentence are not random or fully considered. What it does not answer is the claim that only a few defendants are selected from a group of defendants with equal apparent culpability.

### C.      Underfunding of Capital Defense

Although Harvard Law School Professor Carol Steiker's testimony related primarily to the withdrawal of Model Penal Code §210.6 by the American Law Institute, she also testified concerning shortcomings in the federal system of capital defense. The federal system is superior to many state systems in providing "better funding for defense counsel in capital cases in the federal system." Steiker Tr. 62. In her view, other more specifically federal concerns limit the effectiveness of federal defense counsel. These include limited discovery under the federal rules and very limited experience in defending cases because so few are ever filed in the federal system. Steiker Tr. 63-64. The consequence is a high level of reversals of federal death penalty cases and a relatively high incidence of *Brady* violations. Steiker Tr. 65. Finally, the sheer rarity of federal death penalty charges and their dependence upon interstate elements of the offenses lead to overcharging decisions in those few cases which meet federal jurisdictional

criteria. Steiker Tr. 66. Professor Steiker was credible in her determination to give no "free pass" to the federal public defense system based on the availability of a large budget for defense costs.

Professor Sundby also expressed criticism of the role of defense counsel in capital cases. His research led him to conclude that many defense attorneys in capital cases "do just enough to get their client executed." Sundby Tr. 178. They meet minimum standards under *Strickland v. Washington*, 466 U.S. 668 (1984), without doing enough to present a persuasive case for a life sentence. Alternatively, more skilled lawyers may do the necessary research without having the skill to engage in the "art form of understanding … how to communicate and put [the] case for life together." Sundby Tr. 178. The "wild card" of quality of legal representation contributed to his perception that the death penalty decision was highly arbitrary.

Lisa Greenman provided detailed testimony concerning the effect of defense costs on federal death penalty sentences. Ms. Greenman is one of the authors of the 2010 Report to the Committee on Defender Services Judicial Conference of the United States. Greenman Ex. 5. This report updated the findings of the 1998 Spencer report entitled "Federal Death Penalty Cases: Recommendations Concerning the Cost and Quality of Defense Representation." Both reports were prepared by staff at the Administrative Office of the U.S. Courts. Ms. Greenman was employed at the A.O. from 1995 – 1998 and by the FDPRC from 2003-2013. In these positions she worked on both the original Spencer Report and its update.

The findings of the Spencer update (Greenman Ex. 5) which are most relevant to the constitutional issue concerning the geographic disparity of the federal death penalty and the correlation between higher levels of death sentences and lower levels of defense expenditure. In the same way that state death sentences are concentrated in a handful of southern and

30

southwestern states, federal death penalty sentences are primarily imposed in seven states.  Out of a total of 81 federal death sentences (including sentences later overturned) imposed between 1989 and 2016, three states (Texas with 14; Missouri with 10; and Virginia with 8) account for 32 and in company with four more (N. Carolina with 4; Louisiana with 5; and Oklahoma and Georgia with 3 each) account for 47 or more than half.  Twenty states had none.  The rest had one or two.  Greenman Ex. 6, p.1.  The imposition of the death penalty depends greatly upon geography.

In analyzing the relationship between capital defense budgets and the rate of death sentences, Ms. Greenman found that lower expenditure was correlated with higher rates of death sentence.  The low-cost states (Georgia, Texas, North Carolina and Florida) correlated generally with the states with high rates of federal death sentences.  Florida was an exception with only two federal death sentences between 1989 and 2016, despite low average cost of defense.  Ms. Greenman testified credibly that when she looked closely at case files, she found lower rates of time spent in case preparation in the low-cost states.  She attributed the differences not to unavailable funds (federal death penalty defense attorneys are paid at the same rate in different districts), but to the involvement of less experienced attorneys and less time spent in preparing the cases for trial.  Greenman Tr. 247 (7/14/16), 18 (7/15/16).

In summary, the court finds that the death penalty continues to be imposed in an arbitrary manner.  The state in which a crime occurs is the strongest predictor of whether a death sentence will result.  Whether the murder victim is white is also a significant predictor.  These findings are as true of cases brought under the FDPA as they are for state death sentences.  When large groups of cases which qualified for the FDPA but did not result in death sentences are compared with the much smaller groups which did, it is not possible to identify principled distinctions

31

between the groups. The imposition of the death penalty through the FDPA remains arbitrary despite the efforts of the prosecution and the courts to impose legal standards to guide the decisions leading to a death sentence.

## III.  Excessive Delay

### A.  18 – 25 Year Delays Between Conviction and Execution

One of the unsettling observations about the FDPA is the extreme rarity of executions. Only three people have been executed since 1988. Instead, defendants who receive the death penalty wait on death row for decades. There are reasons in each case for the delay. These individual reasons are beyond the scope of this decision. It is fair to say that the delay is generally the result of searching examination of the cases on appeal and, especially, on collateral review. Second trials, as in this case, are relatively frequent. No judge at any level in the process would wish to overlook a potential legal error which led to an execution. This case – now in its 16th year – is an example of this painstaking process at work. The court ascribes no fault to either side for the delay in this case or more generally in the remaining FDPA cases which have led to death sentences. But it is obviously true that the concern of critics and proponents alike that the process is choked with delay is substantiated by the record of delay in virtually all cases brought under the FDPA.

### B.  Harm Due to Solitary Confinement and Uncertainty of Outcome

The defense contends that the long-term solitary confinement of death row inmates violates the Eighth Amendment due to the psychological harm caused by years and decades of isolation. On this issue, the Government offered evidence of its own from David Berkebile and John Oliver, two former Bureau of Prisons wardens familiar with solitary confinement as it is imposed within the federal system.

Before discussing the evidence, there is one preliminary issue which must be considered. Defendants on federal death row have been convicted of horrific crimes involving great cruelty and suffering by their victims. The stories are hard to tell and hard to listen to. It is no more than human for judges and advocates to compare the victims' experience with the enforced isolation of death row and to reject the claims of cruel and unusual punishment on the ground that the victims suffered far worse.

A comparison of the suffering of the defendant and the victim has never established the legal standard for cruel and unusual punishment. If it did, then there would be few limits to the pain and indignity employed by the state at execution since there are no limits to the measures employed by people who murder. The Constitution holds the nation to a different standard of conduct. In addressing the psychological damage caused by solitary confinement, the court in no way overlooks or purposefully blinds itself to the immense suffering of the victims and their families in these cases.

Dr. Haney testified at length about his work in studying the effects of long-term isolation on death row. He described the unusual measures taken to achieve isolation through the use of slots for food trays, separation of cells, and strict limits on recreational time spent out of the cell. It is undisputed that by design the Bureau of Prisons restricts to an extreme any opportunity for contact among death row prisoners and between prisoners and the corrections officers who supervise them.

Dr. Haney described the conditions of confinement in use at the United States Penitentiary at Terre Haute, Indiana where all male federal death row inmates are held in a "Special Confinement Unit" or SCU. (There is one woman on federal death row. She is held in a different prison. Her conditions of confinement were not addressed by the witnesses.)

Pursuant to written policies governing the SCU, inmates are confined to their cells for 23 out of every 24 hours. Haney Tr. 23, 79 (7/11/16). They have very limited contact with other people.

Dr. Haney reviewed the scholarly literature describing the psychological harm caused by solitary confinement. With remarkable uniformity, researchers have identified the harm caused by social isolation in settings in and out of prison. Haney Tr. 25-30 (7/11/16). The vast majority of people suffer trauma and distress. In time people who are isolated experience psychological change in reaction to their abnormal circumstances. They become averse to human company. Haney Tr. 33 (7/11/16). In two studies performed by Dr. Haney 20 years apart, prisoners held in isolation experienced high rates of depression and social withdrawal. Haney Tr. 35 (7/11/16). Like so many psychological findings, these results are not surprising. They are intuitively obvious. See A. Dumas, *The Count of Monte Cristo* (1844). What is important about these observations is that they are demonstrably true and have broad support from other researchers.

The most troubling result which appears in Dr. Haney's research is the effect of long-term isolation of the type imposed upon death row prisoners. They frequently suffer from what he described as "melancholia, a deep joylessness, a kind of a grief that's deeper than depression, where people just feel like they've lost who they are, who they were. And they've lost the capacity to regain." Haney Tr. 42 (7/11/16). Dr. Haney described this condition as "a deep and widespread phenomenon" on death rows. Haney Tr. 43 (7/11/16).

Dr. Haney described the physical arrangement of the Terre Haute death row. It is set up to minimize contact by prisoners with others. The cell windows are narrow and do not permit prisoners to see one another. Some cells have a sally area or vestibule which serves their cell only and further isolates the prisoner. The conditions are particularly strict during the first year

34

(Phase I) and after a date for execution has been set (Phase III).  The isolation is heightened by the manner in which prisoners are housed in units which have only a few occupied cells and many which are empty.  Haney Tr. 82 (7/11/16).   The cells have no view to the outside, and even the exercise hour permits only a view of the sky.  Haney Tr. 83 (7/11/16).   Prisoners have few visitors and no physical contact with those who do come.  Haney Tr. 83 (7/11/16).  Their psychological distress is heightened by the passage of years of uncertainty about their fate. Haney Tr. 87 (7/11/16).

Federal defendants who have been sentenced to death spend many years on death row awaiting execution.  In 2015, there were a total of 62 death-sentenced prisoners.[3]  More than one-half had been housed at the Terre Haute facility for more than 10 years.  Ten had been there 18 years or longer.  Haney Tr. 85 (7/11/16).

The testimony from two federal prison wardens did little to contradict Dr. Haney's testimony.

David Berkebile, a retired warden, testified that at the Florence super-max prison where he worked (not itself a death row facility but in many respects operated under similar principles of isolation), he and other corrections officers took advantage of moments during the daily routine to have some human exchange with the inmates.  This took the form of short conversations about the inmate's behavior and plans as well as the physical contact of guiding an inmate through the hallways on the way to the recreation cell or some other activity.  In addition, inmates had limited contact with one another at group therapy sessions.

John Oliver, also a retired warden, testified that prison remains a dangerous place, especially at the high security facilities such as the federal penitentiaries.  Weapons can be

---

[3] Different witnesses counted the total number of federal death row prisoners slightly differently.

constructed out of innocuous materials such as cellophane. These risks justify a high level of isolation and control. Mr. Oliver served as associate warden at the federal death row at Terre Haute, Indiana. He described the opportunities prisoners on death row have to speak with corrections officers on rounds, with executive staff, and with professional staff such as psychologists. He described interaction with staff while a prisoner was walked to daily recreation, medical appointments, and similar events. He also described interaction among prisoners through plumbing, air vents, and calling out into the corridor. Death row inmates receive newspapers, mails, and receive "no-contact" visits from clergy, family members, and attorneys. In short, the isolation, while relatively severe, is far from complete, and there are opportunities for interaction with other people.

It is clear to the court that the process of holding prisoners for indefinite terms extending into decades in solitary confinement is highly damaging. No persuasive evidence was offered that such severe isolation was necessary for reasons of security or prison safety. It appears instead that it is a long-standing practice – centuries old – to isolate condemned individuals. In an earlier era in which the time between trial and execution might be measured in days or weeks, that practice may have been less damaging to prisoners who were executed or received commutation to prison sentences. In the modern era, the practice of holding people in solitary confinement under conditions of extreme isolation has little apparent justification or, at least, little was offered in the course of this hearing.

### C.     Volunteering for Death and Rates of Suicide on Death Row

There was no evidence offered on this issue.

36

### D.    Excessive Delay Undermines Penological Purposes Including Deterrence

Whether the death penalty, particularly its imposition through execution of convicted defendants, affects the homicide rate was one of the few hotly contested issues in this case. Both the defense and the Government called witnesses on this issue. Michael Radelet testified for the defense. The Government called H. Naci Mocan, Matthias Schonlau, and Paul Zimmerman.

Social scientific research on this issue involves the statistical comparison of the homicide rates in states with and without the death penalty (panel data studies) and studies directed at a single state or jurisdiction over time. The abolition of the death penalty by *Furman* and its return after *Gregg* provided a natural laboratory for time studies. The independent legal systems of 50 states, some with and some without the death penalty, provided the basis for panel data studies. All studies followed the same principle: homicide rates from different times or different areas were compared after adjustments were made to remove variables other than deterrence which could explain the difference in crime rates.

A court seeking to make use of this information is challenged by the high level of mathematical and statistical skill required to understand the studies. Comprehension and meaningful judgment about the truth of any single econometric study lies beyond the skill and education level of most judges. And testimony from the authors – while helpful – is not sufficient either. Fortunately, for purposes of this decision, two factors make the court's task easier. The first is that whether deterrence works is an important policy issue, but it is not a constitutional requirement for upholding the death penalty. Second, the field of deterrent effect of the death penalty has been considered twice in 30 years by the National Research Council ("NRC"). The NRC is an independent non-profit research body which forms part of the National Academies of Sciences, Engineering and Medicine. It is highly regarded as a source of non-

partisan policy research. Both times the NRC took up the issue of deterrence, it concluded that the evidence is insufficient for decision-makers to rely upon deterrent effect in making policy decisions about the death penalty. In the most recent report which issued in 2012, the NRC panel of experts concluded:

> [R]esearch to date on the effect of capital punishment on homicide is not informative about whether capital punishment decreases, increases, or has no effect on homicide rates. Therefore, the committee recommends that these studies not be used to inform deliberations requiring judgments about the effect of the death penalty on homicide. Consequently, claims that research demonstrates that capital punishment decreases or increases the homicide rate by a specified amount or has no effect on the homicide rate should not influence policy judgments about capital punishment.

National Research Council, "*Deterrence and the Death Penalty*," p. 2, The National Academies Press, Washington D.C. 2012, Radelet, Ex. 32. The court accepts this conclusion as both credible and published by a highly qualified, neutral body.

The conclusion of the NRC is also consistent with the court's own experience of listening to the testimony of witnesses on both sides of the question. The econometric evidence in support of a deterrent effect is statistically fragile because it depends upon the elimination of other powerful variables and because it produces results which demonstrate relatively small differences in homicide rates between states with and without the death penalty. On the other hand, it is difficult to deny the intuitive inference that some people must be discouraged from homicide by the risk of capital punishment. Since people who consider but do *not* commit capital crimes are notoriously difficult to identify or count, this intuition is likely to remain unprovable.

The court will follow the NRC in finding the evidence insufficient either to identify a deterrent effect or to rule it out as a possibility.

In summary, delay continues to be a primary feature of the FDPA as well as state death penalty cases. The decades condemned men and women spend on death row under conditions of severe isolation cause harm. Although deterrence of future murders is identified as a basis for the death penalty, the statistical evidence that executions, many years after the offense conduct, affect the murder rate has not been accepted by the National Resource Council and continues to be unprovable.

## IV.   Unusual – Decline in Use of the Death Penalty

### A.   Reduction in Annual Death Sentences and Executions

Richard Dieter, Executive Director of the Death Penalty Information Center between 1992 and 2015, provided statistical information concerning the rate of death sentences. In the years immediately after the *Furman* ruling, the national rate of execution was, of course, zero. It rose gradually during the 1980's to a high of 25 in 1987. It then increased sharply during the 1990's to 98 executions conducted in 1999. Since 2000 it has dropped to 28 in 2015 which is the last complete calendar year available. Dieter Ex. 10. Thirty-one jurisdictions in the United States, including 28 states, the federal government, the military, and the District of Columbia, have not conducted an execution in ten years. Only six states conducted executions in 2015. Dieter, Ex. 2, 12-13.

These are national figures drawn almost entirely from executions by states. Executions almost never occur under the FDPA. There have only been three in total since its enactment in 1988. The most recent was in 2003. The federal experience is not so much a decline in executions as it is a decision on the part of many decision-makers within the federal legal system never to begin.

The imposition of death sentences has followed a similar pattern. Following *Furman*, states continued to impose death sentences during the 1970's and 1980's. The number of sentences peaked in 1996 at 315. It dropped precipitously during the intervening two decades and as of 2015 was in the range of 50 sentences across the United States annually. Dieter, Ex. 10.

**B.      State-Wide Abolishment Through Legislative Change**

The availability of the death penalty under state law is an important indicator of public support. The Supreme Court in *Atkins* stated that "[w]e have recognized that the clearest and most reliable objective evidence of contemporary values is the legislation enacted by the country's legislatures." 536 U.S. at 312 (internal quotations omitted).

There are three principal positions held among the states. Nineteen states and the District of Columbia have formally abolished the death penalty – nineteen by legislative action and one (Connecticut) through a decision by the state supreme court. One state which had repealed the death penalty by legislation (Nebraska) recently voted by referendum to restore it. Dieter Ex. 11. Governors in four more states with death penalty statutes on the books have imposed moratoria on capital punishment. Dieter Ex. 10.

Of the 31 death penalty states, only about half continue to impose the penalty on a regular basis and in these states, the number of death sentences has dropped greatly over the last decade. In 2015, there were 49 death sentences nationally. This number is down from a peak of 315 in 1996. California (14), Florida (9) and Alabama (6) accounted for more than half. These states were followed by Arizona (3), Oklahoma (3), and Texas (2). Dieter Ex. 10.

Eighteen death penalty states imposed no death sentences in 2015. Dieter Ex. 10. These states included Georgia, Missouri and Virginia which continue to carry out executions.

From this brief survey, the court finds that there is no consensus among state legislatures either that the death penalty is appropriate or that it should be abolished. Imposition of death sentences occurs in a minority of states, but it is a minority constituting approximately one-third of the states, including the very populous states of California, Texas, and Florida. In the other two-thirds of the country, the death penalty has been abolished or remains in effect and is imposed infrequently or not at all.

In addition to legislative activity, the death penalty appeared on the November 2016 election ballot as a referendum question in three states. In Nebraska voters approved Referendum No. 426 which seeks the restoration of the death penalty after the passage of legislation abolishing it. Sixty percent of the electorate voted in favor of restoration. The ballot in California contained two measures. Proposition 62 seeking repeal of the death penalty was rejected by 53.9% of the electorate. Proposition 66 seeking a reduction in delay in executions passed by a margin of 50.9%. In Oklahoma voters approved State Question No. 776 by a two-thirds measure. Question No. 776 proposes amendments to the state constitution permitting the legislature to designate any method of execution which does not violate the U.S. Constitution and preserving death sentences in the face of challenges to the method of execution. (Doc. 954). The result in the three states is consistent with the Gallup poll results which show public opinion to be close to evenly divided with a small majority in favor of the death penalty.

The direction of change since 1996 in all states, including those still actively employing capital punishment, has been towards a decrease in death sentences and executions over the course of the last two decades. But it would be premature to state that the practice has dwindled to nothing. The death penalty remains a feature of criminal prosecution in a substantial number of states, especially in the south and southwest.

41

C.      **State-Wide Lack of Use**

See Part IV (A) above.

D.      **Concentration of Death Sentences in a Few States and Counties**

The great majority of sentences and executions occur in a handful of southern states. As of 2013, Texas led with 38 % of the nation's executions. *Id.* Florida has produced the greatest number of death sentences in recent years. *Id.* Within these states, a handful of counties produce the majority of sentences and executions. *Id.* Since the restoration of the death penalty in 1976, the southern states have carried out 82 % of all executions. The states of the northeast have carried out less than 1 %. *Id.*

E.      **Direction of Change at the Level of the States**

The principal change over the course of the last 20 years has been a marked decrease in death sentences and executions.

F.      **Declining Public Support**

Both sides introduced evidence concerning public support for the death penalty as measured through opinion polling. Both sides showed declining support in recent years. Both sides recognized that support for the death penalty has varied widely over the course of the last 50 years. Although they differed about the direction and speed of current change, they agreed that public support for the death penalty has dropped from 80 % in 1985 to 61 % in 2016.

Frank Newport, Editor-in-chief of the Gallup Poll, testified about the course of public opinion regarding the death penalty. Gallup has been asking the same question of Americans since 1936: "Are you in favor of the death penalty for a person convicted of murder?" In 1936, 59 % of subjects polled were in favor and 38 % opposed. The percentage in favor increased gradually until it reached 68 % in 1954. It then dropped steadily over the next 12 years until in

42

1966 the percentage opposed (47 %) exceeded those in favor (42 %).  From 1966 until 1995, the percentage in favor increased to 80 % while those opposed dropped to 16.  Since 1995, support has declined steadily to 61% in favor and 37% opposed in October 2015.  Gov't Ex. K20 (Newport).

Michael Radelet testified concerning other measures of public support and opposition. When the polling question is altered to whether a subject favors the death penalty or life without parole, a majority now favors life imprisonment (52 %) over the death penalty (42 %).  Radelet Tr. 137.  He also identified more subjective measures such as legislative abolition by states, an increase in jury verdicts in favor of life imprisonment, and the refusal of pharmaceutical companies to permit their products to be used in executions.  Radelet Tr. 138-43.  These confirm the reduction in public support.

The court finds, on the undisputed evidence of the Gallup polling, that support for the death penalty still exceeds opposition but that support has been declining and opposition growing over the course of the last two decades.  The two sides are now approaching an equal balance.

Additional evidence of declining support for the death penalty came from Harvard Law School professor Carol Steiker who was one of two authors of a report to the Council of the American Law Institute (ALI) concerning the ALI's position concerning Model Penal Code § 210.6.  Steiker Ex. 5.  The ALI adopted section 210.6 in 1962 at a time when death penalty decisions were made by judges or juries in the absence of legal standards intended to guide decision making.  The ALI proposed the now-familiar bifurcated process with a separate penalty phase permitting the proof of mitigating and aggravating factors.  Section 210.6 was largely ignored by state legislatures until the *Furman* decision ruled that unguided jury discretion violated the Eighth Amendment.  Four years later the *Gregg* decision approved the enactment of

new death penalty statutes which generally followed Model Penal Code section 210.6. The FDPA also follows section 210.6 in most respects.

In 2007, the ALI requested Carol and Jordan Steiker "to review the literature, the case law, and reliable data concerning the most important contemporary issues posed by the ultimate question of retention or abolition of the death penalty and, if retained, what limitations should be placed on its use and what procedures should be required before that sentence is imposed. Another way of asking the question is this: 'Is fair administration of a system of capital punishment possible?'" Steiker Ex. 5, Annex B.

The Steikers produced a detailed report which was accepted by the ALI and led to the withdrawal of section 210.6 from the Model Penal Code. The report addresses the shortcomings of the death penalty statutes in force in many states as well as in the federal criminal code. Since it was the ALI which first proposed the bifurcated jury trial as a reform of existing practices, criticism of the ALI's own work is a strong indication of the state of support and opposition for the death penalty within the legal profession. Because the ALI seeks to be non-partisan and includes both lawyers and judges who are selected on the basis of experience, the views of the organization on any legal issue carry great weight.

The principal points addressed by the ALI report are:

a. The constitutional requirements that a jury engaged in the penalty phase of the case be guided by standards limiting the death penalty to the most serious cases and at the same time directed to make an individualized decision with wide latitude in considering mitigating circumstances has been a failure. Death penalty statutes have become over-inclusive in permitting most first degree murders to meet the first test. The second stage in the test – unlimited consideration of mitigating and aggravating circumstances – has come to dominate the

sentencing phase. The result is little different from the pre-*Furman* structure in which judges or juries determined most murders to be eligible for the death penalty and then addressed issues of punishment and mitigation in a setting devoid of guidance or legal rules.

b. Racial bias and racially disparate outcomes continue to undermine the fairness of death penalty trials. Bias affects the composition of jury panels from which members of a minority groups are disproportionately removed as well as the sentencing decisions themselves. In particular, the race of the victim plays an improper role in jury decision-making. The decision of the U.S. Supreme Court in *McCleskey* seeks to exclude issues of racial disparity in death sentences from consideration by the courts. The limited protection against biased jury selection afforded by *Batson v. Kentucky*, 476 U.S. 79 (1986), has failed to provide a sufficient remedy for this systemic inequity.

c. Claims of constitutional and other error in state court cases are too frequently shielded from federal habeas review by Supreme Court doctrine and provisions of the Antiterrorism and Effective Death Penalty Act of 1996, 28 U.S.C. §§ 2254(d), 2261-2266.

d. Sixth Amendment guarantees of effective counsel are often effectively blocked from consideration by the governing standard in *Strickland* and by procedural requirements. As a consequence, capital defense remains chronically underfunded and frequently inadequate in many states.

e. A significant number of active and retired Supreme Court justices have publicly repudiated their past support for the death penalty. Among those who continue to express support are several who have publicly criticized the current standards as contradictory and unable to promote guided discretion by juries. Five of the sitting justices at the time of the report had expressed serious doubts about the fairness and constitutionality of the death penalty.

f.  The administration of the death penalty in the states is weakened by the intense politicization of the process of charging, conducting trials, and considering clemency by elected office holders such as prosecutors, judges, and governors.  The politicization of the debate extends to legislators as well.

g.  Social science research has demonstrated that capital jurors frequently fail to understand the multiple and complex questions they are required to answer.

h.  With the advent of DNA testing, the suspicion that significant numbers of capital defendants were convicted in error has hardened into certainty.  Reasonable estimates range between 2.3 and 5 % of capital convictions.

i.  The death penalty – while infrequently charged and more rarely carried out – exerts a strong lunar pull on the national debate over appropriate sentences for non-capital crimes.  Death penalty litigation also imposes enormous costs on all constituent members of the criminal justice system.

The report concluded with the recommendation that the ALI no longer take part in efforts to ameliorate particular problems with the death penalty.

The ALI Council (a governing body drawn from ALI membership) was in general agreement with the critique of the death penalty laid out in the Steiker report.  The Council was more cautious (and divided among its members) about advocating for the abolition of the death penalty.  In the Council's view, section 210.6 of the Model Penal Code "has not withstood the test of time and experience."  Steiker Ex. 5, p. 4.  The Council noted that "[m]any on the Council have concerns, convincingly described in the Steikers' paper and other sources, about the administration of the law of capital punishment in the United States, including the administration of death-penalty laws derived from sec. 210.6."  Steiker Ex. 5, p. 4.  It noted that in the absence

46

of confidence that reforms could remove these concerns, the ALI "should not play a further role in legitimating capital punishment, no matter how unintentionally, by retaining the section in the Model Penal Code." Steiker Ex. 5, p. 4. The Council recognized the political nature of the death penalty debate and believed that consensus among its members on "profound moral, political, and social issues, with the views of individuals often being based on deep personal convictions" made consensus unlikely. Steiker Ex. 5, p. 4.

At the annual meeting in May 2009, the ALI passed an amended version of the recommendation. It took no position on whether capital punishment is an appropriate punishment or should be repealed through legislation. Instead, it adopted the first part of the recommendation in the following language:

> That, for reasons stated in Part V of the Council's report to the membership, the Institute withdraws Section 210.6 of the Model Penal Code in light of the current intractable institutional and structural obstacles to ensuring a minimally adequate system for administering capital punishment.

Steiker Ex. 6, p. 311-12.

The ALI report and subsequent vote is persuasive evidence that the nation's leading non-partisan body of lawyers, judges, and law professors agree that the present death penalty procedures as developed and required by the Supreme Court fail to meet minimal constitutional requirements.

In summary, the evidence does not support the claim by the defense that there is a consensus of public opinion opposed to the death penalty. State legislatures are divided on the issue. Approximately one-third have abolished the practice. Another third retain the death penalty on the books but do not make use of it. One-third of the states impose death sentences with some degree of regularity. A few of these states use it frequently. The rates of death sentences and of executions have dropped sharply over the last two decades. Public support is

divided with a slight majority in favor of the death penalty. Recent referenda in three states (Oklahoma, Nebraska and California) revealed continuing public support for the death penalty by varying margins of 5% to 10%.

### G. Practice by Other Nations

Evidence on this issue was not offered by either side.

## ANALYSIS

Constitutional challenges to the death penalty take three primary forms. All depend upon the Eighth Amendment prohibition against the infliction of cruel and unusual punishments.

There are challenges to the method of execution. See *Wilkerson v. Utah*, 99 U.S. 130 (1878) (permitting execution by firing squad); *In re Kemmler*, 136 U.S. 436 (1890) (permitting execution by electrocution). These cases rest on an understanding that the inhuman and barbarous punishments of the colonial era which included public hanging, burning, nose slitting, branding, whipping and other forms of corporal punishment, conducted before large crowds, no longer meet constitutional standards. Social norms change over time, and ours have changed to require methods of execution which minimize pain and disfigurement. This is not an argument made by the defendant in the motions now before the court.

There are challenges to the proportionality of the punishment to the offense. The body of case law developing this line of analysis starts with non-capital cases. In *Weems v. United States*, 217 U.S. 349 (1910), a civil service employee in the Philippines, then a colony of the United States, received a 15-year sentence of hard labor for relatively minor misconduct. The Supreme Court held that a sentence which was disproportionate to the seriousness of the crime violated the Eighth Amendment.

In *Trop v. Dulles*, 356 U.S. 86 (1958), the offense of desertion had been punished with loss of citizenship. Such a drastic penalty was held to violate "evolving standards of decency

48

that mark the progress of a maturing society." *Id.* at 100. The Court acknowledged the gravity

of declaring a punishment enacted by a popularly elected legislature to be unconstitutional but

recognized its own obligation to enforce constitutional requirements.

Commencing with *Coker v. Georgia*, 433 U.S. 584 (1977), the Supreme Court has

declared certain offenses to be insufficiently severe to warrant death. In *Coker*, the Court

proscribed the death penalty for the rape of an adult woman. In *Enmund v. Florida*, 458 U.S.

782 (1982), the Court held that defendants convicted of felony murder who did not take part

directly in the homicide were not subject to execution. See also *Tison v. Arizona,* 481 U.S. 137

(1987) Today the death penalty is reserved for homicide in the state courts. The FDPA includes

crimes such as treason but for most practical purposes, the federal death penalty is similarly

reserved for murder cases.

In *Atkins v. Virginia*, 536 U.S. 304 (2002), the Supreme Court extended

disproportionality analysis to intellectually disabled offenders charged with murder. Such

defendants are no longer subject to the death penalty. For similar reasons, youths whose offense

conduct occurred while they were under 18 are not subject to the death penalty, *Roper v.*

*Simmons*, 543 U.S. (2005), or to a sentence of life without parole, *Miller v. Jackson*, 132 S. Ct.

2455 (2012). In all these cases, the Court ruled that either the crime or the offender did not

measure up to the gravity of the penalty. The defendant in this case has raised a

disproportionality argument.

Finally, there are challenges to the punishment as arbitrary because it fails to meet the

requirements of *Furman* and *Gregg* that death penalty statutes clearly separate the minority of

the worst murderers who are subject to the death penalty from other offenders charged with

homicide.  The defendant contends that the FDPA is unconstitutionally arbitrary because it fails to provide a reliable means of identifying the very worst offenders.

## DISPROPORTIONALITY

The claim that the FDPA is disproportionate to the offense of murder is a normative, moral claim.  The claim of disproportionality has these qualities when the Supreme Court applies it to offenses less serious than murder or to defendants who are less culpable as a result of youth or intellectual disability.  In *Atkins*, the Court laid down the requirements it would impose upon itself in declaring the death penalty too severe for a particular category of cases or defendants. The requirements are two.  First, the Court required a showing that the particular practice of executing people with intellectual disabilities lacked public support.  It found evidence for this in the widespread actions of state legislatures in abolishing the death penalty for such offenders. Second, the Court looked to its own judgment in considering whether a particular category of cases should be exempted from state death penalty laws.

The disproportionality argument in this case is far broader than the claim in *Atkins* and subsequent cases.  It is not just a sub-set of death penalty cases or defendants which are said to be treated in a manner disproportional to the degree of culpability.  The defense argues that the death penalty is a disproportionate penalty in *all* homicide cases.  The argument is categorical and reaches all possible applications of the death penalty.  But the analytical process is the same as the analysis in any other disproportionality case.  Is there strong evidence of a lack of support in public opinion as well as a basis for an independent judicial judgment that the FDPA violates current standards of decency?  These are legal standards, not invitations to act upon personal convictions and beliefs.  As legal standards, they require the trial court to review the evidence and apply it to the standards.

A.    **Public Opinion**

The evidence concerning public opinion is mixed and depends upon whether one searches for a fixed snapshot of the ratio of support and opposition or a trend or direction. The difference is like the difference between arithmetic and calculus. The Government offers evidence of public opinion at the present moment which is an arithmetic percentage. A majority of states and the federal government have death penalty legislation on the books. About half make use of this authority although use continues to decrease. Eighteen states have abolished the death penalty through legislation and another through judicial decision. Only a few states now conduct executions with frequency. The defense directs the court to the speed and direction of the change in public opinion. The defense relies upon what one might call the derivative function and argues that the steep decline in public support and accelerating abolition of the death penalty by state legislatures is sufficient evidence of a lack of public support to satisfy the *Atkins* requirement.

Both sides are right. There is no doubt that the country is divided over the death penalty. The division is roughly 50/50 in public opinion and two-thirds in favor of outright abolition or at least non-use and one-third against when state legislatures are counted. The trend among the states is toward abolition although the recent referendum in Nebraska, reinstating the death penalty after legislative abolition over the governor's veto, as well as the votes in Oklahoma and California are evidence that the trend is not universal.

The requirement in *Atkins* and related cases for public support for abolition of the death penalty reflects the Court's concern about striking down legislation in violation of the will of the electorate. It also reflects a concern that the Court measure evolving standards of decency on the basis of broad popular support or rejection. If the death penalty is to be held unconstitutional

51

because it violates these standards, then those standards must be seen to be widely shared by the nation as a whole.

The record in this case does not support a view that the country has achieved consensus on the desirability of abolishing the death penalty. Public opinion is turning against the death penalty and state legislatures have done so as well, but the change is insufficiently broad to meet the *Atkins* requirement of consensus at this time.

**B.      "In our judgment"**

There is no need for this court to express personal views on the disproportionality of the death penalty since the requirement of public consensus for abolition has not been met. First, it is unlikely that the Supreme Court intends to extend authority to make such a judgment to the lower courts. To do so would invite a variety of strongly-held beliefs which would do little to assist the Court. Second, the court is aware that this case is scheduled for a second jury selection and that any views of the trial judge will receive publicity. There is little value and considerable mischief in expressing the court's personal views in a manner which could further complicate jury selection.

**ARBITRARY OR CAPRICIOUS**

The court turns now to the final argument made by the defense which is that the FDPA in common with state death penalty provisions contains systemic flaws which make it inherently arbitrary and incapable of a reliable determination of which offenders should die and which should not.

In *McGautha v. California,* 402 U.S. 183, 196 (1971), the Court considered whether "the absence of standards to guide the jury's discretion on the punishment issue is constitutionally intolerable." The Court considered whether the jury instructions met due process standards. The Court declined to require the bifurcated capital trial which it would require five years later in

*Gregg*.  But the relevance of *McGautha* is not that the Court can change its mind.  *McGautha* is most remembered for Justice Harlan's criticism of the bifurcated process.  In upholding a unitary trial in which the jury decided the penalty issue with little guidance from the court, Justice Harlan wrote:

> To identify before the fact those characteristics of criminal homicides and their perpetrators which call for the death penalty, and to express these characteristics in language which can be fairly understood and applied by the sentencing authority, appear to be tasks which are beyond present human ability.

*Id.*, 402 U.S. at 204.  A year later in *Furman* the Court found authority in the Eighth Amendment to hold the death penalty unconstitutional.  Although the decision in *Furman* rests on multiple concurring opinions and lacks a single majority statement, it is clear that it was the lack of guidance by legal principles and the arbitrary application of the death penalty, as well as deep concerns about racial unfairness, which gave rise to its short-lived abolition.  When the Court returned to the field in *Gregg* in 1976, it was to endorse the bifurcated procedure it had previously rejected in *McGautha*.

The *Gregg* decision holds that the death penalty does not invariably violate the Constitution and a jury entrusted with the sentencing decision must be guided by specific legal standards which "focus the jury's attention on the particularized nature of the crime and the particularized characteristics of the individual defendant." *Id.* at 206.  The majority decision expressed confidence that "[n]o longer can a jury wantonly and freakishly impose the death sentence; it is always circumscribed by the legislative guidelines." *Id.* at 207.

*Gregg* issued at the beginning of current, post-*Furman* death penalty jurisprudence.  It considered a newly enacted state statute and approved it on grounds which one may fairly call *a priori* rather than evidence-based.  The majority decision held that the presence of defined aggravating circumstances within the state statutory scheme was sufficient protection against

arbitrary imposition of the death penalty. The Court returned to the problem of arbitrary imposition in *McCleskey v. Kemp*, 481 U.S. 279 (1987), in which it declined to consider social science research concerning the effects of racial prejudice on the imposition of the death penalty. "The Constitution does not require that a State eliminate any demonstrable disparity that correlates with a potentially irrelevant factor in order to operate a criminal justice system that includes capital punishment." *Id*. at 319. The Court referred objections based on empirical observation to the legislative process.

Since *McCleskey*, the Court has rejected arguments that the actual experience of death penalty cases demonstrates the arbitrary nature of jury determinations. *See Glossip* (concurring decisions of Justices Scalia and Thomas). In *Ring v. Arizona*, 536 U.S. 584 (2002), the Court held that the rule expressed in *Apprendi v. New Jersey*, 530 U.S. 466 (2000), requires a jury, not a judge, to make findings concerning statutory aggravators. *See Hurst v. Florida*, 136 S. Ct. 616 (2016). The Government is correct that the current state of the law as expressed by the Supreme Court is that once the required statute is in place and the jury is made the decision-maker, the inquiry into factors such as racial bias, geographical disparity, and other shortcomings in jury decision-making is largely at an end. Justice Breyer's dissent in *Glossip* is just that – a dissent, inviting further consideration by the Court. The trial court can respond by conducting an inquiry and setting the table for further review. The lower court lacks authority under any meaningful rule of law to alter the higher court's ruling.

The court also considers the Second Circuit's decisions concerning the constitutionality of the FDPA, including the prior decision issued in this case. In *United States v. Fell*, 531 F.3d 197 (2d Cir. 2008), the court rejected a claim that the FDPA violated the Fifth and Sixth Amendments by requiring a single penalty phase in which the jury considered the issues of

statutory eligibility for the death penalty. The opinion does not invite an even broader decision from the trial court on the constitutionality of the death penalty.

Although the arbitrary imposition of the death penalty on one defendant but not another has been central to Eighth Amendment concerns about fairness since *McGautha* and *Furman*, it is difficult to apply as an independent constitutional doctrine. It certainly feels unfair when the law treats one person differently from another. The criminal law in general and the law of sentencing in particular strive for equal application to similarly situated defendants. But these are not constitutional principles. When differential treatment is based on race, gender or some other suspect category, a constitutional remedy is generally available. A bare claim that one defendant has been treated differently from another does not give rise to the same constitutional protections. But it remains very hard for any of us to tolerate a legal regime which orders that one person should live and another should die based upon a selection process which is demonstrably flawed at the level of jury decision-making.

The court identifies the arbitrary imposition of the death penalty as a factor most appropriately considered by the Supreme Court in that stage of the disproportionality analysis which relates to the Court's own judgment. See Steiker and Steiker, *Courting Death*, p. 284 (Harvard U. Press, 2016). The record of arbitrary imposition of the death penalty through the FDPA is clear and at least some of the reasons have been identified through the testimony at the evidentiary hearing. These include the effect of the voir dire process on jury decision-making and the high rate of death penalty authorization and conviction in the few states which traditionally favor a high rate of death sentences in their state court systems. In the case of the FDPA, the arbitrary qualities of the death penalty are most clearly visible through the narrative comparison of crimes which do and those which do not receive death sentences. These crimes

are indistinguishable in their severity, and neither side offers any objective measure or qualitative basis for separating one group from another.

It has become clear that the adoption of the bifurcated jury trial by so many states and the federal government has not done enough to eliminate the arbitrary imposition of the death penalty. The court returns to the question it asked at the beginning of the opinion. Has actual experience borne out the promise for a more reliable system of capital punishment expressed in the *Gregg* decision? The evidence produced for the court answers the question in the negative. These findings and the fuller record of the hearing conducted before the court substantiate the questions and the criticism expressed in the *Glossip* dissent. The trial court stops short, however, of altering the holding in *Gregg* that "[t]he concerns expressed in *Furman* that the penalty of death not be imposed in an arbitrary or capricious manner can be met by a carefully drafted statute that ensures that the sentencing authority is given adequate information and guidance." *Gregg* is still the law of the land. As the Supreme Court wrote about its own authority in *State Oil Co. v. Khan*, 522 U.S. 3, 20 (1997), "it is this Court's prerogative alone to overrule one of its precedents."

The time has surely arrived to recognize that the reforms introduced by *Gregg* and subsequent decisions have largely failed to remedy the problems identified in *Furman*. Institutional authority to change this body of law is reserved to the Supreme Court. For this reason, the trial court is required to deny the defense motions related to the constitutionality of the death penalty.

**CONCLUSION**

The Motions to Dismiss the Death Penalty as a Punishment (Doc. 668), to Strike

Amended Notice of Intent to Seek the Death Penalty (Doc. 670), Motion to Dismiss (Doc. 673)

and to Declare the Death Penalty Act Unconstitutional (Doc. 674) are DENIED.

Dated at Rutland, in the District of Vermont, this 13th day of December, 2016.

_____
Geoffrey W. Crawford, Judge
United States District Court